# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17-cr-107 (DWF/TNL) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| MICHAEL MORRIS (1), | |
| Defendant. | |

Laura M. Provinzino and Melinda A. Williams, Assistant United States Attorneys, United States Attorney's Office for the District of Minnesota, 300 South Fourth Street, Suite 600, Minneapolis MN 55415 (for the Government); and

Robert D. Sicoli, Sicoli Law, Ltd., 333 South Seventh Street, Suite 2350, Minneapolis MN 55402 (for Defendant Michael Morris).

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Morris's Motion to Suppress Evidence Obtained as a Result of Searches and Seizures. (ECF No. 590). This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable Donovan W. Frank, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on March 8, 2018. (ECF No. 708). In connection with the Government's original response to Defendant's motion, (ECF No. 694, at 10–13), the Government submitted a search and seizure warrant and accompanying search warrant application from the United States District Court for the Central District of California.

(ECF No. 695).[1] Post-hearing briefing is complete, (ECF Nos. 754, 770), and the motion is ripe for a determination by the Court. Based upon all the files, records, and proceedings herein, the undersigned recommends that Defendant's motion to suppress be denied.

## I.   LEGAL STANDARD

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "The Fourth Amendment requires that search warrants be supported by probable cause." *United States v. Tripp*, 370 F. App'x 753, 757 (8th Cir. 2010) (citation omitted). "If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established." *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008) (quotation omitted); *Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."). "Probable cause requires only a showing of fair probability, not hard certainties." *Hudspeth*, 525 F.3d at 676 (citing *Gates*, 426 U.S. at 213).

> When the issuing court relies solely on an affidavit to establish probable cause, only the information found within the four corners of the affidavit may be considered. The affidavit must provide the issuing court with a

---

[1] While the underlying search warrant, (ECF No. 695), has been filed under seal, the parties' pre- and post-hearing briefs discussing said warrant have not. Accordingly, this Court does not file this Report and Recommendation under seal.

> substantial basis to support a finding of probable cause; wholly conclusory statements that the affiant has cause to suspect and does believe that illegal activity is occurring will not do. The affidavit for a search warrant should be examined using a common-sense, non-technical approach. Courts look to the totality of the circumstances to determine whether information provided by a confidential informant is reliable so as to support a finding of probable cause.

*Tripp*, 370 F. App'x at 757 (internal quotations and citations omitted); *United States v. Augustine*, 663 F.3d 367, 372 (8th Cir. 2011). "A reviewing court should afford great deference to the probable cause determination of the issuing judge." *Tripp*, 370 F. App'x at 757 (citing *Hudspeth*, 525 F.3d at 674).

## II. THE SEARCH WARRANT

On May 19, 2017, Homeland Security Investigations Special Agent Anthony E. Negrelli (hereinafter "SA Negrelli") presented an application for a search warrant to a United States Magistrate Judge for the Central District of California. (ECF No. 695). SA Negrelli submitted a sworn affidavit in conjunction with this search warrant application. SA Negrelli sought a search warrant for a residence in Wildomar, California associated with Defendant Morris. (Negrelli Warrant Aff. ¶¶ 2, 4, ECF No. 695).

SA Negrelli detailed the background of law enforcement's investigation into an ongoing organization engaged in a sex trafficking and money laundering scheme which was trafficking Thai nationals from Bangkok, Thailand to the United States, including Los Angeles, Seattle, Phoenix, Chicago, Minneapolis, and Atlanta for purposes of prostitution. (Negrelli Warrant Aff. ¶ 5). SA Negrelli indicated the investigation led to two indictments in the District of Minnesota, including one which charged Defendant Morris with conspiracy to commit sex trafficking in violation of 18 U.S.C. § 1594, sex

trafficking by force, fraud, and coercion in violation of 18 U.S.C. § 1591, and conspiracy to engage in money laundering in violation of 18 U.S.C. § 1956(h). (Negrelli Warrant Aff. ¶ 5).

The investigation into the international sex trafficking organization determined it uses "bondage debt and other means of force, threats of force, fraud, and coercion" to bring women to the United States where they "are forced to engage in countless commercial sex acts for the financial benefit of the criminal enterprise." (Negrelli Warrant Aff. ¶ 6(a)). SA Negrelli indicates the organization has trafficked hundreds of Thai women since "at least 2009" and continuing to the present date of the affidavit. (Negrelli Warrant Aff. ¶ 6(b)). The organization engages in "widespread visa fraud in order to transport the victims to the United States." (Negrelli Warrant Aff. ¶ 6(b)).

