```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2

 3     ------------------------------------------------------------
                                    )
 4     United States of America,    )   File Nos.
                                    )   17CR107(1)(4)(5)(16)
 5              Plaintiff,          )   (20)
                                    )              (DWF/KMM)
 6     vs.                          )
                                    )
 7     Michael Morris, Pawinee      )   St. Paul, Minnesota
       Unpradit, Saowapha Thinram,  )   November 7, 2018
 8     Thoucharin Ruttanamongkongul )   9:33 a.m.
       and Waralee Wanless,         )
 9                                  )
                Defendants.
10     ------------------------------------------------------------
            BEFORE THE HONORABLE DONOVAN W. FRANK AND A JURY
11                 UNITED STATES DISTRICT COURT JUDGE
                  (TRIAL TESTIMONY OF SUPAPON SONPRASIT)
12
       APPEARANCES
13       For the Plaintiff:        United States Attorney's Office
                                   Laura Provinzino, AUSA
14                                 Melinda Williams, AUSA
                                   300 S 4th Street, Suite 600
15                                 Minneapolis, Minnesota 55415

16       For Defendant Michael     Sicoli Law, Ltd.
         Morris:                   Robert Sicoli, ESQ.
17                                 333 South Seventh Street
                                   Suite 2350
18                                 Minneapolis, MN 55402

19       For Defendant Pawinee     Daniel L. Gerdts, ESQ.
         Unpradit:                 331 Second Avenue South
20                                 Suite 705
                                   Minneapolis, MN 55401

21       For Defendant Saowapha    Paul C. Engh, ESQ.
         Thinram:                  200 South 6th Street
22                                 Suite 420
                                   Minneapolis, MN 55402
23
         For Defendant             Meshbesher & Spence, Ltd.
24       Thoucharin                Daniel Guerrero, ESQ.
         Ruttanamongkongul:        1616 Park Avenue South
25                                 Minneapolis, MN 55404
```

```
1        For Defendant Waralee      Rivers Law Firm
         Wanless:                   Bruce Rivers, ESQ.
2                                   701 4th Avenue South
                                    Suite 300
3                                   Minneapolis, MN 55415

4        Court Reporter:            Lynne M. Krenz, RMR, CRR, CRC
                                    Suite 146
5                                   316 North Robert Street
                                    St. Paul, Minnesota 55101
6
         Interpreters:             Phouratsaphone (Paul) Littana
7                                   Nokon (Bee) Nimit

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

**I N D E X**                                      **Page**

2

**GOVERNMENT'S WITNESS SUPAPON SONPRASIT**

3   Direct Examination by Ms. Williams....................... 5
Cross-Examination by Mr. Sicoli......................... 80
4   Cross-Examination by Mr. Guerrero ......................100
Cross-Examination by Mr. Gerdts........................101
5   Cross-Examination by Mr. Rivers........................101
Redirect Examination by Ms. Williams...................102
6   Recross Examination by Mr. Sicoli......................108

7   **EXHIBITS**                                            **RECEIVED**
Government Exhibit 132............................... 22
8   Government Exhibits 440 & 441....................... 42
Government Exhibit 1035............................. 60
9   Government Exhibit 1037............................. 50
Government Exhibit 1039............................. 61
10  Government Exhibit 1215............................. 36

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2                        **IN OPEN COURT**

3          (Defendants present)

4              MS. WILLIAMS:  And, Your Honor, the Government

5    calls Supapon Sonprasit, S-O-N-P-R-A-S-I-T, nicknamed Jenn,

6    to the stand.

7              THE COURT:  And before you step into the podium,

8    please, Ma'am, if you would raise your right hand.

9              THE INTERPRETER:  I'm sorry, Your Honor, just her?

10             THE COURT:  You took the oath at the pretrial, so

11   we're fine.

12         (Sworn.)

13             THE WITNESS:  Yes, I do.

14             THE COURT:  You may take the witness stand,

15   please.

16             And then you'll both have to sit close to the

17   microphone.  You can slide the microphone base, too.  It

18   does not -- it's not permanent.  You can move it close.

19             If you would please -- are they?

20             MS. WILLIAMS:  Yeah, I was just checking, Your

21   Honor.

22             THE COURT:  Would you please state your full name

23   for the record?

24             THE WITNESS:  Supapon Sonprasit.

25             THE COURT:  And could you spell that for us,

```
 1    please?

 2              THE WITNESS:  S-U-P-A-P-O-N.  S-O-N-P-R-A-S-I-T.

 3              THE COURT:  You may inquire, Counsel.

 4              MS. WILLIAMS:  Thank you, Your Honor.

 5                D I R E C T    E X A M I N A T I O N

 6    BY MS. WILLIAMS:

 7    Q.  Good afternoon.

 8              THE COURT:  Is that little green light on?

 9              THE INTERPRETER:  It's not on, Your Honor.

10              THE COURT:  Push the button.

11              THE INTERPRETER:  Okay.

12              THE COURT:  Is it on now?

13              THE INTERPRETER:  Yes.  Yes, Your Honor.

14              THE COURT:  Okay.  Thank you.

15    BY MS. WILLIAMS:

16    Q.  Okay.  Hi, Ms. Sonprasit, how are you?

17    A.  I'm fine.

18    Q.  Thank you for being with us today.

19    A.  Yes.

20    Q.  You okay.

21    A.  Yes.

22    Q.  Ms. Sonprasit, how old are you?

23    A.  I'm 33 years old.

24    Q.  You speak -- now you speak some English.  Right?

25    A.  Yes.  A little bit.
```

 1    Q.  When you first came to the United States, did you speak
 2    much English?
 3    A.  Just a little bit.
 4    Q.  And your native language, what language is that?
 5    A.  Thai language.
 6    Q.  You're from Thailand?
 7    A.  Yes.
 8    Q.  Okay.  So understanding that you do speak some English,
 9    we always want people to testify in the language they're
10    most comfortable in.  So we're going to use the interpreter,
11    okay?
12    A.  Yes.
13    Q.  Ms. Sonprasit, do you have some nicknames?
14    A.  Yes, I do.
15    Q.  Is it -- is it common for people in Thailand to use
16    nicknames?
17    A.  Yes.
18    Q.  Just because we want to make sure the jury knows all the
19    names people might use for you, could you give the jury
20    first your Thai nickname?
21    A.  I use Aoy.
22    Q.  A-O-Y, Aoy, is your Thai nickname?
23    A.  Yes.
24    Q.  Do you have an American nickname you use?
25    A.  Jenn.

```
 1    Q.  Jenn?

 2            THE COURT:  Can we move that mic a little bit

 3    closer for her, please.  Thank you.

 4    BY MS. WILLIAMS.

 5    Q.  I think it's on the edge, Jenn.  I'm going to ask you to

 6    scooch a little bit get a little closer.

 7            We'll talk about this in a moment, but when you

 8    were in the United States were you sold for sex?

 9    A.  Yes, I did.

10    Q.  And when you were being sold for sex, was there an

11    organization -- a name that the organization used for you, a

12    working name?

13    A.  Yes, I had.

14    Q.  What was that name?

15    A.  The name was Pam.

16    Q.  Pam, P-A-M?

17    A.  Pam, yes.

18    Q.  What name would you like me to call you?

19    A.  Jenn.

20    Q.  Okay.  That's what we'll do.

21            Jenn, when did you first come to the United

22    States?

23    A.  2013 in July.

24    Q.  When you came to the United States, were you under debt?

25    A.  Yes, I had.
```

```
 1    Q.  How much was your debt?

 2    A.  $60,000.

 3    Q.  60,000 U.S. dollars?

 4    A.  Yes.

 5    Q.  And who did you owe that debt to?

 6    A.  To M.

 7    Q.  A woman -- a person named M?  Just the letter M?

 8    A.  Yes.

 9    Q.  And was that a man or a woman?

10    A.  She was a woman.

11    Q.  Are there quite a few other people who were also

12    involved in bringing you to the United States and selling

13    you for sex?

14    A.  Yes, there were.

15    Q.  Okay.  Were -- we're going to talk about that.  But

16    first I want to talk about -- a little bit about your life

17    in Thailand and how you came to come to this country, okay?

18    You okay?

19    A.  Yes.

20    Q.  What part of Thailand are you from?

21    A.  Isan.

22    Q.  Where is that what part of the country?

23    A.  It's in northeast of Thailand.

24    Q.  Tell me a little bit about your family.  Your mother and

25    father, what did they do for a living?
```

```
 1   A.  My mother was a farmer.  My father was a construction

 2   worker.  He would be hired for building house.

 3   Q.  Did you have a lot of money?

 4   A.  No, I didn't.

 5   Q.  Would you consider your family poor?

 6   A.  Yes.

 7   Q.  Did you have siblings?

 8   A.  I have two younger sisters.

 9   Q.  And we'll talk a little bit about them.  Jenn, how far

10   did you go in school?

11   A.  Through high school.

12   Q.  What did you do after high school?

13   A.  I went to work.

14   Q.  Did -- did something happen around that time in your

15   life where you needed to provide for your family?

16   A.  My mother passed away.

17   Q.  How old were you when your mother died?

18   A.  18 years old.

19   Q.  You said you have two little sisters.  How old were your

20   sisters when your mother died?

21   A.  The middle sister was two years younger than I was.

22   The youngest one, four years younger than I was.

23   Q.  Four years younger than you?

24   A.  At the time my youngest sister was four year old.

25   Q.  Four years old.  Okay.
```

```
 1              What -- when your mother passed away, what was
 2    your relationship like with your -- your four-year-old
 3    sister?  What were your responsibilities towards her?
 4    A.  I had to take care of my sisters because my mother
 5    had me promise to her that I had to take care of my
 6    sisters.
 7    Q.  You said you went to work, where was -- where did you go
 8    to work?
 9    A.  I worked at the bakery and ice cream store.
10    Q.  How much money did you make working at the ice cream and
11    bakery store?
12    A.  I made 6,000.
13    Q.  6,000 baht?
14    A.  6,000, yes.
15    Q.  And for anybody who doesn't know, is baht the currency
16    of Thailand?
17    A.  Yes.
18    Q.  And when you say you made 6,000 baht everyday, every
19    week, every month?
20    A.  Every month.
21    Q.  Every month.  And do I have it about right, that that's
22    less than $200 a month?
23    A.  Yes.
24    Q.  Okay.  Your 6,000 baht a month, was that enough money to
25    take care of your sisters?
```

1   A.  No, it wasn't.

2   Q.  What did you need to pay for for your sisters?

3   A.  I had to pay for food.  The things -- the stuff to go

4   to school for, and also the school tuition.

5   Q.  And you said you couldn't pay for that on your ice cream

6   wages.

7   A.  Yes.

8   Q.  So what did you do?

9   A.  So I changed my job to work at a karaoke bar.

10  Q.  At a karaoke bar?

11  A.  Yes.

12  Q.  Okay.  Can you describe for the jury a little bit your

13  work at the karaoke bar?

14  A.  So it was a store for customer to sit and drink.

15  Q.  And what types of things would you do at that store?

16  A.  So I would be selecting the music, the song, and we

17  would be sing together.  And sometime I would be singing

18  with them.

19  Q.  And at the karaoke bar were you mostly servicing wealthy

20  businessmen?

21  A.  Yes.

22  Q.  And was there a component of your job where on occasion

23  you would have sex with a customer for money?

24  A.  It was not necessary.

25  Q.  It was not -- say that again?

1    A.  It was not necessary.

2    Q.  It was not necessary?

3    A.  No.  It was not necessary.

4    Q.  Okay.  So you didn't have to do it for your job, is that

5    right?

6    A.  That's correct.

7    Q.  Did you sometimes choose to do it?

8    A.  Yes.  Sometime, if I chose to do it, I could do it.

9    Q.  Could you explain to the jury how that would look when

10   you did choose to do it?

11   A.  So, it was like I could choose to go with a customer

12   or not.

13   Q.  And how often would you choose to do that?

14   A.  About once a month or sometimes twice a month,

15   depending on how -- how I wanted to do it or not.  It

16   depends on if I needed to do it.

17   Q.  Okay.  And we're using the word want.  Did you ever want

18   to have sex with these men personally?

19   A.  No, I did not want to.

20   Q.  Why did you have sex with them?

21   A.  Because I needed to help support my sister about

22   sending them to school and all the expenses.

23   Q.  You told us that you made about 6,000 baht, less than

24   $200 a month working in the ice cream store.

25           How much could you make if you went with one

1    customer at the karaoke bar?

2    A.  It depends.  I had to talk to customer, myself.

3    Q.  Who would set the price?

4    A.  I was.

5    Q.  And who would get the money?

6    A.  I was.

7    Q.  Okay.  How many customers would you have sex with at a

8    time?

9    A.  One.  One at a time.

10   Q.  Would you ever have time at the karaoke bars where you

11   would have sex with five, or eight, or ten men a day?

12   A.  No.

13   Q.  When you set the price, about how much would you make

14   from one -- one commercial sex act at the karaoke bar?

15   A.  It depends.  5,000.  It depends.

16   Q.  So about what you would make in a month at the ice cream

17   shop?

18   A.  That's correct.

19   Q.  Did you live at the karaoke bar?

20           THE INTERPRETER:  I'm sorry, can you repeat that?

21   BY MS. WILLIAMS:

22   Q.  Did you live at the Karaoke bar?

23   A.  No, I wasn't.

24   Q.  Could you go home at night?

25   A.  Yes, I could.

1   Q.  Could you choose what customers you wanted to have sex

2   with at the karaoke bar?

3   A.  Yes, I could choose.

4   Q.  Could you walk away from the karaoke bar if you wanted

5   to?

6   A.  I could.

7   Q.  The money that you made working at the karaoke bar, what

8   did you use that money for?

9   A.  I used it to support my sisters.  Most of the time it

10  would be spent for food.

11  Q.  And for the record, the witness is crying a little bit.

12          Jenn, are you excited to be here today?  Is this

13  pleasant for you?

14          THE INTERPRETER:  Can you repeat that?

15  BY MS. WILLIAMS:

16  Q.  Is this -- do you want to be here today?

17  A.  Yes, I wanted to.

18  Q.  Is it pleasant for you to be here?

19  A.  No, it wasn't.

20  Q.  Are these easy things to remember?

21  A.  No.  It's not easy.

22  Q.  You explained that you came to the United States in July

23  of 2013 under debt.  I want to talk a little bit about how

24  that happens.

25          Can you tell the jury how you met people in the

1    organization?

2    A.  I went to have some meal at my relative's house.  And

3    I had met my relative's friend.  And then that person

4    talked about his or her life in England for me.

5    Q.  And I know translation, when you say his or her, was it

6    a male or female?

7    A.  It was a woman.

8    Q.  What was her name?

9    A.  Kratae.

10   Q.  And is that K-R-A-T-A-E, for the Court Reporter?

11   A.  Kratae, yes.

12   Q.  Tell me about your conversations with Kratae?

13   A.  So she was talking about her good life in England.

14   She was married, she had kids, she went to England.

15   Q.  What did she tell you about her life?

16   A.  She said that she had a good life.  She had just come

17   back.  And she has been spend her life with her family.

18   Q.  And how did that sound to you?

19   A.  So she was my relative's friend, and so I was happy

20   for her.

21   Q.  Did she suggest that maybe you might want to do the same

22   thing?

23   A.  She was just asking if I wanted to go to a foreign

24   country.  She didn't tell much about anything else.

25   Q.  Did she tell you that it would have anything to do with

1    sex work?

2    A.  She did not.

3    Q.  Did she give you somebody else's name or number?

4    A.  She gave me a phone number of a person named Ton.

5    Q.  Ton, T-O-N?

6    A.  Ton, yes.

7    Q.  Did you call Ton right away?

8    A.  No, I did not.

9    Q.  I want to talk for a minute about what else was going on

10   in your life at the time.  Do you have a daughter?

11   A.  I did.

12   Q.  What is her name?

13   A.  Ivy.

14   Q.  I-V-Y,  Ivy?

15   A.  Yes.

16   Q.  How old is Ivy right now?

17   A.  Now she's 7 years old.

18   Q.  Where does Ivy live right now?

19   A.  In England.

20   Q.  And who does she live with?

21   A.  With her father.

22   Q.  And back then, in 2013, what was going on with Ivy and

23   Ivy's father?

24   A.  So we had problem and he wanted to separate from each

25   other and he wanted to take our daughter to England.

1    Q.  Your daughter's father, he's British?

2    A.  Yes.

3    Q.  What did you think about that?  About him taking your

4    daughter to England?

5    A.  I was very sad.  And I was depressed.

6    Q.  Did you agree to let him do it?

7    A.  So I thought it was better for my daughter, because

8    she would have a better life and better education.

9    Q.  Than she would have in Thailand?

10   A.  Yes.

11   Q.  You said you were depressed.  Did you do anything at

12   that point?

13   A.  What did you mean?

14   Q.  Did -- at some point did you reach back out to Ton?

15   A.  I waited for a little while until I separated from my

16   boyfriend and then I contacted him.

17   Q.  Why did you do that, Jenn?

18   A.  Because I wanted to make sure that my boyfriend and I

19   actually had broken up.

20   Q.  Why did you reach out to Ton, though?  What did -- what

21   were you looking for?

22   A.  Well, I heard from Kratae and then I thought that it

23   would be probably for me to travel to a foreign country.

24   Q.  How was your life in Thailand at that point?

25   A.  Not very good.

1    Q.  You called Ton?

2    A.  I called him.

3    Q.  Did you meet with him?

4    A.  He asked me to come meet him at the mall.  The mall.

5    Q.  Which mall?

6    A.  Terminal 21.

7    Q.  And where is that in Thailand?  What city?

8    A.  It was on Sukhumvit.

9    Q.  Is that in greater Bangkok?

10   A.  Yes.

11   Q.  Tell us about your first meeting with Ton.  What was

12   discussed?

13   A.  So I met him and we were sitting down on the seat in

14   the mall.  And then he asking me about my life.  How I

15   was doing.

16   Q.  What did he ask you?

17   A.  So he asked, How's your life?  Do you want to go to

18   the foreign country?  And I said yes, I wanted to.

19   Q.  Where did he talk about you could go?

20   A.  So he said to talk about Visa first.  And to the Visa

21   pass, then we'll talk about it.

22   Q.  Okay.  Did he mention the United States?

23           MR. GERDTS:  Objection.  Leading, Your Honor.

24           THE COURT:  Well, it's suggestive.  But I'll -- if

25   she has a memory of what he mentioned, I'll permit it.

