```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
 2    ------------------------------------------------------------
                                      )
 3    United States of America,       )   File Nos.
                                      )   17CR107(1)(4)(5)(16)
 4            Plaintiff,              )   (20)
                                      )            (DWF/KMM)
 5    vs.                             )
                                      )
 6    Michael Morris, Pawinee         )   St. Paul, Minnesota
      Unpradit, Saowapha Thinram,     )   November 13, 2018
 7    Thoucharin Ruttanamongkongul    )   10:06 a.m.
      and Waralee Wanless,            )
 8                                    )
              Defendants.
 9    ------------------------------------------------------------
          BEFORE THE HONORABLE DONOVAN W. FRANK AND A JURY
10            UNITED STATES DISTRICT COURT JUDGE
              (TRIAL TESTIMONY OF CHUDAKAN NGAOPOOTHONG)
11
      APPEARANCES
12    For the Plaintiff:         United States Attorney's Office
                                 Laura Provinzino, AUSA
13                               Melinda Williams, AUSA
                                 300 S 4th Street, Suite 600
14                               Minneapolis, Minnesota 55415

15    For Defendant Michael      Sicoli Law, Ltd.
      Morris:                    Robert Sicoli, ESQ.
16                               333 South Seventh Street
                                 Suite 2350
17                               Minneapolis, MN 55402

18    For Defendant Pawinee      Daniel L. Gerdts, ESQ.
      Unpradit:                  331 Second Avenue South
19                               Suite 705
                                 Minneapolis, MN 55401
20
      For Defendant Saowapha     Paul C. Engh, ESQ.
21    Thinram:                   200 South 6th Street
                                 Suite 420
22                               Minneapolis, MN 55402

23    For Defendant              Meshbesher & Spence, Ltd.
      Thoucharin                 Daniel Guerrero, ESQ.
24    Ruttanamongkongul:         1616 Park Avenue South
                                 Minneapolis, MN 55404
25
```

1    For Defendant Waralee      Rivers Law Firm
     Wanless:                   Bruce Rivers, ESQ.
2                               701 4th Avenue South
                                Suite 300
3                               Minneapolis, MN 55415

4    Court Reporter:            Lynne M. Krenz, RMR, CRR, CRC
                                Suite 146
5                               316 North Robert Street
                                St. Paul, Minnesota 55101
6
     Interpreter:               Phouratsaphone (Paul) Littana
7                               Nokon (Bee) Nimit

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**                      **Page**

2    **GOVERNMENT'S WITNESS CHUDAKAN NGAOPOOTHONG**
     Direct Examination by Ms. Provinzino................... 6
3    Cross-Examination by Mr. Sicoli........................110
     Cross-Examination by Mr. Engh..........................136
4    Cross-Examination by Mr. Gerdts........................142
     Redirect Examination by Ms. Provinzino.................144
5    Recross Examination by Mr. Sicoli......................152
     Recross Examination by Mr. Engh........................153

6

7    **GOVERNMENT'S EXHIBITS**                          **RECEIVED**
     Exhibit 8CK............................................ 43
8    Exhibit 28A provisionally..............................108
     Exhibit 120............................................ 16
9    Exhibit 176............................................ 86
     Exhibit 475............................................ 26
10   Exhibit 1004........................................... 48
     Exhibit 1005........................................... 84
11   Exhibit 1006........................................... 47
     Exhibit 1017........................................... 84
12   Exhibit 1018........................................... 61
     Exhibit 1034........................................... 41
13   Exhibit 1065........................................... 36
     Exhibit 1066........................................... 90
14   Exhibit 1067........................................... 57
     Exhibit 1068........................................... 60
15   Exhibit 1069........................................... 30
     Exhibit 1070........................................... 33
16   Exhibit 1410........................................... 50

17

18

19

20

21

22

23

24

25

US v. Bui-Al Hamadie - Jury Trial - Vol. 3 of 6

1            **P R O C E E D I N G S**

2               **IN OPEN COURT**

3      (Defendants present)

4           THE COURT:  Before the Government calls their next

5      witness, a couple of things.

6           One, we haven't changed time zones, so it isn't

7      9:00.  It is a little after 10:00.

8           On a serious note, obviously the lawyers and

9      everyone's been with me since 8:30.  So if you're wondering,

10     well, is the Judge waiting for somebody to appear, no.

11          It's a Judge's responsibility, which means mine,

12     to manage the case and make decisions on, Well, when does a

13     Judge decide to address certain issues or discuss to the

14     lawyers.

15          So I have no doubt that some of you were probably

16     a little -- may have been wondering or frustrated.  That

17     should be placed on my shoulders, not the Government's

18     Counsel, not the Defendant's Counsel.

19          And however you feel like, I can tell you that

20     it's not a lack of respect by anyone for each of you, and

21     the time you're giving in our jury system.

22          But that responsibility rests on my shoulders.

23          And also, not on Ms. Sampson's or any of the

24     lawyers -- or just not any of the lawyers or her as well.

25     That's on my shoulders because I make a decision to discuss

1    certain issues or bring up certain things with Counsel.

2            So it's -- on the one hand, it's not unique to a

3    trial for this to happen from time to time.  But on the

4    other hand, I accept it's my responsibility to minimize

5    those so we can respect your time.

6            And even if you probably weren't going to go for a

7    walk in this nice, warm, balmy weather this morning.

8            So with that, the Government can call its next

9    witness.

10           MS. PROVINZINO:  Thank you, Your Honor.

11           The United States calls Chudakan Ngaopoothong.

12           THE COURT:  If you could step forward now to the

13   front of the courtroom in front of big screen.

14           If you would please raise your right hand.

15           (Sworn.)

16           THE COURT:  And for the record, the witness nodded

17   her head.  She may take the stand, please.  And watch for

18   the two steps there.

19           THE WITNESS:  Yes.

20           THE COURT:  And you can sit behind that -- go to

21   the bigger chair, please.

22           And as I tell every witness, you'll have to move

23   the microphone close, and the chair.  And maybe the

24   interpreter can help you get the microphone close, otherwise

25   that won't pick you up, it's not the -- is the little green

```
1    light on that, too, if we can see?

2              THE INTERPRETER:  Yes, Your Honor.

3              THE COURT:  If you would please state your full

4    name for the record and spell your last name, please.

5              THE WITNESS:  Chudakan Ngaopoothong,

6    C-H-U-D-A-K-A-N, N-G-A-O-P-O-O-T-H-O-N-G.

7              THE COURT:  You may inquire, Counsel.

8              MS. PROVINZINO:  Thank you, Your Honor.

9                D I R E C T   E X A M I N A T I O N

10   BY MS. PROVINZINO:

11   Q.  Good morning.  Ms. Ngaopoothong, where are originally

12   from?

13   A.  Bangkok, Thailand.

14   Q.  And you have a very long Thai name.  Do you have a Thai

15   nickname?

16   A.  It was Sai.

17   Q.  Okay.  And while you were here in the United States,

18   involved in prostitution activities, were you given any

19   working names?

20   A.  Yes, I did.

21   Q.  And what were those working names?

22   A.  Venus.  Paris.  Sandy.

23   Q.  And which name do you prefer for our testimony today?

24   A.  Sai.

25   Q.  And would you spell Sai for the record?
```

1    A.  S-A-I.

2    Q.  Okay.  And Sai, is it the case that you speak some

3    English, but Thai is your first language?

4    A.  Yes.

5    Q.  And for today's proceedings, we'll use an interpreter to

6    translate from English to Thai, is that acceptable?

7    A.  Yes.

8    Q.  So Sai, let's start with some background on you.

9    A.  Yes.

10   Q.  You said you were from Bangkok?

11   A.  Yes.

12   Q.  And is that where you grew up?

13   A.  Yes.

14   Q.  And when you were young, what did your parents do for a

15   living?

16   A.  My mother was a housewife.  My father was working for

17   hire.

18   Q.  And could you describe what working for hire is?

19   A.  He drove taxi.

20   Q.  Did you have any siblings?

21   A.  I have one younger sister.

22   Q.  And how far did you go in school, Sai?

23   A.  To high school.

24   Q.  And after you completed high school, did you start

25   working?

1    A.  Yes.

2    Q.  And what job did you have?

3    A.  I sold clothes.

4    Q.  Did you work in a store?  Or where did you do that?

5    A.  At a store.

6    Q.  And then how -- how many years did you work in that

7    clothing store?

8    A.  Three years.

9    Q.  And then did any significant things happen in your life?

10   A.  I got married.

11   Q.  You got married.  Did you have any children?

12   A.  I have two sons.

13   Q.  And how old are your sons, Sai?

14   A.  Right now the oldest is 26 years-old.  The youngest

15   one 23 year old.

16   Q.  And are you and your husband, the father of your

17   children, still together?

18   A.  No.  We have separated.

19   Q.  And how old were your children when you separated?

20   A.  The oldest one was 6 years old.

21   Q.  Is your ex-husband still alive?

22   A.  No.  He is -- he is not.

23   Q.  Now, while you were married, and then after you

24   separated, what jobs did you have, Sai?

25   A.  I opened a store selling clothes.  I also -- I was

1    also selling food.

2    Q.   Okay.  Approximately how much money did you make doing

3    that work with your store and selling food?

4    A.   About 20,000 baht a month.

5    Q.   Is that roughly 600 U.S. dollars, give or take?

6    A.   Yes.

7    Q.   Now at some point in time you started to work at a

8    massage store, is that right?

9    A.   Yes.

10   Q.   And when did you start doing that, Sai?

11   A.   About -- about five years ago.

12   Q.   And can you explain to the jury what your job was,

13   working at the massage store?

14   A.   It was a Thai massage store.  I started working at

15   11:00 a.m. until 10:00 p.m.

16   Q.   And how many days a week would you work?

17   A.   Five days a week.

18   Q.   And at the end of the day, where would you go?

19   A.   I went home.

20   Q.   And why did you start working at the massage store?

21   A.   At the time my parents got ill.

22   Q.   Could you tell the jury what happened to your parents?

23   A.   My mother has got ill having a disease called SLE.

24   And my father had got cancer.

25   Q.   Now, did you have any responsibilities towards your

1    parents relating to their illness?

2    A.  Yes.

3    Q.  And what were those responsibilities?

4    A.  I had to pay some of the medical expenses.

5    Q.  And what happened to your mother, Sai?

6    A.  After that year, my mother passed away.

7    Q.  And did that happen while you were still in Thailand?

8    A.  Yes.

9    Q.  And you were continuing to work at the massage store, is

10   that right?

11   A.  Yes.

12   Q.  And what was the status of your father's health, Sai?

13   A.  He still needed some care.

14   Q.  And what did you do to help your father during that

15   time?

16   A.  I was working at massage.  And then used that money

17   to help him with the medical care.

18   Q.  Is your father still alive, Sai?

19   A.  No, he's not.

20   Q.  And when did he die?

21   A.  26th of August.  This year.

22   Q.  So very recently?

23   A.  Yes.

24   Q.  Sorry.  Now in the massage store that you worked at in

25   Thailand, were you involved in any kind of commercial sex

1   activity?  Like providing hand jobs to clients?

2   A.  No.  No, I didn't.

3   Q.  And was there any kind of uniform or outfit that you

4   would have to wear to work at the massage store?

5   A.  Yes, there was.

6   Q.  And can you describe that to the jury?

7   A.  It was a long-sleeved shirt and a tie skirt.  It was

8   a long -- a long dress.

9   Q.  And is that part of a traditional massage uniform?

10  A.  Yes.

11  Q.  So you weren't involved in any kind of sex work at the

12  massage store, right?

13  A.  No.  It's not -- no, I did not do that.

14  Q.  And not anywhere else in Thailand or in any other

15  country, is that right?

16  A.  Yes.

17  Q.  So at what point did you hear about an interest in

18  recruiting women to come work in the United States?

19  A.  At the massage store.

20  Q.  And what did you learn?

21  A.  I don't understand the question.

22  Q.  So you learned about recruitment of women to come to the

23  United States at the massage store.  Who did you learn that

24  from, Sai?

25  A.  From a friend that worked together.

1   Q.  And that was a woman who worked at the massage store

2   with you?

3   A.  Yes.

4   Q.  And what did she tell you about the recruitment to the

5   United States?

6   A.  She said that come and hear this job to do.

7   Q.  And what type of job was it?

8   A.  There was Thai massage.  Many other things.  There is

9   dishwashing, housemaid, and picking fruits.

10  Q.  Now, who was this friend that told you about Thai

11  massage, dishwashing, picking fruits and other jobs in the

12  United States?

13  A.  Do I have to tell the name?  Do I have to say the

14  name?

15  Q.  What was the name of your friend in Thailand who told

16  you about this?

17  A.  Her name was Fon.

18  Q.  And there's a defendant in this case who has that same

19  nickname, Fon.  Is that the same person?

20  A.  No.

21  Q.  Now, did your friend Fon from the massage store

22  introduce you to other people?

23  A.  Yes.

24  Q.  Who did she introduce you to?

25  A.  Tu.

1    Q.  Tu?  And is Tu a male or a female?

2    A.  A male.

3    Q.  And do you know his real name, Sai?

4    A.  No, I do not.

5    Q.  And what did Fon tell you about Tu?

6    A.  She had me contact with this man.

7    Q.  And did you contact Tu?

8    A.  Yes, I did.

9    Q.  Did you meet with Tu?

10   A.  Yes, I did.

11   Q.  And where did you meet with him?

12   A.  At a mall on Terminal 21.

13   Q.  Now, was that a shopping mall in Bangkok?

14   A.  Yes.

15   Q.  And what happened when you met with Tu at that shopping

16   mall?

17   A.  So he was agreed to sent me over here.

18   Q.  What did he tell you about coming to the United States?

19   A.  He asked me to prepare documentation.

20   Q.  What type of documentation did he ask for?

21   A.  There's national Thai registration, I.D., national

22   house registration, and a book bank, and an ATM.

23   Q.  Why did he need those documents, Sai?

24   A.  He needed all that so that he could apply for a Visa

25   application.

1    Q.  Now, you mentioned he wanted your national I.D. card.

2    What information is on your national I.D. card?

3    A.  There was my real name, my real last name, and my

4    address.

5    Q.  And what about the national house registration?

6    A.  On -- on the house registration, there was my

7    father's name, my mother's name, my own name, and the

8    house number.

9    Q.  Who was living with you at the house on the house

10   registration, Sai?

11   A.  There were my sons, two.

12   Q.  Your children lived with you there?

13   A.  Yes.

14   Q.  What about your parents?

15   A.  My father lived with me, but his name on a different

16   house registration.

17   Q.  Okay.  Now Tu explained he needed all those documents to

18   prepare the Visa.

19        What did he need your bank account information

20   for?

21   A.  He said that he wanted it to walk the account to run

22   the money in and run the money out.

23   Q.  So that means there would be money coming in and out to

24   make it look like you had income?  Is that what he meant by

25   walking the money through?

```
1    A.  Yes.

2    Q.  Now before you met Tu, Sai, had you ever traveled

3    outside Thailand?

4    A.  No, I never had.

5    Q.  So let's talk a little bit about that Visa process.

6          Sai, who completed the paperwork for your

7    application?

8    A.  People from Tu's.

9          MS. PROVINZINO:  May I approach, Your Honor --

10         THE COURT:  You may.

11         MS. PROVINZINO:  -- with Government Exhibit 120?

12   BY MS. PROVINZINO:

13   Q.  Sai, I'm handing you what's been premarked as Government

14   Exhibit 120.

15         And I'll have you turn to the second page.  And

16   see if you can identify whose record that is?

17   A.  It was mine.

18   Q.  That's your picture and your name, is that right?

19   A.  Yes.

20         MS. PROVINZINO:  The Government moves the

21   admission of Exhibit 120.  It's a certified public record?

22         MR. GERDTS:  No objection, Your Honor.

23         MR. GUERRERO:  No objection.

24         MR. SICOLI:  No objection.

25         MR. ENGH:  No objection.
```

 1          THE COURT:  That's received, 120.

 2    BY MS. PROVINZINO:

 3    Q.  All right.  And Sai, I will show this document to the

 4    jury.  AND you also have a copy in front of you --

 5          THE COURT:  And for the record, without

 6    emphasizing or deemphasising the witness or the witness, at

 7    the request of some of you, you had asked for if the Judge,

 8    last week could turn the light one setting so you can see

 9    the screen a little bit better.  So I'm going to turn it

10    down.  You can continue, because it's right here.

11          MS. PROVINZINO:  Thank you, Your Honor.

12    BY MS. PROVINZINO:

13    Q.  So move to the side of that page you were looking at.

14    And I'll make this record a little bit bigger for the jury

15    to see, and that's your picture, is that right?

16    A.  Yes.

17    Q.  And your name?

18    A.  Yes.

19    Q.  All right.  And this also, I believe, lists -- is that

20    your true date of birth here April 15, 1972?

21    A.  Yes.

22    Q.  So we go through some of the information in this

23    document.  And I'm going to proceed to the next page.  This

24    is Page 3 on Government Exhibit 120.

25          And you see this document lists an employer.  Do

1    you see that?  That you were working with a Vet and Vitro

2    Central Lab Company Limited.   Is that where you worked Sai?

3    A.  No, it wasn't.

4    Q.  How did Tu get that information to list your employer as

5    the Vet and Vitro Central Lab Company?

6    A.  It was a company where my son was working at.

7    Q.  We'll scroll down to the next page.  And there's -- why

8    don't you go to the last page first.

9           And there's information listed in here, Sai, that

10   includes your address and phone.  Do you see that?

11   A.  Yes.

12   Q.  And that's the information you provided to Tu, is that

13   correct?

14   A.  Yes.

15   Q.  The information of your house registration, is that

16   right?

17   A.  Yes.

18   Q.  Then there's also a column that I'll make a little

19   larger for the jury to see that says, "Family."

20   A.  Yes.

21   Q.  And do you see that information in front of you?

22   A.  Yes, I do.

23   Q.  And it lists what appears to be your father's first and

24   last name, and date of birth, is that accurate?

25   A.  Yes.

1   Q.  And the same for your mother?

2   A.  Yes.

3   Q.  And within that section on family, there's a portion

4   dealing with spouses.

5           And there's a very long Thai name listed there as

6   your spouse, your husband's full name.  And was that your

7   husband?

8   A.  Yes.

9   Q.  And at the time of the application for this Visa, were

10  you still married to him?

11  A.  We had separated.

12  Q.  Did he know that his information was put in this Visa

13  application?

14  A.  No, he did not.

15  Q.  So how did that information get in the Visa application?

16  A.  It was probably coming out from my child's birth

17  certificate.

18  Q.  You're mentioning your child's birth certificate, is

19  that information that Tu had?

20  A.  Yes.

21  Q.  I'm going to flip back up one page to Government

22  Exhibit 120, Page 4.

23          And I'm going to make it a little easier to see

24  this information about travel.

25          And can you see that, Sai?

1   A.  Yes, I do.

2   Q.  And it's listing intended dates of travel for April,

3   2015, is that right?

4   A.  Yes.

5   Q.  And were you intending to travel to a Holiday Inn in

6   Binghamton, New York?

7   A.  No, I didn't.

8   Q.  How is that information on your Visa application?

9   A.  The two sides were the one that handled all of this.

10  Q.  And what did you learn about that travel or that

11  anticipated travel to the Holiday Inn in New York?

12  A.  I didn't know anything.

13  Q.  There's also a name of a travel companion, another Thai

14  name, Sirawan Hongladaromp.  Do you see the travel companion

15  section?

16  A.  Yes, I see it.

17  Q.  And did that individual travel with you?

18  A.  No that person didn't.

19  Q.  So it looks like Tu -- or the people he worked with

20  prepared the Visa application, is that right?

21  A.  Yes.

22  Q.  Did he share it with you?  Or did you have an

23  opportunity to review it before it was submitted?

24  A.  He did.  Yes, he did.

25  Q.  Okay.  And at some point, then, did he alert you to a

1  Visa interview in Bangkok?

2  A.  Yes.

3  Q.  Did anyone go with you to that interview?

4  A.  No.  There was nobody.

5  Q.  Did you receive any information to prepare you for the

6  interview?