Once the trafficked victims arrive in the United States, they are sent to "houses of prostitution" where they are "forced to work long hours, often all day for many days in a row, having sex with strangers in order to pay down their bondage debt." (Negrelli Warrant Aff. ¶ 6(c)). Houses of prostitution are run by a "house boss" who "oversees day-to-day operations at each location," which includes "advertising the trafficking victims for commercial sex acts, procuring and maintaining the houses of prostitution, scheduling the sex buyers, and ensuring that a portion of the cash made by the victims is routed back to the boss/trafficker in Thailand to pay down the bondage debt." (Negrelli Warrant Aff. ¶ 6(d)). The house bosses coordinate with traffickers and other house bosses "to facilitate the travel of victims across the United States" so that the houses of prostitution have a "rotation" of new victims. (Negrelli Warrant Aff. ¶ 6(e)). House

bosses "take a significant portion of the cash the victims receive from each commercial sex act." (Negrelli Warrant Aff. ¶ 6(e)).

SA Negrelli indicated the organization communicates using various methods, including email. (Negrelli Warrant Aff. ¶ 6(f)). During their investigation, law enforcement "obtained and executed over a dozen search warrants for email accounts associated with the individuals involved in the [organization]," uncovering "substantial evidence of the ongoing criminal sex trafficking scheme, as well as additional individuals and email accounts used in furtherance of the scheme." (Negrelli Warrant Aff. ¶ 6(f)).

SA Negrelli indicated the organization "generates a substantial amount of cash and engages in widespread money laundering in order to promote, as well as to redistribute and conceal, profits from its sex trafficking business." (Negrelli Warrant Aff. ¶ 6(g)). The organization uses a variety of methods to avoid detection, conceal the source of the illegal proceeds, and promote the sex trafficking operation, including "funnel accounts," bulk cash smuggling, international wire transfers, and a "hawala-based system." (Negrelli Warrant Aff. ¶ 6(g)).

After describing the sex trafficking organization in general, SA Negrelli described Defendant Morris's role in the organization. Law enforcement believed Morris served in the organization as a house boss. (Negrelli Warrant Aff. ¶ 7(a)). In that capacity, Morris "owns and operates houses of prostitution in the Los Angeles area." (Negrelli Warrant Aff. ¶ 7(a)). Morris "has been identified by numerous witnesses and those accounts have been corroborated by a variety of records, including emails." (Negrelli Warrant Aff. ¶ 7(a)).

SA Negrelli provides examples. A defendant charged in the investigation, identified as "W-33," provided information to the Government in hopes of receiving a cooperation plea agreement. (Negrelli Warrant Aff. ¶ 7(b)). W-33 started working with the organization as a victim of bondage debt. (Negrelli Warrant Aff. ¶ 7(b)). W-33 was sent by the organization to work at a house of prostitution in Los Angeles. (Negrelli Warrant Aff. ¶ 7(b)). Morris owned and operated that house of prostitution. (Negrelli Warrant Aff. ¶ 7(b)). W-33 identified Morris by photograph. (Negrelli Warrant Aff. ¶ 7(b)). W-33 indicated Morris ran a house of prostitution in Los Angeles and a second house of prostitution in San Diego. (Negrelli Warrant Aff. ¶ 7(b)). Morris "retained 40% of the cash from each individual commercial sex act." (Negrelli Warrant Aff. ¶ 7(b)). The remaining 60% was routed back to the traffickers who held the victims' bondage debt. (Negrelli Warrant Aff. ¶ 7(b)).

Another defendant charged in the investigation, identified as "W-43," provided information to the Government in hopes of receiving a cooperation plea agreement. (Negrelli Warrant Aff. ¶ 7(c)). W-43 started working with organization as a victim of bondage debt. (Negrelli Warrant Aff. ¶ 7(c)). W-43 was sent by the organization to work at a house of prostitution in Los Angeles operated by Morris. (Negrelli Warrant Aff. ¶ 7(c)).

SA Negrelli avers that a "variety of records" corroborate the accounts of W-33 and W-43, as well as others who have identified Morris "as a house boss with the [organization]." (Negrelli Warrant Aff. ¶ 7(d)). Law enforcement executed a search warrant on Morris's email account, finding "numerous emails between Morris and other

6

known members of the criminal conspiracy concerning the [organization]." (Negrelli Warrant Aff. ¶ 7(d)). On June 6, 2011, Morris's email account sent an email to an email account associated with another indicted member of the organization. (Negrelli Warrant Aff. ¶ 7(d)). The June 6, 2011 email was entitled "Pics." (Negrelli Warrant Aff. ¶ 7(d)). Attached to the June 6, 2011 email were "three escort-style photos of an Asian female, consistent with photographs used by the organization to advertise the victims" on the various websites. (Negrelli Warrant Aff. ¶ 7(d)).