```
 1    What -- I'll just have you rephrase the question, Counsel.

 2    BY MS. WILLIAMS:

 3    Q.  What countries did Ton talk about you visiting?

 4    A.  America.

 5    Q.  Did he talk about England at all?  You had said that

 6    Kratae talked about England?

 7    A.  He -- said to apply for the Visa to England first,

 8    because Visa to America is difficult to obtain.

 9    Q.  Did -- did you think this was about sex when you first

10    met with Ton?

11    A.  I did not think so.

12    Q.  Did he ever explain it was about sex?

13    A.  He never explained it.

14    Q.  Did you think it was about escort-type stuff like what

15    were doing at the karaoke bar?

16    A.  I thought it was about going out on dates.

17    Q.  Did you ask -- at this first meeting did you ask Ton

18    about the money?

19    A.  No, I didn't.  No, I did not.  And he didn't tell me.

20    Q.  What happened after this first meeting?

21    A.  So he -- he said to me to prepare the documents so

22    that I can go apply for the Visa and get a passport.

23    Q.  Did you have to give documents to him?

24    A.  All the document.

25    Q.  When you say all the documents, can you tell the jury
```

```
1    what you gave to Ton?

2    A.  So he was asking me for my address.  My passport, my

3    initials, house registration, the account -- the account

4    book, my boyfriend's address in England, and my

5    daughter's birth certificate.

6    Q.  And so did you give Ton all this information about your

7    family?

8    A.  Yes.

9    Q.  You said something about a bank account.  What did --

10   what did Ton do with a bank account?

11   A.  Because he would deposit money in that account.

12   Q.  Did you know why he would deposit money in that account?

13   What that purpose was?

14   A.  In order to show -- to apply for the Visa.

15   Q.  To make it look like you had money?

16   A.  Yes.

17   Q.  Did you have money?

18   A.  No, I didn't.

19   Q.  Did you get to keep that money that he put in the bank

20   account?

21   A.  No.

22   Q.  Did Ton introduce you to anyone else who assisted in

23   bringing you to the United States?

24   A.  He had introduced me to a person named Tuk.  She was

25   a nurse.
```

1    Q.  Tuk, T-U-K?

2    A.  Yes.

3    Q.  Tell me about what Tuk's part in this was, what did she

4    do?

5    A.  Her job was to fill out the application for a Visa.

6    Q.  So who did the Visa paperwork?  Who actually typed it

7    out?

8    A.  She was the one who handled it.

9    Q.  Okay.  The story that was in the Visa application to

10   come to the United States, was that story true or false?

11   A.  It was false.

12              MS. WILLIAMS:  May I approach, Your Honor?

13              THE COURT:    You may.

14   BY MS. WILLIAMS:

15   Q.  Jenn, I'm handing you what's been marked as Government's

16   Exhibit 132.  Do you recognize this?

17   A.  Yes, I do.

18   Q.  What is it?

19   A.  It was a Visa.

20              MS. WILLIAMS:  Government moves Exhibit 132 into

21   evidence.

22              MR. SICOLI:  No objection.

23              MR. GERDTS:  No objection, Your Honor.

24              MR. ENGH:  No objection.

25              MR. SICOLI:  No objection.

```
1              MR. RIVERS:  No objection.

2              THE COURT:  That is received.

3              MS. WILLIAMS:  Permission to publish, Your Honor?

4              THE COURT:  And you may display it.

5    BY MS. WILLIAMS:

6    Q.  Okay.  Jenn, do you see that in front of your screen

7    right there?

8    A.  Yes.

9    Q.  Okay.  And I'm going to go to the second page of that

10   document, because we're dealing with a big screen, and a lot

11   of little words.  I'm going to blow thing up.

12              That picture, who is that a picture of?

13   A.  It was my picture.

14   Q.  Okay.  Supapon Sonprasit, who's name is that?

15   A.  My name.

16   Q.  And do you see where it says, "Date entered, July 3rd,

17   2013?"

18   A.  Yes, I saw it.

19   Q.  Okay.  Here on Government's 132, it says, "Going to

20   Florida for 10 days in August with half-British Thai

21   daughter and father of the baby.  They are going to travel

22   to UK as part of the visit."

23              Is that -- is that true, Jenn?

24   A.  It was not true.

25   Q.  Who came up with that story?
```

```
 1    A.  Tuk did.

 2    Q.  And did you say this story, though, when you applied for

 3    your Visa?  Did you agree with it?

 4    A.  Yes.

 5            MS. WILLIAMS:  And if we could go to the next

 6    page, maybe.

 7    BY MS. WILLIAMS:

 8    Q.  That's your name again, Supapon Sonprasit, and your date

 9    of birth?

10    A.  Yes.

11    Q.  And does this contain some of your family -- okay.  I'm

12    in trouble.  Some of your family information on it?

13    A.  Yes.

14    Q.  And you see here, there's a box that reads, "Are you

15    coming to the United States to engage in prostitution or

16    unlawful commercialized vice or have you been engaged in

17    prostitution or procuring prostitutes within the last

18    10 years?"

19            You said no.  Is that right?

20    A.  Yes.  I reply, no.

21    Q.  And that wasn't true, either, right?  Because you had

22    been engaged in commercial sex act activities?

23    A.  Yes, I had.

24    Q.  Jenn, why did you say those things?

25    A.  Tuk was the person who filled out the form, so -- and
```

1    I didn't know.

2    Q.  But why did you agree with it?  Why did you lie?  What

3    did you want coming to America?

4    A.  Because I was thinking that coming to America I would

5    have a better life.

6    Q.  Did Ton and Tuk talk about your better life in America?

7    A.  Yes, they did.

8    Q.  Did you believe them?

9    A.  I believed them.

10   Q.  Did you want to believe them?

11   A.  Yes.

12   Q.  Did Tuk tell you about how to conduct yourself at the

13   Visa interview?

14   A.  Yes, she did.

15   Q.  What did she tell you?

16   A.  She said to dress in a professional way and find a

17   pair of glasses to wear so that I would look like a pro.

18   Q.  Did your Visa pass?

19   A.  Yes.  My Visa passed.

20   Q.  After your Visa passed, what happened next?

21   A.  After the Visa passed, the ticket was booked to come

22   to America.

23   Q.  Did the organization have you photographed during that

24   time?

25              THE COURT:  Mr. Gerdts?

 1          MR. GERDTS:  Your Honor, may we approach, please?

 2    And maybe we could -- since we've been in here since

 3    about -- would this be a logical place for an afternoon

 4    recess?

 5          MS. WILLIAMS:  Sure, Your Honor.

 6          THE COURT:  Why don't we take our afternoon recess

 7    here.  This -- you can go back now to your jury deliberation

 8    room.  All rise for the jury.

 9          (Jurors excused.)

10          THE COURT:  Mr. Gerdts.

11          MS. WILLIAMS:  Should this be in open court?

12          THE COURT:  I don't know.

13          MR. GERDTS:  Could we have a sidebar?

14          (Sidebar at 2:31 p.m.)

15          THE COURT:  It's a terrible sound, isn't it?  We

16    should have music or something.  Get up close to the mic

17    here so she can hear.

18          MR. GERDTS:  Your Honor, Counsel at least four

19    times now has asked the witness how did you learn about the

20    organization?  Or what did the organization tell you to do?

21    Or what happened next in the organization?  Things along

22    that line referring to an organization.

23          There's been no testimony from anybody so far that

24    any organization exists.  And she's doing it on purpose.

25          One, it's leading.

 1          Two, it's not supported by any of the evidence so

 2    far.

 3          And the answers she's gotten from the witness have

 4    been, well, I -- I met a family -- a friend of a family

 5    member who suggested I might have a better life someplace

 6    else, so I talked to this guy.

 7          I mean, that's what we have so far.  There's no

 8    organization.

 9          I object to the leading quality of using that

10    word.  And it's -- that's my objection.

11          MS. WILLIAMS:  Yeah.  And I think the record would

12    reflect is one of the first questions I asked her were there

13    many people involved in getting her from Thailand to the

14    United States.

15          I'm happy to jump right into, Was this an

16    organization?  I mean, I don't think it's in question.  I

17    think the Defense has admitted that this is an organization

18    of sorts, so I think it's a little --

19          Well, I'm happy to.  But certainly characterizing

20    it as an organization is not supported by what she's saying,

21    and I can ask her explicitly if that's a fair

22    characterization.

23          THE COURT:  Well, separate from -- because she

24    really hasn't said what the word organization means to her,

25    but separate from the form of the question, it seems to me

1      that we could -- at least avoid the issue at this time.

2      Whether there may or may not be objections to.

3              If she's just asked specific questions on who she

4      was in contact with and what different individuals, if there

5      was more than one or two.

6              And then because right now the only person that's

7      used the word organization is -- and I don't know what that

8      means to her, but the -- even with or without the word, if

9      we just said, Well, who -- who are you having your contact

10     with?  Because it is true, you used the phrase multiple

11     people.  But then -- then she -- we could probably could

12     identify, well, let's talk about who you were involved with,

13     and what --

14              MS. WILLIAMS:  So that's what -- and I'm trying to

15     march through this sequentially.

16              THE COURT:  Because I think the objection,

17     separate from the leading piece is that, well, organization

18     is going to identify that with the phrase organization as

19     used in opening statements.  And nobody's really said, well,

20     who is, or what is it, or who are they?  And so.

21              MR. SICOLI:  Organization is an argument.  It's an

22     argument, it's not a factual statement.

23              THE COURT:  Well, it depends on, well, this

24     witness, if she used a phrase, well, here's who contacted --

25     here's a word somebody used to me.  But I don't think that's

1     what's going to happen.  But can we just identify who she

2     was having contact with.

3               MS. WILLIAMS:  So are you talking about in the

4     United States, Your Honor?

5               THE COURT:  Well, I'm talking about in both areas,

6     having her identify who the individuals are.

7               You said both individuals as opposed to saying the

8     organization.  I mean, whatever that word may mean.  It

9     could mean to her one person, ten people, three people.

10              And so it's a separate issue about how prejudicial

11    it is.  And apart from any question, can we just --

12    obviously she responded to your question and named a person.

13    And that's -- and then I think you had said, Well, there's

14    different people.  Why don't we just have her say, Well,

15    what was it -- who --

16              MS. WILLIAMS:  I can have her name some of the

17    people involved.  I think she would probably testify there

18    were dozens of people involved.  And we're not going to get

19    into all of those people for obvious reasons.

20              But we'll be getting to the next name, and the

21    next name, and eventually Bill.  That's the one Defendant

22    that she had contact with.  It isn't relevant to the other

23    Defendants directly, so.

24              THE COURT:  And then we'll just maybe try to avoid

25    the word organization I guess?