7  A.  Yes, I did.

8  Q.  And what information did you receive?

9  A.  It was all the paperwork.  And also the documents of

10  the person who was my travel companion.  And then also

11  the tour document.  Yes.

12  Q.  And how did you receive that information?

13  A.  There was a motorcycle taxi deliver it to me.

14  Q.  So you received that information and then you went in

15  for your interview?

16  A.  Yes.

17  Q.  Tell the jury about the Visa interview.

18  A.  So, I would go and get in line in the place where I

19  would ask for a Visa processing.  And then I went inside.

20  I would follow the instruction.

21  Q.  And did you follow the instructions that Tu had given

22  you?

23  A.  Yes.  Because in there there would be steps to do

24  when you ask for a Visa.

25  Q.  So what steps did you have to follow, Sai?

 1    A.  When you arrive there, you would receive a number,

 2    what queue you were at for coming in for submitting

 3    paperwork.  Then I would hand in the paperwork.  And then

 4    I would come out and waiting for the -- the interview.

 5    Q.  Okay.  And you must have answered all the questions the

 6    way Tu had intended because you got your Visa, is that

 7    right?

 8              MR. GUERRERO:  Objection, leading.

 9              THE COURT:  I'll sustain as to form.  I'll allow

10    the inquiry.

11    BY MS. PROVINZINO:

12    Q.  Did you learn that you received a Visa?

13    A.  Yes.

14    Q.  How did you learn that?

15    A.  The officers told me.

16    Q.  Did you receive your passport and the Visa in the mail?

17    A.  Yes.

18    Q.  And where was it sent?

19    A.  I -- I do not know.

20    Q.  So I'll put Government Exhibit's 120 back up.  Page 2,

21    and then this is the memo line.

22              So the memo line reads, "Married, 2 children.

23    Veterinarian for several years.  Good income.  Credible.

24    Issuing."  Is that right?

25    A.  Yes.

```
 1    Q.  But you know that not all the information in your

 2        application was true, is that right?

 3    A.  Yes.

 4    Q.  So once you got your Visa, it was approved, did Tu tell

 5        you anything about what you would be doing in the United

 6        States?

 7    A.  He did.

 8    Q.  And what did he tell you, Sai?

 9    A.  He said to me to come and work in massage store.

10    Q.  So how did he describe the work that you would be doing?

11    A.  He said I could just massage alone.

12    Q.  Okay.  And by you saying that, does it mean you didn't

13        have to do any kind of sex work?

14    A.  Yes.

15    Q.  So you understand -- you understood you could come and

16        do massage work just like you were doing in Bangkok, is that

17        right?

18    A.  Yes.

19    Q.  Now when you met with Tu and talked about work in the

20        United States, was there any type of written document or

21        contract?

22    A.  No, there was none.

23    Q.  Did he tell you anything about a debt you would owe?

24    A.  He did.

25    Q.  And what did he tell you about a debt?
```

1    A.  It was the expenses for document and the traveling,

2    everything.

3    Q.  So the expenses for the document and the traveling.  How

4    much would you have to pay Tu back for that?

5    A.  55,000 U.S. dollars.

6    Q.  Did he tell you how long it would take to pay off the

7    debt of 55,000 U.S. dollars?

8    A.  No, he didn't.  He didn't limit the time.

9    Q.  Did he say -- did you have any idea of how long you'd

10   have to work to pay that off?

11   A.  He said about seven months to a year.

12   Q.  And did Tu warn you about what would happen if you

13   didn't pay the debt?

14           MR. ENGH:  Objection, leading.

15           MR. GUERRERO:  Objection, leading.

16           THE COURT:  I'll allow it.  If you understand the

17   question you may answer it.

18   A.  Yes, he did.

19   BY MS. PROVINZINO:

20   Q.  And what did he tell you?

21   A.  He said he knew where my son worked and he knew where

22   my house was and that he knew where my father was.

23   Q.  Did you understand that to be a threat?

24   A.  Yes.

25   Q.  At that point in time, were you concerned about this

1    debt and this deal with Tu?

2    A.  Yes, I was.

3    Q.  Was there anything you could do about it at that time?

4    A.  No.  There was nothing.

5    Q.  Did Tu say anything about how you would repay the debt?

6    A.  I don't understand your question.

7    Q.  What did you understand about each dollar made from

8    massage work in the U.S.?  Would that go toward paying off

9    your debt?

10   A.  Yes.

11   Q.  And so how many years would it take for you to earn that

12   kind of money, approximately 55,000 U.S. dollars, working in

13   Thailand?

14   A.  Probably 20 years, up.

15   Q.  So after that conversation about the debt, did Tu send

16   you anywhere before you were able to go to the United

17   States?

18   A.  What did you mean?

19   Q.  Did you have to get any pictures taken before you could

20   come to the United States?

21   A.  Yes, I did.

22   Q.  And where did you go?

23   A.  Toilet Studio.

24   Q.  Why did you have to have pictures taken?

25   A.  He said that those pictures would be used in working.

1    Q.  And what kind of pictures were those, Sai?

2    A.  Provocative, sexy.

3    Q.  Who paid for the pictures?

4    A.  Tu did.

5    Q.  What did he do with them?

6    A.  What did you mean?

7    Q.  What did Tu do with those pictures that were taken?

8    A.  He would post the -- he would post those on the

9    internet.

10   Q.  Sai, why would you have to have those kind of

11   provocative pictures if you were just coming to the U.S.

12   just to do massage?

13   A.  He said that over there you have to use this type of

14   pictures.

15            MS. PROVINZINO:  May I approach, Your Honor?

16            THE COURT:  You may.

17            MS. PROVINZINO:  With Government Exhibit 475.

18   BY MS. PROVINZINO:

19   Q.  So I'm handing you Government Exhibit 475.  And I'll

20   give you a moment to look through what I believe are 12

21   photographs attached to an e-mail.

22            And do you recognize those photographs?

23   A.  Yes, I did.

24   Q.  And where were those photographs taken?

25   A.  At Toilet Studio.

1    Q.  And who is in those photographs?

2    A.  It's Sai.

3           MS. PROVINZINO:  At this time the Government moves

4    to admit Exhibit 475.

5           MR. SICOLI:  No objection.

6           MR. ENGH: No objection.

7           MR. GUERRERO: No objection.

8           THE COURT:  Those are received.

9           MS. PROVINZINO:  We'll publish that for the jury.

10          Government Exhibit 475, I'm going to make the

11   first page a little bit larger for the jury to see.

12   BY MS. PROVINZINO:

13   Q.  And the Sai, or the S-A-I, that appears here in the top

14   corner, that's you, is that right?

15   A.  Yes.

16   Q.  And it appears to be an e-mail from the Toilet Studio?

17   To somebody named Sirawan Burwat, or tonbm@hotmail.com.

18          Do you know who that is, Sai?

19   A.  No, I do not know.

20   Q.  And they're dated Thursday, April 9th, 2015?

21          And it contains 12 photos of you, right.  We'll

22   show one to the jury.

23          And Sai, you see there's a black box in front of

24   you?

25   A.  Yes.

1    Q.  The actual picture doesn't have that black box.  The

2    original picture taken of you at the Toilet Studio, right?

3    A.  That's correct.

4    Q.  So you have these photos taken.  And then the next step,

5    I assume, would be traveling to the United States, is that

6    right?

7    A.  Yes.

8    Q.  Who purchased your ticket, Sai?

9    A.  Tu did.

10   Q.  And when were you scheduled to travel?

11   A.  25th of May, 2015.

12   Q.  Did you travel with anyone to the United States?

13   A.  No, I didn't.

14   Q.  Did you see Tu, again before you left for the United

15   States?

16   A.  I did.

17   Q.  And tell the jury about that time you saw Tu before

18   leaving for the U.S.?

19   A.  He brought me the ticket, along with some money.

20   Q.  And where was it that you met?

21   A.  At the airport.

22   Q.  So the airport in Bangkok just before you were going to

23   depart?

24   A.  Yes.

25   Q.  So he said he brought you the ticket and some money?

1    A.  Yes.

2    Q.  How much money did he give you?

3    A.  When he was giving it to me, he said there was

4    $1,000.  But I didn't open up the envelope until I got

5    here.  I learned that it was only 900 U.S. dollars.

6    Q.  And so it was U.S. dollars?

7    A.  Yes.

8    Q.  Did he give you instructions on what to do with that

9    money?

10   A.  So he said just in case that the immigration asks to

11   see the money, and also using this money to open a hotel.

12   Q.  Now this 900, or the supposed $1,000, was that something

13   you'd have to pay back in addition to the $55,000 debt?

14   A.  No, I wasn't.

15   Q.  So that wasn't an extra expense?

16            MR. RIVERS:  Objection.  Asked and answered.

17            THE COURT:  I'll allow it.  I believe it -- it was

18   asked, but just to make sure.  You may -- you may answer, if

19   she understand the question.

20   A.  I understand the question.  When I arrived here, I

21   had to give it back.

22   BY MS. PROVINZINO:

23   Q.  So just to clarify, so the way you're describing that,

24   that's an additional $1,000 separate from the $55,000 debt.

25   Is that right, Sai?

```
 1    A.  Yes.

 2    Q.  Did you and Tu discuss how you would stay in contact

 3    when you were in the United States and he was in Thailand?

 4    A.  He bought me a SIM card that I could turn on roaming.

 5    Q.  And when you say SIM card, is that for your own

 6    particular cell phone?

 7    A.  Yes.

 8    Q.  So is the plan to continue to communicate by phone?

 9    A.  Yes.

10    Q.  And did you do that by calling and speaking on the

11    phone?  Or did you use text messages or other ways to

12    contact each other?

13    A.  We called.

14    Q.  Did he tell you anything more about the debt?

15    A.  No, he didn't.

16    Q.  Did he tell you where you would be going in the United

17    States?

18    A.  No, he didn't.

19              MS. PROVINZINO:  May I approach, Your Honor?

20              THE COURT:  You may.

21    BY MS. PROVINZINO:

22    Q.  I'm handing you Government Exhibit 1069.  Do you

23    recognize the person in the photograph for Exhibit 1069?

24    A.  Yes, I do.

25    Q.  Who is that?
```

```
 1      A.  Tu.

 2              MS. PROVINZINO:  The Government moves admission of

 3      Exhibit 1069.

 4              MR. SICOLI:  No objection.

 5              MR. GERDTS:  May I have a word with Counsel?

 6              THE COURT:  Pardon?

 7              MR. GERDTS:  May I have a word with Counsel.

 8              THE COURT:  That's okay.  Just not too close to

 9      the mic.

10              (Off-the-record discussion.)

11              MR. GUERRERO:  No objection.

12              MR. GERDTS:  No objection, Your Honor.

13              THE COURT:  1069 is received -- or excuse me, 59

14      excuse me.

15              MS. PROVINZINO:  And you're correct it was 1069.

16              THE COURT:  Right the first time.  It's received.

17              MS. PROVINZINO:  I'll publish that for the jury.

18      BY MS. PROVINZINO:

19      Q.  And this is the individual that's identified as Tu, is

20      that right?

21      A.  Yes.

22              MS. PROVINZINO:  At this time, Your Honor, it

23      might be beneficial to take a short break for the

24      interpreter and start up again in 10 minutes or so.

25              THE COURT:  All right.  We'll take a 10-minute
```

1    recess.

2              Members of the Jury, as I mentioned last week, to

3    give proper breaks for our interpreter since we don't have a

4    second interpreter at this time.  So we'll stand in recess

5    for 10 minutes.  All rise for the jury.

6              (Jurors excused at 10:57 a.m.)

7              (In open court at 11:15 a.m.)

8              THE COURT:  And the witness can retake the stand

9    when she's ready.  Whenever you're ready, Counsel.

10             MS. PROVINZINO:  Thank you, Your Honor.

11   BY MS. PROVINZINO:

12   Q.  Welcome back, Sai.  Just before we took the break, you

13   had identified Tu.  And we were just getting to the point of

14   you coming to the United States.

15             So where in the United States did you enter the

16   country?

17   A.  You mean the first time that I arrived?

18   Q.  Yes.  Where did you enter?

19   A.  LA.

20   Q.  And where did you go once you landed in LA?

21   A.  I called a taxi and I went to a hotel.

22   Q.  How long did you stay in the hotel?

23   A.  For a night.

24   Q.  And had anyone arranged that hotel for you?

25   A.  Tu keep me -- Tu gave me a business card and had me

1    booked the hotel by myself.

2    Q.  And after you stayed that night in the hotel, what

3    happened next?

4    A.  Tu called in and told me that there would be someone

5    to pick me up the next morning.

6    Q.  And did someone pick you up the next morning?

7    A.  Yes.  There was a Thai taxi who picked me up.

8    Q.  And where were you taken, Sai?

9    A.  To go to the working house.

10   Q.  Whose working house?

11   A.  Angel.

12   Q.  Does Angel have any other names?

13   A.  Maya.

14   Q.  And do you know Maya's real name?

15   A.  No, I do not.

16   Q.  And you ended up working closely with Maya the first

17   month you were in the United States, is that right?

18   A.  Yes.

19   Q.  And can you describe her for the jury?

20   A.  She was a female, shorter, but a little bit taller

21   than I am.  She's almost about 50-years-old.

22            MS. PROVINZINO:  And may I approach with

23   Government Exhibit 1070?

24            THE COURT:  You may.

25   BY MS. PROVINZINO:

```
1    Q.  Sai, I'm handing you Government Exhibit 1070.  And do

2    you know the person in that photograph?

3    A.  Yes, I do.

4    Q.  And who is it?

5    A.  Maya or Angel.

6         MS. PROVINZINO:  The Government moves the

7    admission of Exhibit 1070.

8         MR. SICOLI:  No objection.

9         MR. RIVERS:  No objection.

10         MR. GUERRERO: No objection.

11         THE COURT:  That is received.

12         MS. PROVINZINO:  Thank you, Your Honor.

13         THE COURT:  And, again, Members of the Jury, not

14    to -- I'll just turn down the lighting again, until get a

15    better adjustment here, so you can see it more clearly.

16    BY MS. PROVINZINO:

17    Q.  So before you on the screen, Sai -- and the jury can see

18    behind you, is the photograph you just identified as Maya,

19    who also goes by the name Angel?

20    A.  Yes.

21    Q.  And where was Maya's house located?

22    A.  Orange County.

23    Q.  And did -- when you met with Maya, did you learn about

24    her house rules there?

25    A.  Yes, I did.
```

1    Q.  What were Maya's rules?

2    A.  The working hours is from 10:00 a.m. to 10:00 p.m.

3    Also about how to work.  Shower the customers.  There's

4    kissing.  There's oral sex without condoms.  And also

5    massage.

6    Q.  And what about sex?  Was that part of the house rules?

7    A.  Yes.  Yes.  But there needed to be condoms wearing.

8    Q.  Okay.  Now, Sai, you had never done sex work like this

9    before?

10   A.  Yes.

11   Q.  And I think you told the jury you understood that you'd

12   just be doing massage work in the United States?

13   A.  Yes.

14   Q.  Did you talk to Maya about your understanding?

15   A.  I did.

16   Q.  And what did she tell you?

17   A.  She said if I don't do it I wouldn't have a job.

18   Q.  So did Maya then train you in how to meet with

19   customers?

20   A.  Yes.

21   Q.  So let's break this down a little bit.

22           You said that your hours were from 10:00 in the

23   morning until 10:00 at night, is that right?

24   A.  Yes.

25   Q.  And was that everyday?

1    A.   Yes.

2    Q.   What were the prices set at Maya's house?

3    A.   $200 for one hour.  $160 for half an hour.

4    Q.   And were those rates pretty standard at most of the

5    houses you worked?

6    A.   Most of the houses were like that.

7    Q.   And for a $200 session for an hour, how much money would

8    Maya get to keep for the house fees?

9    A.   70.

10   Q.   And what about for half hour?

11   A.   60.

12   Q.   Now, how were you feeling at this point?  Because this

13   wasn't the deal you were told in Thailand, is that right?

14   A.   I felt bad.

15   Q.   Did you know anything about these house fees?

16   A.   No, I did not.

17   Q.   Now what would happen with the remaining money?  So if

18   it were a $200 session for an hour, and 70 went to Maya,

19   what happened with the remaining money?

20   A.   The remaining money she would keep it in order to

21   send over to Tu.

22   Q.   Did anyone collect that money?

23   A.   The first time there was.

24   Q.   And who was that?

25   A.   The name was Moo.

1    Q.  And can you describe her for the jury?

2    A.  She was a tomboy.

3    Q.  Sai, I'm showing you Government Exhibit 1065.  And do

4    you know the person in that photograph?

5    A.  Yes, I do.

6    Q.  And who is it?

7    A.  Moo.

8            MS. PROVINZINO:  The Government moves the

9    admission of Exhibit 1065.

10           MR. SICOLI:  No objection.

11           MR. GUERRERO: No objection.

12           THE COURT:  That is received.

13   BY MS. PROVINZINO:

14   Q.  So Sai, I'll show the picture of Moo to the jury that

15   you just identified, Government Exhibit 1065.

16           Now, in addition to Moo collecting the money to

17   send back to Tu, did Maya sometimes do that?

18   A.  Yes.

19   Q.  And where were you supposed to put the money for Maya or

20   Moo to collect?

21   A.  In the freezer, in the fridge.

22   Q.  And why would you have to put it there?

23   A.  That's what she told me, to do that everyday.

24   Q.  So in addition to training you and helping with the

25   money, what else did Maya do at her house in Orange County?

1    A.  No.  There's nothing else.

2    Q.  Did she answer phones?

3    A.  Oh, yes.

4    Q.  And how would you know when she had a customer to send

5    you?

6    A.  She would send me texts.

7    Q.  And did she give you any instructions about what to do

8    with those text messages?

9    A.  Yes, she did.

10   Q.  And what did she tell you?

11   A.  She would say there's the customer.  What time the

12   customer would be coming.  And how long was the session.

13   Q.  And were you instructed to keep those text messages?

14   A.  After I finished working at that house, I would have

15   to erase them.

16   Q.  Let's talk about your schedule there.  You worked at

17   Maya's house for the month of June of 2015, is that right?

18   A.  Yes.

19   Q.  How many customers would you see on a typical day?

20   A.  Somewhere to eight.

21   Q.  Could you choose the customers?

22   A.  No, I couldn't.

23   Q.  Could you say no to a customer?

24   A.  No, I couldn't.

25   Q.  Would any of them pressure you to do additional work

1    outside of the house rules that Maya had established?

2    A.  No.  There was none.

3    Q.  And did you want to do this work?

4    A.  No, I did not.

5    Q.  Were there any other women working in Maya's house with

6    you?

7    A.  There was.

8    Q.  Did you know that individual?

9    A.  No, I did not know her before.

10   Q.  Could you describe any interaction you had with her to

11   the jury?

12   A.  With who?

13   Q.  There was one other woman working in Maya's house, is

14   that right?

15   A.  Yes.

16   Q.  Now, did you have separate bedrooms?

17   A.  Yes.

18   Q.  Did you interact much with that other woman?

19   A.  Yes, there was.

20   Q.  And so you might speak to each other occasionally?

21   A.  Yes.

22   Q.  And how often would you then be sent to another house?

23   A.  Every 15 days.

24   Q.  And so by virtue of that, you wouldn't be sent,

25   necessarily, with the person in the bedroom next to you,

1   right?

2            THE INTERPRETER:  Will you repeat the question?

3   BY MS. PROVINZINO:

4   Q.  So you would be sent every 15 days to a new house?

5   A.  After that, yes.

6   Q.  And you'd be sent on your own to that new location, is

7   that right?

8   A.  No, it wasn't.

9   Q.  You would often be sent on your own to another house, is

10  that right?

11           MR. GUERRERO:  Objection.  Leading as to the word

12  sent.

13           THE COURT:  It stands to the form.  I'll allow the

14  inquiry.  So she'll rephrase the question for you.