Law enforcement also examined a Bank of America account belonging to Morris. (Negrelli Warrant Aff. ¶ 7(d)). From December 7, 2013 to October 6, 2016, "over $50,000 in cash (28 total deposits each between $2000 and $3000) was deposited into" the account. (Negrelli Warrant Aff. ¶ 7(d)). Law enforcement believed this activity "is consistent with the money-laundering scheme utilized by the [organization] and described by various members of the [organization], including cooperating co-defendants." (Negrelli Warrant Aff. ¶ 7(d)).

California driver's license records, bank records, and credit reports confirmed Morris's current residence as the premises to be searched in Wildomar, California. (Negrelli Warrant Aff. ¶ 8). Morris's email account received emails indicating his residence was the premises in Wildomar, California, including a February 10, 2017 email regarding shipment of pharmacy medications to Morris's wife. (Negrelli Warrant Aff. ¶ 10). On May 12, 2017, law enforcement observed Morris at the residence in Wildomar, California. (Negrelli Warrant Aff. ¶ 9).

SA Negrelli then details, based on his knowledge and experience with sex trafficking and money laundering enterprises, what evidence might be found at Morris's residence. (Negrelli Warrant Aff. ¶ 11). These include items evidencing possession of assets and personal financial transactions, including personal financial statements, receipts, invoices, statements, investment records, stock and bond records, tax records, correspondence, ledgers, diaries, and handwritten notes, all of which are "often maintained for extended periods of time, often years." (Negrelli Warrant Aff. ¶ 11(a)). Persons attempting to conceal their assets or income from illegal sources "often secrete currency and other monetary instruments within safe deposit boxes and the keys and rental agreements for these boxes are often maintained in a secure location within their residence." (Negrelli Warrant Aff. ¶ 11(b)). Physical items, such as cash, monetary instruments, precious metals, and jewelry tend to evidence accumulation of wealth and often are maintained at a person's residence. (Negrelli Warrant Aff. ¶ 11(c)). While individuals participating in illegal activities sometimes discard or hide items that indicate involvement in criminal activity, some items may remain because of "failure to understand the incriminating nature of certain innocuous appearing items, their inadvertence, or simple carelessness." (Negrelli Warrant Aff. ¶ 11(d)). Individuals attempting to conceal their assets from illegal sources may conduct financial transactions using names and social security numbers other than their own, often of fictitious or deceased individuals or friends and relatives. (Negrelli Warrant Aff. ¶ 11(e)). SA Negrelli also believed digital devices may contain evidence. (Negrelli Warrant Aff. ¶¶ 11–17).

Based on the foregoing information, a United States Magistrate Judge for the Central District of California issued a search warrant for Morris's residence in Wildomar, California.

### III. ANALYSIS

In looking at the sufficiency of the affidavit, SA Negrelli provided information that Defendant Morris was a suspected "house boss" involved with an international sex trafficking organization. Law enforcement suspected Morris was a house boss operating a house of prostitution in the Los Angeles area. SA Negrelli provided law enforcement's definition of what a house boss and house of prostitution were with respect to the organization under investigation. As a house boss, Morris supposedly oversaw the day-to-day operations of a house of prostitution where trafficked victims were required to perform sex acts. Morris would have been responsible to advertising, maintaining the house of prostitution, coordinating a schedule of sexual services, coordinating the movement of trafficked persons between houses of prostitution, and controlling the cash received from purchasers of sexual services. W-33 and W-43 corroborated Morris's position as a house boss. W-33 also indicated Morris kept 40% of the cash from each commercial sex act, sending 60% to the traffickers holding the bondage debt, acts consistent with the house boss role. A June 6, 2011 email was sent by Morris to a known member of the organization with three escort-style photographs attached, consistent with the advertising role of a house boss. Morris made frequent cash deposits which law enforcement believed was consistent with the money-laundering scheme utilized by the organization. Under the totality of the circumstances, the affidavit presents sufficient

facts to lead a prudent person to believe there was a fair probability that evidence of a crime would be found at Morris's residence. *Hudspeth*, 525 F.3d at 674; *Augustine*, 663 F.3d at 372.