```
 1              MS. WILLIAMS:  Sure.

 2              MR. GERDTS:  Well, yeah.  That's my complaint.

 3   It's both leading and it's prejudicial.

 4              One thing they have to prove that there's a

 5   conspiracy.  You can't just assume that.

 6              THE COURT:  All right.  And sorry for the hissing

 7   sound here.

 8              MR. RIVERS:  I like it.

 9              THE COURT:  You like it?

10              (In court, jurors not present at 2:49 p.m.)

11              MS. WILLIAMS:  So the witness after this witness,

12   Ms. Boonluea, she is an in-custody witness.  And the

13   Marshals have asked if we're not going to use her today to

14   be able to transport her back.

15              I've spoken with Defense Counsel.  I think we all

16   feel pretty firm that we're not going to get to her today.

17   If we would, that would create carryover problems with the

18   Court.  And I'd just want to relate that to the Court that

19   4:30 or 4:45 if it would be an appropriate time to break.

20              THE COURT:  That would be fine.  Unless there's

21   any particular objection by Defense Counsel?

22              MR. GERDTS:  Boonluea, is that right?

23              MS. WILLIAMS:  Yes.

24              THE COURT:  All right.

25              MS. WILLIAMS:  And then second of all, then all
```

1    the parties would request, maybe as soon as the jury comes

2    back in, they just seem very chatty.  Just not necessarily

3    about the case, but to remind them not to talk about the

4    case.

5           THE COURT:  So it isn't about chatting out in the

6    hallway, it's -- yeah, what I thought I would do, at the end

7    of when we recess today I'd cover that topic -- that topic.

8    And then tell them that based upon -- and then I'll make

9    sure -- that based upon the schedules that I anticipate

10   going all day tomorrow and not recessing at noon.

11          MS. WILLIAMS:  Okay.  Great.

12          Yeah.  Nobody's heard them talking about the case

13   they're just chatty in general.

14          THE COURT:  And I was going to do it.  I have it

15   on my list.

16          MS. WILLIAMS:  Great.

17          THE COURT:  Unless somebody says otherwise, I

18   assume that would it probably be the preference of Counsel

19   not just to make up some time, but to minimize some

20   disruption of a witness to tell them, we won't be going home

21   at noon tomorrow, since we're down on Friday, and then

22   Monday is Veteran's Day.

23          That we'll go -- separate from that issue, because

24   that's already on the schedule.

25          But that we'll go -- and I'll let them know that I

 1     anticipate that we'll be spending essentially a full day

 2     here tomorrow.

 3              So they should plan on that as they come in when

 4     they leave tonight.

 5              MS. WILLIAMS:  And for our scheduling purposes and

 6     particularly getting witnesses come up from Sherburne, does

 7     the Court intend to go as long as it takes to complete our

 8     expert tomorrow?

 9              Or should we have a witness another witness behind

10     that witness?

11              THE COURT:  Well, it depends on how long that

12     witness is going to take?

13              MS. WILLIAMS:  All right.  So now it's a full days

14     regardless?

15              THE COURT:  Yeah.  We could run a full day.  On

16     the other hand, if everybody was saying, well, it could be a

17     logical place to break?

18              I mean, sometimes this happens in two ways.

19              One or all parties are saying, Well, it's fine

20     with us if we break whenever that witness ends because it

21     would be sometime in the afternoon.  We can't -- it's not

22     likely to be done by noon.

23              And then -- then it would be one or two responses,

24     well, we're now as far ahead as we thought we would be, we

25     could get another witness in this afternoon, or we're now at

1    a logical place to break.

2         So I'll -- unless there's a strong agreement among

3    Counsel, I'll probably defer to the group here on -- what

4    you think about that.

5         MS. WILLIAMS:  I'm sure we can figure that out

6    between Counsel.

7         THE COURT:  I suppose what we don't want to do is

8    start a second witness after the expert's done, because

9    whoever we start we should be able to finish.

10        MS. WILLIAMS:  Well, we've been pretty good about

11   these things but we can figure this out.

12        THE COURT:  Mr. Sicoli stood up there.

13        MR. SICOLI:  I just want to clarify, so we are

14   going to go with another witness other than the expert?  Is

15   that a plan?

16        MS. WILLIAMS:  Well, we have a chain-of-custody

17   witness first that I think we had mentioned.

18        MR. SICOLI:  Not any other witnesses?

19        MS. WILLIAMS:  That's what I was seeking to

20   clarify.  Then we'll decide.

21        THE COURT:  Her question was -- well, I

22   interpreted the question, as, well, are we going to stay as

23   long as it takes so we make sure we don't break up this

24   expert?  Or should we plan on being here a full day, even if

25   the expert finishes, whether it's early afternoon, or

1    whatever it is, and then be prepared to call other

2    witnesses?

3            And I said, well, I will defer to input from all

4    Counsel.  Because one or more of you may be thinking, well,

5    yeah, if we can get another witness in so we can kind of

6    keep things moving, fine.

7            Or sometimes, well, that's a logical place to

8    break for all of us.  You know, the -- I'll defer to Counsel

9    in that regard.

10           MS. WILLIAMS:  Thank you, Your Honor.  We'll talk

11   about it.

12           THE COURT:  But we should probably have that

13   discussion.

14           MS. WILLIAMS:  Okay.  Let me slide over.

15           THE COURT:  Don't get too close to the mics.

16           (Off-the-record discussion.)

17           MS. WILLIAMS:  Easy agreement, Your Honor.  We're

18   going to do the chain-of-custody quickly in the morning,

19   then the expert.  Then we're going to stop.

20           THE COURT:  Oh, I think then at the end of the

21   day, probably the fairest thing to say to the jury is, we're

22   likely to -- we are -- I'm anticipating being here, so we

23   can finish and find a fair place to break for everyone.  I

24   believe it will be sometime in the afternoon, not in the

25   morning, not by noon.  That way if it's done early, fine, if

```
 1    not, then we haven't misled the jury.

 2              MS. WILLIAMS:  Perfect.

 3              THE COURT:   And so then we'll -- I'll take up --

 4    well, let's not take up another issue.  You can let -- oh,

 5    you're right there watching over me.  Okay.

 6              MS. WILLIAMS:  Should I get the witness, Your

 7    Honor?

 8              THE COURT:  You can bring the jury in.

 9              MS. WILLIAMS:  Thank you.

10              THE COURT:   Have the witness take the stand, too.

11              Something I don't need an answer on now, and it's

12    handled totally different in different trials over the

13    years.

14              When people are coming that are testifying who are

15    witnesses who are in custody, some people don't -- it

16    doesn't matter whether the jury knows they're in custody,

17    because they figure it's going to come out anyway in the

18    testimony and -- or sometimes one or both parties say, well,

19    no there's reason why -- whenever you're going to take the

20    recess, the jury shouldn't need to know that the person's in

21    custody.

22              So we can have that decision because it affects

23    the Marshal service more than anyone else.

24              MS. WILLIAMS:  Sure.  We'll just have ours here in

25    jumpsuits.
```

 1          THE COURT:  Well, and then some over the years,

 2    as many of you know, some witnesses demand to be in

 3    jumpsuits, to some don't.  So, we'll -- we'll have that

 4    discussion.

 5          MS. WILLIAMS:  Thank you.

 6          (In open court at 2:58 p.m.)

 7          THE COURT:  You may continue when you're ready,

 8    Counsel.

 9          MS. WILLIAMS:  Thank you.

10    BY MS. WILLIAMS:

11    Q.  Jenn, I think when we left off, we were talking about

12    photographs.  Were photographs taken of you in Thailand?

13    A.  Yes.

14    Q.  Who had you take those photographs?

15    A.  Ton did.

16    Q.  Can you tell us about -- about that?

17    A.  Ton told me to go get pictures taken.

18    Q.  Where did you go?

19    A.  To the photo studio.

20    Q.  Do you remember what the name of it was?

21    A.  I don't remember.

22          MS. WILLIAMS:  May I approach the witness, Your

23    Honor?

24          THE COURT:  You may.

25    BY MS. WILLIAMS:

```
 1    Q.  Jenn, I'm showing you marked as Government's 1215, do
 2    you recall what that is?
 3    A.  Yes.
 4    Q.  What is that?
 5    A.  They were -- they are pictures.
 6    Q.  Are these photos of you that we were just talking about?
 7    A.  Yes, they are my pictures.
 8          MS. WILLIAMS:  Government moves Exhibit 1215 into
 9    evidence.
10          MR. GUERRERO: No objection.
11          MR. GERDTS:  No objection.
12          MR. RIVERS:  No objection.
13          MR. SICOLI:  No objection.
14          MR. ENGH:  No objection.
15          THE COURT:  Those are received.
16          MS. WILLIAMS:  And permission to publish to the
17    jury?
18          THE COURT:  You may.
19    BY MS. WILLIAMS:
20    Q.  I'm just going to put these up very quickly.  Is that
21    you Jenn?
22    A.  Yes.
23    Q.  Is that you?
24    A.  Yes.
25    Q.  These are the pictures that were taken in Thailand?
```

```
 1    A.  Yes.

 2    Q.  Is it easy for you to see those pictures?

 3    A.  No.

 4    Q.  The clothes that we just saw you wearing in those -- in

 5    those pictures, were those your clothes?

 6    A.  No.  No, it wasn't.

 7    Q.  Where did you get those clothes?

 8    A.  They were at the studio.

 9    Q.  And tell me what happened when you got to the studio?

10    A.  Ton told me to go up and take pictures.

11    Q.  You said Ton told you to go up.  Had he transported you

12    there?

13    A.  He waited downstairs to pay money.

14    Q.  And that's probably my next question.  Who paid for the

15    photos?

16    A.  Ton did.

17    Q.  What did you think the pictures were for?

18    A.  I didn't think much.  I thought that those pictures

19    were to be used for finding dates.