15  A.  There would be somebody who handle finding a working

16  house for me and then send me over.

17  BY MS. PROVINZINO:

18  Q.  So let's talk about that.  After working at Maya's house

19  in Orange County, where did she send you next?

20  A.  To Chicago.

21  Q.  And whose house was it in Chicago?

22  A.  It was another house of Angel.

23  Q.  So this is Angel or Maya who you've identified for the

24  jury.  Who helped her run that house?

25  A.  Kevin did.

1   Q.  And was it a similar house, two-bedroom apartment like

2   the one you'd worked at in Orange County?

3   A.  Yes.

4   Q.  And do you remember the address of that apartment?

5   A.  I do.  It's 5441.

6   Q.  And how do you remember that?

7   A.  Because Kevin took me to open a bank account.

8   Q.  And where did he take you to open a bank account?

9   A.  At Wells Fargo.

10  Q.  And why did you need that account?

11  A.  So I was told that I would be booking the ticket by

12  myself and that I would be sending money.

13          MS. PROVINZINO:  May I approach, Your Honor?

14          THE COURT:  You may.

15  BY MS. PROVINZINO:

16  Q.  Sai, I'll be handing you a Government Exhibit that's

17  been premarked for identification purposes as 1034.

18          And do you recognize what's in that exhibit?

19  A.  This is the building that my working room was in.

20  Q.  In Chicago?

21  A.  Yes.

22          MS. PROVINZINO:  The Government moves admission of

23  Exhibit 1034.

24          MR. ENGH:  No objection.

25          MR. SICOLI:  No objection.

```
 1                  MR. GERDTS:  No objection.

 2                  MR. GUERRERO:  No objection.

 3                  THE COURT:  Received.  1034 is received.

 4      BY MS. PROVINZINO:

 5      Q.  And Sai, I'll put this up on the screen so everybody can

 6      see it.

 7                  As you just indicated, this is where Maya had a

 8      house in Chicago?

 9      A.  Yes.

10      Q.  And that's what the outside of the apartment looked

11      like, is that right?

12      A.  Yes.

13      Q.  And I think that indicates the address for that

14      apartment, is that right?

15      A.  Yes.

16      Q.  So while you were there in Chicago, how many customers a

17      day would you see?

18      A.  Six to seven.

19      Q.  And was it the same rates per hour and house fees as

20      Maya's house in California?

21      A.  Yes.

22      Q.  And a portion of that would go to the house fees, is

23      that right?

24      A.  Yes.

25      Q.  How would you get the money back to Tu to pay off your
```

```
 1    debt?

 2    A.  Kevin would collect the money and sending it over to

 3    Maya.

 4    Q.  So did Maya know how many customers you had?

 5    A.  Yes.  She would -- she did.

 6    Q.  And how would she know?

 7    A.  Kevin would be the one who told her.

 8    Q.  And how long were you there at Maya's house in Chicago?

 9    A.  Probably about 27 to 28 days.

10    Q.  Okay.  So to help the jury keep track, June of 2015,

11    you're at Maya's house in Orange County, is that right?

12    A.  Yes.

13    Q.  And then in July you're at Maya's house in Chicago that

14    we just saw the picture of?

15    A.  Yes.

16    Q.  And so where were you sent next for the month of August?

17    A.  Bill's house.

18    Q.  And where was Bill's house?

19    A.  San Diego.

20    Q.  And who sent you there, Sai?

21    A.  Kevin bought me the ticket.

22    Q.  And how did you get there?

23    A.  Did you mean when I arrived?  How I arrive at the

24    airport or?

25    Q.  So you traveled by airplane, is that right?
```

```
 1    A.  Yes.

 2    Q.  And who bought your ticket?

 3    A.  Kevin did.

 4    Q.  And did anyone pick you up at the airport?

 5    A.  Uncle Bill.

 6    Q.  Sai, I'm going to show you what's been remarked as

 7    Government Exhibit 8CK.  It appears to be a screen shot.

 8    And what is in this exhibit?

 9    A.  It's a -- it's a plane ticket.

10    Q.  And is that your name on it?

11    A.  Yes.

12    Q.  And a flight that you took from Chicago to Los Angeles

13    on August 2nd of 2015?

14    A.  Yes.

15              MS. PROVINZINO:  The Government moves the

16    admission of Exhibit 8CK.

17              MR. SICOLI:  No objection, Your Honor.

18              MR. GERDTS:  No objection.

19              MR. GUERRERO:  No objection.

20              THE COURT:  Those are received.

21    BY MS. PROVINZINO:

22    Q.  And so this is what you're testifying, that's your name

23    up here at the top left corner, Chudakan Ngaopoothong?

24    A.  Yes.

25    Q.  So that's the ticket you took from LA to Chicago to go
```

```
1    to Bill's house?

2    A.  Yes.

3    Q.  And who picked you up at the airport?

4    A.  Uncle Bill did.

5    Q.  And where did he take you?

6    A.  We stopped by to buy food someplace.

7    Q.  Okay.  And when you were at Bill's house, did he have a

8    working name for you?

9    A.  Yes, there was.

10   Q.  And what was your working name?

11   A.  Venus.

12   Q.  And did Bill have any particular house rules?

13   A.  9:00 a.m. to 9:00 p.m.

14   Q.  So his hours were slightly different from the other

15   house bosses?

16   A.  Yes.

17   Q.  Did Bill have a rule for a customer would paid for a

18   full hour?

19   A.  Yes, there was.

20   Q.  And what was that rule?

21   A.  $260 for one hour.  They can have sex twice.

22   Q.  And what about a half hour?

23   A.  Half an hour is $180.

24   Q.  So how many customers a day would you typically see at

25   Bill's house?
```

```
 1    A.  Three to five people.

 2    Q.  And who would schedule the customers?

 3    A.  Uncle Bill did.

 4    Q.  So how would you know a customer was coming?

 5    A.  There was text sending.

 6    Q.  And did Bill get house fees?

 7    A.  Yes, he did.

 8    Q.  And what would that be?  I think you just indicated an

 9    hour was $260 for the customer.

10    A.  The house fee was $100.

11    Q.  And did he give you any instructions on where to put

12    money?

13    A.  In the freezer.

14    Q.  Would he come to pick up the money?

15    A.  Yes, he did.

16    Q.  And how often would he do that?

17    A.  Once a week.

18    Q.  You said he picked you up at the airport, is that right?

19    A.  Yes.

20    Q.  And you stopped to get some food on the way?

21    A.  Yes.

22    Q.  And then you'd come to pick up cash from the apartment?

23    A.  Yes.

24    Q.  Sai, can you identify Bill here in the courtroom?

25    A.  Yes.
```

1    Q.  Can and could you point him out?

2    A.  Yes, I can.

3    Q.  You can you can do that now?

4    A.  (Indicating.)

5         MS. PROVINZINO:  So let the record reflect that

6    the witness has identified who she identifies to be Bill,

7    Defendant, Michael Morris.

8         THE COURT:  So reflected.

9    BY MS. PROVINZINO:

10   Q.  Now during your time at Bill's house of prostitution in

11   San Diego, did you take any photographs?

12   A.  Yes, there was.

13   Q.  And why did you take photographs?

14   A.  It was kind of like I just want to shoot the

15   location.

16   BY MS. PROVINZINO:

17   Q.  So I'm approaching with Government Exhibits 1004 and

18   1006.  And Sai, I'll have you start with Government

19   Exhibit 1006.

20        And do you recognize the photograph in that

21   exhibit?

22   A.  Yes, I do.

23   Q.  Is that one you took?

24   A.  Yes.

25   Q.  And what is the photograph of?

1    A.  It was the backside of the apartment.

2    Q.  And this is the apartment that Bill had in San Diego?

3    A.  Yes.

4           MS. PROVINZINO:  The Government moves the

5    admission of Exhibit 1006.

6           MR. SICOLI:  No objection.

7           MR. GERDTS: No objection.

8           THE COURT:  Those are received.

9    BY MS. PROVINZINO:

10   Q.  So Sai, I'm going to put this on the screen.  This is

11   your phone, right?

12   A.  Yes.

13   Q.  I'll make this a little bit bigger.

14          Then I'm going to focus on the information here on

15   the bottom.  It says Chudakan Nadia, who's that?

16   A.  It's Sai.

17   Q.  And then there appears to be a date, 3, and then a Thai

18   word, 2015.  When did you take this photograph, Sai?

19   A.  It was 3rd of August, 2015.

20   Q.  And that was the Torrey Villas apartment homes?

21          THE INTERPRETER:  I'm sorry can you repeat?

22   BY MS. PROVINZINO:

23   Q.  And that was for the Torrey Villas Apartment homes?

24   A.  Yes.

25   Q.  And can you describe where you took this photo?

1    A.  There was a pathway walking out from the apartment.

2    There was a patio.  I was just taking a picture from the

3    back of the apartment.

4    Q.  And there was a two-bedroom apartment that Bill had

5    there?

6    A.  Yes.

7    Q.  And you have in front of you Government Exhibit 1004.

8    I'll have you open that.

9              And is that another photograph you took?

10   A.  Yes.

11   Q.  And what is that photograph of?

12   A.  It's a bedroom and the working room.

13             MS. PROVINZINO:  The Government moves the

14   admission of Exhibit 1004.

15             MR. SICOLI:  No objection.

16             MR. GERDTS:  No objection.

17             MR. RIVERS:  No objection.

18             MR. GUERRERO:  No objection.

19             THE COURT:  Received.

20   BY MS. PROVINZINO:

21   Q.  All right.  So Sai, we're going to blow that up a little

22   bit larger.

23             All right.  So describe what's -- what this

24   photograph is for the jury.

25   A.  This is a working room and a sleeping room.

1   Q.  Okay.  So to break that down, does that mean that's

2   where you would meet with the customers?

3   A.  Yes.

4   Q.  So that's the working room part of it?

5   A.  Yes.

6   Q.  And what do you mean by sleeping room?

7   A.  I sleep here.

8   Q.  So you work and sleep in the same bedroom?

9   A.  Yes.

10  Q.  Did you know that was part of the deal when you were in

11  Thailand before coming to the United States?

12  A.  No, I did not know.

13  Q.  Now during the time you were working for who you call

14  Uncle Bill, you started recording your payments, your debt

15  payments, is that right?

16  A.  Yes.

17          MS. PROVINZINO:  Permission to approach, Your

18  Honor?

19          THE COURT:  You may.

20  BY MS. PROVINZINO:

21  Q.  Sai, I'm handing you what's been marked as Government's

22  Exhibit 1410.  I'll give you a moment to look through that.

23          And do you recognize this document?

24  A.  Yes, I do.

25  Q.  And what is it?

1    A.  It was a document that I took a picture of, so that I

2    can keep track of how much money I would pay off my debt.

3    The contract.

4    Q.  So this is your document to keep track of money for the

5    debt or the contract.  And all of your -- and all of your

6    writing is in the dark black, is that right?

7    A.  Yes.

8    Q.  And you notice there's also some writing and boxes in

9    blue?

10   A.  I do.

11   Q.  And that's not your writing, right?

12   A.  What you mean?  Did you mean this box?

13   Q.  So the blue boxes and the blue words are translations

14   into English, isn't that right?

15   A.  Yes.

16   Q.  And you've had an opportunity to review your original

17   document and with the translation.  And it's a true and

18   accurate copy of your records, is that right?

19   A.  Yes.

20          MS. PROVINZINO:  The Government moves the

21   admission of Exhibit 1410.

22          MR. SICOLI:  No objection.

23          THE COURT:  It's received.

24   BY MS. PROVINZINO:

25   Q.  All right.  So there's a collection of paperwork in

1     front of you.

2                And I'm going to focus on the August period we're

3     talking about.  And I'll put it on the screen in front of

4     you.  So if you're following on the screen or if you're

5     working on the original side, the last numbers are 891.

6                And you see this part at the top of the record?

7                There are dates -- and you usually put the month

8     in the middle, is that right?  So this would be the 10th of

9     August of 2015, am I reading that right?

10    A.  Yes.

11    Q.  And where were you working at the time you were

12    recording this amount?

13    A.  At Uncle Bill's house.

14    Q.  At Uncle Bill's house.  And then there are two notations

15    here, one with a 1 and one with a 2.  Can you tell the jury

16    what you're recording there?

17    A.  It was the total that I would be sending and how much

18    I made in that week, particular week.

19    Q.  Okay.  And so the total you'd be sending, and that would

20    be who were you sending that total to?

21    A.  To Tu.

22    Q.  And that's to Tu to pay off your contract debt, is that

23    right?

24    A.  Yes.

25    Q.  There appears to be a notation here in this blue box

1    that says, Ticket cost, food and suitcase cost.

2              Can you explain that to the jury?

3    A.  So there are a ticket cost and the food cost.  I

4    would be given $100 a week, and I can deduct that amount

5    off the money that I would have to pay back.

6              As far as a suitcase, I probably bought a

7    suitcase.

8    Q.  And so are those additional costs added to your

9    contract?

10   A.  What do you mean?

11   Q.  So are those additional fees you had to pay in addition

12   to the $55,000 debt?

13   A.  At first he didn't -- he didn't talk about he would

14   be paying for my tickets or other expenses.

15   Q.  Okay.  So those were costs he never told you about, is

16   that right?

17   A.  Yes.

18   Q.  So you spent the first -- so how much money were you

19   able to send to Tu during your work for Uncle Bill?

20   A.  The total is $4,100.

21   Q.  Okay.  And was money sent anywhere other than to Tu?

22   A.  There were some that I send back home.

23   Q.  And that was to your children and your father, is that

24   right?

25   A.  Yes.

1    Q.  So the first part of the month of August you were at

2    Uncle Bill's.  And then where were you the second part of

3    the month?

4    A.  I was at Angel's house for three days.

5    Q.  Okay.  And why did you finish -- or why were you at

6    Angel's house for a couple days in August?

7    A.  So it happened that there was a woman who would come

8    to work at Uncle Bill's house before the specified time.

9    Q.  And so they had to find you another place to go?  Or did

10   you go back to Maya's?

11   A.  So it was like they send me back to Maya's.

12   Q.  What did you observe between Maya and Bill about their

13   relationship or partnership?

14   A.  It was like they share a business.

15   Q.  And then for the next month, September of 2015, you

16   worked out of Houston, is that right?

17   A.  Yes.

18   Q.  And who sent you to that location?

19        And I'm going to pull up that part of your

20   Government Exhibit 1410 on Page 37 of it.  Who ran that

21   house?

22   A.  Joy was.

23   Q.  And did you meet her?

24   A.  Once.

25   Q.  So is she another house boss like Bill and like Maya?

1    A.  Yes.

2    Q.  Did she have anyone help her run that house in Houston?

3    A.  Ton.

4    Q.  And what did Ton do?

5    A.  He would pick up and drive.  And he also would pick

6    up -- pick up money.

7    Q.  And was there any special way money was dealt with at

8    Joy's house?

9    A.  That would be money being put in an envelope.  And

10   then I would take pictures and then send the pictures to

11   Joy.

12   Q.  So I'm going to pull up what it seems you're describing,

13   is this correct, on Page 45 of Exhibit 1410?

14   A.  That's correct.

15   Q.  So that's an envelope.  There's a name Paris on there,

16   who's that?

17   A.  It's Sai.

18   Q.  And would this be dated September 12th of 2015, is that

19   right?

20   A.  Yes.

21   Q.  And it looks like here you saw five customers?  Am I

22   reading that right?

23   A.  That's correct.

24   Q.  At the times you listed starting at 10:45 in the

25   morning.

1   A.  Yes.

2   Q.  And there's a total of $300.  Is that just the house

3   fee?

4   A.  Yes.

5   Q.  Okay.  So the remainder of that then would be going to

6   Tu to pay down your contract debt, is that right?

7   A.  Yes.

8   Q.  Now you continued to work the remainder of that month in

9   Houston at Cindy's house, is that right?

10  A.  That's correct.

11  Q.  And what were the house rules there?

12  A.  10:00 a.m. to 10:00 p.m.

13  Q.  And pretty similar to the other houses you'd worked at?

14  A.  Yes.

15  Q.  And during the time you worked at Cindy's house, how did

16  you send money to Tu to pay down your contract debt?

17  A.  I sent to Maya.

18  Q.  Okay.  Did you send directly to Maya, or did somebody

19  help you get money to Maya?

20  A.  Do you mean I send to Maya's, right?

21  Q.  Did anybody help get that money to Maya?

22  A.  There was no other people.  I was the one who sent.

23  Q.  Okay.

24  A.  But there would be someone else send money over to

25  people as well.

```
 1    Q.  So somebody would help get the money to Tu for you in

 2    Thailand, is that right?

 3    A.  Yes.

 4    Q.  And who would do that?

 5    A.  Peearm.

 6    Q.  You're mentioning someone called Peearm, who is that?

 7    A.  He's a Thai taxi in LA.

 8    Q.  Had you met him before?

 9    A.  I have.

10    Q.  And can you describe him?

11    A.  He was a man about 60-years-old.  He was wearing

12    glasses.

13    Q.  And so for the organization he would drive taxi for

14    people and help move money to Thailand, is that right?

15    A.  Yes, correct.

16    Q.  And Sai, I'm going to be approaching with Government

17    Exhibit 1067.  There are two photographs contained in

18    Government Exhibit 1067.  Take a moment to look at those.

19          And can you identify the person identified in that

20    exhibit?

21    A.  It's Peearm.

22    Q.  Peearm.

23          MS. PROVINZINO:  Government moves the admission of

24    1067.

25          MR. SICOLI:  No objection.
```

```
 1              MR. GUERRERO: No objection.

 2              THE COURT:  Received.

 3    BY MS. PROVINZINO:

 4    Q.  And so here's Peearm, the first page of the exhibit.

 5    And another photograph of him on Page 2.

 6              Did Arm know about your debt?

 7    A.  He did.

 8    Q.  And what did he know?

 9    A.  He knew that I send money over for the contract to

10    pay off.

11    Q.  And that was to Tu?

12    A.  Yes.

13    Q.  Similarly you had worked at these other houses, Cindy,

14    and Joy, and Maya, and Bill.  Did they know if you were

15    under debt?

16              MR. GERDTS:  Objection.  Calls for foundation.

17              THE COURT:  If she understands the question, then

18    I'll let her answer.  But would require her source of

19    information, how she knew, if she did.

20    A.  That's correct.

21    BY MS. PROVINZINO:

22    Q.  And how did they know?

23    A.  What did you mean for every house?

24    Q.  So did the house boss know if you were under debt?

25    A.  Yes, they did.
```

```
 1    Q.  Is that because you'd be sent --

 2              MR. GUERRERO:  Objection, leading.

 3    MS. PROVINZINO:

 4    Q.  -- to that house?

 5              THE COURT:  And I'll have you rephrase the

 6    question.

 7              THE INTERPRETER:  I'm sorry.  Can you repeat the

 8    question one more time?

 9    BY MS. PROVINZINO:

10    Q.  How would a house boss know you were under debt?

11    A.  It was because of the person who contacted the houses

12    for me.  For like Maya, she would be the person who told

13    them.

14    Q.  So somebody else was creating your schedule, is that

15    right?

16    A.  Yes.

17    Q.  You didn't choose what house you were going to?

18    A.  No.

19    Q.  So let's focus on October of 2015.  And where were you

20    working then?

21    A.  In Austin.

22    Q.  And who was the house boss in Austin?

23    A.  Kung was.

24    Q.  Do you know Kung by any other names?

25    A.  Nancy.
```

1   Q.  And can you identify Kung or Nancy here in the

2   courtroom?

3   A.  Yes, I could.

4   Q.  And go ahead and identify her for the jury.

5   A.  That's she.

6           MS. PROVINZINO:  Okay.  So let the record reflect

7   that the witness has identified who she understands to be

8   Kung or Nancy, Saowapha Thinram, on the far left next to her

9   attorney, Paul Engh?

10          THE COURT:  So reflected.

11  BY MS. PROVINZINO:

12  Q.  So while you were at Kung's house, what were the house

13  rules?