Defendant argues that there was no nexus linking his residence in Wildomar, California to his suspected role in the organization. "There must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue. The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence." *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016) (internal quotations and citations omitted). Law enforcement confirmed the Wildomar, California residence as belonging to Morris via California driver's license records, bank records, credit reports, an email shipping confirmation, and personal observation of Morris's presence shortly before the warrant application. As SA Negrelli indicated in his affidavit, persons suspected of accumulating wealth via criminal means often have evidence regarding possession of valuable assets, financial transactions, valuable assets secreted away or information detailing where valuable assets are secreted away, physical manifestations of monetary gains such as precious metals and jewelry, items of evidentiary value, and evidence that may denote an attempt to conceal the true source of money made via illegal means. These persons often maintain many of these items within their residence, making it reasonable to believe there was a logical likelihood such evidence would be available in Morris's residence. *Id.* In addition, keys to and leases of safe deposit boxes containing cash or other proceeds of the criminal enterprise often are maintained at a suspect's

residence. Thus, law enforcement demonstrated probable cause that contraband or evidence of a crime would be found at Morris's Wildomar, California residence. *Hudspeth*, 525 F.3d at 674; *Gates*, 462 U.S. at 238.

Defendant also argues that the information within the warrant application was stale, particularly the June 2011 email. "A warrant becomes stale if the information supporting the warrant is not 'sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search.'" *United States v. Brewer*, 588 F.3d 1165, 1173 (8th Cir. 2009) (quoting *United States v. Palega*, 556 F.3d 709, 715 (8th Cir. 2009)). "There is no bright-line test for determining when information in a warrant is stale," instead, courts "look to the circumstances of the case, including the nature of the crime involved." *United States v. Lemon*, 590 F.3d 612, 614 (8th Cir. 2010) (citing *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008)); *United States v. Davis*, 867 F.3d 1021, 1028 (8th Cir. 2017) (courts "have no fixed formula for deciding when information has become stale, but . . . consider the nature of the crime being investigated and the property to be searched") (quotation omitted). "Important factors to consider in determining whether probable cause has dissipated, rendering the warrant fatally stale, include the lapse of time since the warrant was issued, the nature of the criminal activity, and the kind of property subject to the search." *United States v. Gibson*, 123 F.3d 1121, 1124 (8th Cir. 1997) (citing *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995)).

SA Negrelli indicated the sex trafficking organization was long-running, operating from 2009 to 2017. Two witnesses, W-33 and W-43, confirmed Morris's role as a house

boss in the Los Angeles area, although they did not put a specific date on their interactions with him. Morris made cash deposits consistent with illegal activity from December 2013 through October 2016. A June 2011 email shows Morris communicated with another member of the organization, sending escort-style photographs. Based on the above, SA Negrelli put forth evidence that tied Morris, in some manner, to the organization from June 2011 through October 2016. And, the nature of the criminal activity here—an almost decade-long sex trafficking conspiracy with attendant money-laundering schema—was not such that evidence of the crime would rapidly dissipate. Instead, from the information provided by SA Negrelli, the organization was operating as an efficient and sophisticated business and Morris was part of that organization. *See Davis*, 867 F.3d at 1028 (warrant not stale because the underlying criminal activity was continuing in nature); *see also United States v. Ortiz-Cervantes*, 868 F.3d 695, 700 (8th Cir. 2017) (warrant not stale where evidence supported law enforcement's inference that defendant had an ongoing conspiracy). The evidence resulting from the financial transactions necessary to maintain such an operation were not likely to disappear rapidly and, as SA Negrelli indicated, are likely maintained for long periods of time. *Brewer*, 588 F.3d at 1173 (holding that, given the nature of the evidence, the several months' delay did not render the information stale so as to alter the probable cause analysis). Moreover, the accumulation of wealth from illegal means is not likely to dissipate, as SA Negrelli indicated, given the proclivity to turn cash into other valuables and secrete them away. Thus, rather than the information being stale, SA Negrelli provided a cross-section of

evidence from throughout the alleged nearly decade-long conspiracy that, under the totality of the circumstances, established probable cause at the time of the search.

In sum, the warrant at issue is supported by probable cause. There was a fair probability that evidence of a crime—namely sex trafficking, money laundering, and transportation for prostitution—would be found at the Wildomar, California residence. The information provided by SA Negrelli was not stale, but instead provided a cross-section of information from Morris's lengthy tenure in the organization that showed a continued role as a house boss. Moreover, SA Negrelli established a nexus between the evidence of crimes and the location to be searched, as such evidence is typically maintained and secreted away for long periods of time. Accordingly, this Court recommends Defendant's motion to dismiss be denied.

[Continued on next page.]

## IV. RECOMMENDATION

Based upon the foregoing, and all files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Morris's Motion to Suppress Evidence Obtained as a Result of Searches and Seizures, (ECF No. 590), be **DENIED**.

Date: May 14, 2018
                                           *s/ Tony N. Leung*
                                           Tony N. Leung
                                           United States Magistrate Judge
                                           District of Minnesota

                                           *United States v. Morris (1)*
                                           Case No. 17-cr-107 (DWF/TNL)

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.