20    Q.  Did Ton ever explain what you would be doing in the

21    United States?

22    A.  He did not explain.

23    Q.  What did you think it would be?

24    A.  I thought it would be -- I came to meet with dates.

25    Q.  Like what you had done at the karaoke bar?
```

1          MR. GERDTS:  Objection.  Leading, Your Honor.

2          THE COURT:  Sustained as to -- excuse me,

3     sustained as to form.  I'll allow inquiry, but if you

4     rephrase the question.

5     BY MS. WILLIAMS:

6     Q.  What did you think it would look like?

7     A.  I thought it was probably about something that I was

8     doing.

9     Q.  You said that the first time that you met with Ton he

10    didn't tell you about the debt.  Did Ton ever tell you about

11    the debt?

12    A.  No, he did not.

13    Q.  What did you think in your mind you would have to pay?

14    Obviously not a free trip.  What did you think you would

15    have to pay?

16    A.  I thought that the expenses wouldn't be too

17    expensive.

18    Q.  Did you ever ask Ton about the expenses?

19    A.  I did.  But he didn't answer me directly.

20    Q.  Did you do anything to try and figure out what your --

21    what your expenses would be?

22    A.  I went to the -- I went on the internet.

23    Q.  What did you -- what did you learn?

24    A.  I learned about to apply for a Visa.  It wasn't -- I

25    thought it wasn't expensive.

1   Q.  Do you know about how much it was?

2   A.  It was probably not -- not rich.  10,000.

3   Q.  10,000 baht?

4   A.  Yes.

5   Q.  Did you have a number that you thought you would have to

6   pay the organization?  That you would have to pay Ton for

7   coming to the United States?

8   A.  I thought it wasn't probably going to be too

9   expensive.  I had a number in my head about 40,000 to

10  50,000.

11  Q.  $50,000 or baht?

12  A.  Thai baht.

13  Q.  When did you come to the United States, Jenn?

14  A.  July of 2013.

15  Q.  Tell us about coming to the United States.  How did you

16  get here?

17  A.  I flew from Bangkok to Korea, and Korea to Vegas.

18  Q.  Did Ton give you any instructions about what would

19  happen once you got to the United States?

20  A.  He told me that M would be the person who would call

21  me and she would be the one who took care of me after I

22  arrived in America.

23  Q.  The same woman M who you told us you ended up owing a

24  $60,000 debt to?

25  A.  Yes.

1    Q.  When you got on the plane to go to the United States,

2    did you know you would owe $60,000?

3    A.  No, I did not know.

4    Q.  If you had known that, would you have gotten on that

5    plane?

6    A.  No, I would not.

7              MS. WILLIAMS:  Permission to approach, Your Honor?

8              THE COURT:  You may.

9              MS. WILLIAMS:  I'm approaching with Government's

10   Exhibits 440 and 441.

11   BY MS. WILLIAMS:

12   Q.  Jenn, I'm going to have you look at these exhibits.  Do

13   you recognize these?

14   A.  Yes, I do.

15   Q.  And what are these?

16   A.  They are flight schedule.

17   Q.  For you?

18   A.  Yes.

19   Q.  Okay.  To come to the United States?

20   A.  Yes.

21             MS. WILLIAMS:  Government moves Exhibits 440 and

22   441 into evidence.

23             MR. GERDTS:  Objection to 441 on foundation

24   grounds, Your Honor.

25             MS. WILLIAMS:  Your Honor, the Government has

1   stipulated that these are authentic.

2           MR. GERDTS:  I can explain if you want me to.

3           THE COURT:  Well, we'll have to come to the

4   podium.

5           (Side bar at 3:09 p.m.)

6           MR. GERDTS:  Exhibit 441 has -- this is obviously

7   not the original document.  Somebody's added some

8   descriptions to it that are not authentic to the original

9   document.

10          It looks like it's supposed -- I'm guessing it's

11  supposed to be some sort of translation, but there's no

12  foundation for that translation.

13          MS. WILLIAMS:  And even the documents have Thai in

14  them have a translation that ties it to so the jury can read

15  them.

16          As Defense Counsel has been provided with all of

17  this, Defense Counsel has known about this.  We have asked

18  Defense Counsel, if you have any questions with the

19  translation, please tell us now.  We have heard nothing.

20          I -- I can certainly, subject to calling a witness

21  later on, it would be Bee to testify that she translated all

22  of these documents.  I can even have her translate on the

23  stand to say, Is that what that says?  But it's a

24  translation.

25          MR. SICOLI:  I don't have any objection to the

1    document.

2              MR. GERDTS:  I do not agree to any translations,

3    Your Honor.  And I object to having an interpreter in the

4    courtroom being a witness, because if I want to

5    cross-examine her about her translation, I want her to be on

6    the stand.

7              THE COURT:  Noting what Mr. Gerdts' objection is,

8    what I'll do is provisionally receive them and I'll define

9    provisionally.

10             So, at some point someone can, without

11   translating, you can just have -- if somebody wants to point

12   out on direct or cross that this was something added to,

13   whatever it may say.  And I'll leave that up to direct and

14   cross, and then separate from any agreements that were made

15   or not made.

16             So provisionally received.

17             With that, is there any -- it seems to me there's

18   not a request -- Mr. Gerdts, noting your objection to give

19   an explanation of the jury, because probably it will just --

20   -- and they'll be looking at that translation, so, are

21   you --

22             MR. GERDTS:  They're going to look at it now.

23             MS. WILLIAMS:  I'll publish it.

24             THE COURT:  They're going to publish it.  But even

25   somebody raising that, it will just point something out,

1    because you're not going to have a witness testify to it.

2          MS. WILLIAMS:  No.  I would be certainly fine.  It

3    would be helpful for the Court to tell the jury one of those

4    documents is going to have a translation, that's what the

5    document is.  It's clearly not authentic to the document.

6          I -- we have raised this issue weeks ago to say if

7    anybody has any issues please let us know.

8          THE COURT:  Anyway, you want any --

9          MR. GERDTS:  I object to any purported translation

10   of a document that did not begin with the document itself.

11         THE COURT:  So do you want any explanation to the

12   jury?  Because I'm going to provisionally receive it subject

13   to any additional examination with -- because I doubt that

14   you're going to be asking the witness, Let's talk about the

15   translation.

16         MS. WILLIAMS:  No.  I mean, she can certainly read

17   it.  It's her nickname.  I'm going to say that, Aoy, that is

18   your Thai nickname.  That's what we'll talk about.

19         THE COURT:   All right.  I'll note the objection.

20   Proceed.

21         (In open court at 3:13 p.m.)

22         THE COURT:  Members of the Jury, I said this at

23   the beginning of the trial, the lawyers are doing exactly

24   what they're supposed to do.  Because unlike what you see on

25   TV shows, movies about trials, there's certain issues about

1    when the Court needs to address them.  It's not proper for

2    them to just stand up and start discussing it at Counsel

3    table.

4            In fact, that's why they have -- and if you're

5    wondering -- and I'm sorry I didn't explained this, I'm

6    sorry I can't have music in the background.  And the loud

7    hissing is what's called white noise.

8            What that does is kills all the microphones except

9    my Court Reporter.  She's the only one that can hear,

10   because there's a microphone over here, so for the benefit

11   of all the parties, there's a transcript of everything.

12           But they're doing everything that they're supposed

13   to do.

14           So if you have any concerns about that, that rests

15   on my shoulders not theirs.

16           So the Court will provisionally receive those

17   consistent with the discussion and ruling up here.  And

18   we'll then go forward.

19   BY MS. WILLIAMS:

20   Q.  Okay.  Jenn, I'm going to pull you up Government's

21   Exhibit 440, which I just showed you.

22           So this is an e-mail sent July 12th, 2013, from

23   Tonbm@hotmail.com.  Do you see that?

24   A.  Yes, I see it.

25   Q.  And I think I already just did this, but who's name is

1   this?

2   A.  My name.

3   Q.  And can you tell us, you said you flew to Vegas.  Did

4   you fly through anywhere to get to Vegas?

5   A.  I flew to Vegas and then I catch another flight to

6   here.

7   Q.  Okay.  And you see where it says -- oh, I'm sorry.  A

8   flight here to Minnesota is where you said?

9   A.  Yes.

10  Q.  Okay.  So I'm asking about the flight between Bangkok

11  and Las Vegas.  Did it stop anywhere?

12  A.  It stopped in Korea.

13  Q.  Okay.  And do you see here where it says, "Bangkok to

14  Seoul, Korea, July 20th, 2013, arriving July 21st?"

15  A.  Yes.

16  Q.  Was that the flight you took?

17  A.  Yes.

18  Q.  And then that same day, "July 21st, Seoul, Korea to Las

19  Vegas."  Do you see that?

20  A.  Yes.

21  Q.  Is that the flight you took?

22  A.  Yes.

23  Q.  And I want to focus on the very top of this e-mail.  We

24  already read from tonbm@hotmail.com.  But do you see where

25  it says the to line there?

```
1    A.  Yes, I see it.

2    Q.  Okay.  And it says, M to newcatcat_ty@life.com.  Is that

3    right?

4    A.  Yes.

5    Q.  Okay.  Now I'm going to show you Government's 441.  Does

6    this also reflect your travel information that we just went

7    through?

8    A.  Yes.

9    Q.  Okay.  I want to focus you to what's different about

10   this one.  And do you see from and to?  From tonbm to

11   catcat_ty.  Do you see that?

12   A.  Yes, I see it.

13   Q.  And the Thai characters there, do you see it?

14   A.  Aoy's ticket.

15   Q.  Who is Aoy?

16   A.  It's me.

17   Q.  That's the Thai nickname that you told us about at the

18   beginning?

19   A.  Yes.

20   Q.  And then this e-mail was forwarded from catcat_ty to

21   gangsmoo@hotmail.com, is that right?

22   A.  Yes.

23   Q.  Do you know who Gangsmoo is?  Is that name familiar to

24   you?

25   A.  Yes.  I do know her.
```

1    Q.   Who is Gangsmoo?

2    A.   The person is -- the person who booked the ticket.

3    Q.   Booked the ticket for who?

4    A.   For me.

5    Q.   Do you know where Gangsmoo lives?

6    A.   In California.

7    Q.   And we'll get to this part of the story in a little

8    while, but did you personally meet with Gangsmoo?

9    A.   Yes, I have.

10   Q.   What did Gangsmoo have you do?

11   A.   To have me open a bank account in California.

12   Q.   Okay.  And Jenn, maybe this is a good place to talk

13   about this.

14        You've mentioned a few people now.  Ton, and Tuk,

15   and Gangsmoo.  How many people were involved in sending you

16   around the country and selling you for sex?

17   A.   There were house owners from different houses.

18   Q.   Was it a lot of people?

19   A.   Yes, there were.

20   Q.   Okay.  You explained that you flew from Bangkok to Korea

21   and then Korea to Las Vegas.  I want to ask you what

22   happened at the airport in Korea when you landed.

23        Could you tell the jury about that?

24   A.   When I got off the plane, there was a phone call.  M

25   called me.

1    Q.  And tell me about the conversation with M?

2    A.  She said she would be the person who took care of me

3    after the plane left Korea and arrive in Las Vegas.  She

4    -- she will call again.

5    Q.  Did she explain anything about a debt?

6    A.  No.

7    Q.  Was there any other conversation?

8    A.  No.

9    Q.  When you -- you said you flew from Korea to Las Vegas.

10   When you landed in Las Vegas, what happened?

11   A.  M called and that she said to me to catch another

12   flight to Minneapolis.

13   Q.  Had you ever been to Minneapolis before?

14   A.  No, I never have.

15   Q.  Had you ever been to Las Vegas before?

16   A.  No, I never did.

17   Q.  Had you ever been to America before?

18   A.  No, I never did.

19   Q.  Did you speak English?

20   A.  I -- I could speak a little English.

21   Q.  Was your English good?

22   A.  No, it wasn't good.

23   Q.  Did you know anyone in the United States?

24   A.  No, I did not.

25   Q.  In Las Vegas, did you get on the flight to come to

```
 1    Minnesota?

 2    A.  Yes.

 3    Q.  You landed in Minneapolis?

 4    A.  Yes.

 5    Q.  What did you call it when you first got here?  Do you

 6    remember?

 7    A.  Mini-inapolis

 8            MR. RIVERS:  I'm sorry, I couldn't hear.

 9    A.  I call it Mini-inapolis.

10    BY MS. WILLIAMS:

11    Q.  What happened when you landed in Minneapolis?

12    A.  M told me to take taxi to go to the hotel.

13    Q.  Do you remember what hotel it was?

14    A.  Yes, I do.

15    Q.  What was the name of the hotel?

16    A.  Comfort Inn.

17            MS. WILLIAMS:  May I approach?

18            THE COURT:  You may.

19    BY MS. WILLIAMS:

20    Q.  I'm showing you what's been marked as Government's 1037.

21    Do you recognize that?

22    A.  Yes, I do.

23    Q.  What is that?

24    A.  It was the hotel that I stayed.

25    Q.  The same hotel you just talked about, the Comfort Inn?
```

```
1     A.  Yes.

2              MS. WILLIAMS:  Government moves 1037 into

3     evidence.

4              THE COURT:  Any objection.

5              MR. RIVERS:  No objection.

6              MR. GUERRERO: No objection.

7              MR. SICOLI:  No objection.

8              MR. ENGH:  No objection.

9              MR. GERDTS:  No objection.

10             THE COURT:  May be received.

11             MS. WILLIAMS:  Permission to publish?

12             THE COURT:  You may proceed.

13    BY MS. WILLIAMS:

14    Q.  Is that the hotel that you went to?

15    A.  Yes, it was.

16    Q.  Did you pick this place?  Did you pick this hotel?

17    A.  I did not.

18    Q.  Who picked it for you?

19    A.  Moo did.

20    Q.  When you say Moo, are you talking about Gangsmoo who you

21    referred to?

22    A.  Yes.

23    Q.  And it might be helpful to the jury what -- what is

24    Gangsmoo's job in helping you in all that you experienced?

25    A.  The person would be booking the ticket and the hotel.
```

1    Q.  When you say the person, are you talking about Gangsmoo?

2    A.  Yes.

3    Q.  And I don't know if we said this, but is Gangsmoo a male

4    or a female?

5    A.  She was a woman but she's a tomboy.

6    Q.  Okay.  When you got to the hotel, what happened?

7    A.  M called me and said to me to go buy stuff.

8    Q.  What kind of stuff?

9    A.  They were condoms and gel for slippery.

10   Q.  You're talking about sexual lubricant?

11   A.  Yes.

12   Q.  What did you think when she told you that?

13   A.  I thought it was something that I had to do.

14   Q.  Did she tell you where to go to get the gel and condoms?

15   A.  She -- she told me the taxi to take me to Walmart.

16   Q.  Did you have any money?  Had anybody given you any money

17   for the trip?

18   A.  I do not have money.

19   Q.  How did you pay for the condoms and the lube?

20   A.  It was the money that Ton gave some to me to spend

21   just a little bit, not much.

22   Q.  So I just want to back up to make sure we understood

23   this.  So when had Ton given you money?

24   A.  When I was getting on the plane he said I had to have

25   some money.

1    Q.  Do you remember how much it was?

2    A.  About 1,000.

3    Q.  1,000 baht?

4    A.  $1,000.

5    Q.  It was $1,000.  When you got to the Walmart, what

6    happened?

7    A.  So I went to buy the condoms, as what she told me,

8    but I couldn't find them.

9    Q.  So what happened?

10   A.  So she was mad.  And that she said, Why are you so

11   stupid?

12   Q.  Is she there in person or is she talking to you on the

13   phone?

14   A.  We talked through the phone.

15   Q.  Have you ever met M?

16   A.  I never have.

17   Q.  Did you eventually find the condoms and the lube at the

18   Walmart?

19   A.  Yes, I did.

20   Q.  What's going through your mind when you're at the

21   Walmart and you can't find the condoms and the lube?

22   A.  I was afraid.

23   Q.  What were you afraid of?

24   A.  I was -- I was afraid about the stuff that she asked

25   me to buy.  And I was also afraid because she was yelling

1    at me.

2    Q.  Where did you go after you purchased the condoms and the

3    lube?

4    A.  She had a taxi and send me back to the hotel.

5    Q.  What happened when you got back to the hotel?

6    A.  When I arrived at the hotel she -- she said that

7    tomorrow she would call me again to tell me about

8    working.

9    Q.  Had you met anyone else at the hotel at that point who

10   was also working?

11   A.  No, I did not.

12   Q.  Did M call you the next day?

13   A.  Yes, she did.

14   Q.  What happened?

15   A.  So she said to me how I would have to do -- how would

16   I have customer and have I worked before?

17   Q.  Tell us more about that conversation.  What did she say

18   and what did you say?

19   A.  So she asked me if I had worked before and had I been

20   to any other country?  I told her I never done it before

21   and I never been to anywhere else.

22   Q.  What did she say?

23   A.  So she told me if there are customers she would call

24   me to tell me.

25   Q.  What happened next?

```
1    A.  So she told me to put makeup on.

2    Q.  What else?

3    A.  And dress up waiting for customer in the morning.

4    Q.  Did you know how many customers there would be?

5    A.  I did not know.

6    Q.  What happened next?

7    A.  So she called me to tell me about the customer.  And

8    I had to meet my first customer.

9    Q.  Tell us about that, please?

10   A.  The customer was named John.  He was like a regular

11   customer.

12   Q.  After that day, he would come again and again?

13   A.  Yes.  Yes.  He came again.

14   Q.  Tell me what happened?

15   A.  He took me to take a shower.

16   Q.  Did you know what he was doing with you?

17   A.  I -- I was scared, I was very scared.

18   Q.  What happened next?

19   A.  Then he took me to the bed and he was the one who

20   starting the sexual act.

21   Q.  What were you wearing?

22   A.  I was wearing the dress that I had prepared for

23   myself, like going out to eat for a date.