14  A.  Working from 10:00 a.m. to 10:00 p.m., as well.

15  Q.  And what were the prices and fees?

16  A.  One hour for $200.  The house fee was $70.

17  Q.  And what would a customer get for one hour, $200?

18  A.  So they would be taking a shower, having sex and

19  massage.

20  Q.  Did anyone else work with you at Kung's house?

21  A.  There was.

22  Q.  And who was that?

23  A.  The first week there was Anna.

24  Q.  And you worked more than one week, right?

25          MR. ENGH:  Objection, leading.

1          THE COURT:  Sustained as to the form.  I'll allow

2     the inquiry, but if we could rephrase the question.

3     BY MS. PROVINZINO:

4     Q.  How long did you work at Kung's house in Austin?

5     A.  One month.

6     Q.  What did Kung do to run her house in Austin?

7     A.  She pick up phones.  The last week she was also

8     working, too.

9     Q.  So in addition -- did anyone help her answer phones or

10    schedule?

11    A.  Her husband did.

12    Q.  And who was her husband?

13    A.  Name was Gregg.

14    Q.  I'm approaching with Government Exhibit 1068.

15          Sai, I've handed you Government Exhibit 1068.  Do

16    you recognize the person in that photograph?

17    A.  I do.

18    Q.  And who was it?

19    A.  Kung's husband.

20          MS. PROVINZINO:  The Government moves the

21    admission of Exhibit 1068.

22          MR. ENGH: No objection.

23          THE COURT:  That's received.

24          MS. PROVINZINO:  We'll publish that for the jury.

25    A little bit larger.

1    BY MS. PROVINZINO:

2    Q.  So that's Kung's husband, who you called Gregg, is that

3    right?

4    A.  Yes.

5    Q.  Who would collect money when you were working at Kung's

6    house?

7    A.  Kung and her husband.

8    Q.  And how would you send the money back to Tu during that

9    time you were at Kung's house?

10   A.  I send it over to Peearm.

11   Q.  And during that time you were at Kung's house, you took

12   photographs like you did at Uncle Bill's, is that right?

13   A.  Yes.

14   Q.  And I'm going to approach, Sai, with a collection of

15   exhibits.  Government Exhibit 1005, 1017 and 1018.

16          And we'll start with 1018 first.

17          And I'll have you start with Government

18   Exhibit 1018.  And what's in Government Exhibit 1018?

19   A.  It was the back view of the working house in Austin.

20          MS. PROVINZINO:  The Government moves admission of

21   Exhibit 1018.

22          MR. ENGH:  No objection.

23          MR. GERDTS:  No objection.

24          THE COURT:  Received.

25   BY MS. PROVINZINO:

1    Q.  Sai, I'm putting Government Exhibit 1018 in front of the

2    jury.  So, again, this is a photo you took, is that right?

3    A.  Yes.

4    Q.  And what date did you take that photo?

5    A.  13th of October, 2015.

6    Q.  And that was at Kung's house in Austin Texas, is that

7    right?

8    A.  That's correct.

9    Q.  All right.  So describe what the jury's seeing from --

10   in this photo?

11   A.  It was a back view of the apartment that had a patio.

12   When you -- when you stand at the patio, this is the view

13   you see.  This is the back of the apartment.

14   Q.  And would you ever go out to the patio?

15   A.  Yes, I did.

16   Q.  And when would you do that?

17   A.  I went out there sometimes to take pictures.  And if

18   sometimes there were customers in both rooms, that's

19   where I would be standing -- staying.

20   Q.  And when you say customers -- so those two bedrooms --

21   there was sex and other things happening in those bedrooms

22   at the time, right?

23              MR. ENGH:  Objection, leading.

24              THE COURT:  Sustained as to form.  I'll allow the

25   -- she'll put a new question in front of you.

1    BY MS. PROVINZINO:

2    Q.  So you talked about both bedrooms being used.

3    A.  Yes.

4    Q.  What was happening to make you go out onto the patio?

5    A.  So that the customer wouldn't see me.

6    Q.  And why wouldn't you want the customer to see you?

7    A.  So that they wouldn't see that there's another woman

8    in the house.  They wouldn't let us see each other.

9    Q.  Now, during that time you worked at Kung's house, you

10   kept a record of the customers you had to see and the money

11   you earned to pay down your debt, is that right?

12   A.  That's correct.

13   Q.  And that's the ledger we've already looked at,

14   Government Exhibit 1410.  And I'm referring to Page 32.

15        So let's start up here at the top, I'll make this

16   a little bigger, if I can.

17        It looks like the first half of the month.  And

18   can you describe for the jury what information is in this

19   first part of that page?

20   A.  It was between the 1st and the 15th of October of

21   2015.  I worked and I made $2,500.  And then I deducted

22   two weeks of the food costs.

23   Q.  And what does that mean to deduct two weeks of the food

24   costs?

25   A.  For one week, he would give me $100 for food.

1    Q.  And when you say he, are you referring to Tu?

2    A.  Yes.

3    Q.  And is there anything significant about the 15th of the

4    month?

5    A.  No, there's nothing.

6    Q.  So that's the first part of the month, the money you

7    earned to pay back your contract.

8            And let's focus on the bottom part of that page.

9    It's a little bit darker.  But can you describe to the jury

10   what's contained in this?

11   A.  The second part of the month I already made $700 from

12   work.

13   Q.  So less than the first part of the month, is that right?

14   A.  Yes.

15   Q.  And so that was the money then, minus the food deduction

16   that was sent back to Tu for your contract debt, is that

17   right?

18            THE COURT:  And if we could find a logical place,

19   it doesn't have to be at this exact moment.  Because we've

20   been going about an hour.

21            MS. PROVINZINO:  We could break right here, Your

22   Honor.

23            THE COURT:  You sure?

24            All right.  Members of the Jury, we'll take a

25   one-hour recess.  That takes us to 1:15.  Please rise for

```
 1      the jury.

 2                  (Jurors excused at 12:15 a.m.)

 3                  THE COURT:  Do you have an approximate estimation

 4      about your direct exam?

 5                  MS. PROVINZINO:  Probably about 30 minutes left,

 6      Your Honor.

 7                  THE COURT:  All right.  And then what -- just kind

 8      of curious when Counsel -- when is a good time to meet over

 9      whatever the issues may be today that needs to be resolved

10      before the end of the day?

11                  MS. WILLIAMS:  Sure.  We could do that now, or we

12      could do it coming back from the lunch break.

13                  One issue that needs to be resolved sooner rather

14      than later is -- well, two issues, really.

15                  If we're going to call the witness that we

16      discussed this morning this afternoon, which is our

17      tentative plan, but I still haven't had a chance to meet

18      with her, so we're trying to figure that out.

19                  I -- we would certainly want a ruling on that

20      letter.

21                  And then, as a related issue, we may seek to

22      proactively elicit some of the obstruction attempts by Ms.

23      Wanless, which, of course, would require talking about her

24      being in custody.

25                  And even if we don't do that, Ms. Wanless in --
```

1    with regards to this witness, confessed her role to this

2    witness.  And that was a jailhouse confession.

3         So, again, the in-custody piece of this, we would

4    need resolved prior to the afternoon witness, if that's who

5    we do indeed call.

6         THE COURT:  Well, without a lot of discussion here

7    we can either do it now or we can come back at at 1:00.

8    I'll go either way.

9         But if -- we're not going to have a long debate

10   about what's preferable by all the attorneys, so.

11        MS. WILLIAMS:  Defer to the Court.

12        Frankly now would be easier, because if we have to

13   scramble for a different witness, I'd like to do that now

14   rather than later.

15        THE COURT:  Why don't I hear, then, briefly from

16   Counsel, or whatever, on --

17        So right now, we have the -- at a minimum, the

18   issue of -- apart from any questioning, the letter itself.

19        MS. WILLIAMS:  Yes, Your Honor.

20        I would request through the Court a proffer from

21   Ms. Wanless, and anybody else who had a role in obtaining

22   this letter about precisely the circumstances under which it

23   was obtained.

24        At the same time, I think the substance of the

25   letter should be excluded under 403.

1   There's nothing inconsistent here with any of the

2   witness's prior statements.  And there's certainly all sorts

3   of prejudice issues, including unhappiness with her

4   attorney.

5   THE COURT:  I'll hear from Counsel.

6   MR. RIVERS:  Well, Your Honor, with regard to the

7   jailhouse confession, we just received that ROI today from a

8   meeting that happened on October 1st.

9   I don't know why I got it today, I suppose that's

10  because the witness is going to testify today.

11  And so I -- you know, I barely have had a chance

12  to even read it.

13  THE COURT:  Now are you talking about jailhouse

14  confession, I'm assuming you're talking your client?

15  MR. RIVERS:  Correct.

16  THE COURT:  All right.

17  MR. RIVERS:  With regard to this witness that's

18  going to be testifying.

19  THE COURT:  All right.

20  MR. RIVERS:  The one who wrote the letter.

21  I have absolutely no discovery as to the

22  obstruction attempts that they're talking about.

23  Had I known about it, maybe what I would have done

24  is try to garner some information from the jail to see if

25  it's either corroborated or disputed.

1          I don't know why I'm getting this ROI as they call

2     them today.  From a meeting that happened on October 1st.

3          So I would say that that's late discovery, and

4     they should not even be able to inquire.

5          MS. WILLIAMS:  So as to the ROI, Your Honor, it

6     was in draft form until today, as we told Defense Counsel.

7     And it's entirely consistent with everything that the

8     witness has -- has said previously.

9          Arguably, an ROI wasn't necessary, because it's

10     the same stuff, with the addition of this conversation with

11     Ms. Wanless.

12          In terms of the prior -- in terms of obstruction,

13     so certainly we're responding to this letter that I saw for

14     the first time this morning.

15          I -- I haven't even talked to the witness.  So

16     it's hard for me to say precisely I have some contours of it

17     from Counsel -- from her Counsel, but I haven't talked to

18     her directly.

19          However, I would note that this is an issue,

20     jailhouse confessions, that we flagged in our trial brief

21     because this isn't the only one.

22          This is also -- I would note that I believe at the

23     at the pretrial conference we also flagged obstructive

24     efforts by -- including, other people, I believe, Ms.

25     Wanless, towards a different Government cooperator.

```
 1              So this -- this is broadly something that seems to

 2     be a little bit of a pattern and the Government may want to

 3     elicit that.

 4              THE COURT:  Now, just on the jailhouse

 5     confessions, just so that I'm on the same page here of all

 6     Counsel.

 7              The -- how -- you're talking jailhouse -- asserted

 8     jailhouse confession of Ms. Wanless.  How did that come up

 9     through the next witness?

10              MS. WILLIAMS:  So Ms. Wanless talked to that

11     witness in jail and said, Here was my role.  I was a house

12     boss.  I was a ma-tac.  And, you know, kind of goes through

13     what she did.

14              THE COURT:  So that's what this witness is going

15     to --

16              MS. WILLIAMS:  Well, no.  I mean, this is a

17     substantiative witness.  This is mostly a money launderer,

18     Your Honor.  There's -- it will be a long witness, frankly.

19              But this is -- so these jail house confessions

20     have been happening.  There's something that, for various

21     Defendants, though not -- not all, and that's something that

22     we've been disclosing.

23              As we said in the trial brief, I don't know that

24     we will necessarily, as a strategic matter, seek to put them

25     all into evidence.
```

1    However, we would seek to put this one into

2    evidence in part because of what happened today.

3    I think the relationship is -- is at issue here

4    potentially.

5    THE COURT:  I'll hear from Counsel.

6    MR. RIVERS:  Perhaps the Government can explain

7    why this meeting that happened on October 1st, a meeting of

8    a witness that's going to testify today, is just disclosed

9    moments before she's supposed to testify?

10    The Government has said that they've gone

11    overboard, overboard, with -- with courtesies, even though

12    they're ordered to do this by the Court.

13    But, yet, for a meeting that happened on

14    October 1st, it looks like this ROI was approved today.

15    Today.

16    And it's really not so much as a jailhouse

17    confession.

18    Your Honor, I don't think they should be able to

19    inquire.  It sounds about retaliatory.

20    And that's -- and I was going overboard, myself,

21    in delivering what I had to the Government.

22    In fact, I didn't even intend to ask this witness

23    any questions, quite frankly.  Because my client didn't even

24    know her and has only met her in jail.

25    And I would have really liked to have had this

1    October 1st meeting that was memorialized -- certainly this

2    report wasn't written today.  I would have liked to have had

3    it a long time ago.  It might have avoided some of this?

4              THE COURT:  Counsel?

5              MS. WILLIAMS:  Certainly, Your Honor, in preparing

6    for this witness, we were double checking, and this was

7    something that was written at the time but had not on been

8    approved.

9              We have been giving over more than what we need to

10   give over frankly right when we get it.  This is the

11   complaint that we are giving discovery pretty much on a

12   weekly basis.

13             Of course, this is -- these are all things that,

14   as long as Defense Counsel has them before

15   cross-examination, they can certainly make use of.

16             I will also note that the vast majority of this is

17   just basically the same as the witness said the five other

18   times, I believe, is memorialized in ROI's.

19             But -- and I would also take issue with this being

20   retaliatory.

21             Ms. Wanless appears to have a pattern of

22   obstructing in this case.

23             We brought this up before the Court, I believe, at

24   the pretrial conference.  And certainly her substantiative

25   confession, as we flagged in the trial briefs, we have a lot

1      of confessions.

2              Defense Counsel is certainly right, that all of

3      these -- the Defendants and the cooperating witnesses, most

4      of whom are females, are all housed together.  We've been in

5      ongoing discussions with the Marshals, and the jail, and

6      Defense Counsel about trying to keep separations in place.

7      That is just frankly very difficult because of limited

8      housing for females.

9              But this has been something that -- that is quite

10     concerning.

11             I would also suggest that I'm -- well, I think

12     I've said enough.

13             THE COURT:  Any other Defense Counsel has anything

14     to say, at least at this time?  Other than give us a lunch

15     break?

16             MR. RIVERS:  Just what I hear from the Government

17     is that there's obstruction.  That -- it's just a blanket

18     statement.

19             What is the obstruction?  Having lunch and giving

20     your opinion on cases or, you know, just talking with the

21     other people is not obstruction.

22             But I've not heard what the obstruction actually

23     is.

24             THE COURT:  Well, why don't -- I think what we

25     should do is this.

1              Let me ask one question unrelated to this issue,

2    this will be for Defense Counsel on the current witness on

3    the stand.  Then I'm going to make a ruling.  And then

4    you'll know why in terms of timing here, so I can -- the --

5    any approximation, I can't hold anyone to it, perhaps a

6    length of this witness on cross-examination, do you know?

7              MR. ENGH:  15 to 20 minutes.

8              MR. SICOLI:  I'm first up, Your Honor.  I'm not

9    sure, but I would probably say half an hour.

10             THE COURT:  Okay.

11             MR. RIVERS:  Your Honor, I -- I don't know.  It

12   depends upon if they go into -- if they go into what they

13   want to go into and they threaten to go into --

14             THE COURT:  We're talking about this witness now.

15             MR. RIVERS:  Oh, this witness.

16             THE COURT:  This witness.

17             MR. RIVERS:  I don't have any questions for this

18   witness, I'm sorry.

19             THE COURT:  So.

20             MR. RIVERS:  Sorry.

21             MR. GERDTS:  Maybe just a few cleanup questions.

22             MR. GUERRERO:  Same here.

23             THE COURT:  All right. What we'll do is this --

24   and then I'll make a ruling, give you a timeframe, and then

25   you can let me know, well, then we want to get this on the

1     record or we suggest this.

2                 First of all, I'll -- and it also seems because --

3     and why I asked the approximate length of time for the

4     witnesses on the stand, then at some point there will be at

5     least one, probably two, afternoon recesses.

6                 So, obviously, before the next witness -- I'm

7     going to make a ruling on the letter now.

8                 But before the witness takes -- takes the stand,

9     I'll hear any additional things.

10                 And, of course, we haven't let Counsel for -- we

11     haven't let Mr. McLurkin be heard yet.

12                 And so we'll take -- we'll do that after this

13     witness is done at some appropriate recess.

14                 And then -- because I -- I referenced something

15     earlier this morning, but haven't, we haven't -- I haven't

16     made a decision, with or without agreement, and that is

17     whether I'll have an obligation, with or without request of

18     any -- one or more lawyers, to treat this as kind of a

19     Rule 104 situation.  With, well, I need to find out just

20     some of the -- what exactly is going to be said.

21                 But the -- and I'm not conceding that will or will

22     not be necessary until I've heard from Counsel, including

23     Mr. McLurkin.

24                 But the -- what we'll do is this, then.

25                 First of all, with respect to the letter, absent

1    further order of the Court, number one, I view it as

2    extrinsic -- whether we call it prior consistent or prior

3    inconsistent statement, it's -- it's -- until there's

4    inquiry without reference to this letter, and other rulings

5    of the Court on the letter -- obviously sometimes a witness

6    is asked, Well, didn't you say on a prior occasion this?

7    And whether that prior occasion was in the letter or

8    standing out in the hallway, it's still either prior

9    consistent or inconsistent statement.

10            And whether it's on 403 grounds, or hearsay, in

11   terms of extrinsic evidence, until they've been asked the

12   questions here, without reference to the letter, saying,

13   well, isn't it a fact that this is your position, or this --

14   and then whether or not I'm obligated to then say, Well,

15   once the witness -- whether to allow a reference to this

16   letter, I guess we'll know if and when that happens,

17   depending on the nature of the examination of the witness

18   and what her position is today.

19            And I might get a small clue, once I hear from Mr.

20   McLurkin, and whether there's a -- I'm required to let one

21   or all lawyers inquire of this witness, or Rule 104, I'm not

22   conceding that will be necessarily, I won't make that

23   decision prematurely.  But that's the ruling at this time.

24            The -- that there will be no reference to this

25   letter, absent further ruling of the Court, or inquiry,

```
 1    first of all, about -- because obviously there can be

 2    inquires of her position today, consistent or inconsistent

 3    with whatever she's going to say without reference to, Well,

 4    I'm reading here from a letter, didn't you say this?

 5              And so, whether it's appropriate or not to use

 6    this, we will soon find out.

 7              Well in, that context, knowing that we're all

 8    going to be getting back together again.  Hopefully there

 9    will be some timing so we don't interfere too much with the

10    jury's time.

11              Any requests for clarification or requests for

12    other timing at this time?

13              MS. WILLIAMS:  Yes, Your Honor.

14              So when Your Honor says -- of course you can't

15    read from the letter.

16              THE COURT:  Or reference it.

17              MS. WILLIAMS:  But whether or not the subjects in

18    the letter -- I don't think the witness will deny she didn't

19    actually type it herself.

20              THE COURT:  No.  I mean, my point is whether she

21    typed it or said this to somebody, the issue

22    evidentiary-wise is the same.

23              Well, isn't this your position?  Or didn't you say

24    this on a prior -- whether it was said, typed, whatever the

25    case may be.
```

1          MS. WILLIAMS:  Sure.  And my -- my question for

2     the Court, or clarification is, the substance that is in

3     here.  That she at one point was unhappy with her plea.  Or

4     at one point thought about firing her attorney.  Whether

5     that is an appropriate line of inquiry, frankly.

6          Because if it's going to be appropriate, I might

7     like to front it myself in direct examination.

8          If it's not appropriate --

9          THE COURT:  Well, I'll --

10         MS. WILLIAMS:  I'm done.

11         THE COURT:  I'm sorry to interrupt you and talk

12    twice over my Court Reporter.

13         I will make that ruling before she takes the stand

14    but after I've heard from -- without suggesting it,

15    depending upon something that Mr. McLurkin said, I'll make

16    that ruling.  Because that's kind of a separate issue.  And

17    that maybe would be an issue, even if it wasn't in the

18    letter about, well, what's the relevance?  Is somebody

19    happy, unhappy with the -- and I have taken the time to read

20    the transcript from the from plea hearing.