24   Q.  Do you remember what it looked like?

25   A.  It was a dress that is kind of polite for going out
```

1   and to eat.

2   Q.  Do you remember what color it was?

3   A.  I do.

4   Q.  What color was it?

5   A.  It was a white dress.

6   Q.  Had you been given a name at that point?

7   A.  She gave me the name in the morning.

8   Q.  What happened with John, that first customer?

9   A.  We had sex for two hours.

10  Q.  Did you want to have sex with him?

11  A.  No, I did not.

12  Q.  It's been suggested that some men are good at sex.  Was

13  that good for you, Jenn?

14          THE INTERPRETER:  Repeat the last sentence?

15          MR. RIVERS:  Objection.  Asked and answered.

16          THE COURT:  It was asked, but in light of the

17  response, I'll permit it.

18  A.  No, I did not want to.

19  BY MS. WILLIAMS:

20  Q.  How did it feel physically to you?

21  A.  It was I was painful all over inside.  It was bruised

22  all over.

23  Q.  How did it feel emotionally?

24  A.  I felt really bad.

25  Q.  Why didn't you stop it?

1   A.  Because I had to pay off my debt.

2   Q.  At this point, did you know what your debt was, though?

3   A.  I did not know yet.

4   Q.  Was John your only customer that day?

5   A.  No, he wasn't.

6   Q.  Jenn, how many customers did you have on your very first

7   day?

8   A.  Ten men.

9   Q.  Did you think about running away?

10  A.  I had.

11  Q.  Why didn't you run?

12  A.  I was scared.  It was like I was scared.

13  Q.  Did you have anywhere to run to?

14  A.  No, I did not.

15  Q.  How did you feel at the end of that day?

16  A.  I was tired.  And drained.  My -- my mind wasn't in a

17  good place.

18  Q.  Did M call you at the end of that day?

19  A.  Yes, she did.

20  Q.  Tell us about that conversation?

21  A.  So she told me that I was in debt with her for

22  60,000.

23  Q.  60,000 baht?

24  A.  It was dollars.

25  Q.  What did you think when you heard -- was that the first

```
1    time you heard that?

2    A.  It was -- it was the first time.

3    Q.  At the end of your first day?

4    A.  Yes.

5    Q.  What did you think when you heard that you were in debt

6    $60,000?

7    A.  My heart dropped.  My heart was dropping.

8    Q.  Could you call up your dad in Thailand and say, Hey dad,

9    wire me $60,000 so I can get out of this?

10              MR. GERDTS:  Objection.  Leading, Your Honor.

11              THE COURT:  It's suggestive, but I'll let her

12   answer the question.  I'll let her answer the question, if

13   she understood it.

14   A.  No, I could not.

15   BY MS. WILLIAMS:

16   Q.  Did you have any skills, Jenn?

17   A.  No, I did not.

18   Q.  Did you have any way to pay this money off except for

19   sex acts?

20   A.  No, I did not.

21   Q.  How much were you paid for one customer?

22   A.  $20.  May you repeat one more time?

23   Q.  How much were you paid for one hour with one customer?

24   A.  They would pay $200 each.

25   Q.  How much of that money would go to pay down your debt?
```

```
 1              THE INTERPRETER:  May I clarify?
 2    A.  So I would pay M $180 and Ton.  And it left for me
 3    $20.
 4    Q.  So $100 would go to the debt?
 5    A.  Yes.
 6    Q.  So half?
 7    A.  Yes.
 8    Q.  The $20 that you got to keep, what did you use that for?
 9    A.  I would buy the stuff for my personal use.
10    Q.  Like what?
11    A.  For food, shampoo or personal female stuff.
12    Q.  When you were back in Thailand with Ton, did you know
13    that only half of what you made would go to pay?
14    A.  I did not know that.
15    Q.  How many customers did you typically have in one day?
16    A.  Ten people a day.
17    Q.  For how long?
18    A.  For four months.
19    Q.  It's been suggested that that's a quick amount of time.
20    Did that feel quick to you, Jenn?
21    A.  No, it was not.
22    Q.  The men who came to the door, were you allowed to turn
23    down a man and say, No, I don't want you?
24    A.  No, you could not.
25    Q.  Were some of the men worse than others?
```

1    A.  Yes, there were.

2    Q.  I know this is very difficult, Jenn, but it's important.

3    Could you describe some of the rougher customers?

4    A.  Yes, I can.  So some man would like to do it really,

5    really hard.  And some man would pull my hair.  They

6    would like to choke myself in a rough way.  And sometime

7    they want to make me hurt and that I would have some

8    wound.  May I added one more thing?  Also some guys want

9    to do it for a long time.

10   Q.  If it hurt you, did you tell them to stop it?

11   A.  I told them but they did not listen.

12   Q.  How were you supposed to treat the men who came there to

13   have sex with you?

14   A.  I had to have sex with them.  I could not choose or

15   say anything.

16   Q.  Where did you live, Jenn?

17   A.  In Minnesota.

18   Q.  The room that you slept in, was that the same room that

19   you would have sex in?

20   A.  Yes.

21   Q.  Were you taken to a few different places in Minnesota?

22   A.  Yes.

23            MS. WILLIAMS:  May I approach, Your Honor?

24            THE COURT:  Yes.

25            MS. WILLIAMS:  Approaching with Government's 1035.

 1    BY MS. WILLIAMS:

 2    Q.   Do you recognize with this?

 3    A.   I do.

 4    Q.   What is this?

 5    A.   It was an apartment.

 6    Q.   Was this one of those apartments you were talking about

 7    where you stayed?

 8    A.   Yes.

 9              MS. WILLIAMS:   Government moves Exhibit 1035 into

10    evidence.

11              MR. GERDTS:   No objection, Your Honor.

12              MR. GUERRERO:   No objection.

13              MR. ENGH:   No objection.

14              MR. SICOLI:   No objection.

15              MR. RIVERS:   No objection.

16              THE COURT:   Those are received.

17              MS. WILLIAMS:   So permission to publish to the

18    jury?

19              THE COURT:   You may.

20    BY MS. WILLIAMS:

21    Q.   And that says Genesee Apartments for the record.

22              At the Genesee apartments, how did it work?   Was

23    it the same?

24    A.   It was the same.

25    Q.   Did you leave the apartment much?

```
1    A.  No.

2    Q.  You talked about buying shampoo, or condoms or things

3    like that.  Were there times when you went out and did that?

4    A.  Generally that would be someone who would drive the

5    car and bought for me.

6    Q.  What was that person's name?

7    A.  John.

8              MS. WILLIAMS:  Permission to approach, Your Honor?

9              THE COURT:  You may.

10   BY MS. WILLIAMS:

11   Q.  Showing the witness Government's 1039, do you recognize

12   that?

13   A.  Yes, I do.

14   Q.  What is that?

15   A.  John.

16             MS. WILLIAMS:  Government moves 1039 into

17   evidence.

18             MR. SICOLI:  No objection.

19             MR. GERDTS:  No objection.

20             MR. GUERRERO: No objection.

21             MR. RIVERS:  No objection.

22             MR. ENGH:  No objection.

23             THE COURT:  Received.

24             MS. WILLIAMS:  Permission to publish?

25   BY MS. WILLIAMS:
```

```
 1    Q.  You just told us -- that's the John you're talking

 2    about?

 3    A.  Yes.

 4    Q.  Who did John work for?

 5    A.  For M.

 6    Q.  What did John do?

 7    A.  He was a driver.

 8    Q.  What does that mean?  Just explain to the jury what did

 9    drivers do?

10    A.  He would be the person who ran to buy stuff, pick up

11    women and drive women.

12    Q.  Was John a customer?  Did John have sex with you?

13    A.  Yes.  We did.

14    Q.  Was John mean to you or kind to you?

15    A.  He was a kind person.

16    Q.  Did he eventually become your friend?

17    A.  Yes.

18    Q.  Even though he had sex with you and worked for M?

19    A.  Yes.

20    Q.  Was it nice to have a friend?

21    A.  Yes, it was.

22    Q.  Did you have any friends in Minnesota?

23    A.  No, I did not.

24    Q.  You said it took you four months to pay off the debt, is

25    that right?
```

```
1    A.  Yes.

2    Q.  Did you have a lot of customers during that time?

3    A.  Yes, there were a lot.

4    Q.  Did you want to have sex with any one of those men?

5    A.  No, I did not.

6    Q.  Why did you do it?

7    A.  I had to pay debt to M.

8    Q.  Did you think about running?

9    A.  I had.

10   Q.  Did you run?

11   A.  No, I did not.

12   Q.  Why not?

13   A.  I was scared.  If I ran away, I didn't want my family

14   to have any problem.  I was afraid if I ran there would

15   be problem.

16   Q.  Had anyone back in Thailand said what would happen to

17   you if you ran away?

18   A.  There was.

19   Q.  What happened?

20   A.  Ton said, If you told this to anyone, or if you ran

21   away, we would meet in Thailand.

22   Q.  When Ton tells you, If you run away, we will meet in

23   Thailand, what does that mean to you?

24   A.  It felt like being threatened.

25   Q.  Who were you scared for?
```

1   A.  I was afraid for -- for everyone.  Yes.

2   Q.  Did Ton have your family information?

3   A.  Yes.

4   Q.  Did people getting hurt -- people getting hurt in

5   Thailand, is that common?

6   A.  Yes.

7   Q.  Jenn, why didn't you run to a police officer here in the

8   United States?

9   A.  I was scared if I was sent back home I would have to

10  go back and work off my debt.

11  Q.  Work off your debt in Thailand?

12  A.  Yes.

13  Q.  How long do you think it would have taken you to work

14  off $60,000 in debt in Thailand?

15  A.  Many years.

16  Q.  Was Minnesota the only place that you were sent?

17  A.  No, it wasn't.

18  Q.  Can you tell the jury where else -- well, who sent to

19  different places?  Let's start there.

20  A.  M was the one.

21  Q.  Did you get to choose where you would go?

22  A.  No, you couldn't.

23  Q.  Where did M sent you?

24  A.  She send me to Phoenix.

25  Q.  What was the house boss's name in Phoenix that you

```
 1   worked for?

 2   A.  Tan.

 3   Q.  Was it T-A-N?

 4   A.  Yes.

 5   Q.  Where else were you sent?

 6   A.  To Chicago, Houston.

 7   Q.  In Chicago -- who ran the house in Chicago?

 8   A.  The house owner, the first one named Du.  And then

 9   changed to Pla, then changed to joy.

10   Q.  Okay.  So let's just get that clear for the record.  The

11   house owner in Chicago, what was her name?  Or was her name

12   Du?

13   A.  DU.

14   Q.  D-U?

15   A.  Yes.

16   Q.  Was that a man or a woman?

17   A.  A woman.

18   Q.  And you said you were also sent to Houston?

19   A.  Yes.

20   Q.  And who ran the house in Houston?

21   A.  It was Du and then changed to Pla, and then changed

22   to Joy in Houston.

23   Q.  So there were three different bosses in Houston?

24   A.  Yes.

25   Q.  And that's Pla, P-L-A?
```

```
 1    A.   Yes.

 2    Q.   Were any of these houses really nice places to work?

 3    A.   No, there was none.

 4    Q.   How would it work in these houses?

 5    A.   They would open the house at 9:00 a.m. in the morning

 6    and close at 11:00 p.m. at night.

 7    Q.   And how many customers would you see?

 8    A.   Was like ten.

 9    Q.   Where would you sleep?

10    A.   I would sleep in that house.

11    Q.   Would you sleep in the same bed?

12    A.   I would sleep on the floor.

13    Q.   Jenn, why did you sleep on the floor?

14    A.   Because the bed made me that I couldn't fall asleep.

15    Q.   At any of these places could you say no to customers?

16    A.   No, I could not.

17    Q.   At any of these places could you choose your customers?

18    A.   No, I couldn't.

19    Q.   What types of sex acts would you have to engage in,

20    Jenn?

21    A.   It depends to -- it depends on different people.

22    Some -- some guys want to do it really hard.

23    Q.   Would you have anal sex?

24    A.   I had to do it.

25    Q.   Would you get paid more -- could you pay off your debt
```

1   more quickly that way?

2   A.  Yes.

3   Q.  Were there any customers -- or were there any houses

4   where things were really good and there were really no bad

5   customers?

6   A.  They were all the same.

7   Q.  Did you get to take days off?

8   A.  No.  I could not.

9   Q.  What about if you had your period?

10  A.  I would have to keep going.

11  Q.  You talked about meeting a woman named Gangsmoo in Los

12  Angeles.  Can you tell us about that?

13  A.  I met with Moo in California.  And then she took me

14  to open up a bank account at a bank.

15  Q.  Did you do that?

16  A.  Yes, I did.

17  Q.  Do you remember what bank?

18  A.  It was Wells Fargo and Bank of America.

19  Q.  What happened with those bank accounts?

20  A.  She would keep all those accounts.

21  Q.  Did you have control over those accounts?

22  A.  No, I could not.

23  Q.  What were the prices for sex at these different places?

24  What was the range?

25  A.  It would be about $200.

```
 1    Q.  And how much of that would go to pay down your debt to
 2    M?
 3    A.  I -- I would pay down to debt $180 and I would have
 4    $20 left.
 5    Q.  In terms of you said that $100 had gone to M where does
 6    the other money go?
 7    A.  I was -- they told me it was for the debt and the
 8    house fee.
 9    Q.  And that's what I'm trying to get at.  What was the
10    house fee at these different places?
11    A.  It was not the same for every house.
12    Q.  What was the range, just give us a sense?
13    A.  About 70-80.
14    Q.  At the different houses, the person that ran the house,
15    did you have a word for them?
16    A.  House owner.
17    Q.  What would the house owner do?  What was their job?
18    A.  They had to sent customers to the room.
19    Q.  And the money that you owed the house owner, how did you
20    get them that money?
21    A.  Sometimes they would come in and collect it in the
22    apartment.
23    Q.  The money for your debt, the money to M -- you explained
24    that you hadn't met M.  How would you get that money to M?
25    A.  That would be a guy who drive -- who do the driving
```

1   that they would -- he would take the money and send money

2   to them.

3   Q.  The guy who did the driving, which guy?

4   A.  If I was in Minnesota, it would be John.

5   Q.  If you were somewhere else, who would it be?

6   A.  If it was Phoenix, it would be a different driver for

7   a different house.

8   Q.  But the same type of person, the same job?

9   A.  Yes.

10  Q.  Who kept track of the debt?

11  A.  M.  She would call.

12  Q.  How often would you talk to M?

13  A.  I would have to tell her every time I finished

14  working.  I -- I would tell her how many customer, how

15  much money I made and then we would just keep track of

16  the debt that way.

17  Q.  You talked about house owners in different cities.

18          Who was the house owner here in Minnesota?

19  A.  M was.

20  Q.  Who ran things day-to-day for M in Minnesota if you

21  weren't -- if she wasn't here?

22  A.  It was Lily.

23  Q.  Lily.  Is that a man or a woman?

24  A.  A woman.

25  Q.  Can you tell us about a little bit what Lily did?

1    A.  She would be the person who would teach about how to

2    have sex, how to have customer finish in the mouth and

3    how I would use my mouth.

4    Q.  Did Lily teach you those things?

5    A.  Yes, she did.

6    Q.  The photos that you took in Thailand -- well, how were

7    you advertised?

8    A.  I wasn't the one that posted it, so I don't know.

9    Q.  So when you say posted, were you posted online?

10   A.  She told me post it online, but I didn't really know

11   what it was.

12   Q.  Who told you you were posted online?

13   A.  It was Lily.

14        MS. WILLIAMS:  I'm going to publish Government's

15   1215, Your Honor?

16        THE COURT:   All right.

17        MS. WILLIAMS:  Already in evidence.  I'm going to

18   blow up this top part.

19   BY MS. WILLIAMS:

20   Q.  Do you see where this says backpage?

21   A.  Yes, I do.

22   Q.  And what city is this being advertised in?

23   A.  Minneapolis/St. Paul.

24   Q.  And there we see, "Asian girl Pam."  Was that your

25   working name?