21         And I'll make sure I hear from Counsel.

22         But we'll finish this witness and I'll make any --

23    so everybody will know what their parameters are before she

24    steps on the witness stand.

25         MS. WILLIAMS:  And I would also seek a ruling from

1    this Court about our e-mails with Defense Counsel.

2          I -- certainly there's back and forth that happens

3    with -- with any plea negotiation.  I think almost every

4    Defense Counsel at this table is aware that with several of

5    the defendants we had extensive plea negotiations.

6          However, I mean, absent some sort of, Here's the

7    sentence -- or here's the sentence then we'd ask for your

8    client or I'm going to give your client, or something like

9    that, which, of course, would be inappropriate.

10          I don't see how any of that would be -- would be

11    disclosable or relevant.

12          And certainly not, I mean the *Giglio* is inherent,

13    obviously, it's cooperators.  But I would seek a ruling from

14    the Court on that.

15          THE COURT:  Well, the ruling -- and I was going to

16    bring that up.

17          I would -- and without knowing the timeframe for

18    your office, I'll -- before anybody sees anything, I'll --

19    I'll look at anything "in camera."

20          So whatever the e-mails are per witness, or

21    whatever's easier.  Because you may say, look this is going

22    to take more than a few minutes and we're busy for trial,

23    you know, we're not going to stop and have somebody do it in

24    the next hour.

25          I will -- I would -- I believe I have an

```
 1    obligation and that also resolve -- I'll in camera define --

 2    and I'll look it and I'll either say, the inquiry stops

 3    here.  Or I'll hear additional argument because here's what

 4    I'm going to disclose to the opposing Counsel.

 5              MS. WILLIAMS:  And, certainly, that would be the

 6    case, Your Honor.  That would take me a while to go through

 7    and gather.

 8              THE COURT:  Yes.

 9              MS. WILLIAMS:  I -- I think I did an e-mail with

10    this attorney's -- this -- I don't think I e-mailed with

11    this attorney very much.

12              THE COURT:  Well, I'm not --

13              MS. WILLIAMS:  Well, I don't -- I don't think

14    that -- I don't think we would be seeking to have the Court

15    in camera review all of our communications with -- with

16    various Defense Counsels in this case.

17              I don't think the Defendants have articulated any

18    basis for those to be produce and reviewed.

19              And, obviously, if the Court wants to, we will

20    comply.  But it seems like that's -- that's not something

21    that is typically done.  And I don't think there's any

22    reason to do it here.

23              THE COURT:  Very briefly from -- I think it was

24    two Counsel that raised it.  So I can give you a break, and

25    my Court Reporter a break and everybody else in the room?
```

1              MR. GERDTS:  Yes, Your Honor.

2              I would note that the interpreter's gone well past

3      an hour at this point.

4              THE COURT:  Oh, yes.

5              MR. GERDTS:  Yes.  Even the DOJ guidelines explain

6      that they're supposed to go through e-mails when looking for

7      *Brady or Giglio* stuff.  Not internal e-mails between

8      themselves, that's not what we're talking about, because

9      that would be work product, that would be privileged.

10             I'm talking about e-mails with another Defense

11     Counsel representing one of the parties in this case.  That

12     -- that's what we're looking for.

13             If the Court doesn't want to, if they obviously

14     don't want to turn them over without some order by the

15     Court.  But if the Court feels it's appropriate to do an in

16     camera review before disclosing them to us, we're happy with

17     that.

18             We believe that the Court can effectively look for

19     what probably should already have been looked for by the

20     Government.

21             MS. WILLIAMS:  Your Honor, if I may?  This is a

22     complete fishing expedition.

23             We, of course, know our *Giglio* and *Brady*

24     obligations.  This witness is getting potentially a benefit.

25     That's why she's testifying.  That has been disclosed again,

1    and again, and again, including in her written plea

2    agreements, including in her grand jury transcript.

3            I think what Defense Counsel is saying, is why

4    don't you take a look at all their e-mails and see what we

5    find.  And that -- that isn't the standard.  It's just

6    simply not the standard.

7            All of these Defense Counsel sitting here are

8    familiar with how we conduct ourselves in this case, and how

9    the Government generally will send around plea agreements

10   and things like this.

11           And we'll -- we'll do what the Court orders.  But

12   this is -- this is so transparently a fishing expedition.

13           THE COURT:  I'll -- not to interfere with, I won't

14   let it interfere with the timing of the witness, preparation

15   by respective Counsel, but I -- the -- noting one, the

16   objection of the Defense, with or without the -- without the

17   in camera review and noting the objection of the Government,

18   that, well, we shouldn't have to even do the in camera

19   review.

20           I'm going to -- to me it's one way to make it --

21   with or without some type of fishing expedition, or whatever

22   phrases everybody's used today, it's the one way that I'll

23   believe I'll make this a nonissue one way or the another.

24           So I'll just -- obviously I need to give some

25   deference to your staff and Counsel on timing of that, but

1     we're not just to going to just screech to a halt,

2     especially with the time we've taken.

3             And the interpreter's going to probably seek an

4     article of impeachment on me for keeping him this long, but.

5             So, and whether you come up with a timeframe for

6     that after you've checked with staff -- I don't need to know

7     now.  I don't need to know that now, so.

8             It's -- if we -- if we go by the jury, it's --

9     it's what I told them it's 1:15.  Can we go 1:25?  And then

10    I'll take the blame?

11            And because I need to give that time to everybody,

12    including my reporter.  So we'll see you at 1:25.

13            All right, thank you.

14            (Recess at 12:40 p.m.)

15            (In open court at 1:31 p.m.)

16            THE COURT:  Two things.  You may notice we made an

17    adjustment in the lighting, so the witness isn't so dark, so

18    the jury can see.

19            So it's the same for, when there's not an exhibit.

20    That hasn't been changed.  The only thing that's been

21    changed for the exhibit, is we added one more light here,

22    because even though the jury hasn't complained, it was very

23    difficult, I think, for the jury to see the witness.

24            So we added that one light that used to be on.  So

25    that was changed.

1          And actually that's the way most of our courtrooms

2     are set up, up on 7.

3          On a second note, even though we needed and got

4     approval from D.C., we are in the process of making a

5     contract with a legal interpreter agency here in Minnesota

6     with a woman who's been interpreting for 10 years in Thai

7     for the state court.  And if the contract is approved,

8     before the end of the day she will be here in the morning

9     for the rest of the trial.  So that's in the process of

10    being done as we speak.  And Lori can bring in the jury.

11          (In open court at 1:33 p.m.)

12          THE COURT:  Whenever the jury is ready, Counsel,

13    you may continue your examination.

14          MS. PROVINZINO:  All right.

15    BY MS. PROVINZINO:

16    Q.  Sai, we were talking about your time at Kung's house in

17    Austin in October of 2015.

18          And just before we took our lunch break, I had

19    brought a couple of exhibits up for you.

20          And I will have you turn your attention to

21    Government Exhibit 1017 and 1005, and have you look at

22    those.

23          And do you recognize those photographs?

24    A.  I do.

25    Q.  Those are photographs you took, is that right?

```
 1    A.  Yes.

 2    Q.  And what are they of?

 3    A.  1017 is a birthday party picture.

 4    Q.  And 1005?

 5    A.  It was the picture of Kung's house.

 6              MS. PROVINZINO:  The Government moves to admit

 7    Exhibits 1017 and 1005.

 8              MR. ENGH:  No objection.

 9              MR. GERDTS:  No objection, Your Honor.

10              THE COURT:  Those are received.

11    BY MS. PROVINZINO:

12    Q.  So Sai, I'm showing you and the jury, Government

13    Exhibit 1017.

14              I think you had identified this as a birthday

15    picture, is that right?

16    A.  Yes.

17    Q.  And whose birthday was it?

18    A.  Kung's husband.

19    Q.  And where was the birthday party?

20    A.  It was in Austin.

21    Q.  And who's the woman with the white T-shirt?

22    A.  It was Kung.

23    Q.  And do you know anyone else in the photo?

24    A.  No, I do not.

25    Q.  And what is the date of this party?
```

1     A.  The 3rd of October, 2015.

2     Q.  And were you a guest at the party?

3     A.  I went to help cooking and helped with everything

4     else after the party was over.

5     Q.  So what did you do for the party?

6     A.  I cooked, and then I helped cleaning up the party and

7     washed dishes.

8     Q.  And after you cooked and helped cleaned up, where did

9     you stay that evening?

10    A.  I stayed there for one night.

11    Q.  Other than that, did you stay any other time at Kung's

12    house?

13    A.  No, I never did.

14    Q.  What type of food did you cook?

15    A.  Thai food.

16    Q.  I'm showing you Government Exhibit 1005.  And what is

17    this a photo of, Sai?

18    A.  It is a house.

19    Q.  And whose house is that?

20    A.  Kung's house.

21    Q.  And did you take this photo after you helped clean up

22    for the party?

23    A.  Yes.

24    Q.  So who lives at Kung's house?

25    A.  There's husband and husband's child.

1    Q.  Now were you posted for ads so customers could find you

2    in Austin?

3    A.  Which pictures?

4    Q.  I'll show you those.  Did Kung and her husband post you

5    online?

6              MR. ENGH:  Objection.  Leading.

7              THE COURT:  I'll allow the -- I'll allow the

8    question, if she understands it.

9              THE INTERPRETER:  May I repeat the question?

10             THE COURT:  Yes.  Note the objection.  You may ask

11   it.

12   A.  Yes.

13   BY MS. PROVINZINO:

14   Q.  I'm going to approach with Government Exhibit 17G.

15             And if you could open that exhibit.  Do you

16   recognize that?

17   A.  I do.

18   Q.  And who is that in the photo?

19   A.  The most left, in the blue dress was Sai.

20             MS. PROVINZINO:  The Government moves admission of

21   Government Exhibit 17G.

22             MR. ENGH:  No objection.

23             THE COURT:  That's received.

24   BY MS. PROVINZINO:

25   Q.  So you just identified that you were the person on the

1     far left, is that right?

2     A.  Yes.

3     Q.  And what are you holding there, Sai?

4     A.  It was a signage of the name so that it would be

5     taken the picture of and posted on a website.

6     Q.  And who took that picture of you?

7     A.  They had me and other of my friends take turn taking

8     pictures and send those pictures to her cell phone.

9     Q.  And when you say they, are you referring to Kung and her

10    husband?

11    A.  Yes.

12    Q.  So your notes, which the jury will get to see, documents

13    that you were working in Atlanta in November of 2015.  Does

14    that sound right?

15    A.  Yes.  Atlanta, right.

16    Q.  And you also working at somebody's named John's house in

17    LA, is that right?

18    A.  Yes.

19    Q.  And who was John in LA?

20    A.  He was a house owner.

21    Q.  Do you know if he has any connection to Bill or Maya?

22    A.  Yes, I do.

23    Q.  And what is it?

24    A.  John told me that previously they were partners.

25              MR. SICOLI:  Objection, hearsay.

```
 1                THE COURT:  Sustained.

 2                MS. PROVINZINO:  We'd offer the exception, Your

 3    Honor, that those are statements of a coconspirator.

 4                THE COURT:  And who had she said made them?

 5                MS. PROVINZINO:  This is another house boss in the

 6    LA area.  His name is John, or that's how he's referred to.

 7    It's the Constantine Ramirez on the witness list.  He's

 8    somebody who knows Bill and Maya.  So we would offer that

 9    exception as a statement of a coconspirator.

10                MR. GERDTS:  Your Honor, it has been made in

11    furtherance of -- there's been no -- it can't just be

12    gossip.

13                THE COURT:  I'll provisionally receive it -- Mr.

14    Sicoli?

15                MR. SICOLI:  Yes.

16                THE COURT:  I'll provisionally receive it, Members

17    of the Jury, provisionally means you evaluate the testimony

18    based upon all the evidence to determine, what if any, a

19    relationship it has to one or more of these Defendants, and

20    any alleged connection or conspiracy.  But it would be for

21    you to decide, based upon all the evidence and my

22    instructions to you.

23                With the appropriate objections noted, I'll permit

24    the question.

25                I think she's already answered it.  But I'll
```

1    permit her to -- subject to any additional objections, based

2    upon her opinions, so.

3    BY MS. PROVINZINO:

4    Q.  So Sai, I think you were just starting to describe

5    information you learned from John about his connections with

6    Bill and Maya.

7              Can you tell the jury what you learned from John

8    at his house in LA?

9    A.  He said that previously they had opened working

10   houses -- opened house together.

11   Q.  And when you said previously had opened working houses,

12   was that with Bill and Maya?

13   A.  Yes.

14   Q.  Now when you were working at John's house in LA, how did

15   you get money to Tu to pay your debt?

16   A.  I send it through Peearm.

17   Q.  Now we're going to focus on December of 2015.  Do you

18   have any information about that in your notes?  Go ahead and

19   translate, sorry.

20             So I'm pulling up your records, Government's

21   Exhibit 1410 Page 18.

22             And we're going to make this top section a little

23   bit easier for the jury to see.  Let's start with that.

24             Okay.  So what month are we focusing on here?

25   A.  It's December of 2015.

1    Q.  And where were you working?

2    A.  Phoenix.

3    Q.  And who was the house boss there?

4    A.  It was Moo.

5    Q.  And who was Moo?

6    A.  She was a house owner.

7    Q.  Is that the same Moo that we already identified in a

8    picture?

9    A.  No.  They weren't the same.

10          MS. PROVINZINO:  Approach with Government

11   Exhibit 1066.

12          THE COURT:  You may.

13   BY MS. PROVINZINO:

14   Q.  Showing you Government Exhibit 1066, who's in that

15   photograph?

16   A.  Moo.

17   Q.  Is she the house boss of Phoenix?

18   A.  Yes.

19          MS. PROVINZINO:  The Government moves admission of

20   Exhibit 1066.

21          MR. ENGH:  No objection.

22          MR. GERDTS:  No objection, Your Honor.

23          THE COURT:  All right.  After no objection, that's

24   received, 1066.

25   BY MS. PROVINZINO:

1    Q.  So this is Moo the house boss you were just referring to

2    in Phoenix, is that right?

3    A.  Yes.

4    Q.  Do you know her by any other names?

5    A.  No, I do not.

6    Q.  And as the house boss there, what did Moo set for the

7    price per hour and what was her house fee?

8    A.  One hour for $210.

9    Q.  And how much would Moo get to keep as the house fee?

10   A.  90.

11   Q.  Now, let's go back to the December record that we were

12   just looking at, because it's pretty detailed.  So I want to

13   walk the jury through this record.  And we'll talk with that

14   top part here.

15          This very first column on the far left with the

16   numbers 1, 2, 3, 4.  What does that refer to, Sia?

17   A.  It was the date.

18   Q.  So the 1st of December?

19   A.  Yes.

20   Q.  And is your second column the day of the week?

21   A.  Yes.

22   Q.  So what's in this third column here, 5, 1, 4, 2, 3, et

23   cetera?

24   A.  The amount of customers.

25   Q.  Okay.  And then this column right here, what does this

```
 1    cover?

 2    A.  It was the amount of money to be sent to Tu.

 3    Q.  And how did you get your money back to Tu when you were

 4    working at Moo's house in Phoenix?

 5    A.  I sent it through Wells Fargo to Peearm.

 6    Q.  And so turning to the next page, 19, is that an example

 7    of a Wells Fargo receipt where you would have sent money to

 8    Peearm?

 9    A.  Yes.

10    Q.  Now after your work in December, you continued on being

11    sent to different houses, is that right?

12    A.  Yes.

13    Q.  And the jury will get to see in your notes, it looked

14    like you worked in Chicago, is that right?

15    A.  Yes.

16    Q.  And Reno?

17    A.  Yes.

18    Q.  Seattle?

19    A.  Yes.

20    Q.  Back in Orange County?

21    A.  Yes.

22    Q.  And for some chinese houses, is that right?

23    A.  Yes.

24    Q.  You end up being in Reno for a fairly long period of

25    time, is that right?
```

1    A.  Yes.

2    Q.  And why were you in Reno that long?

3    A.  Because at the houses in other places started to

4    close down.

5    Q.  And what did you know about other houses starting to

6    close down?

7    A.  There was news about people got arrested.

8    Q.  During the time you've been here in the United States,

9    have you paid off your full debt of $55,000 to Tu?

10    A.  No.  It was not all.

11    Q.  How much have you paid Tu of your debt?

12    A.  About $45,000.

13    Q.  So now we're well into 2016.  And when we first looked

14    at information of your -- about your Visa, you came on a

15    B1/B2 tourist Visa, is that right?

16    A.  Yes.

17    Q.  So with that tourist Visa, how long could you stay in

18    the United States?

19    A.  Six months.

20    Q.  So at this time, you've stayed long than six months, is

21    that right?

22    A.  Yes.

23    Q.  And you knew that being involved in prostitution work

24    was illegal, right?

25    A.  Yes.

1    Q.  But you were still working to pay off the debt, is that

2    right?

3              MR. ENGH:  Objection, leading.

4              THE COURT:  I'll sustain as to the form.  Allow

5    the inquiry, but if we can break it down.

6    BY MS. PROVINZINO:

7    Q.  So why did you continue to work, Sai?

8    A.  Because I couldn't do anything else.

9    Q.  Now at some point in time, did you have difficulty

10   communicating with Tu?

11   A.  Yes.

12   Q.  And describe for the jury what happened?

13   A.  After there was a news about people who got arrested

14   here, he just shutdown the line app and disappeared.

15   Q.  So arrests for house bosses, is that right?

16              MR. ENGH:  Objection.  Leading again.

17              THE COURT:  I'll -- sustained.  I'll allow the

18   inquiry.  But if we could rephrase the question.

19   BY MS. PROVINZINO:

20   Q.  What information did you know about arrests from Tu?

21   A.  I knew about the news about who were -- who was

22   arrested and what were the causes for being arrested.

23   Q.  So were there any houses for Tu to send you to?

24   A.  There was.

25   Q.  And where was that?

```
 1    A.  It was in LA.

 2    Q.  And you said at some point Tu disappeared.  Can you

 3    describe to the jury what you mean by that?

 4    A.  He probably knew the news about people who got

 5    arrested.  And so he was probably afraid about it's --

 6    he's going to get to have -- get to have some

 7    involvement.  So he just turned off the line and -- line

 8    app and just disappeared.

 9              THE COURT:  Mr. Gerdts?

10              MR. GERDTS:  Objection to the speculation, Your

11    Honor.

12              THE COURT:  Members of the Jury, this witness has

13    given -- I don't allow a witness -- the rules don't allow

14    witnesses to speculate.

15              You'll have to evaluate what's called her -- her

16    testimony or opinion, and see what basis, if any, she has

17    for that.

18              Because what's called the weight to be given, if

19    any, to a witness's testimony is for you to decide.

20              So, with that in mind, note the objection.  I'll

21    let her answer stand with that instruction to the jury.

22    BY MS. PROVINZINO:

23    Q.  So Sai, I want to focus on how you would communicate

24    with Tu.

25    A.  I would communicate with him through line
```

 1     application.

 2     Q.  And how frequently would you communicate?

 3     A.  Once a month before the day that I have to pay off my

 4     -- pay down my debt.

 5     Q.  So tell the jury about that communication once a month.

 6     A.  He would send me a text message telling me that it's

 7     time to pay down the money.

 8     Q.  And so you'd get that once a month?

 9     A.  Yes.

10     Q.  Then after you hear about arrests there's no more line

11     app messages from Tu, is that right?

12     A.  That's correct.

13     Q.  Did you have a cell phone number to contact him?

14     A.  I had -- I used to have it before I came here, but

15     then after that, it was not usable.

16     Q.  So did you try to call him by phone?

17     A.  I have.

18     Q.  And you weren't able to connect with him by phone, is

19     that right?

20     A.  Yes.

21     Q.  Now previous to that, had Tu ever told you what he would

22     do if you were arrested?

23                 MR. RIVERS:  Objection.  Asked and answered.

24                 THE COURT:  Well, whether it was or wasn't in part

25     in this context, I'll let her -- I'll let her answer the

1    question.