```
1    A.  Yes, it was my name.

2    Q.  Did you pay off your debt, Jenn?

3    A.  I did.

4    Q.  It's been suggested that this debt was a great

5    opportunity for you.  Did it feel like a great opportunity?

6    A.  No, it was not.

7    Q.  Did you keep working even after you finished paying off

8    the debt?

9    A.  Yes, I had to keep doing it.

10   Q.  At that point, you could have walked away, right?  You

11   had paid your debt?

12   A.  Yes, I could have.

13   Q.  But you didn't.

14   A.  Right.

15   Q.  Why did you keep working at that point?

16   A.  Because I wanted to save some money, just a little

17   bit.

18   Q.  What were you trying to do with that money?

19   A.  I wanted to leave this job.

20   Q.  Were you supporting anyone back home?

21   A.  I was supporting my sisters.

22   Q.  Did you go to other houses in the organization even

23   after your debt was paid?

24   A.  I did.

25   Q.  And I should say, I don't want to put words in your
```

```
 1    mouth.  Was this an organization in your view?  Was it a

 2    group of people?

 3    A.  Yes, it was.

 4    Q.  When you would go to different houses would there be

 5    some girl under debt and some not?

 6    A.  Most of them were in debt.

 7    Q.  Let's start with who you don't know here.  Do you know a

 8    person named Fon?

 9    A.  No, I don't know.

10    Q.  Do you know a person named Nancy or Kung?

11    A.  No, I don't know her.

12    Q.  Do you know a person named Noiy -- Ann -- I'm sorry.  Do

13    you know a person named Noiy?

14    A.  No, I do not know.

15    Q.  Do you know a person named Wan?

16    A.  No.

17    Q.  Do you know a person named Bill?

18    A.  Yes, I do.

19    Q.  Do you see Bill in the courtroom today?

20    A.  Yes, I do.

21    Q.  Can you please point to him and identify something that

22    he's wearing?

23    A.  He's there.

24         MS. WILLIAMS:  Let the record reflect, unless

25    there's an objection, an in-court identification.
```

```
 1              MR. SICOLI:  No objection.
 2              THE COURT:  So noted.
 3   BY MS. WILLIAMS:
 4   Q.  So tell us how you met Bill?
 5   A.  He was a house owner in California.
 6   Q.  How many houses did Bill have?
 7   A.  About three houses.
 8   Q.  Tell me about working for Bill?
 9   A.  It was like other houses that I had been to, but Bill
10   didn't have a driver.  Bill would be the one who drove.
11   Q.  At that point were you under debt or were you
12   independent?
13   A.  I was independent.
14   Q.  So you decided to go work at Bill's house, is that fair
15   to say?
16   A.  Yes, correct.
17   Q.  From your observations, were there people at Bill's
18   house who were under debt?
19   A.  Yes, there were.
20   Q.  How would it work at Bill's house?
21   A.  It was -- it wasn't so different than other houses.
22   Q.  Did Bill tell you how he wanted you to work?  What he
23   wanted you to do?
24   A.  He would ask what sort of stuff I could do.  Could I
25   do from behind?
```

1   Q.  And would Bill talk to you about how you should treat

2   the customers?

3   A.  He would tell to work -- work very well.  That make

4   the customer to come back again.

5   Q.  When you say work very well, did he give you more

6   specific instructions?

7   A.  He would teach that to kneel on the floor so as to

8   beg customers to come back.

9   Q.  How important were reviews in this business?

10  A.  So it would be to have the customer come back and to

11  make the house have a good review.  And if I didn't do

12  well, I wouldn't be able to come back to that house.

13  Q.  Were there times when Bill was unhappy with your work?

14  A.  It would be when I took time off.

15  Q.  Did he ever talk to you about getting a bad review?

16  A.  Yes, there were times.

17  Q.  What would he say?

18  A.  He would say that when I was having sex act I would

19  be -- I would not move as naturally as I should have.

20  Q.  Did Bill, himself, drive you to different houses?

21  A.  Yes, he did.

22  Q.  Where did he take you?

23  A.  He would take me to a different apartments that he

24  owns.

25  Q.  And at that point, you're independent.  Does that mean

1    you get to keep all your money?

2    A.  No, not all.

3    Q.  What do you have to pay?

4    A.  I would have to pay Bill.

5    Q.  How much would you have to pay him?

6    A.  For his house fee, I'm not really sure.  It was about

7    70 to 80.

8    Q.  For one sex act?

9    A.  For one customer.

10   Q.  And I think this is clear, but all the money that you're

11   taking in, is that cash?

12   A.  It was all -- it was cash.

13   Q.  And how do you get the money to Bill?

14   A.  So he would come in and collect money from the fridge

15   at the end of the day, every day.  I would have to write

16   down on the envelope and put money in the envelope, put

17   into the fridge.

18   Q.  When you're saying put money in the fridge, can you

19   describe that a little bit more to the jury who told you to

20   put money in the fridge?

21   A.  Bill would say to write down on an envelope and then

22   put it in the fridge.

23   Q.  What would you write on the envelope?

24   A.  To write out the name Pam and how -- how many

25   customers there were and total of the money.

1    Q.  Jenn, you lived here in Minnesota for a little while, is

2    that right?

3    A.  Yes.

4    Q.  You married a Minnesota man?

5    A.  Yes.

6    Q.  Can you tell us a little bit about that man?

7    A.  So I was -- I got married with my husband.  He likes

8    to -- he likes to drink and when he got drunk, he would

9    like to be aggressive with me.

10   Q.  Your husband, how did you meet him?

11   A.  At my work.

12   Q.  He was a sex customer?

13   A.  Yes.

14   Q.  Is he a nice man?

15   A.  No, he was not.

16   Q.  Why did you marry him?

17   A.  Because he said he wanted to help me with the

18   paperwork.

19   Q.  When you say the paperwork, you mean immigration

20   paperwork to stay here?

21   A.  Yes.

22   Q.  You were arrested, is that right, Jenn?

23   A.  Yes.

24   Q.  Do you remember when you were arrested?

25   A.  It was on the 4th, 2016, it was on my birthday.

1    Q.  What month was that?

2    A.  October.

3    Q.  You were charged federally with conspiracy to commit

4    Visa fraud, is that right?

5    A.  Yes.

6    Q.  And after you were arrested, you sat down with Special

7    Agent Price and you sat down with me, is that right?

8    A.  Yes.

9    Q.  And what happened during that interview?

10   A.  I was scared to tell the truth.

11   Q.  Did you lie?

12   A.  I was trying to, but I wasn't lying.

13   Q.  You weren't lying -- did you lie, I'm sorry.  I didn't

14   quite --

15   A.  No, I did not.

16   Q.  When I asked you if you had a debt, were you truthful

17   with me about that debt?  During the very first interview?

18   A.  Yes.

19   Q.  Do you remember during your very first interview telling

20   myself and Special Agent Price that you did not have a debt?

21   A.  I don't remember.

22   Q.  What do you remember about that interview?

23   A.  I was telling the story about what had happened.

24   Q.  How did you feel when you were arrested?

25   A.  I was scared that I would be sent back home.

```
1    Q.   What did Special Agent Price -- what did we ask you for?

2    A.   You have asked me about what had happened.

3    Q.   And what have we told you it's your job to do?

4    A.   To tell the truth.

5    Q.   Was there another interview after that where you told us

6    everything?

7    A.   May you repeat?

8    Q.   Well, let me ask an it a different way.  That wasn't a

9    great question.

10            You said we've asked you for the truth.  Have you

11   told us the truth?

12   A.   Yes, I did.

13   Q.   Was that a scary thing to do?

14   A.   Yes, it was.

15   Q.   Jenn, you were granted continued presence to stay in the

16   country at least for a little while, and you're trying to

17   obtained a T Visa, is that right, to stay in the country?

18   A.   Yes.

19   Q.   And law enforcement has certified you as a verified

20   victim of human trafficking?

21   A.   Yes.

22   Q.   Have I ever promised you that you can stay in this

23   country?

24   A.   No, I never did.

25   Q.   Do I have the power to make that promise?
```

```
 1    A.  No.
 2              MR. GERDTS:  Objection.  Foundation.
 3              MS. WILLIAMS:  I think it's the witness's
 4    perception that's at issue.
 5              THE COURT:  Well, I'll -- I'll so instruct the
 6    jury at the end of the case on any applicable -- if she has
 7    an opinion or exception, I'll allow her to give it.
 8              THE INTERPRETER:  Will you repeat it?
 9    BY MS. WILLIAMS:
10    Q.  Do I have the power to keep you in the United States?
11    A.  No, you don't.
12    Q.  Your life is a little bit better now?
13    A.  Yes.  It's a lot better.
14    Q.  Where do you live now?
15    A.  I live in Vegas.
16    Q.  And are you still married to that man?
17    A.  No, I wasn't.  No I am not.
18    Q.  Your life is a little bit better now?
19    A.  Yes, a lot better.
20    Q.  But if you could go back in time, was it all worth it?
21    Would you come here if you knew what was really going to
22    happen to you?
23    A.  I would not.  I would not.
24              MS. WILLIAMS:  No further questions, Your Honor.
25              THE COURT:  You may inquire when you're ready,
```

```
 1   Counsel.
 2                   C R O S S - E X A M I N A T I O N
 3   BY MR. SICOLI:
 4   Q.  Good afternoon, Ms. Sonprasit?
 5   A.  Good afternoon.
 6   Q.  I want to first go back to when you were in Thailand.
 7            Now, you're 33 years old now, correct?
 8   A.  Yes.
 9   Q.  So back in 2013, you would have been how old?
10   A.  27.
11   Q.  All right.  And you also had a child you said named Ivy,
12   is that correct?
13   A.  Yes.
14   Q.  And in 2013, how old was Ivy?
15   A.  A year and a half.
16   Q.  Now, you were working you said in a karaoke bar, is that
17   correct?
18   A.  Yes.
19   Q.  And it doesn't sound like you were making very much
20   money in karaoke bar, is that correct?
21            THE INTERPRETER:  May you repeat that?
22            MR. SICOLI:  Sure.
23   BY MR. SICOLI:
24   Q.  You weren't making that much money in the karaoke bar,
25   enough to live?
```

1   A.  It was a little bit better.

2   Q.  Well, let me ask you this, when did you start working in

3   karaoke bar?

4   A.  When I was 22 year old.

5   Q.  All right.  And so what year was that, do you remember?

6   A.  I don't remember the year.

7   Q.  Okay.  How long did you work in the karaoke bar doing

8   prostitution, sex acts?

9   A.  About two years.

10  Q.  All right.  And you were, I think you were saying you

11  were doing at least a sex -- you were having sex with

12  somebody maybe once or twice a month, is that correct?

13  A.  Not necessarily.

14  Q.  You're not sure?  Was that the average?  Or what would

15  you say was the average?

16          THE INTERPRETER:  May I repeat your question?

17          MR. SICOLI:  Sure.

18  A.  So it was depending on the woman whether or not they

19  want to have customers.

20  BY MR. SICOLI:

21  Q.  Okay.  All right.  But you had sex with customers over a

22  two-year period, is that correct?

23  A.  If I wanted to.

24  Q.  And that was to make more money for your family,

25  correct?

1    A.  Yes.  To -- to help my sisters.

2    Q.  And did you -- did your daughter live with you at that

3    time?

4    A.  At the time I didn't have a child yet.

5    Q.  When you had a child, though, you were still doing

6    karaoke, correct?

7    A.  No, I did not.

8    Q.  Wasn't it true that you told the Government that you

9    actually ended up losing your child to your -- I don't know

10   was it -- was the child's father -- were you married to him

11   or was he just a boyfriend?

12   A.  He was a boyfriend.  We didn't get registration.

13   Q.  Wasn't it true that he actually wanted you to quit

14   having sex at the karaoke bar and he was quite a bit older

15   than you, right?

16   A.  Yes, he was.

17   Q.  And he wanted you to stop having sex with customers at

18   the karaoke bar, isn't that true?

19   A.  Yes.  I -- I stopped.

20   Q.  Isn't it true that he actually ended up taking your

21   child Ivy to England because you would not stop working in a

22   karaoke bar and having sex with customers?

23   A.  No.  That's not true.

24   Q.  All right.  So if you've said that in the past, then was

25   a mistake on your part?

1    A.  We were in argument.  It was stuff about family

2    issue.

3    Q.  So my -- my question to you, though, is you're

4    testifying that you never told anybody that story about him

5    being upset that you were working at a karaoke bar having

6    sex with customers?

7    A.  Because he loved me so he didn't care about that.

8    Q.  But he ended up going to England without you, correct?

9    A.  That's correct.  But we were in argument.  We were

10   not a good fit.

11   Q.  All right.  But he ended up taking your child Ivy.  And

12   you let him take Ivy with him to England, is that correct?

13   A.  Yes.

14   Q.  Now I wanted to shift gears a little bit and talk to you

15   about any conversations you had with Ton then about coming

16   to the United States, okay?

17        I believe you testified that you needed to make

18   more money, correct?  To support your sisters?

19   A.  Yes.

20   Q.  And you were told then that you could end up possibly --

21   or you thought you could possibly go to England, correct?

22   A.  He said that to just get the Visa pass.  He did say I

23   would have to go.

24   Q.  Well, wouldn't you want to go to England with a Visa so

25   you could be with your daughter?  Or wasn't that a concern

1   to you?

2   A.  Because I broke up with my boyfriend already.  So I

3   wanted to come to America.

4   Q.  So you didn't want to be with your daughter at all in

5   England, is that what you're saying?

6   A.  I wanted to.

7   Q.  You wanted to do what?

8   A.  I wanted to be with my daughter but we had already

9   broken up.  And I had already given the document to him

10  so he could take care of my child.

11  Q.  So you'd rather go to America because you would make

12  more money?  Or what was the reason you wanted to go to the

13  United States instead of Britain?

14  A.  I just wanted to come to America.  I didn't know if I

15  came here to make more money or what.

16  Q.  All right.  So you were willing to come to America

17  without even knowing what you were going to do to make money

18  in America?

19  A.  No.  I didn't know.

20  Q.  And you don't speak the -- you didn't speak the language

21  very well, right?

22          THE INTERPRETER:  May I repeat your question?

23          MR. SICOLI:  Sure.

24  A.  Yes.

25  BY MR. SICOLI:

1   Q.  So -- and you had a high school education, is that

2   correct?

3   A.  Yes.

4   Q.  And so what you're testifying to, though, is that you

5   wanted to go to the United States not knowing what you were

6   going to do, correct?

7   A.  Yes.  That's correct.

8   Q.  Not knowing the English language very well, correct?

9   A.  Yes.

10  Q.  And not having an education?

11  A.  Yes, that's correct.

12  Q.  Now, you testified, too, that you ended up taking some

13  pictures -- and I think it was Exhibit 1215 that was put

14  up -- some pictures that you took before you came to the

15  United States, is that correct?

16  A.  Yes.

17  Q.  And I'm not going to put the picture up again, I think

18  the jury has seen it enough, and they can certainly look at

19  it in jury room during deliberations.

20          But those weren't normal sorts of pictures that

21  you would put in a yearbook or something like that, correct?

22  A.  Yes.

23  Q.  I mean, those are very sexy pictures, is that correct?

24  A.  Yes, correct.

25  Q.  And you're still testifying, though, that you did not

1    know you were coming to the United States to engage in

2    prostitution, is that correct?

3    A.  That's correct.

4    Q.  All right.  So you're not -- you're told that you're

5    going to be sent to the United States in, I believe, it was

6    July of 2013, is that correct?

7    A.  Yes.

8    Q.  And who's on the plane with you?

9    A.  I was alone.

10   Q.  Okay.  And nobody told you -- they said, we're going to

11   send you to the United States but they're not even going to

12   tell you what they're going to charge you to go to the

13   United States?  Is that what your testimony is?

14   A.  That's correct.

15   Q.  All right.  And you didn't -- you said you had some idea

16   eventually but you didn't know for sure, is that correct?

17   A.  That's correct.

18   Q.  Now, when you got to the United States, who picked you

19   up?

20   A.  I took taxi.

21   Q.  And where did you go to?

22   A.  To the hotel.

23   Q.  And this was Las Vegas, correct?

24   A.  The flight went to Las Vegas, but then I had to

25   connect another flight to Minnesota.