2    BY MS. PROVINZINO:

3    Q.  Had Tu ever told you what he would do if you were

4    arrested?

5    A.  He said that if I was arrested, don't be afraid.

6    There would be -- or having any problem, somebody would

7    be coming in and help out.

8    Q.  Was that the case?

9    A.  No, it wasn't.

10   Q.  Did you get arrested?

11   A.  Yes, I was.

12   Q.  And when was that, Sai?

13   A.  The first time on the 7th of September of 2017.

14   Q.  Was there another time?

15   A.  The second time was on the 12th, October 2017.

16   Q.  And where was that?

17   A.  In Reno.

18   Q.  And were you held in jail?

19   A.  The first time I was in jail for 12 hours.

20   Q.  What about the second time, Sai?

21   A.  I was in jail.

22   Q.  And did you have a defense lawyer?

23   A.  I did.

24   Q.  And you had a chance to talk with him?

25   A.  Yes.

1    Q.  And who realized you were a victim of this Minnesota

2    case?

3    A.  The lawyer told me.

4    Q.  And with that then, did you meet with members of the

5    U.S. Attorney's Office and some agents?

6    A.  Yes.

7    Q.  And do you remember when that was?

8    A.  Did you mean the -- the prosecutors here or where?

9    Q.  When did we first meet, Sai?

10   A.  Here.  Here on the 17th of January, 2018.

11   Q.  And you told agents about your experience?

12   A.  Yes.

13   Q.  You shared your ledger?

14   A.  Yes.

15   Q.  And you shared photographs that you had taken.  You

16   allowed us to review your phone, is that right?

17   A.  Yes.

18   Q.  And you were prepared to testify before the grand jury?

19   A.  Yes.

20   Q.  Did you actually testify before the grand jury?

21   A.  You mean the first time?

22   Q.  In January.  Did you get a chance to testify before the

23   grand jury?

24   A.  No, I did not.

25   Q.  Do you remember you actually walked down there and they

1    had already been released for the day?

2    A.  Yes.

3    Q.  And I explained it was my poor communication with our

4    grand jury coordinator, right?

5              MR. ENGH:  Objection.  Hearsay, Your Honor.  Not a

6    question.

7              THE COURT:  I'll just ask that a question be put

8    in front of her.

9              THE INTERPRETER:  Can you repeat?

10   BY MS. PROVINZINO:

11   Q.  And I explained that I had failed to communicate well

12   with our jury coordinator on scheduling?

13   A.  Yes.

14   Q.  But you were willing to testify in front of the grand

15   jury just as you're testifying here today, is that right?

16   A.  Yes.

17   Q.  And Sai, do you now have immigration counsel?

18   A.  I do.

19   Q.  Are you familiar with the T Visa?

20             THE INTERPRETER:  May I repeat the question?

21             THE COURT:  Yes.

22   A.  I do know just when it got here.

23   BY MS. PROVINZINO:

24   Q.  And have you applied for a T Visa?

25   A.  I did.

1    Q.  That's just for you, not your family members, right?

2    A.  Yes.

3    Q.  And the Department of Homeland Security provided a

4    certification corroborating your victimization, is that

5    right?

6    A.  I don't understand why -- the letter you mean?

7    Q.  Was there a letter from law enforcement included in your

8    application?

9    A.  Yes.

10   Q.  Has any decision been made on whether your T Visa will

11   be granted?

12   A.  Not yet.

13   Q.  Now looking back, Sai, had you known all of what you had

14   experienced here, would you have come to the United States

15   under debt with Tu?

16   A.  No.

17   Q.  So, Sai, we talked about your arrest in Reno, right?

18   A.  Yes.

19   Q.  And that was in September and October of last year?

20   A.  Yes.

21   Q.  What was the state court charge, Sai?

22   A.  Prostitution.

23            MS. PROVINZINO:  Court's indulgence.

24            Permission to approach, Your Honor, with

25   Government Exhibit 28A.

```
 1                    THE COURT:  All right.

 2    BY MS. PROVINZINO:

 3    Q.  I'll have you take a look at Government Exhibit 28A.

 4                    And take a moment to look at each page, because

 5    there are a series of photographs.

 6                    Sai, who is depicted in those photographs?

 7    A.  It was Sai.

 8                    MS. PROVINZINO:  The Government moves admission of

 9    Exhibit 28A.

10                    MR. GERDTS: I have a lot of foundation objections

11    here, Your Honor.

12                    MS. PROVINZINO:  May we approach?

13                    THE COURT:  You may.

14                    (Sidebar at 2:07 p.m.)

15                    MR. GERDTS:  If the -- if they're offering just

16    the photographs of a person named Sai, I thought this

17    witness was Sai?

18                    MS. PROVINZINO:  It is Sai.  They're her photos.

19                    MR. GERDTS: If she wants to introduce her

20    photographs, we have no problem with that.

21                    But this is an extraction report from somebody

22    else's phone.  And it also has what purports to be a bunch

23    of translations and stuff of this phone.  And it's a whole

24    bunch of communications, I have no idea with whom.

25                    So there hasn't been any foundation laid for the
```

1   "extraction report" because somebody apparently got this off

2   a phone someplace.  It's not the witness's phone.

3            And the -- there's no foundation for the -- for

4   the for the incidents alleged in her interpretation.

5            And I can't tell what the relevance is of any of

6   the -- it looks like hundreds and hundreds of

7   communications.

8            MS. PROVINZINO:  Well, I have several responses to

9   that Mr. Gerdts.

10           First this is a telephone from Chatarak Taufflief,

11  she is Defendant Number two, a coconspirator.  Also, these

12  are statements of hers that come in as coconspirator

13  statements.  They have all been disclosed to you.

14           The extraction report was made by Special Agent

15  Nate Price of the IRS.  I previously indicated he will be

16  testifying.  He's on, in fact, on the witness list for

17  today.

18           There's been no challenge to chain-of-custody, nor

19  would you have standing to do that on this particular

20  exhibit.  And all of the translations have been done by Bee.

21  There has been no objection, and those have been disclosed.

22  To the extent that anyone has had any challenges to those

23  extractions, we have had none.

24           THE COURT:  What's her -- what's knowledge of -- I

25  was going to ask her.

1    MS. PROVINZINO:  These are photographs of her in

2    communication between the house boss and her trafficker in

3    Thailand.

4          THE COURT:  And so what is she going to be asked

5    about these?

6          MS. PROVINZINO:  She can identify that these are

7    the photographs of her, and information, including her own

8    passport photograph.

9          THE COURT:  And that is that also going to be

10   asked of her?

11         MS. PROVINZINO:  Yes.  Because she wouldn't

12   necessarily know other information about it, but she can

13   identify.  And she knows that there was -- that some of this

14   information had been provided to Tu, her trafficker.

15         MR. GUERRERO:  I think the photographs just come

16   in --

17         THE COURT:  Come closer to the microphone.

18         MR. GUERRERO:  She can identify the photographs of

19   herself, which is appropriate.  But this exhibit will be far

20   well suited by another witness who would have more

21   foundation for these documents.

22         MS. PROVINZINO:  And as I've indicated, that's

23   subject to Special Agent Nathan Price who will be

24   testifying.

25         THE COURT:  But, as I understand it, she's only

 1    going to be asked to identify the photographs.  And then

 2    whatever happens after that, I guess --

 3              MS. PROVINZINO:  Correct, Your Honor.

 4              THE COURT:  -- it's up to Agent Price or whomever

 5    to say --

 6              In other words, so not to oversimplify the issue

 7    or the objections, but to that extent, to whether these are

 8    on blank pieces of paper, or whatever, she's just going to

 9    say, Yes.  Somebody else is going to presumably, subject to

10    objection, connect to the dots.

11              MS. PROVINZINO:  That's correct, Your Honor.

12              THE COURT:  Saying, well, here's where we found

13    the photographs.  Because she wouldn't know.

14              MS. PROVINZINO:  No.  Nor am I eliciting that kind

15    of testimony.

16              THE COURT:  You'll just about each photograph?

17              MS. PROVINZINO:  Correct, Your Honor.

18              THE COURT:  Well, can we display that without the

19    jury saying the -- did you want to just display the

20    photographs, as well?

21              MS. PROVINZINO:  I can blow those particular

22    photographs up.

23              THE COURT:  Then with that understanding --

24              MS. PROVINZINO:  I'm not asking her about the

25    texts.

1          THE COURT:  -- I'll permit that.

2              So this really isn't being -- the document itself

3      and its contents, other than the photographs, is not being

4      offered at this time?

5              MS. PROVINZINO:  We are offering it -- it could be

6      admitted subject to shoring up by our forensic investigator,

7      or we could provisionally --

8              THE COURT:  Or the testimony is going to be -- if

9      it's provisionally received for the limited purpose of

10     these, so she can identify the photos?

11             MS. PROVINZINO:  Yes, Your Honor.

12             THE COURT:  So with that understanding, I'll

13     permit it.

14             Now whether there are bigger concerns, it appears

15     from Counsel as, Well, at some point is this whole thing

16     going to be introduced so we can start reading from it, I

17     guess that's up to Counsel.

18             MR. GERDTS:  Yeah.  And if I may respond?

19             THE COURT:  Sure.

20             MR. GERDTS:  I do have objections.

21             It's not my job to tell the Government where their

22     witness had made mistakes in their interpretations.

23             I object to any interpretation unless they lay a

24     foundation for it.  That's just standard procedure.

25             And -- and one more thing about the 801(d)(2)(e)

```
 1    exception, it is not the jury's responsibility to determine

 2    if the statement is admissible --

 3              THE COURT:  That's true.

 4              MR. GERDTS:  -- under that rule.

 5              THE COURT:  That's very true.

 6              MR. GERDTS:  It's the Court's determination.  And

 7    it has to be in furtherance of the conspiracy --

 8              THE COURT:  That's, in fairness --

 9              MR. GERDTS:  -- and offered against a

10    party-opponent.  And Counsel can just say, Well, these are

11    statements by coconspirators, isn't good enough.

12              THE COURT:  That's true.  That's true.

13              MS. PROVINZINO:  Well, Chatarak Taufflief is a

14    coconspirator.

15              THE COURT:  I think he was referring back to the

16    last exchange we had, so.

17              But we'll proceed with the photographs.  They'll

18    be provisionally received.

19              Obviously there may not be any reference to

20    context or what's in here.  And then you're going to show

21    her the photographs.

22              MS. PROVINZINO:  That's right.  Because foundation

23    will come in for extraction of the forensic expert and the

24    translation through the interpreter.

25              THE COURT:  And in that she wouldn't know -- she
```

1    wouldn't even begin to know whose chat this was.  It could

2    be anybody's.  But only if she identifies the photographs or

3    not, in light of what Mr. Gerdts said, even separate from

4    the photographs, there may be other foundational issues.

5         If people want to be heard on the whole issue of

6    the 801(b)(2) with respect to the issue about the foundation

7    for the conspiracy.  So we can deal with that, as well, so.

8    All right.

9         MS. PROVINZINO:  Well, I believe, to respond to

10   that, there was sufficient indication of furtherance of the

11   conspiracy.

12        Because during the time Sai worked at John's home

13   in LA, she was using Arm to send money back to Tu.  So it's

14   clearly connected to her trafficking that she was paying

15   contact debt at the time she was working at John's home in

16   LA.  Similar to what she was doing at Maya's home and Bill's

17   home and others.

18        THE COURT:  And we'll revisit that at another

19   time.  But part of my limiting instruction wasn't that it

20   was up for the jury to decide if a conspiracy exists, we've

21   got five Defendants not one.  And so they.  It would be --

22   there will be some issues on that issue.

23        But we'll get to that, I'm certain, not too far in

24   the future, so.  All right.

25        (In open court at 2:14 p.m.)

```
 1              Sorry for the hissing sound.  I've asked for music

 2     over the years.  I guess that's not allowed.  Not --

 3     because it wouldn't be allowed because of the copyrights and

 4     what we're allowed to use with the software.

 5              But, again, the lawyers are doing exactly what the

 6     rules require with respect to bringing issues up to the --

 7     to the Court that are -- that it's required to discuss this.

 8              In fact, that's why we have technology where

 9     there's a microphone over here.  And the only individual

10     taking everything down is my Court Reporter, because it

11     knocks out everything else but her headphones.

12              So we'll continue consistent with our discussion

13     here at sidebar.

14              MS. PROVINZINO:  Thank you, Your Honor.

15              And I'd ask to publish the photographs, subject to

16     the provisional admission of Government Exhibit 28A at this

17     time.

18              THE COURT:  And we'll do that consistent with my

19     ruling or discussions with all Counsel here at the sidebar.

20     BY MS. PROVINZINO:

21     Q.  So Sai, I'm only focused on the photographs with you.

22              And I'm going to show you the first page of the

23     first page of Government's Exhibit 28A.  And who's depicted

24     in that photograph?

25     A.  It's Sai.
```

```
 1    Q.  And where is that taken?

 2    A.  Toilet Studio.

 3    Q.  And I'm going to go down to Page 3.  There's some photos

 4    on the far right corner.

 5    A.  It's Sai.

 6    Q.  And when were those photos taken?

 7    A.  It's been a while.

 8    Q.  What did you do with those photos?

 9    A.  This -- I probably sent it over to Tu.  He's probably

10    asked for the normal -- me in normal clothing without

11    having any makeups.

12    Q.  And Sai, we're focusing on Government's Exhibit 28A.

13    And I have made some photos on the far right of the page

14    larger.  And who's in those photos?

15    A.  It's Sai.

16    Q.  And where were those taken?

17    A.  They were taken on October 24th.

18    Q.  And do you recall who took those photographs?

19    A.  It was my friend.

20    Q.  And what did you do with those photos?  You or your

21    friend do with those photos?

22    A.  Tu asked for actual pictures, so I went and took more

23    pictures.

24    Q.  And I'm focusing on Page 5 of 28A.  I'm just going to

25    make a few larger on the far right.  What are these photos
```

1    of?

2    A.  It's Sai.

3    Q.  That's you, right?

4    A.  Yes.

5    Q.  And where were those taken?

6    A.  At Toilet Studio.

7    Q.  Were these the photos we saw earlier that Tu had

8    directed you to take at Toilet Studio?

9    A.  Yes.

10   Q.  I'm going to turn your attention to Page 7.  And I'm

11   just going to make what appears to be a Thai passport larger

12   for you and the jury to see.

13         And who's passport is that?

14   A.  It's Sai.

15         MS. PROVINZINO:  Nothing further, Your Honor.

16         THE COURT: Counsel may inquire when you're ready.

17              C R O S S - E X A M I N A T I O N

18   BY MR. SICOLI:

19   Q.  Good afternoon.

20   A.  Good afternoon.

21   Q.  You're 46 years old now, is that correct?

22   A.  Yes.

23   Q.  And you came to the U.S. in May 25th of 2015, is that

24   correct?

25   A.  That's correct.

1    Q.  So you were 43 years old when you came to the United

2    States?

3    A.  Yes.

4    Q.  Now prior to coming to the United States, you testified

5    that you worked in a massage parlor in Thailand, is that

6    correct?

7    A.  That's correct.

8    Q.  And in one of your many statements to the Government,

9    you told the Government that you did traditional massage

10   work, is that correct?

11   A.  Yes.

12   Q.  And in Thailand, prostitution is pretty much accepted,

13   isn't it?

14           THE INTERPRETER:  May I repeat the question?

15           THE COURT:  Yes.

16   A.  I don't know either.  Who's the people that accept

17   it?

18   BY MR. SICOLI:

19   Q.  Well, let me get more specific.  In the massage parlors

20   in Thailand, there's a lot of commercial sex work that goes

21   on, isn't there?

22   A.  No, it's not.

23   Q.  So your testimony in front of this jury is that there's

24   no commercial sex work in massage parlors in Thailand?

25   A.  Yes.

1  Q.  Now, you told the Government that you did traditional

2  massage work.  But you also told the Government that you

3  could do additional work beyond traditional massage work,

4  but it wasn't commercial sex work.

5         So what kind of work would be nontraditional

6  massage work?

7  A.  So there were massage store that also selling sex.

8  There were places like that.

9         There were places where you could have

10 traditional Thai massage, there's things like that.

11        There's places that you can have foot massage.

12 There's places like that.  And some places there were no

13 sex either.

14 Q.  So now you are testifying that there were sex work in

15 massage parlors.  Is that what you're testifying to now?

16        THE INTERPRETER:  Will you repeat your question?

17        MR. SICOLI:  Sure.

18 BY MR. SICOLI:

19 Q.  I think I heard in your answer that there is commercial

20 sex work now that goes on in Thai massage parlors.  Is that

21 true?

22 A.  There were places that's called shower massage.  It

23 was a legal place.

24 Q.  Okay.  Was there commercial sex work that went in

25 there?

```
 1    A.  Yes.

 2    Q.  And when you told the Government that you could do

 3    additional work beyond traditional sex work, I'm still not

 4    sure I understand what your answer was.

 5              What would be the nontraditional sex work that you

 6    would do?

 7    A.  Personally, what I said was I only did the massage.

 8    I never did something -- anything beyond that.

 9    Q.  Did you ever tell the Government that you did additional

10    work beyond traditional in your October 17, 2018, statement?

11    A.  17 of October?

12    Q.  Yes.  October 17, 2018?

13    A.  I didn't say things like that.

14    Q.  Now you mentioned -- or you went through the Visa

15    process with Tu to come to the United States, correct?

16    A.  Yes.

17    Q.  And I think you testified that there was false

18    statements on that Visa application, right?

19    A.  Yes.

20    Q.  And we saw the Visa application, which was Exhibit 120.

21              And I don't know if you still have that in front of

22    you.  Did you find 120?

23    A.  I didn't --

24    Q.  One thing that's true on that exhibit, is that you had a

25    passport, is that correct?
```

```
 1    A.  Yes.

 2    Q.  And the passport was issued in 2013, is that correct?

 3    A.  Yes.

 4    Q.  And that's true.  You had a passport in 2013, correct?

 5    A.  Yes.

 6    Q.  And you testified, I believe, that you've never traveled

 7    outside of Thailand before you came to the United States, is

 8    that correct?

 9    A.  Yes.

10    Q.  Okay.  Why did you have a passport in 2013, if you've

11    never traveled outside of Thailand?

12    A.  At the time I was doing it because there was somebody

13    who contacted me asking if I was interested in doing

14    massage work outside the country.

15    Q.  Well, let me ask you this.  Isn't it true that you

16    actually traveled to England in the past?

17    A.  Yes, I did.

18    Q.  All right.  So you did travel outside of Thailand in the

19    past, is that correct?

20    A.  Yes.

21    Q.  And, in fact, you traveled to England -- when was that,

22    do you remember?

23    A.  2009.

24    Q.  And in 2009 you actually traveled to England to engage

25    in prostitution, isn't that true?
```

1    A.  Yes.

2    Q.  Okay.  Why didn't you tell the jury that before?

3    A.  Because I didn't think they were related.

4    Q.  You were asked specifically if you ever traveled outside

5    of Thailand, correct?

6    A.  Yes.

7    Q.  And you're under oath, correct?

8    A.  Yes.

9    Q.  And so you lied to this jury, is that correct?

10   A.  I -- I didn't think like that.  I thought what I give

11   an oath here is about the case here, and not related to

12   other thing.

13   Q.  Okay.  And it's basically because it didn't help your

14   case to tell the jury that you actually have engaged in

15   prostitution in the past, correct?

16   A.  I don't understand.

17   Q.  Well, it didn't help -- it doesn't help your T -- it

18   doesn't help your T Visa for the Government to know now that

19   you engaged in prostitution in Britain -- in England, does

20   it?

21   A.  No, that's not correct.

22   Q.  Well, let's move on.  Did you travel to any other

23   countries to engage in prostitution?

24   A.  No.  There was not.

25   Q.  Okay.  Have you ever had any plastic surgery to enhance

1    your looks?

2    A.  Did you mean on my body or on my face?

3    Q.  Did you have breast enhancement surgery?

4    A.  Yes, I did.

5    Q.  And that was, again, to enhance your worth as far as the

6    prostitution goes, is that correct?