```
 1   Q.  And, again, your testimony is you didn't know what you
 2   were going to do at all, you just followed orders to come to
 3   Minnesota without knowing what's going to happen?
 4   A.  That's correct.
 5   Q.  Now, when you get to Minnesota, that's when you find out
 6   that you're going to be engaged in prostitution, is what
 7   your testimony is, correct?
 8   A.  Yes.
 9   Q.  And your -- you testified I think that your debt was --
10   you were told it was going to be $60, is that correct?
11   A.  Yes, correct.
12   Q.  And you ended up paying it off in four months, is that
13   correct?
14   A.  That's correct.
15   Q.  And the -- and the -- the debt actually got reduced to
16   $55,000, is that correct?
17   A.  Yes.
18   Q.  And that's because you paid it off so quickly, is that
19   correct?
20   A.  Yes.
21   Q.  So you got a discount?
22   A.  Yes.
23   Q.  Now, you said that you went to several houses while you
24   were under debt.  You just named different cities, is that
25   correct?
```

1     A.  Yes.

2     Q.  And when you were under debt, did you -- you said you

3     had to work every day, is that correct?

4     A.  Yes.

5     Q.  And you always had ten customers a day, is that correct?

6     A.  Correct.

7     Q.  So there's 30 days in a month, is that correct?

8     A.  That's correct.

9     Q.  And is it always about $200 a customer?

10    A.  Yes.  About so.

11    Q.  All right.  So if you worked 30 days and you have 10

12    customers, that would be 300 customers in a month, is that

13    correct?

14    A.  That's correct.

15    Q.  And you multiply that by 4, that would be 1,200, is that

16    correct?

17    A.  Yes.

18    Q.  So if you saw that many customers and you did it over a

19    four-month period, isn't it true that it would be $240,000

20    gross money that would be paid?

21    A.  About so.

22    Q.  All right.  And you said that you would get to keep $100

23    to send to M, is that correct?

24    A.  Yes.

25    Q.  So you would send half of that to M?

1    A.  Yes.

2    Q.  So that would be $120,000 over a four-month period, not

3    $55,000, that's correct?

4    A.  It was total for the debt $60,000.

5    Q.  Right.  I'm just exaggerating that you saw ten customers

6    a day for 30 days a month, is that correct?

7    A.  Some days it weren't ten people.

8    Q.  You testified in front of the grand jury on

9    October 12th, 2016, is that true?

10   A.  That's correct.

11   Q.  And isn't it true that you told the grand jury -- and

12   I'm looking at Page 18, that you told the grand jury that on

13   a slow day you would see five customers and on a busy day

14   you would see more like ten or maybe even a little bit

15   more, is that correct?

16   A.  Yes.

17   Q.  So, again, you didn't see ten customers a day for

18   30 days out of the month, is that correct?

19   A.  Yes.  So some days that would be less.  Depends.

20   Q.  Now, I want to move forward a little bit because you

21   said you went to several houses.  And we saw Exhibit 1215.

22   And, again, I'm not going to put it up.

23          But that ad that was put in Exhibit 1215, that was

24   actually when you were put off the debt, is that correct?

25   A.  Can you speak slower?

1    Q.  Sure.  I'll put it more bluntly.

2           If you started in July of 2013, you would have

3    paid off the debt then by November of 2013, is that correct?

4    A.  Yes.  It was within four months.

5    Q.  Okay.  And that -- and the jury can see this in the jury

6    room, I don't need to put it up.  But it was January 9th,

7    2014, that that ad was placed, is that correct?

8    A.  Yes.

9    Q.  So it was after you were off of debt?

10   A.  Do you mean that picture?

11   Q.  Yes.  Not the picture but the actual advertisement?

12   A.  Can you please repeat your question?

13   Q.  Sure.  I'm not going to belabor the point.  The ad that

14   was showed to you with the sexy pictures that were taken in

15   Thailand, that ad was actually placed after you were off the

16   debt, is that correct?

17   A.  It was placed before I paid off my debt.

18   Q.  Okay.  Let's talk then about what happened after you

19   paid off your debt.

20          So you paid off your debt in late 2013, correct?

21   A.  That's correct.

22   Q.  And you've testified that you had real bad experiences

23   with customers.  You had bad experiences with people who ran

24   the houses while you were in debt, is that correct?

25   A.  Yes.

1    Q.  And even though you've testified that you had all of

2    these bad experiences, you continued to contact some of the

3    same people that were mean to you to actually have you in

4    their houses, is that correct?

5    A.  Yes.  There were contacts.

6    Q.  Yeah.  And what they would do for you is they would set

7    up the customers, correct?

8    A.  Yes.

9    Q.  And they would screen the customers to make sure to --

10   at least attempt to make sure they were safe, correct?

11   A.  Well, I don't know if they were safe.

12   Q.  But you don't know that.  But that was one of the

13   functions that the person was running the house was doing,

14   is that correct?

15   A.  Yes.

16   Q.  And you continued to -- you continued to do commercial

17   sex acts because you needed to make money, correct?

18   A.  Yes.

19   Q.  And you were doing that voluntarily, at that time,

20   correct?

21   A.  It wasn't so voluntarily, but it was a necessity.

22   Q.  How much money did you send back to Thailand after the

23   debt was stopped?  After the debt was paid?

24   A.  It depends.  It depends on whether or not I had

25   worked for 15 days and then take day off.  It depends.

1   Q.  How much when you -- how much when you were working

2   without the debt, how much would you generally make in a

3   month?

4   A.  After I paid off the debt, my jobs was -- was slower.

5   It wasn't much money that I made.

6   Q.  How much did you make?

7   A.  For 15 days, I would make about $1,000 to $2,000.

8   Q.  And you'd work for 15 days?

9   A.  Yes.

10  Q.  All right.  And so that would be -- and so you said

11  $1,000 or $1,500.  Which one was it?

12  A.  It was about $1,000 to $2,000.  Depends.

13  Q.  Okay.  And that's just for working 15 days out of the

14  month?

15  A.  Yes.

16  Q.  Now, when you were off of the debt.  You chose which

17  houses to go to, correct?

18  A.  Yes.  I could choose.

19  Q.  And you choose to go to Michael Morris's house, whom you

20  knew as Bill, is that correct?

21  A.  Yes.  That's correct.

22  Q.  And I assume that you knew about Bill because you talked

23  to other girls -- other women that are in the industry, that

24  are in the field?

25  A.  Yes.

1    Q.  And you obviously wouldn't have gone to Bill's house if

2    he was a bad -- if it was a bad house to go to, is that

3    correct?

4    A.  Because I had paid on all of my debts, so I could

5    make decision of where I could go.

6    Q.  Right.  And other women told you that working at Bill's

7    house was a good house to work?

8    A.  They didn't say it was a good house.

9    Q.  Well, did they tell you it was a safe house?

10   A.  They said it was just a house just like other houses.

11   Q.  All right.  So you just decided to call up Bill out of

12   the blue not knowing whether it was a good place to be or a

13   bad place to be?

14   A.  No, I did not know.

15   Q.  And Bill never forced you to do anything that you didn't

16   want to do, is that correct?

17   A.  He just taught as to what to do when I would be

18   having sex with customer.

19   Q.  Yeah.  He wanted you to be successful and make money for

20   yourself and for him, is that correct?

21   A.  Yes.

22   Q.  And he didn't tell you you have to do a certain sex acts

23   or you don't have to do a certain sex act.  He never gave

24   you orders like that, right?

25   A.  He would ask if I could go from behind.

1    Q.  He would ask if you would do that, correct?

2    A.  That's correct.

3    Q.  Right.  And if you did that, you would actually get to

4    keep the extra money for the premium for having anal sex, is

5    that correct?

6    A.  Yes.

7    Q.  And so if you were willing to do anal sex, he would win

8    because more customers might want to come to the place.  But

9    you would also win because you would get more money, is that

10   correct?

11   A.  Yes.

12   Q.  And you decided not to do anal sex, is that correct?

13   A.  Yes.

14   Q.  And that was fine.  Nobody complained about that, is

15   that correct?

16   A.  No, nobody did.

17   Q.  And he did talk to you about reviews, though, right?  In

18   getting good reviews?

19   A.  Yes.

20   Q.  And he wanted you to be friendlier to clients,

21   customers, is that correct?

22   A.  Yes.

23   Q.  And he told you that if you're not friendly to

24   customers, you may not get the business, is that correct?

25   A.  That's correct.

```
1    Q.  So he was telling you from a business standpoint that

2    the best thing to do is to be nice?

3    A.  Yes.

4    Q.  Now, you continued to work -- because it sounds like you

5    don't want to -- you didn't want to do prostitution, is what

6    you're telling us, correct?

7    A.  Yes.

8    Q.  But you continued to work in prostitution in the United

9    States up until the day you got arrested, isn't that

10   correct?

11   A.  Yes.

12   Q.  And that was October of 2016, is that correct?

13   A.  Yes.

14   Q.  So that was like two and a half years after you had

15   paid -- it was about two years after you had paid off the

16   debt?

17   A.  But it wasn't every day, every month, after I paid

18   off my debt.  I can take time off.

19   Q.  Sure.  But what you're telling us is you had more

20   freedom, right?

21   A.  Not so much.

22   Q.  After you -- after the debt was paid, you didn't have

23   freedom because what, you wanted to make money because you

24   wanted to send back to your family?

25   A.  I would have to support my family.
```

```
 1   Q.  Right.  And it was a financial decision you made?

 2   A.  Yes.

 3   Q.  Now, I want to talk just briefly -- and I should be done

 4   here in a second.

 5            But I want to talk briefly about the deals you got

 6   in this case.

 7            You were originally charged with conspiracy to

 8   commit Visa fraud, correct?

 9   A.  Yes.

10   Q.  And then you were going to -- were you charged with a

11   misdemeanor after that and they got rid of the felony case?

12   Or what happened?

13   A.  It was dismissed.

14   Q.  Yeah.  The case was -- so first you were charged with a

15   felony conspiracy, is that correct?

16   A.  Yes.

17   Q.  And on May 2nd of 2018, Ms. Williams, on behalf of the

18   Government filed a motion to dismiss the case against you,

19   is that correct?

20   A.  Yes.

21   Q.  And the Judge then dismissed the case because of the

22   Government's motion, is that correct?

23   A.  Yes.

24   Q.  And so you're not charged with anything, you're not

25   convicted of anything, is that correct?
```

1    A.  Yes.

2    Q.  Now you -- you're in the United States originally on

3    this continued presence, is that correct?

4    A.  Yes.

5    Q.  And continued presence means you're allowed to stay in

6    the United States to help the Government in a prosecution.

7    In other words, in pursuing a case against others, correct?

8    A.  Yes.

9    Q.  Yeah.  In fact, you're still in the United States

10   because you're testifying against all of these people,

11   right?

12   A.  Yes.

13   Q.  And if you didn't testify against these Defendants you

14   would not be in this country, is that correct?

15   A.  Yes.

16   Q.  And you know that if you said that you did this

17   voluntarily, that you wanted to do this for economic

18   reasons, that you would not be in this country right now

19   they would have deported you, is that correct?

20   A.  Yes.

21   Q.  And now you're not only pursuing continued presence, but

22   now you're pursuing a T Visa, is that correct?  Is that

23   correct?

24   A.  Yes.  That's correct.

25   Q.  And if you were -- if you were forced -- forced or

1     coerced into prostitution in the United States, and if the

2     Government supports that position, you can stay in this

3     country for another four years, is that correct?

4              THE INTERPRETER:  May you repeat that question,

5     please?

6              MR. SICOLI:  Sure.

7     BY MR. SICOLI:

8     Q.  If you were forced or coerced in prostitution in the

9     United States, meaning you didn't do that voluntarily, and

10    the Government supports that position, you could be granted

11    a T Visa and be allowed to stay in the United States for at

12    least four years?

13    A.  I don't understand the question.

14    Q.  Sure.  If you're granted a T Visa, you can stay in the

15    United States for another four years, at least, is that

16    correct?

17    A.  I don't think so.

18    Q.  All right.  So you're -- it's your understanding that if

19    you're granted a Visa, a T Visa, that you're not going to be

20    allowed to stay in the United States?

21    A.  I would be able to stay.

22    Q.  And right now, are you working?

23    A.  No, I'm not.

24    Q.  All right.  And if you get a T Visa, you would be

25    allowed to work, correct?