7    A.  No, it was not.

8    Q.  Okay.  Was there another reason why you had breast

9    enhancement surgery?

10   A.  No.  I just wanted to have it.

11   Q.  Okay.  Did you engage in prostitution in Thailand?

12   A.  No, I did not.

13   Q.  You also testified that your father was diagnosed with

14   cancer and that you needed to take care of him, is that

15   correct?

16   A.  Yes.

17   Q.  And you told the Government that in your October 17th,

18   2018, statement, is that correct?

19           THE INTERPRETER:  I'm sorry.  Can you repeat the

20   last question?

21           MR. SICOLI:  Sure.

22   BY MR. SICOLI:

23   Q.  In the October 17, 2018 statement to the Government, you

24   told them that your father was diagnosed with cancer, that

25   you needed to take care of him, is that correct?

1    A.  Yes.

2    Q.  Now you didn't mention anything about your father's

3    condition in a statement that you gave to the Reno Police

4    Department in November 17th, 2017, after you were arrested,

5    is that correct?

6    A.  I don't remember.

7    Q.  You -- you didn't tell the Government -- and when I'm

8    saying the Government, I'm talking about Ms. Provinzino and

9    the Government team here, in your January 17th, 2018,

10   statement, you also did not tell your -- the Government

11   about your father being diagnosed with cancer, is that

12   correct?

13   A.  I did tell them.

14   Q.  Okay.  So did you tell them in October of 2018?  Or did

15   you tell them in January?

16   A.  In January.

17   Q.  All right.  Let's move on then.  I want to talk a little

18   bit about your conversations with Tu then about coming to

19   the United States.

20          You've testified in front of this jury that Tu

21   told you that you could actually just do massage work in the

22   United States, isn't that correct?

23   A.  Yes.

24   Q.  And he told you that you would have a debt of about

25   $55,000, correct?

1    A.  Yes.

2    Q.  But he also told you that you would get -- get time off

3    from your job in the United States when you had your period,

4    is that correct?

5    A.  No.

6    Q.  Do you remember telling the Government on -- let's make

7    sure I've got the right statement.

8              In the October 17th, 2018, statement -- have you

9    had a chance to review your statements at all?  Or have you

10   not had a chance to review them?

11   A.  I did not have a chance.

12   Q.  Well, let me ask you if you have a chance to recall

13   talking about -- on October 17, 2018, talking with Special

14   Agent Price and Assistant U.S. Attorney Laura Provinzino, in

15   which you told them that Tu told you that you would get time

16   off when you had your period, but otherwise you would have

17   to work?

18   A.  17 of what?

19   Q.  Of October, 2018.  Less than a month ago.

20   A.  Yes.  Yes.

21   Q.  Do you remember that, now?

22   A.  Yes.

23   Q.  So let me ask you this, if he didn't tell you that you

24   weren't going to be performing sex work, why would you get

25   time off for when you have your period?  Do you know?

1     A.  I don't understand.

2     Q.  Well, why -- why -- do you know, and only if you know,

3     why Tu would tell you that you would have time off for when

4     you have your period if you're not going to be performing

5     sex work?

6     A.  For massage work, when you have period -- when I have

7     a period, I wouldn't be working as masseuse.

8     Q.  Okay.  So something just about giving a massage you

9     can't have your period, is that what your testimony is?

10    A.  Yes.

11    Q.  Now, you also said that, again, you didn't think you

12    were going to have to do sex work.  But we've seen the

13    pictures that were presented, which is Government

14    Exhibit 475.  And I think the jury's seen enough of that, so

15    I don't need to put it up again.

16          But would you acknowledge that those were sexy

17    photos that would be something that would be different than

18    photos that you would need to do massage work?

19    A.  Yes.

20    Q.  And it's still your testimony, though, even with those

21    pictures, and even with you not telling us the truth about

22    being a prostitute in England, it's still your testimony

23    that you did not know you were going to do sex work in the

24    United States, is that correct?

25    A.  For the pictures, he told me that here, in the U.S.,

1    they needed this kind of pictures.  But for massage work,

2    I could pick whether or not I could do something else or

3    not.

4    Q.  So are you saying that he did tell you, though, that

5    you -- you could do sex work then in the United States, if

6    you wanted to?

7    A.  Yes.

8    Q.  All right.  Let's get to the United States then.

9    Because I wanted to get to the allegations that you made.

10              So when you first came to the United States in May

11   of 2015, you went to Maya's house in LA and then in Maya's

12   house in Chicago, is that right?

13   A.  Yes.

14   Q.  And you were only -- only after that then, did you come

15   to Bill's house in San Diego, is that correct?

16   A.  Yes.

17   Q.  And that was for a two-week period, August 3rd through

18   the 15th, is that correct?

19   A.  Yes.

20   Q.  And in the San Diego house, customers were charged $260

21   per hour, is that correct?

22   A.  Yes.

23   Q.  And I think you referred to Bill as Uncle Bill, is that

24   correct?

25   A.  That's correct.

1    Q.  And Uncle Bill would take -- out of that $260, he would

2    take $100 for the expenses that he had, as well as renting

3    the house and all of that kind of stuff, is that correct?

4    A.  Yes.

5    Q.  And if was a half an hour, it would be $180 and he would

6    take $60, is that correct?

7    A.  Yes.

8    Q.  And he had nothing to do with what you did with the rest

9    of the money, is that correct?

10   A.  That's correct.

11   Q.  So he didn't take any money to send to anybody or

12   anything, you got to keep that?  And then what you did was

13   up to you?

14          THE INTERPRETER:  May I repeat the question?

15          MR. SICOLI:  Sure.  Go ahead.

16          THE COURT:  Yes.

17   A.  That's correct.

18   BY MR. SICOLI:

19   Q.  And you actually only met Bill four times, Uncle Bill

20   four times, is that correct?

21   A.  That's correct.

22   Q.  Once when he picked you up at the airport, correct?

23   A.  That's correct.

24   Q.  Once when he dropped you back at the airport, is that

25   correct?

1    A.  Yes.

2    Q.  And then two times at the San Diego house, is that

3    correct?

4    A.  Yes.

5    Q.  And you told the Government that Uncle Bill was kind to

6    you, is that correct?

7    A.  Yes, correct.

8    Q.  And that Uncle Bill would buy you things for the

9    apartment that you needed, is that correct?

10   A.  That's correct.

11   Q.  And he even, I think you described the fact that when he

12   picked you up at the airport he actually took you out to get

13   some food, is that correct?

14   A.  That's correct.

15   Q.  And he would buy other supplies for the apartment, is

16   that correct?

17   A.  That's correct.

18   Q.  And he seemed to care about you, is that correct?

19   A.  Yes.

20   Q.  And that's one reason you call him Uncle Bill, right?

21   A.  Yes.

22   Q.  And a lot of other women that came to Uncle Bill's

23   house, also called him Uncle Bill, is that correct?

24   A.  That's correct.

25   Q.  And when you were over at Uncle Bill's place in San

1    Diego, he didn't restrict any of your movements, is that

2    correct?

3    A.  That's correct.

4    Q.  You could go anywhere you wanted to go, is that correct?

5    A.  That's correct.

6    Q.  And he didn't force you to do anything, is that correct?

7    A.  He didn't force me?  I don't understand.

8    Q.  Well, he didn't -- he didn't make you engage in

9    commercial sex acts.  You could have left if you wanted to,

10   correct?

11   A.  You couldn't go anywhere anyway.

12   Q.  Well, I realize you feel that you had a debt to Tu, but

13   that wasn't anything that Uncle Bill told you, correct?

14   A.  So it was a working house that I have to go work

15   there, so that I can make money to pay Tu.

16   Q.  Right.  Because you felt an obligation to pay Tu,

17   correct?

18   A.  Yes.

19   Q.  But Uncle Bill didn't tell you that you had to pay Tu.

20   He was just there to set up the appointments for you and to

21   make sure you had the supplies, correct?

22   A.  So he has a job to pick me up and work at that house.

23        I'm not sure if he has something to do with the

24   contract or not.  I don't know.

25   Q.  Right.  He never talked to you at all, though, about

1     any debt you owed Tu, right? He never talked to you about

2     that?

3     A.  That's correct.

4     Q.  And the only thing he did is drop you off at the house

5     and you did some work for him, correct?  Or at the house?

6     A.  That's correct.

7     Q.  And business was slow at Uncle Bill's house, is that

8     correct?

9     A.  I don't understand.

10    Q.  Let me put it this way, you only -- when you were at

11    Bill's house for those 12 days or 13 days, you only saw

12    three to five customers a day, maximum, is that correct?

13    A.  That's correct.

14    Q.  And during that short period of time, you testified you

15    could go anywhere you wanted, right?

16    A.  Going anywhere meaning I could go buy stuff?  Or

17    there was somebody who took me to places?

18    Q.  Well, in fact, you left the second day you were there to

19    go buy food yourself, isn't that correct?

20    A.  Yes.

21    Q.  And it was a -- it was a nice place that you were in,

22    correct?

23    A.  Yes.

24    Q.  In fact, that's why you took the pictures that we saw

25    in -- as Government Exhibit 1004 through 1006, where you

```
 1    took pictures of his house because it was a nice house, is

 2    that correct?

 3    A.  Oh, yes.

 4    Q.  Now, I want to shift gears a little bit then, and go to

 5    when you stopped paying Tu back.

 6              So I want to get into October of 2016, if I can?

 7              THE COURT:  I'm wondering if there's a logical

 8    place, without interrupting your exam, if we can take a

 9    break here for everyone, including the interpreter?

10              MR. SICOLI:  Your Honor, this is a perfect place

11    for a break.

12              THE COURT:  Is that acceptable to all attorneys on

13    both sides?

14              MS. PROVINZINO:  No objection, Your Honor.

15              THE COURT:  All right.  We'll take a 15-minute

16    recess here.

17              Members of the Jury -- rise for the jury, please.

18              (Jurors excused at 2:49 p.m.)

19              THE COURT:  And then you can step down.

20              And then whenever the examination is done, all of

21    cross, and direct, I think -- and redirect, we'll probably

22    take another recess there and see where we're at before we

23    proceed in fairness to all the lawyers, so.

24              All right, we'll see you in about 10, 12 minutes

25    in that neighborhood.
```

```
1                    (Recess at 2:49 p.m.)

2                    (In open court at 3:06 p.m.)

3              THE COURT:  And as soon as the jury is ready, you

4     can proceed, Mr. Sicoli.

5              MR. SICOLI:  Thank you, Your Honor.

6     BY MR. SICOLI:

7     Q.  Are you all set?  I just want to make sure you're ready

8     to go.

9     A.  Yes, I am.

10    Q.  Okay.  I want to shift gears then to when you stopped

11    paying the debt back to Tu.

12             It was October of -- approximately of 2016 when

13    you were in Reno, Nevada, is that correct, that you stopped

14    paying him?

15    A.  I had not stopped paying yet, at the time.

16    Q.  Well, in October of 2016, you heard about some arrests

17    in the case, is that correct?

18    A.  Yes.

19    Q.  And you had already paid Tu back over $40,000, is that

20    correct?

21    A.  Not yet.  Not to that amount, full amount.

22    Q.  Okay.  And the full amount is $50,000, that you owe?

23    A.  Yes.

24    Q.  And in regardless of what the date was, when you decided

25    you weren't going to pay Tu back, you actually sent him a
```

1    line communication, which is basically similar to like a

2    text, in which you told him that you weren't going to pay

3    him back any more money, correct?

4    A.  Yes.

5    Q.  And you told him that you had paid enough back and you

6    just weren't going to pay him, right?

7    A.  Yes.

8    Q.  And this is the person that you were deathly afraid of,

9    correct?

10    A.  Yes.

11    Q.  Now, it took you much longer -- it took you over a year,

12    and you hadn't paid the whole thing back yet, is that

13    correct?

14    A.  That's correct.

15    Q.  Part of the reason you didn't pay it back is that you

16    didn't work sometimes, is that correct?

17              THE INTERPRETER:  May I rephrase the question in

18    Thai?

19              MR. SICOLI:  Yes.

20    A.  While I was under contract debt that I was working

21    the whole time.

22    BY MR. SICOLI:

23    Q.  Well, wasn't it true that there was a time period right

24    around Christmas of 2015 that you didn't work for a period

25    of time because there wasn't any work for you?

1    A.  2015?

2    Q.  Yes.

3    A.  Yes.  Yes.  Around Christmas time there would not be

4    customers, so I didn't work.

5    Q.  Right.  And in addition, though, you -- you actually had

6    an arrangement where you would send money back to your

7    family while you were under debt, is that correct?

8    A.  That's correct.

9    Q.  Because you wanted to support your family, is that

10   correct?

11   A.  That's correct.

12   Q.  And, in fact, on most months, you sent back at least

13   $2,000 back to your family, is that correct?

14   A.  That's correct.

15   Q.  And no one told you you couldn't do that, right?

16   A.  Nobody.

17   Q.  And you felt free to do that, that you didn't have to

18   pay Tu all the money back?

19   A.  This is agreement that he had told me when I arrive

20   here and when I had to work.

21   Q.  Right.  And so you could send money back and you could

22   send him some money as well, but he didn't give you a

23   timeframe and he would let you do what you want, correct?

24   A.  I don't understand.

25   Q.  Well, why don't we move on just -- and I'm almost done

```
 1    here.
 2              But I'm going to show you -- you took notes of the
 3    amount of money that you paid back and the amount of
 4    customers you had, correct?  Is that correct?
 5              THE INTERPRETER:  I'm sorry.  May you repeat the
 6    question?
 7              MR. SICOLI:  Sure.
 8    BY MR. SICOLI:
 9    Q.  We've already seen this as Government Exhibit 1410.
10              You actually took notes of all the customers and
11    the amount of money that you had received and paid back to
12    Tu, is that correct?
13              I have the exhibit, I'm sorry.  I have the
14    exhibit, sorry.
15              MR. SICOLI:  May I approach the witness, Your
16    Honor?
17              THE COURT:  You may.
18    BY MR. SICOLI:
19    Q.  Just take a look at that.  And I'll come and get it.
20              That's Government Exhibit 1410, is that correct?
21    A.  Yes.
22    Q.  And those are your notes of the various houses that you
23    went to and how much money you paid back to Tu, is that
24    correct?
25    A.  That's correct.
```

```
1    Q.  Thank you.  And I'm not going to go through all of

2    these, but I wanted to show just a couple of them to the

3    jury.

4            All right.  So this would be one of the documents

5    that you drafted.  And it's Chicago P'Du's house, is that

6    correct?

7    A.  That's correct.

8    Q.  All right.  And what's the date on that?

9    A.  Where did you mean?

10   Q.  The dates are from January 11th to January 31st of 2016,

11   is that correct?

12   A.  That's correct.

13   Q.  Right.  And it's -- it's right now down here, is that

14   correct?

15   A.  Yes.

16   Q.  And there's a translation there, but Number three says,

17   "Sent to family."  Is that correct?

18   A.  That's correct.

19   Q.  And number three then above would be the $2,000 that was

20   sent back to the family, is that correct?

21   A.  That's correct.

22   Q.  So from January 11th through the 31st -- and that's not

23   even a month and you sent back $2,000 to your family, is

24   that correct?

25   A.  This is the money that I made and I sent back.  This
```

1   was the money carried over from December.

2   Q.  This was money, though, that you sent back to your

3   family, correct?

4   A.  Yes.

5   Q.  And nobody stopped you from doing that?

6   A.  I don't understand.

7   Q.  Well, you were -- nobody said you can't do that.  You

8   can't send $2,000 back?

9   A.  That's correct.

10  Q.  All right.  And is this the same thing?

11  A.  Yes.

12  Q.  All right.  And it's again showing $2,000?

13  A.  Yes.  This is -- this is the same -- the same as the

14  previous page.

15  Q.  Right.  And there's other -- there's other -- and I'm

16  not going to go through it with the jury, because the jury

17  can look back when they go back to the jury room on 1410.

18          But there's other entries on that where you're

19  paying back $2,000 to your family, is that correct?

20  A.  That's correct.

21  Q.  Now you continued to work in prostitution then when you

22  were in Reno, is that correct?

23  A.  Yes.

24  Q.  And nothing -- none of these Defendants were involved in

25  any of that, is that correct?

1    A.  That's correct.

2    Q.  And the only reason you stopped -- because you had

3    already told Tu you weren't going to pay any money back,

4    right?  You had already told him that?

5    A.  I don't understand.

6    Q.  Sure.  Prior to -- let's just say prior to your

7    arrest -- you were arrested in September of 2017 and then,

8    again, in October of 2017, is that correct?

9    A.  That's correct.

10   Q.  And you had stopped paying Tu back any money a year

11   before that, isn't that true?

12   A.  It wasn't a year.

13   Q.  Okay.  Was it a half a year?

14   A.  I'm not really sure.

15   Q.  But it was before -- it was certainly several months

16   before September of 2017, is that correct?

17   A.  That's correct.

18   Q.  And you continued to engage in prostitution, correct?

19   A.  That's correct.

20   Q.  And the reason is, is because you're making more money

21   than you could ever make in Thailand, isn't that correct?

22   A.  That's correct.

23   Q.  And you were sending money back to your family.  And now

24   you were even sending more money back to your family?

25   A.  That's correct.

1    Q.  And you were arrested then for prostitution twice, is

2    that correct?

3    A.  That's correct.

4    Q.  And it was discovered that you may have some connection

5    to this investigation in Minnesota, is that correct?

6    A.  That's correct.

7    Q.  And the charges in Las Vegas -- or in Reno, Nevada were

8    dismissed then, is that correct?

9    A.  That's correct.

10   Q.  And then in addition to that, you were allowed to stay

11   in the United States, is that correct, to help the

12   investigation?

13   A.  That's correct.

14   Q.  And you understood that you would only be allowed to

15   stay in the United States if you helped the Government's

16   investigation, correct?

17   A.  That's correct.

18   Q.  And after -- and that's why you're here today, is to

19   help the Government's investigation?

20   A.  Yes.

21   Q.  And after that, you actually did file for a T Visa,

22   correct?

23   A.  I don't understand.

24   Q.  Well, you have an immigration lawyer, right?

25   A.  Yes.

1    Q.  And your immigration lawyer filed a T -- what's called a

2    T Visa on your behalf, as victim of trafficking, is that

3    correct?

4    A.  Yes.  That's correct.

5    Q.  And you understood -- and you understand that you

6    wouldn't be able to get approved for a T Visa unless you

7    were a victim of sex trafficking, is that correct?

8    A.  Yes.

9    Q.  And what that means is that you have to basically say

10   that you were forced or coerced into engaging in

11   prostitution in the United States, is that correct?

12   A.  I don't understand.

13   Q.  Well, if -- if you would have told the Government that

14   you engaged in prostitution voluntarily, you would not be

15   able to get a T Visa, is that your understanding?

16   A.  No.  It's not related.  I don't understand.

17   Q.  All right.  So your testimony is that even if you

18   engaged in prostitution voluntarily, you could get a T

19   Visa?  That's what your understanding is?

20   A.  No.  I don't understand.

21   Q.  Okay.  Well, let me just go -- let me go away from that

22   for a second.

23          Isn't it true that in your T Visa application, one

24   thing that you said, and that you have to say to qualify

25   for, is that you're scared to go back to Thailand because

1    the traffickers may harm you?  Isn't that in the T Visa that

2    you submitted?

3    A.  Yes.

4    Q.  And so you're basically saying that you're scared of the

5    people in Thailand, even though you told Tu that you weren't

6    going to pay him back and there's nothing he could do about

7    it?

8    A.  Yes.

9    Q.  And your children are -- your adult children are in

10   Thailand, isn't that correct?

11   A.  That's correct.

12   Q.  Okay.  And the jury's heard a little bit about T Visas,

13   so I don't need to go into all the particulars.

14        But you understand that you can stay in the United

15   States now for up to four years if it's granted.  Do you

16   understand that?