```
 1    A.  Yes.

 2    Q.  And if you're not working right now, how are you

 3    supporting yourself?

 4    A.  I have -- I have a boyfriend who's taking care of me.

 5    Q.  Okay.  And so you're not getting any assistance from the

 6    Government right now?

 7    A.  No, I'm not.

 8    Q.  All right.  And you said you're having a good life in

 9    Las Vegas?

10    A.  Yes.

11    Q.  Las Vegas is fun, right?

12    A.  Yes.  It's fun.

13    Q.  And if you get a T Visa, you also might be able to bring

14    your daughter over here, is that correct?

15    A.  Yes.

16    Q.  And that's a -- that's what you would like to do, right?

17    A.  Yes.

18    Q.  If you also get a T Visa, you might qualify for

19    Government benefits, too, correct?

20    A.  Yes.

21    Q.  You might qualify for health insurance aid if you need

22    health insurance, correct?

23    A.  Yes.

24    Q.  You might also get housing assistance if you need it?

25    A.  I don't really know.
```

```
 1   Q.  Okay.  But you know you could get some benefits, is that

 2   correct?

 3   A.  Yes.

 4            MR. SICOLI:  Thank you.  I have no further

 5   questions, Your Honor.

 6            THE COURT:  Additional questions by any Defense

 7   Counsel?

 8            MR. GUERRERO: I have just a couple but I don't

 9   know if you want to --

10            THE COURT:  We'll go forward.  We have no

11   redirect.  I'd like to finish her before we recess for the

12   day.

13              C R O S S - E X A M I N A T I O N

14   BY MR. GUERRERO:

15   Q.  Ms. Sonprasit, I want to just ask you a couple questions

16   about your marriage.  You testified you got married?

17   A.  Yes.

18   Q.  And when you did get married?

19   A.  I was married on November 20th.

20   Q.  What year?

21   A.  2014 at the time.

22   Q.  And how long were you married?

23   A.  I was married for about almost two years.

24   Q.  And you got married because you wanted to get some

25   authorization to stay here in the United States?
```

1    A.  Yes.

2    Q.  Did you love this man?

3    A.  No, I did not.

4    Q.  So this is what we would call a fake marriage?

5    A.  Yes.

6            MR. GUERRERO:  Thank you.  Nothing further.

7            THE COURT:  I think are there -- go ahead,

8    Counsel?

9            MR. GERDTS:  Thank you, Your Honor.

10              C R O S S - E X A M I N A T I O N

11   BY MR. GERDTS:

12   Q.  Madam, have you ever met Pawinee Unpradit?

13   A.  No.  I never met her.

14           MR. RIVERS:  Just one or two.

15              C R O S S - E X A M I N A T I O N

16   BY MR. RIVERS:

17   Q.  You got married just before that your Visa had expired,

18   right?

19   A.  Yes.

20   Q.  And when it expired, you applied for a Visa, right?

21   A.  Yes.

22   Q.  And on that application it asked you specifically if you

23   had engaged in prostitution in the last ten years, right?

24   A.  Yes.

25   Q.  You signed the form and you said in that form that you

1    had not, correct?

2    A.  Yes.

3    Q.  And as part of that application you had to submit

4    photographs of your life with this person you married, Mr.

5    Maki, right?

6    A.  Yes.

7    Q.  And these pictures included the two of you riding a

8    go-kart, right?

9    A.  Right.

10   Q.  It showed you at his house at a barbecue, is that

11   correct?

12   A.  Yes.

13   Q.  It showed you at temple with him, correct?

14   A.  Yes.

15   Q.  And it showed a whole host of photos.  Were those real

16   photos or were those all staged?

17   A.  They were real photos.

18   Q.  And you don't know Ms. Wanless?  You've never met her in

19   your life, right?

20   A.  I never met her.

21             MR. RIVERS:  No further questions.

22             MR. ENGH:  No questions.

23             MS. WILLIAMS:  Briefly, Your Honor.

24             R E D I R E C T   E X A M I N A T I O N

25   BY MS. WILLIAMS:

1    Q.  I forgot to ask you the first time around, because I

2    think I was doing too many things.  Your case got dismissed,

3    right?

4    A.  Yes.

5    Q.  Did I promise you when you told me everything that had

6    happened that I would dismiss your case?

7    A.  No, you did not.

8    Q.  What was the only thing I asked you for?

9    A.  To tell the truth.

10   Q.  Has the Government ever asked you for anything else?

11   A.  No.

12   Q.  You were charged with conspiracy to commit Visa fraud.

13   Did you do that?

14   A.  Yes, I did.

15   Q.  Were you willing to plead guilty to that?

16   A.  Yes, I was.

17   Q.  But we decided to dismiss the case.

18        Let's clear up a few things about your status.  Do

19   you remember Bill's attorney asking you a bunch of questions

20   about how T Visas worked?

21   A.  Yes.

22   Q.  Do you really understand very well how T Visas work?

23   A.  No, I do not.

24   Q.  Were you just agreeing with him because he sounded

25   really sure of what he was saying?

```
 1                MR. GUERRERO:  Objection, leading.

 2                MS. WILLIAMS:  That's absolutely fair.

 3                MR. SICOLI:  I could list all the objections.

 4                THE COURT:  Well, that's enough.

 5                I'll -- I'll allow the inquiry.  Rephrase the

 6       question.

 7       BY MS. WILLIAMS:

 8       Q.  Why did you agree with all the things Defense Counsel

 9       was saying?

10       A.  Because I -- even if I didn't understand, I just

11       wanted to just make it pass.

12       Q.  Just making it pass.  Is that something you did a lot

13       when you were brought to the United States?

14                MR. RIVERS:  Objection.  Beyond the scope.

15                MS. WILLIAMS:  It's not beyond the scope.

16                THE COURT:  It goes to the issues of credibility

17       all raised.  I'll allow it.  Even if it is beyond the scope,

18       I'll allow it.

19       BY MS. WILLIAMS:

20       Q.  Is that something you did a lot, Jenn, just make it

21       pass?

22       A.  Yes.

23       Q.  And when we met, when you were arrested, you had status

24       in this country through your marriage, right?

25       A.  Yes.
```

1    Q.  You -- you admitted that was a fake marriage, but in

2    terms of fake marriage, did you still have to have sex with

3    him?

4    A.  Yes, we did.

5    Q.  And was that a violent marriage?

6    A.  Yes, it was.

7    Q.  You're happy to be out of that marriage?

8    A.  I'm happy.

9    Q.  You were asked about bringing your daughter to this

10   country.  Where does your daughter live?

11   A.  In England.

12   Q.  And is she a UK citizen?

13   A.  Yes.

14           MR. RIVERS:  Your Honor, I'm going to object

15   projecting images on the screen.

16           MS. WILLIAMS:  I don't think Ms. Provinzino's

17   attempting to do that.

18           THE COURT:  I'm just assuming they're trying to

19   get something on the screen.

20           MS. PROVINZINO:  Could we close the monitor down?

21           THE COURT:  I think -- can't you do that from

22   there?

23           MR. GERDTS:  No, Your Honor.  It's up there

24   somewhere.

25           THE COURT:  Okay.  This is a different.  Let me

```
 1    close that down.
 2              MS. WILLIAMS:  Okay.  I'm going to need that.
 3    BY MS. WILLIAMS:
 4    Q.  Did you -- do you remember Bill's attorney asking you
 5    questions about how Bill taught you to be nice to the
 6    customers?
 7    A.  Yes, I do.
 8    Q.  What did Bill tell you to do if a customer came in and
 9    was violent with you?
10    A.  He didn't tell anything.
11    Q.  For that one -- for that violent customer, what would
12    you do?
13    A.  I wouldn't tell anyone.
14    Q.  You would endure it?
15    A.  Yes.
16    Q.  Defense Counsel characterized you having sex as a
17    win/win situation -- I'm sorry, anal sex as a win/win
18    situation for you.  Did that feel like a win for you?
19    A.  No.  It was not a win.
20    Q.  And, finally --
21              MS. WILLIAMS:  And we can do this the
22    old-fashioned way if I can't get it going.  May I approach,
23    Your Honor?
24              THE COURT:  You may.
25    BY MS. WILLIAMS:
```

1    Q.  Defense Counsel asked you some questions about

2    Government's Exhibit 1215.  That's the ad from Minnesota, is

3    that right?

4    A.  Yeah.

5    Q.  And he said -- he said -- well that was from after your

6    debt, right?

7    A.  Yes.

8    Q.  Okay.  Until Mark tells me otherwise we're going to do

9    it this way.

10            The first page of the exhibit, that says

11    January 9th, 2014, right?

12    A.  Yes.

13    Q.  Let's dig a little deeper.  I'm going to publish

14    Government's 1215, already in evidence.

15            So the first page does say January 9th, 2014.

16    Let's go down to the third page.  These are additional

17    photos of you, Jenn?

18    A.  Yes.

19    Q.  Taken in Thailand?

20    A.  Yes.

21    Q.  And this has the date the ad was first created, is that

22    July 25th of 2015?

23    A.  Yes.

24    Q.  So that would have been after you came?

25    A.  Yes.

1   Q.  And then the ad was posted again, and again, and again,
2   and again, is that right?
3   A.  Yes.
4           MS. WILLIAMS:  No further questions, Your Honor.
5           THE COURT:  Any additional?
6           MR. SICOLI:  I just have one question, Your Honor.
7           THE COURT:  All right.
8               R E C R O S S   E X A M I N A T I O N
9   BY MR. SICOLI:
10  Q.  Just -- just to clarify, when you were asked by Bill
11  whether you do anal sex, you said no, right?
12  A.  Yeah.
13  Q.  And you didn't have anal sex then when you were at
14  Bill's house?
15  A.  I did.
16  Q.  So then you decided to do it to make extra money?
17  A.  I had to do it.
18  Q.  Okay.  So now you had to do it, before you said you
19  didn't do it, but now you had to do it?
20  A.  It was necessary.
21          MR. SICOLI:  Thank you.
22          THE COURT:  Anything else by Defense Counsel?
23          MR. GERDTS:  No.
24          THE COURT:  Nothing?  All right.
25          You may step down.  Thank you.

1          Okay.  We're going to stand in recess.  I -- I --

2     it was my decision -- I think in fairness to everyone,

3     including you the jury, even though we spilled past 5:00 to

4     finish a witness, so we don't kind of finish in the middle

5     of something in fairness to everyone.  And we stand in

6     recess.

7          Two things.  One, you've heard me say once or

8     twice in the last couple days, one -- and I acknowledge that

9     Lori Sampson had asked me that one or more had asked you,

10    and it is a rule not unique to this case, and I'll explain

11    why, that we request that you not discuss even with each

12    other, or even one or two of you.

13          And even in the privacy of the deliberation

14    room -- or the jury room, an aspect to the evidence, or a

15    witness -- the whole -- the importance of that is until

16    you've heard or seen everything.

17          You can take as many notes individually as you

18    want, so you can refresh your memory if there's something --

19    if you want to make sure you discuss with -- and I'll talk

20    about that at the end of the trial.

21          But, yes -- so to the extent one or more of you

22    ask Ms. Sampson, well, was he -- did he say that we really

23    can't even with one another discuss until we've heard and

24    seen everything?  The answer is yes to that.

25          Because it maximized fairness and context until

1    everything has been put before you.

2              Now, on the calendar that you received when you

3    appeared on Monday, it said anticipated adjournment date at

4    noon tomorrow.

5              I anticipate we may go into the early afternoon.

6    And I just didn't -- I want to make sure people understand,

7    because we are going to -- our witness is going to be called

8    and I want to make certain that we don't -- that -- that

9    however long the direct and cross takes, that -- in other

10   words, especially when we'll be down on Friday and Monday's

11   a federal and national holiday.

12             So we will go until we're done with the witnesses

13   being called.  And I anticipate it will be

14   early-to-midafternoon, and then we'll recess at that time.

15             I just wanted to let you know that, depending on

16   what -- because on that original calendar it says noon.  And

17   that actually wasn't at the request that -- of the parties,

18   but was my schedule.  But I actually felt obligated to

19   change it in fairness to everyone that we are going to start

20   and finish the witness.

21             It would be different if it was a witness which

22   happens one out of every hundred trials where someone's on

23   the stand for a couple of days at a time.  That's indeed

24   rare.

25             So we -- I'd like to start and finish this witness

1    in fairness -- both so you get the whole -- all the

2    testimony and all the lawyers can ask their questions. Then

3    we'll be adjourning.

4          And in all other respects, the calendar is

5    accurate about Friday and Monday.

6          So with that, safe travels.  Even though I'm sure

7    it's -- I haven't looked outside, it's probably dark.  I

8    don't know.  But I don't know, I hope it's not snowing out.

9          So have a good evening, and I'll see you in the

10   morning.  We are in recess.  Rise for the jury, please.

11          (Court adjourned at 5:22 p.m.)

12                REPORTER'S CERTIFICATE

13

14

15          I, Lynne M. Krenz, do certify the foregoing
     pages of typewritten material constitute a full, true and
     correct transcript of my original stenograph notes, as they
16   purport to contain, of the proceedings reported by me at the
     time and place hereinbefore mentioned.

17

18                /s/Lynne M. Krenz
                  Lynne M. Krenz, RMR, CRR, CRC
19
     Date:  November 22, 2018.
20

21

22

23

24

25