17   A.  Yes.

18   Q.  And you understand, too, that you can -- even though you

19   haven't filed for your children, your adult children to come

20   over here to the United States, if you get a T Visa, then

21   you can apply for them to come over to the United States.

22   You understand that, don't you?

23        MS. PROVINZINO:  Objection.  That misstates the

24   Government's rules about the age of children you can bring

25   over to the United States.

```
 1                  THE COURT:  Well, even -- whether it misstates it

 2      or not, the question is what's -- what's her understanding?

 3      And then I'll make sure that the jury's so informed in the

 4      case of how it works.

 5                  But if the question calls for her understanding of

 6      what it is, she may answer.

 7      A.  I did not know that.

 8      BY MR. SICOLI:

 9      Q.  So you don't know that a spouse or child of a victim of

10      trafficking who is 21 years of age or older can come into

11      the United States?

12      A.  No, I did not know.

13                  MR. SICOLI:  Thank you.  I have no further

14      questions.

15                  THE COURT:  Mr. Engh, if you wish?

16                    C R O S S - E X A M I N A T I O N

17      BY MR. ENGH:

18      Q.  Good afternoon.  I have some questions for you, as well.

19      I want to direct your attention to your time in Austin.

20                  You arrived on one occasion?

21      A.  Yes.

22      Q.  Okay.  Not twice or three times, right?

23      A.  Yes.

24      Q.  And that was in October of 2015?

25      A.  Yes.
```

```
 1    Q.  Okay.  And one of the first things that happened was

 2    that you were invited to Ms. Thinram's house, is that

 3    correct?

 4    A.  Yes.

 5    Q.  Showing you Exhibit 1005, do you see that?

 6    A.  Yes, I do.

 7    Q.  She lived there with her husband, Gregg?

 8    A.  Yes.

 9    Q.  You understood that they had just purchased that house?

10    Or did you know?

11    A.  Yes.  They just bought it.

12    Q.  It's in a nice neighborhood?

13    A.  Yes.

14    Q.  And Ms. Thinram and Mr. Kimmy were happily married, as

15    far as you could see?

16    A.  Yes.

17    Q.  All right.  And you knew they were married?

18    A.  Yes.

19    Q.  And they seemed happy together?

20    A.  Yes.

21    Q.  And in order to welcome you to Austin they invited you

22    to a party, is that right, at their house?

23    A.  No, there wasn't.

24    Q.  Well, showing you Exhibit 1017, you recognize that from

25    your camera?
```

```
1    A.  Yes, I do.

2    Q.  That is a party at their house?

3    A.  Yes.

4    Q.  It was a birthday party?

5    A.  Yes.

6    Q.  It was on October 3rd, 2015?

7    A.  Yes.

8    Q.  You were invited?

9    A.  Yes.

10   Q.  You wanted to go, I assume?

11   A.  Well, I had to go.

12   Q.  I see.  And it was a birthday party for which -- which

13   person?  Was it Gregg Kimmy's birthday?  Or was it Ms.

14   Thinram's birthday?  Do you remember?

15   A.  It was Gregg's.

16   Q.  Okay.  His family was there?

17   A.  Yes.

18   Q.  He has a brother and a sister?

19   A.  I recall that there were his brother.  But I don't

20   remember anybody else.

21   Q.  And there were children at the party?

22   A.  Yes.

23   Q.  Nobody threatened you to attend the party?

24   A.  Yes.

25   Q.  They asked you to go and you went?
```

1    A.  I was asked to help out and there was another friend

2    who went to help to cook.

3    Q.  Okay.  And you cooked as well, right?

4    A.  Yes.

5    Q.  Okay.  And you were never excluded from the party in any

6    sense?

7    A.  No, I wasn't -- I did not.

8    Q.  It lasted for several hours?

9    A.  Yes.

10   Q.  Okay.  And I assumed you were happy you came?

11   A.  Yes.

12   Q.  Because they included you in their family, right?

13   A.  Yes.

14   Q.  And they made no effort to isolate you with other

15   individuals?

16   A.  No.

17   Q.  Showing you 1018, this is a photograph from your

18   phone -- another photograph, is that right?

19   A.  That's correct.

20   Q.  It's a view of a window from where you worked, is that

21   right?

22   A.  No, it wasn't.

23   Q.  It was a -- I thought you mentioned it was on a balcony?

24   A.  It was a balcony where you could open up the door and

25   you could walk out -- you could walk out from the

```
1    balcony.

2    Q.  And this is where you were working, is that right?

3    A.  Do you mean at the picture or in the apartment?

4    Q.  In the apartment?

5    A.  Yes.

6    Q.  And then you -- you got to Austin, you indicated that

7    you did engage in prostitution, is that right?

8    A.  Yes.

9    Q.  Ms. Thinram did not hold your passport?

10   A.  No.

11   Q.  She did not ever threaten you?

12   A.  No.

13   Q.  She didn't cause you to be fearful in any respect?

14   A.  No.

15   Q.  She didn't cheat you or defraud you?

16            THE INTERPRETER:  I'm sorry, could you repeat

17   that?

18   BY MR. ENGH:

19   Q.  She didn't cheat you out of my money?

20   A.  No.

21   Q.  You weren't defrauded, in other words?

22   A.  No.

23   Q.  She didn't make you stay?

24   A.  I don't understand that.

25   Q.  She didn't make you stay there?
```

```
1              THE INTERPRETER:  May I repeat the question?

2    BY MR. ENGH:

3    Q.  Well, she didn't make you stay there?

4    A.  She didn't make me, but it was like she already

5    accepted me to work there.

6    Q.  Okay.  But eventually you left, is that right?

7    A.  Yes.

8    Q.  She didn't stop you from leaving?

9    A.  No, she didn't.

10   Q.  She said goodbye to you when you left?

11   A.  That's correct.

12   Q.  Was pleasant about it?

13   A.  That's correct.

14   Q.  Okay.  Viewed you as -- she viewed you as a sister?

15              THE INTERPRETER: Can you repeat that?

16   BY MR. ENGH:

17   Q.  She viewed you or thought of you as a sister?

18   A.  Yes.

19   Q.  Okay.  And on direct you indicated that the first two

20   weeks you were there, you did better in terms of money, is

21   that right?

22   A.  That's correct.

23   Q.  But the second two weeks you made something around $700?

24   A.  That's correct.

25   Q.  All right.  So in the two weeks that you made $700, how
```

```
1    many customers did you have a day?

2    A.  Some day there was none.

3    Q.  It wasn't ten a day, day after day, day after day,

4    though was it?

5    A.  What do you mean?

6    Q.  Well, you didn't have ten customers a day that second

7    week, day after day, day after day, did you?

8    A.  No, no, no.  It's not like that.

9              MR. ENGH:  Thank you, very much.

10             THE COURT:  Any other Defense Counsel?

11                C R O S S - E X A M I N A T I O N

12   BY MR. GERDTS:

13   Q.  Good afternoon, I want to ask you some questions about

14   Bangkok.

15   A.  Yes.

16   Q.  In Bangkok you worked at a couple places including a

17   place called Soapland, correct?

18   A.  What's that?

19   Q.  Soapland.  That's an ap op nuat place?

20             THE INTERPRETER:  I'm sorry, Counsel, can you

21   repeat?

22             MR. GERDTS:  Soapland.

23             THE INTERPRETER:  Soakland?

24             MR. GERDTS:  Soap.

25             THE INTERPRETER:  Oh, Soapland.
```

```
1              MR. GERDTS:  Yes.
2       A.  I didn't work there.
3       BY MR. GERDTS:
4       Q.  You did not work at Soapland?
5       A.  No.
6       Q.  Is it your testimony that you did not work at a place on
7       Phetburi Road?
8       A.  No, it was not.
9       Q.  I didn't understand the answer.  Did you not work at a
10      place at Phetburi Road?
11      A.  Yes.  There was a massage store there.
12      Q.  There was a massage store on Phetburi Road where you
13      worked?
14      A.  Yes.
15      Q.  That was a place where you sat in a glass room waiting
16      for customers to choose you?
17      A.  No.  That's not it.
18      Q.  That's not the place you worked at Phetburi Road?
19      A.  No.  It was not.
20      Q.  And is it your testimony that you did not engage in
21      prostitution when you worked in Bangkok at any time?
22      A.  Yes.
23              MR. GERDTS:  Thank you, Your Honor.
24              MR. GUERRERO:  No questions.
25              MR. RIVERS:  No questions.
```

1          THE COURT:  Redirect, if you wish, Counsel.

2          MS. PROVINZINO:  Thank you, Your Honor.

3                R E D I R E C T   E X A M I N A T I O N

4    BY MS. PROVINZINO:

5    Q.  So I have a couple of questions for you.  When you were

6    sending money to your family, how did you do that?

7    A.  I would send through Peearm.

8    Q.  And how would Peearm get it to your family?

9    A.  He would send it through account, bank account.

10   Q.  Directly to your family?  Or would it go through Tu?

11   A.  The first two months it went through Tu.

12   Q.  And then Tu would get it to your family?

13   A.  Yes.

14   Q.  And then after that Arm would get it to your family, is

15   that right?

16   A.  After the first two months Sai send it myself.

17   Q.  You were asked some questions about the time you were at

18   Kung's house in Austin.

19          And you were shown pictures of a party -- the

20   party for Kung's husband, right?

21   A.  Yes.

22   Q.  In response to the question from Kung's attorney, you

23   told them you had to go -- or you felt like you had to go.

24   A.  I had to.

25   Q.  And can you explain to the jury what you mean by that?

```
 1    A.  So there was no working.  And so they would come and
 2    pick me up to go there.
 3    Q.  So were you a guest at the party?  Or were you in charge
 4    of cooking and cleaning and other help for the party?
 5              MR. GUERRERO:  Objection, leading.
 6              THE COURT:  I'll let -- why don't you just -- I'll
 7    sustain as to form.  I'll allow the inquiry.  We'll just
 8    rephrase the question.
 9    BY MS. PROVINZINO:
10    Q.  What was your role at the party?
11    A.  I went to help cooking and clean and wash -- washing
12    dishes.
13    Q.  And you were asked some questions about the number of
14    customers you saw while you were working at Kung's house in
15    Austin?
16              THE INTERPRETER:  I'm sorry.  Can you repeat that?
17    BY MS. PROVINZINO:
18    Q.  You were asked questions about the number of customers
19    you saw?
20    A.  That's correct.
21    Q.  And Sai, who would control the customers who came to
22    you?
23    A.  Kung and her husband.
24    Q.  So who did the advertising?
25    A.  Kung and her husband.
```

```
 1    Q.  And who did the scheduling?

 2    A.  Both of them.

 3    Q.  And who sent you to Kung's house in the first place?

 4    A.  Anna did.

 5    Q.  So Anna, another member of the conspiracy?

 6    A.  I don't know.  Because she was also a working woman.

 7    Q.  Was that at Tu's direction?

 8         MR. ENGH:  Objection, leading.

 9         THE COURT:  I'll ask Counsel to rephrase it.

10    BY MS. PROVINZINO:

11    Q.  So you were sent to Kung's house in October of 2015, is

12    that right?

13    A.  That's correct.

14    Q.  And who sent you or scheduled you there?

15    A.  Anna did.

16    Q.  And did she work with anyone else to do that?

17    A.  Did you mean Anna?

18    Q.  Did she work with anyone else to send you to Kung's

19    house?

20    A.  I don't know.

21    Q.  And you know that Anna knows Tu, is that right?

22    A.  Yes.

23         MR. ENGH:  Objection.  Leading.

24         THE COURT:  I'll sustain the objection, let the

25    answer stand.
```

```
 1    BY MS. PROVINZINO:

 2    Q.  Does Anna have a relationship with Tu?

 3    A.  Yes, they did.

 4    Q.  What is that?

 5    A.  She was also a working woman, just like Sai.  Tu was

 6    the agent.

 7    Q.  And when you say Tu was the agent, did Anna owe her debt

 8    to Tu?

 9    A.  Yes.

10            MR. GERDTS:  Objection, foundation.

11            THE COURT:  If she -- I'll allow it if she has

12    firsthand knowledge.

13            THE INTERPRETER:  Can you repeat the question one

14    more time?

15    BY MS. PROVINZINO:

16    Q.  Just to clarify, so Anna, just like you, owed her debt

17    to Tu, is that right?

18            MR. ENGH:  Objection.

19            THE COURT:  Note the objection.  Again, if she has

20    first-hand knowledge, I'll let her answer.

21    A.  That's correct.

22    BY MS. PROVINZINO:

23    Q.  And Sai, we've met a couple times, right, before your

24    testimony here today, correct?

25    A.  Yes.
```

1  Q.  And we talked about one rule, one rule that you had,

2  right?

3  A.  Yes.

4  Q.  And what is that rule, Sai?

5  A.  To speak the truth.

6  Q.  And you violated that rule today, didn't you?

7  A.  Yes.

8  Q.  You hadn't told me about working in the United Kingdom

9  before, true?

10         MR. ENGH:  Objection.  This is hearsay.  She's the

11  Government's witness.

12         THE COURT:  I'll permit the inquiry.  I'll permit

13  the inquiry.

14  BY MS. PROVINZINO:

15  Q.  And you never mentioned, even though I asked if you had

16  worked anywhere else, including in England, is that right?

17  A.  That's correct.

18  Q.  And we told you if you were scared, we would understand,

19  is that right?

20         MR. SICOLI:  She's leading the witness.

21         THE COURT:  Sustained as to the form.

22  BY MS. PROVINZINO:

23  Q.  Do you remember we talked about that rule?

24  A.  I do.

25  Q.  And you just told the jury that was to tell the truth?

1    A.  That's correct.

2    Q.  And if you were scared, what was the rule?

3    A.  That I -- that I have to speak.

4    Q.  Even if you're scared, you still have to speak the

5    truth, is that right?

6    A.  That's correct.

7    Q.  Even if you're afraid of getting someone in trouble,

8    what was the rule?

9    A.  To speak.

10   Q.  And even if you're afraid it might make you look bad,

11   what was the rule?

12   A.  It's to speak.

13   Q.  And with that, you lied to us about that, right?

14   A.  Yes.

15   Q.  Now, you were asked about an interview done by the Reno

16   Police Department when you were arrested on prostitution.

17   A.  That's correct.

18   Q.  And just to be clear, in that interview, did they ask

19   you anything about your family back home in Thailand?

20   A.  Yes.

21   Q.  They did ask you?

22   A.  Who did you mean that asked me?

23   Q.  Okay.  So you were arrested for prostitution in Reno

24   last fall, right?

25   A.  Yes.

1    Q.  And you had a very short interview with the Reno Police

2    Department, right?

3    A.  That's correct.

4    Q.  And they never asked you about your family in Bangkok,

5    right?

6    A.  That's correct.

7    Q.  Now you were asked a little bit about your time working

8    for Uncle Bill in San Diego?

9    A.  Yes.

10   Q.  And we saw the photograph of the apartment, the house of

11   prostitution you work out of?

12   A.  Yes.

13   Q.  And you were asked if you could control where you were

14   to go?

15   A.  Yes.

16   Q.  Did you have a car?

17   A.  I did not.

18   Q.  Could you have left that place?

19   A.  No, I could not.

20   Q.  Now you were also asked about your T Visa.

21   A.  Yes.

22   Q.  And you have provided an application to the Government

23   for a T Visa, right?

24   A.  Yes.

25   Q.  And you were asked about the basis of your fear of going

1    back to Thailand, right?

2    A.  Yes.

3    Q.  And do you remember what you put in that application?

4    A.  I do.

5    Q.  Now, you're worried that the traffickers had your sons'

6    information and they hadn't been arrested in Thailand, is

7    that right?

8            MR. ENGH:  Objection.  This is all leading.

9            THE COURT:  Sustained as to the form.  I'll allow

10   the inquiry, but sustain the objection.

11   BY MS. PROVINZINO:

12   Q.  And what was the basis for your fear in your T Visa

13   application?

14   A.  I don't understand the question.

15   Q.  We talked a little bit earlier about all the information

16   Tu had about your family?

17   A.  That's correct.

18   Q.  Remember we went through your Visa application?

19   A.  Yes.

20   Q.  And you had even told this jury, Tu told you he knew

21   where your family lived, where your sons lived and worked,

22   is that right?

23   A.  That's correct.

24   Q.  And is that the information you put in your T Visa

25   application?

```
 1    A.  Yes.
 2              MS. PROVINZINO:  No further questions.
 3              THE COURT:  Any additional recross?
 4              MR. SICOLI:  Just briefly, Your Honor.
 5              R E C R O S S   E X A M I N A T I O N
 6    BY MR. SICOLI:
 7    Q.  So after you stopped paying Tu, how did you get around
 8    then?
 9    A.  What did you mean?  I don't understand.
10    Q.  Well, the Government said that you didn't have a car so
11    you couldn't leave Bill's place.
12              When you stopped paying Tu and you were on your
13    own, how did you get around?
14    A.  Did you mean -- did you mean in my daily life?  Or
15    about working?
16    Q.  I mean, you ended up going to Las -- I mean, you ended
17    up going to Reno after you were done paying Tu.  So how did
18    you get to Reno?
19    A.  I took the flight.
20    Q.  Right.  And you did that on your own, correct?
21    A.  That's correct.
22    Q.  The last part -- and I'm just going to briefly ask you
23    this question.
24              You said that you're fearful because of your
25    children, your adult children in Thailand, correct?
```

1    A.  That's correct.

2    Q.  And you haven't asked yet, at this point in time, to

3    bring them over to the United States, have you?

4    A.  No, I did not.

5    Q.  Can't be too concerned about them, can you?

6    A.  No, that's not true.

7          MR. SICOLI:  Thank you.

8                R E C R O S S   E X A M I N A T I O N

9    BY MR. ENGH:

10   Q.  You mentioned that you found out about Nancy's house

11   through Anna, right?

12   A.  Yes.

13   Q.  And Anna and Nancy were very good friends, is that

14   right?

15   A.  Yes.

16   Q.  And because of that friendship Anna suggested that it

17   would be a good place for you to go?

18   A.  Yes.

19   Q.  And one of the ways to welcome you was to invite you to

20   this party, fair enough?

21   A.  That party -- that party was not the party to welcome

22   me.  It was their party and I just had to go there

23   because nobody's working.

24   Q.  Well, I appreciate it wasn't a party for, it was a

25   birthday party, isn't that correct?

1    A.  That's correct.

2    Q.  I mean, she could have done one or two things.  She

3    could have invited you to the party or she could have let

4    you stay by yourself, right?

5    A.  Yes.

6    Q.  I mean, she could have isolated you or she could have

7    had you join a family event.  Fair enough?

8    A.  That's correct.

9             MS. PROVINZINO:  No further questions, Your Honor.

10            THE COURT:  Anything by?  Then you may step down.

11            Members of the Jury, I want to give a short break

12   for the interpreter and to take up a matter with the

13   attorneys.

14            We're going to take -- we'll try to hold it to a

15   10 minute recess.

16            Now, one or more of you may have concerns, well,

17   because of some of the schedule today, does that mean we're

18   going to go past 5:00.  No.

19            So some of you were concerned about that because

20   of parent teachers and some other conferences.

21            And, no, at the beginning of the case we -- with

22   rare exceptions, we try to hold, no matter what's going on

23   during the day.

24            So if you're concerned, well, does this mean that

25   the Judge is going to tip us past 5:00?  The answer is no.

1          So we're going to take a short recess here.

2     You're free to go back to the jury room and we'll stand in

3     recess.  Rise for the jury, please.

4          (Jurors excused at 3:57.)

5

6                    **REPORTER'S CERTIFICATE**

7

8

9          I, Lynne M. Krenz, do certify the foregoing
      pages of typewritten material constitute a full, true and
      correct transcript of my original stenograph notes, as they
10    purport to contain, of the proceedings reported by me at the
      time and place hereinbefore mentioned.

11

12              /s/Lynne M. Krenz
                Lynne M. Krenz, RMR, CRR, CRC

13

      Date:  November 25, 2018

14

15

16

17

18

19

20

21

22

23

24

25