```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2

 3     ------------------------------------------------------
                                        )
       United States of America,        )   File Nos.
 4                                       )   17CR107(1)(4)(5)(16)
              Plaintiff,                 )   (20)
 5                                       )            (DWF/KMM)
       vs.                               )
 6                                       )
       Michael Morris, Pawinee           )   St. Paul, Minnesota
 7     Unpradit, Saowapha Thinram,       )   November 19, 2018
       Thoucharin Ruttanamongkongul      )   11:45 a.m.
 8     and Waralee Wanless,              )
                                         )
 9            Defendants.
       ------------------------------------------------------
10          BEFORE THE HONORABLE DONOVAN W. FRANK AND A JURY
                   UNITED STATES DISTRICT COURT JUDGE
11              (TRIAL TESTIMONY OF CHABAPRAI BOONLUEA)

12     APPEARANCES
        For the Plaintiff:        United States Attorney's Office
13                                Laura Provinzino, AUSA
                                  Melinda Williams, AUSA
14                                300 S 4th Street, Suite 600
                                  Minneapolis, Minnesota 55415
15
        For Defendant Michael     Sicoli Law, Ltd.
16      Morris:                    Robert Sicoli, ESQ.
                                  333 South Seventh Street
17                                Suite 2350
                                  Minneapolis, MN 55402
18
        For Defendant Pawinee     Daniel L. Gerdts, ESQ.
19      Unpradit:                  331 Second Avenue South
                                  Suite 705
20                                Minneapolis, MN 55401

21      For Defendant Saowapha    Paul C. Engh, ESQ.
        Thinram:                   200 South 6th Street
22                                Suite 420
                                  Minneapolis, MN 55402
23
        For Defendant             Meshbesher & Spence, Ltd.
24      Thoucharin                Daniel Guerrero, ESQ.
        Ruttanamongkongul:        1616 Park Avenue South
25                                Minneapolis, MN 55404
```

1    For Defendant Waralee        Rivers Law Firm
     Wanless:                     Bruce Rivers, ESQ.
2                                 701 4th Avenue South
                                  Suite 300
3                                 Minneapolis, MN 55415

4    Court Reporter:              Lynne M. Krenz, RMR, CRR, CRC
                                  Suite 146
5                                 316 North Robert Street
                                  St. Paul, Minnesota 55101
6
     Interpreters:                Phouratsaphone (Paul) Littana
7                                 Nokon (Bee) Nimit
                                  Chetlue Vang
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**I N D E X**</u>                                          <u>**Page**</u>

**GOVERNMENT'S WITNESS CHABAPRAI BOONLUEA**
Direct Examination by Ms. Provinzino................... 4
Cross-Examination by Mr. Sicoli.......................142
Cross-Examination by Mr. Engh.........................175
Cross-Examination by Mr. Guerrero.....................184
Cross-Examination by Mr. Gerdts.......................185
Redirect Examination by Ms. Provinzino................187
Recross Examination by Mr. Sicoli.....................204
Recross Examination by Mr. Guerrero...................206

<u>**GOVERNMENT EXHIBITS**</u>                          <u>**RECEIVED**</u>
Exhibit 36.........................................111
Exhibit 36A........................................114
Exhibit 36B & 36C..................................112
Exhibit 105........................................ 26
Exhibit 241 provisionally.......................... 69
Exhibit 276 & 277..................................100
Exhibit 302 provisionally.......................... 43
Exhibit 304........................................105
Exhibit 306........................................ 78
Exhibit 492........................................ 77
Exhibit 501........................................ 90
Exhibit 504........................................ 79
Exhibit 1011....................................... 38
Exhibit 1012....................................... 71
Exhibit 1013 provisionally......................... 95
Exhibit 1014.......................................116
Exhibit 1024....................................... 86
Exhibit 1031.......................................109
Exhibit 1038 provisionally......................... 80
Exhibit 1069....................................... 23
Exhibit 1200....................................... 91
Exhibit 1250....................................... 97
Exhibit 1503....................................... 37

1                    **P R O C E E D I N G S**

2                        **IN OPEN COURT**

3          (Defendants present)

4                MS. PROVINZINO:  The United States calls Chabaprai

5     Boonluea.  She is an in-custody witness, so it may take a

6     while to get her set.

7                THE COURT:  All right.

8                MS. PROVINZINO:  And, Your Honor, as I indicated,

9     this is an in-custody witness, so this Court may want to be

10    prepared to give a cautionary instruction, if Defense so

11    requests.

12                If you would like to give the jury a stretch

13    break, I have no objection to that.

14                THE COURT:  Yeah.  You're free to stand up if you

15    like.

16                And before you sit down, if you could raise your

17    right hand, please.

18                (Sworn.)

19                THE WITNESS:  I do.

20                THE COURT:  Okay.  Both may be seated.

21                And then if you could please state your full name.

22                THE WITNESS:  My name is Chabaprai Boonluea.

23                THE COURT:  You may inquire, Counsel.

24                MS. PROVINZINO:  All right.

25                  D I R E C T   E X A M I N A T I O N

1    BY MS. PROVINZINO:

2    Q.  And Ms. Boonluea, could you spell your name for the

3    record?

4    A.  The name Chabaprai is C-H-A-B-A-P-R-A-I.

5    Q.  And the last name, is that B-O-O-N-L-U-E-A, is that

6    correct?

7    A.  Yes.

8    Q.  And Ms. Boonluea, where are you from?

9    A.  I came from Thailand.

10   Q.  What part of Thailand?

11   A.  Northeast of Thailand.

12   Q.  And do you have a Thai nickname?

13   A.  Yes, I do.

14   Q.  And what is that?

15   A.  Named Chaba and Ploy.

16   Q.  And C-H-A-B-A, is that right?

17   A.  Correct.

18   Q.  And Ploy, is that P-L-O-Y?

19   A.  Yes.

20   Q.  And do you have an American nickname?

21   A.  I do.

22   Q.  And what is that?

23   A.  There were Lily and Iris.

24   Q.  Okay.  And did you have any working name that you would

25   use when you were working for the organization?

```
 1    A.  I do.

 2    Q.  And what is your working name or working names?

 3    A.  It was Lily.

 4    Q.  Lily, either L-I-L-Y or L-I-L-L-Y, is that right?

 5    A.  L-I-L-Y.

 6    Q.  And thank you for correcting that.  And what would you

 7    prefer your name testimony today?

 8    A.  Iris, please.

 9    Q.  So, Iris, is it fair to say to say that you speak some

10    English but Thai is your first language?

11    A.  Thai is better.

12    Q.  Okay.  So we'll have you testify in Thai with use of the

13    interpreter, is that fair?

14    A.  Okay.

15    Q.  Okay.  And you are here, Iris, to talk about a sex

16    trafficking organization, is that right?

17    A.  Yes.

18    Q.  Were you a member of this organization?

19    A.  Yes, I was.

20    Q.  Did you serve as a house boss for this organization?

21    A.  I was.

22    Q.  And where did you serve as a house boss?

23    A.  In Atlanta, Georgia.

24    Q.  Did you also help this organization here in Minnesota?

25    A.  I did.
```

```
1    Q.  In October of 2016, Iris, what happened to you?

2    A.  I was arrested by the law enforcement.

3    Q.  Where were you arrested?

4    A.  In Atlanta, Georgia.

5    Q.  And what happened after you were arrested in Georgia?

6    A.  The agent had put me in the custody in Atlanta for

7    10 days.

8    Q.  Okay.  And then at some point were you transferred here

9    to Minnesota?

10   A.  Yes.

11   Q.  And I see you have a blue uniform on, have you been in

12   custody since that arrest in October of 2016?

13   A.  Yes.

14   Q.  And where are you currently held?

15   A.  Sherburne.

16   Q.  You're referring to Sherburne County Jail, is that

17   right?

18   A.  Yes.

19   Q.  So you, along with others, have been charged out of

20   District of Minnesota with crimes, is that right?

21   A.  Yes.

22   Q.  And you were charged with a range of crimes, including

23   sex trafficking conspiracy and money laundering conspiracy,

24   is that right?

25   A.  Yes.
```

1    Q.  Iris, are you guilty of those crimes?

2    A.  I was.

3    Q.  Now after you were transported here to Minnesota, very

4    early on did you agree to sit down with the Government and

5    cooperate?

6    A.  Yes.

7    Q.  Why did you agree to do that?

8    A.  I wanted to speak the truth to the government to hear

9    it all.

10   Q.  And so what is your responsibility as someone who

11   cooperates with the Government?

12   A.  I don't understand the question.

13   Q.  Okay.  And so you said you wanted to speak the truth to

14   the Government, is that why you're cooperating?

15   A.  Yes.

16   Q.  And is that your job as a cooperator?

17   A.  Yes.

18   Q.  And so we -- is it fair to tell the jury that we have

19   met many times for many hours?

20   A.  Yes.

21   Q.  And you've told us all the things you've done in terms

22   of money laundering and sex trafficking?

23   A.  Yes.

24   Q.  And we've talked a lot about other people, is that true?

25   A.  Yes.

1    Q.  And Iris, there are five people here on trial today.

2    Are you aware of that?

3    A.  I do know.

4    Q.  Now is the criminal conspiracy bigger than just the five

5    people here sitting at Defense Counsel table?

6    A.  There are more.

7    Q.  And do you know everyone?

8    A.  I don't know everyone.

9    Q.  Do you know all the different roles people played?

10   A.  No, I do not.

11   Q.  And when we met, is it fair that you'd tell us if you

12   didn't know someone?

13   A.  Yes.

14   Q.  But in terms of the rules, you couldn't just answer the

15   questions you wanted to, is that right?

16   A.  That's correct.

17   Q.  You had to talk about everyone if you had information,

18   true?

19   A.  Yes.

20   Q.  Now, at some point, Iris, did you plead guilty?

21   A.  Yes, I did.

22   Q.  Why did you do that?

23   A.  Because I have done something wrong and I admitted to

24   my guilt.

25   Q.  And you admitted your guilt to the sex trafficking

1    conspiracy, is that right?

2    A.  Yes.

3    Q.  And you admitted your guilt to being part of a money

4    laundering conspiracy, is that right?

5    A.  Yes.

6    Q.  Now at the same time you entered your guilty plea, did

7    you also enter into a cooperation agreement?

8    A.  Yes.

9    Q.  And what do you have to do under the cooperation

10   agreement?

11   A.  Speak the whole truth and nothing to held back.

12   Q.  So it's even the case if the truth makes you look bad,

13   is that fair?

14   A.  Yes.

15   Q.  Now you were arrested quite a while ago and pled guilty

16   quite a while ago.  Have you been sentenced, yet, Iris?

17   A.  Not yet.

18   Q.  And you know you're facing a lot of time in prison, is

19   that fair?

20   A.  I do know that.

21   Q.  At this point in time, do you know what your sentence

22   will be?

23   A.  I don't know.

24   Q.  And did the Government promise you what your sentence

25   would be?

1    A.  No.  They did not promise me.

2    Q.  But you hope that by testifying today you will get a

3    shorter sentence, is that -- is that right?

4    A.  Yes.

5    Q.  And Iris, who's ultimately going to be sentencing you?

6    A.  Judge Frank.

7            MS. PROVINZINO:  So at this time if the Court

8    could provide its limiting instruction?

9            THE COURT:  If that's acceptable to Counsel?

10           MR. SICOLI:  Yes, Your Honor.

11           THE COURT:  Members of the Jury, the -- you are

12   hearing evidence that this witness pled guilty to a crime

13   which arose out of some of the events for which the

14   Defendants before you are on trial.

15           It's for -- you may not consider the guilty plea

16   as evidence of the other Defendant's guilt.  You may

17   consider this witness's guilty plea for the purpose of

18   determining how much, if at all, to rely on your testimony.

19   And you are hearing testimony also that she -- she has

20   entered into a cooperation agreement in hopes to receive a

21   reduced sentence because of that agreement with the

22   Government.

23           As I've told you before in such cases, it's up to

24   the Court, in this case myself, to decide whether to reduce

25   the sentence.  And if so, how much to reduce it by.

```
 1              You may give the testimony of this witness such

 2      weight that you think it deserves.  Whether or not the

 3      testimony of a witness may have been influenced by the hopes

 4      of receiving a reduced sentence is by you, though, the jury

 5      to decide.

 6              MS. PROVINZINO:  Thank you, Your Honor.

 7      BY MS. PROVINZINO:

 8      Q.  All right.  Iris, let's talk about the criminal

 9      organization.

10              And in your testimony we're going to focus on the

11      Defendants on trial.

12      A.  Yes.

13      Q.  But let's start on some background on you so the jury

14      gets a chance to know who you are.

15      A.  Yes.

16      Q.  Tell the jury about where you grew up.

17      A.  I grew up Buriram Province.

18      Q.  And what did your parents do in Buriram Province?

19      A.  They were farmers.

20      Q.  And what type of farming did they do?

21      A.  Rice farming.

22      Q.  Do you have any siblings, Iris?

23      A.  Yes, I do.

24      Q.  And what is your order -- birth order?

25      A.  I'm the first one.
```

1    Q.  And what about your other siblings?

2    A.  I don't understand what do you mean.

3    Q.  Well, that was a bad question.  So you're the oldest.

4    Tell the jury about your other two siblings?

5    A.  I'm the oldest.  I have one younger sister and one

6    younger brother.

7    Q.  How far did you go in school, Iris?

8    A.  I got up to only to ninth grade.

9    Q.  And so -- at what age would that be in Thailand going

10   through or completing the ninth grade?

11   A.  15 year old.

12   Q.  So at 15 years old then, when you're no longer in

13   school, what did you do?

14   A.  I traveled to Bangkok.

15   Q.  And why did you travel to Bangkok?

16   A.  To find a job.

17   Q.  Did you find a job?

18   A.  Yes, I did.

19   Q.  And what did you do, Iris?

20   A.  My first job was to working at plastic manufacturing.

21   Q.  Okay.  Was that in a factory of some sort?

22   A.  It was a small factory, family-owned.

23   Q.  And how much money would you make working in the plastic

24   factory?

25   A.  I made 40 baht a day.  And I worked eight hours a

1    day.

2    Q.  And 40 baht a day, just so the jury understands, was

3    that a little more than -- or would that be a little more

4    than 1 U.S. dollar a day?

5    A.  Yes.

6    Q.  And in addition to working in the plastic factory, did

7    you have any other jobs in Bangkok?

8    A.  I did.

9    Q.  And what were those, Iris?

10   A.  When I got into 18 year old, I had applied to a

11   textile garment industry.

12   Q.  And what was your job in the textile or garment

13   industry?

14   A.  I sold clothing.

15   Q.  And was that similar schedule, eight hours a day?

16   A.  Yes.

17   Q.  And what was your pay for your job of sewing?

18   A.  120 baht a day.

19   Q.  So fair to say that would be a little more than 3 -- or

20   between $3 and $4 a day?

21   A.  Yes.

22   Q.  Okay.  While you're working in Bangkok, where is your --

23   the rest of your family?

24   A.  They were still in Buriram.

25   Q.  Did you take other jobs in Bangkok?

1   A.  Yes, there was.

2   Q.  And what else, Iris?

3   A.  When I was 20 year old, I had applied to electronic

4   manufacturing.

5   Q.  And did you get that job?

6   A.  Yes, I did.

7   Q.  Now, at some point in time, did your family move from

8   Buriram?

9   A.  Yes.

10   Q.  And where did they move?

11   A.  They moved to Bangkok.

12   Q.  Okay.  They left farming.  What where they doing then in

13   Bangkok?

14   A.  They came to sell food on the street.

15   Q.  Did you help with that?

16   A.  Yes, I did.

17   Q.  And did you continue to work in Bangkok outside of

18   selling food on the street?

19   A.  Yes.

20   Q.  And what type of job was that?

21   A.  At the time I was still working at the electronic

22   manufacturing.  It's about making phone parts.

23   Q.  Okay.  At some point in time, did you get involved in

24   real estate work?

25   A.  Yes.

1    Q.  When did you do that?

2    A.  When I turned into 22 year old.

3    Q.  And where did you do that?

4    A.  It was in Bangkok.

5    Q.  And what were your responsibilities in real estate?

6    A.  I was a real estate agent.

7    Q.  And what did you do as a real estate agent?

8    A.  I would collect the document from the customer to

9    pass on to the bank.  And take the customer to change the

10   title at the land department.

11   Q.  And how long did you do that work?

12   A.  13 years.

13   Q.  Okay.  And did you continue to do that on up to when you

14   came to the United States?

15   A.  Yes.

16   Q.  So let's talk about -- so your family's now in Bangkok

17   at this time, is that right?

18   A.  Yes.

19   Q.  And what was happening in your family at the time?

20   A.  My mother got sick.

21   Q.  And tell the jury about that?

22   A.  My mother got sick with a heart disease.  For so many

23   years.

24            And there was a need for money to have a surgery

25   to change something inside.

1    Q.  And did you help with that?  Getting money for the

2    surgery?

3    A.  Yes, I did.

4    Q.  And what was your role in that, Iris?

5    A.  I tried to make money in every way that I can so that

6    I could help my mother to go to see the doctor.

7    Q.  Okay.  And what were you doing to make money to help

8    your mom?

9    A.  I was still working as a real estate agent selling

10   houses as much as I could, so I could make a lot of

11   commission.

12   Q.  Okay.  And when you talk about commission, what were you

13   making on a monthly basis doing real estate work?

14   A.  My salary was between 6,000 to 10,000 baht.  The

15   commission I got was 2 percent per one house that I sold.

16   Q.  Okay.  And when you give that range of 6,000 to 10,000,

17   is that somewhere between $200 and $350 a month, roughly?

18   A.  Yes.

19   Q.  Was that money enough to cover your mother's medical

20   costs?

21   A.  No, it was not.

22   Q.  So what did you do to look for ways to help cover those

23   medical costs for your mom?  What happened?

24   A.  My family had put the land deed with the bank so that

25   we can get the loan out.

1   Q.  Okay.  So this is the farmland you had in Buriram

2   Province, is that right?

3   A.  Yes.

4   Q.  So your family was trying to sell that land to get some

5   money for your mom's surgery, is that right?

6   A.  Yes.

7   Q.  Or to get a loan on that land, is that right?

8   A.  Yes.

9   Q.  Did you have any responsibilities relating to that land

10  transaction?

11  A.  No, I was not.

12  Q.  And so you started -- you had met some people through

13  selling houses and other and property, is that right?  In

14  your work in real estate?

15  A.  Yes.

16  Q.  This might be a good place to stop.

17          THE COURT:  All right.

18          MS. PROVINZINO:  Otherwise we could continue for a

19  few more minutes, Your Honor.

20          THE COURT:  Okay.  We can break here, if that's

21  acceptable to everyone.

22          So Members of the Jury, we'll take -- it's about

23  12:15.  So we'll -- we'll stand in recess until 1:20.

24          And so we'll stand in recess until that time.

25  Please rise for the jury.

```
 1                    (Jurors excused at 12:14 p.m.)

 2              THE COURT:  And the witness -- the witness is

 3     excused.  May step down until 1:20.

 4              Anything further additional by Counsel?  All

 5     right.

 6              MS. PROVINZINO:  Not from the Government, Your

 7     Honor.

 8              THE COURT:  We will see you at 1:20.  I'll have

 9     Lori check in with you a few moments before just in case,

10     but we'll see you at 1:20.

11                    (In open court at 1:22 p.m.)

12              MS. PROVINZINO:  Thank you, Your Honor.

13     BY MS. PROVINZINO:

14     Q.  Welcome back, Iris.

15              Before our lunch break we were just getting to the

16     point where you met someone who could help you to get to the

17     United States.  I want to walk the jury through that

18     process.

19              So you, through your real estate, work met someone

20     who told you they could help you get some money, is that

21     right?

22     A.  Yes.

23     Q.  Who was it who could help you?

24     A.  A person named Teow.

25     Q.  Before you met Teow, was there somebody else who you had
```

1    sold a house to who offered to help?

2    A.   There was.

3    Q.   Okay.  And who was that?

4    A.   It's a woman who live in the same complex.  Her name

5    was Keang.

6    Q.   And so we're clear, we're not talking the Kung, Saowapa

7    Thinram, here on trial, correct?

8    A.   That's correct.

9    Q.   So how did that Keang inform you that she could help?

10   A.   She had come to me and offered me -- convinced me to

11   go sell sex in Spain.

12   Q.   And were you able to go to Spain?

13   A.   I did not go.

14   Q.   And why not?

15   A.   The person who handled the document notify me that

16   the Visa had not passed.

17   Q.   Okay.  Did you learn then about the possibility of going

18   to the United States to sell sex?

19   A.   Yes.

20   Q.   What did you learn?

21   A.   So she told Teow that I wanted to come sell sex in

22   America.

23   Q.   And when we're talking about Teow, is that the T-E-O-W.

24   A.   I don't know how to spell it but she was a female.

25   Q.   So that's a female?

```
 1    A.  Yes.

 2    Q.  All right.  Iris, I'm approaching with Government

 3    Exhibits 10 and 11.

 4    A.  Yes.

 5    Q.  And I think it would be helpful to clarify, who that

 6    individual is.

 7             And do you recognize the person in this

 8    photograph?

 9    A.  I do.

10    Q.  And hat's the female Teow?

11    A.  Yes.

12    Q.  And just so the jury can distinguish, I will refer to

13    her as Teow.  Is that fair?

14    A.  Yes.

15    Q.  And I will show her photo to the jury.  So how did you

16    meet Teow?

17    A.  She had called to contact me.

18    Q.  Did you meet with her?

19    A.  I did.

20    Q.  And where did you meet?

21    A.  In Bangkok.

22    Q.  And where in Bangkok?

23    A.  I don't remember the area.  But it was somewhere in

24    the mall.

25    Q.  And did Teow know the situation about your family?
```

1    A.  Yes, she did.

2    Q.  And what did she tell you about coming to the United

3    States to sell sex?

4    A.  She told me that I had to meet with a man so that we

5    could make agreement as to how much debt I would have to

6    pay to come here.

7    Q.  And what did you understand about the debt to come to

8    the United States?

9    A.  That I had to come here to work off my debt.

10   Q.  Okay.  And did you know how much the debt would be?

11   A.  Yes, I do.

12   Q.  And what did you understand the amount to be?

13   A.  60,000 U.S. dollars.

14   Q.  And did you meet with this man that Teow had suggested?

15   A.  I did.

16   Q.  And who was it?

17   A.  Khun Tu.

18   Q.  Okay.  And so this Tu is a male, is that right?

19   A.  Yes.

20          And may I approach with Government Exhibit 1069?

21          THE COURT:  You may.

22   BY MS. PROVINZINO:

23   Q.  And there are two photographs as part of Government

24   Exhibit's 1069, that has already been admitted into

25   evidence.

1           And do you recognize the individual portrayed in

2    Government Exhibit 1069?

3    A.  I do.

4    Q.  And who is it?

5    A.  Khun Tu.

6    Q.  And this is the Tu you met to talk about your debt?

7    A.  Yes.

8           MS. PROVINZINO:  The Government moves the

9    admission of the second part of Government Exhibit 1069, the

10   page -- second page of that.

11          MR. SICOLI:  No objection.

12          MR. GERDTS:  No objection.

13          THE COURT:  It's received.

14   BY MS. PROVINZINO:

15   Q.  So as the jury saw before, this is a photograph of Tu.

16          And I'm going to show you on the doc cam the new

17   portion of the exhibit.

18          Is it fair to say, Iris, you recognize him from

19   this photograph?

20   A.  Yes.

21   Q.  More than the other?

22   A.  Yes.

23   Q.  And at the top of that there's a string of red that says

24   June 16, 2009.  Do you see that?

25   A.  Yes.

1    Q.  So what does Tu, the male, tell you about the debt?

2    A.  So he told me that I would come to sell sex in

3    America.  I had to pay off the debt for 60,000 U.S.

4    dollar.  And I had to work off for about four to six

5    months.

6    Q.  So you knew the amount and he told you it would take

7    about four to six months, is that right?

8    A.  Yes.

9    Q.  Did he tell you about how you would pay back the debt?

10   A.  He said -- he said that I could come to work here and

11   gradually pay off my debt.  I could work from four to six

12   months.

13   Q.  Okay.  And would each dollar you earned go to pay off

14   the debt?

15   A.  Yes.

16   Q.  Did he tell you anything about house fees?

17   A.  No, he did not.

18   Q.  Did he tell you anything about other expenses like for

19   transportation or food?

20   A.  He did.

21   Q.  And what did he tell you about those?

22   A.  So he told me during the period of four to six months

23   there would be someone would bought me tickets and I

24   would be able to receive $80 for food.

25   Q.  And this debt -- this agreement that you were talking to

1    Tu about, was any of that written down?

2    A.  No, there was not.

3    Q.  Now you indicated you knew you would have to sell sex?

4    A.  I did know that.

5    Q.  And did he describe what you would actually have to do?

6    A.  He said that if I ever have a boyfriend I would be

7    able to work as selling sex in America.

8    Q.  But did he describe it like you'd be having sex with a

9    boyfriend?

10   A.  Yes.

11   Q.  Did he tell you anything else about the debt?

12   A.  He told me that that there would be someone in

13   America that would notify me more about the detail.

14   Q.  So at that point you had some limited information about

15   the debt and what you would be expected to do, is that

16   right?

17   A.  Yes.

18   Q.  And did the man, Tu, do anything further to get you

19   ready for the United States?

20   A.  No, he didn't.  But we came here together.  We

21   traveled together.

22   Q.  Okay.  And I want to get that.  But first talk about how

23   you actually got to the point where you could travel to the

24   United States.

25        Did the female Teow do anything further to help

1    you get to the United States?

2    A.  Yes, she did.

3    Q.  And what did she help you do?

4    A.  She helped me to fill out the form.  And she had me

5    walk the passport traveling to Hong Kong, Macau, China,

6    and also had somebody to marry to me.

7    Q.  So let's take those in order.  We'll start with the

8    Visa, then we'll get to the passport, and then we'll talk

9    about the marriage.

10   A.  Yes.

11   Q.  Iris, I'm approaching with Government Exhibit 105.

12           MS. PROVINZINO:  Which I move into admission as a

13   Certified Public Accountant record.

14           MR. SICOLI:  I'm sorry, which one is this?

15           MS. PROVINZINO:  Government Exhibit 105.

16           MR. SICOLI:  Okay.

17           MS. PROVINZINO:  Any objection from Counsel?

18           MR. SICOLI:  No objection.

19           MR. GERDTS:  No objection.

20           MR. GUERRERO: No objection.

21           THE COURT:  Received.

22   BY MS. PROVINZINO:

23   Q.  Now, Iris, you have a hardcopy in front of you.  I'll

24   also put it up on the screen so the jury can follow along.

25           Now, is this the type of form that the female Teow

1    helped you fill out?

2    A.  Yes.

3    Q.  So who is that?

4    A.  It's me.

5    Q.  And that's your true name and information about your

6    place of birth, right?

7    A.  Yes.

8    Q.  Okay.  Now let's focus on this.

9             For the Visa application.  Now this is information

10   about you, is that true?

11   A.  Yes.

12   Q.  And your date of birth, in January, 1974?

13   A.  Yes.

14   Q.  And where did Teow get the information to fill out that

15   record?

16   A.  I had provided her.

17   Q.  Okay.  And so there's a reference here that you're a

18   director of finance.  Is that right?

19   A.  Yes.

20   Q.  Was that your job?

21   A.  No, it was not.

22   Q.  So who put that information in your application?

23   A.  Khun Teow did.

24   Q.  At the top in Box 15, there's a home address listed.

25   A.  Yes.

1    Q.  And is that your true address?

2    A.  It was not.

3    Q.  Who's address was that?

4    A.  I don't know.

5    Q.  All right.  And you mentioned that Teow filled this

6    information out, but also helped you with a marriage, is

7    that right?

8    A.  Yes.

9    Q.  And you see the reference here in Boxes 17 and 18

10   indicating that you're married?

11   A.  Yes, I do.

12   Q.  And who is Mr. Pradit Yooyen?

13   A.  It's the person that Khun Teow found me to marry to

14   him.

15   Q.  Had you ever met him before?

16   A.  I never did.

17   Q.  Tell me the jury about your interaction with Pradit

18   Yooyen?

19   A.  I had never new him before until Khun Teow introduced

20   me to be married to him.  And we had gone for -- request

21   applying for the Visa together.

22   Q.  Okay.  Did you get married?

23   A.  We did.

24   Q.  And did you ever have any sexual relations or consummate

25   the marriage?

1    A.   No.  There was not.

2    Q.   And did Teow explained to you why you should get

3    married?

4    A.   She did.

5    Q.   What was the purpose of it?

6    A.   So that the Visa to America would be easily approved.

7    Q.   And it lists on Box 24 that you were intending to go to

8    the Hilton in San Francisco, is that right?

9    A.   Yes.

10   Q.   And I believe you listed the purpose of the trip.  And

11   what was that?

12   A.   I don't understand the question.

13   Q.   And did you represent on this Visa application that the

14   purpose of your trip was a honeymoon with your husband?

15   A.   Yes.

16   Q.   And Iris, in asking you these questions, you didn't

17   actually fill in these answers in English, is that true?

18   A.   That's correct.

19   Q.   Did you fill in any of the information for this

20   application?

21   A.   I did not.

22   Q.   All right.  So after you provide this information -- and

23   I want to scroll down -- let's see, sorry about that -- to

24   page -- let's see, this would be the last page, 6, of the

25   document.  And there's some supplemental information here.

```
1              Okay.  So is that your full name?

2    A.  Yes.

3    Q.  And then the -- your fake husband, true?

4    A.  Yes.

5    Q.  And there's some additional names listed here, and who

6    are they?

7    A.  How does it read?

8    Q.  Mr. Samien Boonluea and Mrs. Sommai Boonluea?  I may be

9    mispronouncing those.

10   A.  Mr. Samien is my father.  Mrs. Sommai is my mother.

11   Q.  And how did Teow get that information?

12   A.  I have given it to her.

13   Q.  So this application was prepared and sent, along with

14   your fake marriage.

15           And you had indicated one other thing that Teow

16   helped you do, and that was to walk your Visa, is that

17   right?

18   A.  Yes.

19   Q.  And what does that mean?

20   A.  I don't understand the question.

21   Q.  You said Teow helped you to walk your Visa to prepare

22   for your Visa application, is that right?

23   A.  Yes.

24   Q.  And how did she help you do that?

25   A.  She helped me to fill out the form.
```

```
 1    Q.  And in part of filling out the form, did she suggest you

 2    do some travel before applying for a Visa to the United

 3    States?

 4              MR. GERDTS:  Objection, leading.

 5              THE COURT:  Sustained as to the form.  She'll put

 6    a new question in front of you.

 7    BY MS. PROVINZINO:

 8    Q.  All right.  You had mentioned several things that Teow

 9    helped you do and that related to helping you get your Visa

10    to the United States.

11    A.  That's correct.

12    Q.  Did you do travel to other countries before coming to

13    the United States?

14    A.  Yes, I did.

15    Q.  Where did you go?

16    A.  I went to Hong Kong, Macau, and China.

17    Q.  Who suggested that?

18    A.  Khun Teow had taken me there.

19    Q.  And describe that to the jury.  How did Khun Teow take

20    you there?

21    A.  Khun Teow had taken me to all these three countries

22    so that my Visa would get stamped within thee days, so I

23    could apply to the Visa to America easier -- easily.

24    Q.  After filing out that application, you're walking your

25    Visa and getting involved in the fake marriage, did you then
```

1   have a Visa interview?

2   A.  Yes, there was.

3   Q.  Were you prepared for the Visa interview?

4   A.  Yes, I was.

5   Q.  And who prepared you for that?

6   A.  Khun Teow did.

7   Q.  How did she prepare you for that?

8   A.  She said I had to go with my husband.  Walk with my

9   husband as if we were a real couple.

10  Q.  And did you go to the interview?

11  A.  I did.

12  Q.  Were you with anyone?

13  A.  I went with Mr. Pradit.

14  Q.  And tell the jury about the Visa interview?

15  A.  The officers at the embassy asked me what would I go

16  to the America for.  And my husband told them that we

17  would go for a honeymoon.

18  Q.  In this Visa interview, did you answer any of the

19  questions?

20  A.  I don't remember.  But most of the time they

21  interviewed my husband, my so-called husband.

22  Q.  Okay.  How did you find out that your Visa had been

23  approved?

24  A.  The officer from the embassy sent me the Visa?

25  Q.  And then at what point what did you do?

1    A.  I was preparing to come to America.

2    Q.  All right.  And so one of the -- I'm going to read you

3    the note here.

4            It indicates that "Couple on honeymoon to San

5    Fran.  Owns a catalog printing company.  Husband has

6    previous regional and Europe travels."  Is that right?

7    A.  Yes.

8    Q.  Did you own a catalog printing company?

9    A.  No, I did not.

10   Q.  Was that an answer your husband provided?

11   A.  Yes.

12   Q.  So you get the Visa and you're preparing to come to

13   America.

14   A.  Yes.

15   Q.  Do you do anything further with your fake husband, this

16   Mr. Pradit Yooyen?

17   A.  We went to get divorce.

18   Q.  And where did you do that?

19   A.  At the district.

20   Q.  So you got divorced before coming to the United States,

21   is that true?

22   A.  Yes.

23   Q.  All right.  So we've got your Visa.  Did Teow do

24   anything further to get you ready for the United States?

25   A.  So I just was prepared to come to United States.

```
1    Q.  Okay.  And was part of that preparation having

2    photographs taken?

3    A.  Oh, yes.

4    Q.  And where did you go for that?

5    A.  I went to a store called toilet.

6    Q.  Did anyone come with you?

7    A.  Khun Teow took me there.

8    Q.  And why did she take you there?

9    A.  She wanted me to take the pictures for using to sell

10   sex here.

11   Q.  And so what type of photographs were taken?

12   A.  It was sexual, provocative.

13   Q.  And then did she have those photos?

14   A.  Yes, she did.

15   Q.  Or do you know what happened to those?

16   A.  I don't -- I don't know.

17   Q.  So now you're ready to go to the United States, is that

18   right?

19   A.  Yes.

20   Q.  So who did you fly with?

21   A.  I flew with Khun Teow, Khun Tu and the husband.

22   Q.  Okay.  So Teow, is that right?

23   A.  Yes.

24   Q.  And Tu?

25   A.  Yes.
```

 1    Q.  And the fake husband.

 2    A.  Yes.

 3    Q.  Focusing on Tu for a minute on the screen in front of

 4    you.  Does he have a relationship with anyone else in the

 5    organization?

 6    A.  He was a significant other to Khun M.

 7    Q.  All right.  So you get on the plane and where do you

 8    guys go?

 9    A.  We arrive in an Francisco.

10    Q.  Okay.  I'm going to approach with Government

11    Exhibit 1503, which is a certified public record.

12              MS. PROVINZINO:  And I'll move for admission of

13    that.

14              MR. GERDTS:  What number?

15              MS. PROVINZINO:  1503.

16    BY MS. PROVINZINO:

17    Q.  And do you recognize that, Iris?

18    A.  What is this?  I couldn't read it.

19    Q.  And when I say recognize, there's a second line that

20    lists last name and first name.  Is that your name?

21    A.  My name, yes.

22    Q.  And I don't think I've ever shown you this.

23              MS. PROVINZINO:  Government moves admission of

24    1503.

25              MR. SICOLI:  No objection.

1        MS. PROVINZINO:  It's a certified public document.

2        MR. GERDTS:  Your Honor, might we approach?

3        THE COURT:  All right.

4        (Side bar at 1:54 p.m.)

5        MR. GERDTS:  Your Honor, I'm looking at the

6    document right now.  To me it -- Counsel is suggesting it's

7    just a record from the state department regarding an entry.

8    It looks to me like it's a police record, but I'll look at

9    it a little more, maybe my objection's not founded.

10        Merely because it's a certified, whatever, it

11   doesn't mean that it will come in because the police records

12   by definition are hearsay and are not admissible.

13        But may I have a look at it, please?  Because I

14   thought it was -- I thought it was something different than

15   Counsel's saying it is.

16        MS. PROVINZINO:  And that's fair.  I'll allow Mr.

17   Gerdts to look at it.

18        It's a certified public record from Customs and

19   Border Protection.  It's the record they make when somebody

20   enters the United States.  So it lists name, date of birth,

21   date of entry, and location of entry, because they are all

22   produced pursuant to our certification from Customs and

23   Border Protection.  It's not a police report.

24        MR. GERDTS:  Let me look at it again.  I may

25   withdraw my objection.

```
 1                    (In open court at 1:55 p.m.)

 2              MS. PROVINZINO:  I'll just give Defense Counsel

 3      again a moment to look at that.

 4              THE COURT:  All right.

 5              MR. GERDTS:  Thank you, Your Honor.  I'll withdraw

 6      my objection.

 7              THE COURT:  And that was 1503?

 8              MS. PROVINZINO:  1503.  Thank you, Your Honor.

 9              THE COURT:  Is received.

10              MS. PROVINZINO:  I'll put that on the screen.

11      BY MS. PROVINZINO:

12      Q.  And Iris, I was referring to the last name and first

13      name, that's you, is that right?

14      A.  That's correct.

15      Q.  And that's your true date of birth?

16      A.  Yes.

17      Q.  And that's the date you entered the United States, is

18      that right?

19      A.  Yes.

20      Q.  June 16, 2009?

21      A.  Correct.

22      Q.  And you traveled from Tokyo to the San Francisco

23      International Airport, is that right?

24      A.  Correct.

25              MS. PROVINZINO:  And I made on error, Your Honor.
```

```
 1      My colleague informed me that I failed to move admission of

 2      Government Exhibit 1011, which is a photograph the witness

 3      just identified of Teow, T-E-O-W.  And I'll move for the

 4      admission to Government Exhibit 1011?

 5              THE COURT:  I was going to ask if that had been

 6      offered.

 7              MR. SICOLI:  No objection, Your Honor.

 8              MR. GERDTS:  No objection.

 9              THE COURT:  And 1011 is received.

10              MS. PROVINZINO:  All right.  And that was the

11      picture.  Now it's in the record.

12      BY MS. PROVINZINO:

13      Q.  All right. So you land in San Francisco?

14      A.  Yes.

15      Q.  At that point then what's the next step for you in terms

16      of doing sex work in the United States?

17      A.  When I arrive in San Francisco in the morning.  In

18      the evening I met with a person named M.

19      Q.  Okay.  And who is M?

20      A.  She was woman who I had to pay the debt to for

21      $60,000.

22      Q.  And do you call M by any other names?

23      A.  No.

24      Q.  And so you had earlier identified that Tu had a

25      relationship -- or he was a significant other to M, is that
```

1    right?

2    A.  Yes.

3    Q.  So it wasn't until you came to the United States that

4    you understood your debt would be to M, is that right?

5    A.  Yes.

6    Q.  So what did M tell you when you got to the United States

7    about the debt?

8    A.  M told me work as how you would be doing with your

9    boyfriend and that you would be spending four to six

10   months to pay off your debt.

11   Q.  Okay.  And how much did she tell you the debt would be

12   when you got to the United States?

13   A.  $60,000.

14   Q.  Okay.  And she told you that it would be four to six

15   months, is that right?

16   A.  Yes.

17   Q.  Did she explain anything about house fees?

18   A.  She -- she did when I got here.

19   Q.  And what did she tell you?

20   A.  She said that when I would go to work at different

21   places, the house fee wouldn't be the same, it range from

22   60 to 80.

23   Q.  So the house fee of 60 to 80, depending on which house

24   you were at.  Did you understand that you had to pay for

25   that?

1    A.  I did not know.

2    Q.  And while you were under the debt of the 60,000 to M,

3    could you decide where you would go?

4    A.  No, I could not.

5    Q.  Could you decide what houses you would go?

6    A.  No, I could not.

7    Q.  What customers you would see?

8    A.  I don't understand the question.  Can you ask again?

9    Q.  Yes.  Thank you, Iris.  Could you decide what customers

10   you would see?

11   A.  No, I -- I can't.  I couldn't.

12   Q.  Could you decide what sex acts to do?

13   A.  Yes, I could.

14   Q.  And did M have any rules about the sex acts?

15   A.  Yes, she did.  So working for one hour -- for -- for

16   $270.

17   Q.  Okay.  So one hour was $270, right?

18   A.  Oh, no.  It was $170.

19   Q.  Okay.  Thank you.  So one hour was $170.

20   A.  Yes.

21   Q.  And what would a customer get for one hour?

22   A.  The main thing is to have sex.  Yes.  Having massage

23   and taking shower.

24   Q.  Okay.  You said three things there, shower, massage and

25   sex.  Were those required services?

1    A.  Yes.

2    Q.  And I think you said were there some other services that

3    you could choose to do?

4    A.  Yes.

5    Q.  And what would those be?

6    A.  If I wanted additional money, I would have to do a

7    blow job without condoms.

8              MS. PROVINZINO:  May I approach with Government

9    Exhibit 302?

10             THE COURT:  You may.

11             MR. RIVERS:  Which Exhibit Number is that?

12             MS. PROVINZINO:  302 and Government Exhibit 303 at

13   the same time.

14   BY MS. PROVINZINO:

15   Q.  So Iris, let's start Government Exhibit 302 first.

16             All right.  And I'll call your attention to

17   Page 2, the attachment on the e-mail.  And do you recognize

18   Page 2 of that exhibit?

19   A.  Yes, I do.

20   Q.  And was that?

21   A.  It's my passport.

22   Q.  And then on the first page?

23   A.  Yes.

24   Q.  This is a reference to an e-mail sent by

25   catcat_Thai@live.com?

```
1     A.  Yes.

2     Q.  And who is that?

3     A.  It's M.

4     Q.  And do you see the subject line on that e-mail?

5     A.  I do.

6     Q.  It says Lilyid?

7     A.  Yes.

8     Q.  And who was that?

9     A.  It's me.

10    Q.  And about halfway through the page, there's one

11    translation.  And do you see some Thai characters in a blue

12    box?  What is that word?

13    A.  Orman.

14    Q.  And do you know who that is?

15    A.  I don't know.

16          MS. PROVINZINO:  The Government moves the

17    admission of Exhibit 302?

18          MR. GERDTS:  Well, Your Honor there's a -- object

19    on relevance and foundation for the communication.  There's

20    a -- we don't have any foundation for the recipient of this.

21          THE COURT:  Counsel?

22          MS. PROVINZINO:  There is foundation established

23    in that it's the Defendant's passport.  She identified that

24    on Page 2.

25          She also identified that the sender of the e-mail
```

 1    is catcat_Thai or M, who held her bondage debt.  And the

 2    time -- and the subject for this is Lilyid.

 3            There also is a further subject line of Chaba,

 4    which the witness already said was her name.

 5            So I believe there's both adequate foundation for

 6    it and certainly relevance to the scheme of this underlying

 7    conspiracy.

 8            MR. GERDTS:  Object to Page 2, Your Honor.  The

 9    the communication is on Page 1.

10            THE COURT:  What the Court will do is

11    provisionally receive it.  And after I've heard -- at least

12    with reference to Page 1 of the two.  And then I'll make any

13    final ruling after the -- any direct and cross-examination

14    by respective Counsel.

15            So note the objection.  But received with that

16    understanding.

17    BY MS. PROVINZINO:

18    Q.  All right.  Iris, let's focus on Page 2, first.  Bless

19    you.  And then we'll come back to Page 1.

20            I'm going to make the image on this page slightly

21    larger for the jury to see.

22    A.  Yes.

23    Q.  And was is that in this -- what is in the attachment of

24    this e-mail?

25    A.  It is my passport picture.

1    Q.  That's your passport picture?

2    A.  Yes.

3    Q.  And focusing on the first page of Government

4    Exhibit 203.

5              MR. GERDTS:  Your Honor, I misunderstood the

6    Court's ruling.  Was the first page admitted or not?

7              THE COURT:  Provisionally received until I've seen

8    both the direct and the cross, yes.

9    BY MS. PROVINZINO:

10   Q.  And there's a from e-mail, catcat_TY@live.com.  Is that

11   correct?

12   A.  Yes.

13   Q.  And whose e-mail is that?

14   A.  It's M's.

15   Q.  There's another e-mail listed joyzone88@yahoo.com.  Do

16   you know whose e-mail that is?

17   A.  I don't know.

18   Q.  Did you have another name for M, Iris?

19   A.  I heard customer called her Joy, but I called her M.

20   Q.  Okay.  So you often heard M sometimes referred to as

21   Joy, is that right?

22   A.  Yes.

23   Q.  And the subject there is Lilyid, do you see that?

24   A.  I do.

25   Q.  And there's a series of some other e-mails, subject

1    Chaba.  Who's that?

2    A.  It's me.

3    Q.  And, again, it's from sexynancy.  Do you know who that

4    is?

5    A.  I don't know.

6    Q.  To M, right?  Catcat_ty?

7    A.  Yes.

8    Q.  All right. And here we've got this mmka_za or Orman.  Do

9    you know who that is?

10   A.  I don't know.

11   Q.  It referenced a passport, do you see that?

12   A.  Yes.

13   Q.  And this was originally sent July 6, 2009, right?

14   A.  Yes.

15   Q.  And remind the jury of your entry date into the United

16   States?

17   A.  I arrived to the United States on the date of 16th

18   January, 2009.

19   Q.  And I think it was about June, Iris -- and then we'll go

20   back to --

21              THE INTERPRETER:  I would like to correct that.

22   Actually she said June.

23              MS. PROVINZINO:  That's right?  Okay.  Perfect.

24   BY MS. PROVINZINO:

25   Q.  Fair to say, Iris, you don't know everybody who's a part

1    of the conspiracy?

2            MR. GERDTS:  Your Honor, I object.  She can't know

3    what she does not know, so.

4            THE COURT:  I'll sustain as to the form of the

5    question.

6    BY MS. PROVINZINO:

7    Q.  And Iris, have you been on e-mail strings where you

8    haven't known everybody who's in the chain?

9    A.  Yes.

10   Q.  And let me jump ahead of this, because we're going to

11   talk about this with the jury, but you took different steps

12   within the organization, is that right?

13   A.  Yes.

14   Q.  And in that role did you have occasion to receive sexy

15   pictures and passports in an e-mail chain?

16   A.  Yes.

17   Q.  Is that something the organization would do?

18   A.  Yes.

19   Q.  And you might not necessarily know every single

20   individual or their e-mail in the chain, is that true?

21   A.  Yes.

22           MS. PROVINZINO:  The Government moves the

23   admission of Exhibit 302.

24           THE COURT:  That's already --

25           MS. PROVINZINO:  Admitted provisionally.

1          THE COURT:  Well 2, Page 2 is received.  And 1 was

2     provisionally received until I've heard all the direct and

3     cross.

4          MS. PROVINZINO:  Thank you, Your Honor.

5          THE COURT:  All right.

6     BY MS. PROVINZINO:

7     Q.  And Iris, do you see Exhibit 303 in front of you?

8     A.  I do.

9     Q.  And there are a series of photographs that are

10    attachments to that e-mail.  Do you see those?

11    A.  I do.

12    Q.  And who's in those photographs?

13    A.  It's me.

14    Q.  And where were those photographs taken?

15    A.  In Thailand.

16    Q.  And focusing on that first page of the exhibit.

17    A.  Yes.

18    Q.  There's a Thai word that's been translated.  Can you

19    read that word?

20    A.  I couldn't see.

21    Q.  Okay.  And maybe -- Government Exhibit 303.

22    A.  "Sister, these are pictures."

23    Q.  And did you read that right, Iris?

24    A.  Yes.

25    Q.  And it's referring to Lily?

```
 1    A.  Yes.

 2    Q.  And that's you, right?

 3    A.  Yes.

 4             MS. PROVINZINO:  The Government moves the

 5    admission of Exhibit 303.

 6             MR. GERDTS:  No objection, Your Honor.

 7             MR. GUERRERO:  No objection.

 8             MR. SICOLI:  No objection.

 9             THE COURT:  Those are received.

10    BY MS. PROVINZINO:

11    Q.  All right.  Briefly so the jury can see.  That's M's

12    e-mail, the catcat, right?

13    A.  Yes.

14    Q.  And these were sent in July of 2010?

15    A.  Yes.

16    Q.  And "Sister, these are pictures."  Lily and attachments

17    that say Chaba?

18    A.  Yes.

19    Q.  And Chaba's you, is that right?

20    A.  Yes.

21    Q.  And they had originally been information forwarded to M

22    in April of 2010, is that -- do you see that?

23    A.  Yes.

24    Q.  And the jury had get a chance to look at these, but just

25    to show them one, is that one of the pictures taken at
```

```
 1    Toilet Studio?

 2    A.  Yes.

 3    Q.  So these are the ones you took with Teow?

 4    A.  Yes.

 5    Q.  So you met with M soon after arriving in San Francisco,

 6    is that right?

 7    A.  Yes.

 8    Q.  And she explained a little bit more about the debt and

 9    the work itself?

10    A.  Yes.

11    Q.  And then did you start working or selling sex for M?

12    A.  Yes.

13    Q.  And where did that occur?

14    A.  It happened first in San Francisco.

15    Q.  And where in San Francisco?

16    A.  It was an Asian house, but the customer was

17    foreigners.

18    Q.  Okay.  And how was your experience there, Iris?

19    A.  I couldn't work at all, because I had never done this

20    before.  So the house owner send me back to M within one

21    week.

22    Q.  And so what happened once you were sent back to M?

23    A.  M had me to travel to Chicago.

24    Q.  So where in Chicago did you go?

25    A.  In the area of O'Hare.
```

1    Q.  And what type of place were you working out of?

2    A.  It was a hotel.

3    Q.  Was anyone else there?

4    A.  I don't know.

5    Q.  Or -- so were you with M at the time?

6    A.  Yes.

7    Q.  Was anyone else with you?

8    A.  At the time, no.

9    Q.  Okay.  And so what did M instruct you to do?

10   A.  She told me to work.  So -- to work so that I give

11   the good service to the customer and I could pay off my

12   debt quickly.

13   Q.  Okay.  And so what did you do when you were with M near

14   O'Hare?

15   A.  I sell sex.

16   Q.  And so what happened with the money?

17   A.  The money that I made from work I gave it to M.

18   Q.  Would that be to pay off the debt?

19   A.  Yes.

20   Q.  And were any of those house fees?

21   A.  There was.

22   Q.  And how much was the house fee?

23   A.  70.

24   Q.  And while you were working in Chicago, how would you

25   communicate with M?

```
 1     A.  By phone.

 2     Q.  And how frequently would you communicate with her?

 3     A.  Every day.

 4     Q.  And how would you get customers?

 5     A.  M would be the one who send me customers.

 6     Q.  Okay.  And did something happen where you were unable to

 7     communicate with M for a period of time?

 8     A.  Yes, there was.

 9     Q.  And tell the jury what happened?

10     A.  After I had been to Chicago for two, three weeks, M

11     was arrested by the police.

12     Q.  How did you find out?

13     A.  After M did not contact me for half a day.  The next

14     day in the morning she contacted me and said that she was

15     arrested.

16     Q.  Was anyone else arrested with her?

17     A.  Yes, there were.

18     Q.  And who was arrested with M?

19     A.  The name were Pu and Anna -- I'm sorry.  I'm sorry, I

20     said the name wrong.

21     Q.  That's okay.  What were the names with people with M?

22     A.  The name the name was Faa and Pu.

23     Q.  So Faa and Pu were arrested with M.  And who were Faa

24     and Pu?

25     A.  So Pu was sister to M.  And Faa, I'm not sure if she
```

1    was in debt to M because she had come before me.  But

2    both of them were working for M.

3    Q.  And when you say working for M, does that mean they had

4    debt to M?

5            MR. RIVERS:  Objection, leading.

6            THE COURT:  Sustained as to the form of the

7    question.

8            I'll allow the inquiry if you want to put a new

9    question in front of the witness.

10   BY MS. PROVINZINO:

11   Q.  And you say they were working for M.  Iris, what does

12   that mean?

13   A.  M would be the person who send them customers.

14   Q.  And that was like your arrangements with M?

15   A.  Yes.

16   Q.  Did Pu and Faa owe debt to anyone?

17   A.  I don't know.

18   Q.  And they came to the United States before you, is that

19   right?

20   A.  Yes.

21   Q.  So you learned about the arrest.  And then what happens

22   next in your communication with M?

23   A.  After M and I met in for the next day, we were

24   staying together 10 days in Chicago.

25   Q.  And during that stay, the 10 days in Chicago, were you

```
1    doing sex work for M?

2    A.  No.  There was not.

3    Q.  Not after the arrest, is that right?

4    A.  No.

5    Q.  Had M been involved in sex work?

6    A.  This I don't know.

7    Q.  And during the time you were in Chicago with M, who had

8    your passport?

9    A.  M did.

10   Q.  How long did she have it?

11   A.  About two weeks.

12   Q.  Why did she have it?

13   A.  She said that -- let her keep it because she was

14   afraid the customer would steal it.

15   Q.  Was that the real reason?

16   A.  It's not.

17   Q.  What was the real reason she had your passport?

18   A.  I had learned it later on, I think that she was

19   afraid that I would run away.

20   Q.  Did you get your passport back?

21   A.  I did.

22   Q.  And how did you get it back?

23   A.  After she got arrested she returned it to me.

24   Q.  All right.  Iris, do you know anyone else in the

25   criminal organization that holds onto passports?
```

1   A.  I only heard something in Sherburne that people are

2   talking.

3   Q.  And what are they saying about people holding passports?

4            MR. GUERRERO:  Objection.

5            MR. GERDTS:  Objection.

6            MR. ENGH:  Objection.

7            THE COURT:  Sustained.

8   BY MS. PROVINZINO:

9   Q.  So other than that you don't know?

10  A.  No, I don't -- I don't know.

11  Q.  But yours -- how long had M held onto your passport?

12  A.  Two weeks.

13  Q.  Now you said the reason M held onto your passport is she

14  was afraid you would run away, is that true?

15  A.  Yes.

16  Q.  At some point did you want to leave?

17  A.  I had the thought of going back to Thailand after I

18  had been here for three to four months.

19  Q.  And was it more than just a thought?

20  A.  I was really had intention to do back.

21  Q.  And did you take any steps to do that?

22  A.  I had talked to M.  I had asked her -- I wanted to go

23  back to Thailand.

24  Q.  How did she respond?

25  A.  She said to me, if I hadn't paid off my debt and

1     didn't come back to pay off my debt, she wouldn't

2     guarantee the safety of my family.

3     Q.  What did you do after hearing that?

4     A.  I was concerned about my family in Thailand.  So I

5     had decided to -- to stay.

6     Q.  So at that point you said you were here for about four

7     months, is that right?

8     A.  Yes.

9     Q.  And how long did it take you to pay off your debt?

10    A.  15 months.

11    Q.  Iris, do you know of any others who tried to run away or

12    escape from M?

13    A.  I have heard.

14    Q.  What do you know?

15          MR. ENGH:  Objection.  Eliciting hearsay.

16          THE COURT:  Yes.  I would like to know the source

17    of the information and the timing of it.  I'll allow the

18    inquiry.  But until I know that, I'll sustain the objection.

19    BY MS. PROVINZINO:

20    Q.  How do you know this information, Iris?

21    A.  There was a woman who I used to work together called

22    and asked me.

23    Q.  A working woman that you worked with?

24    A.  Yes.

25    Q.  And she told you this directly?

1    A.  Yes.

2    Q.  And was this the woman who had tried to escape or run

3    away from M?

4            MR. ENGH:  Objection.  It's leading and again

5    hearsay.

6            THE COURT:  Sustained as to the form.

7            And then, Members of the Jury, I'll let her answer

8    stand, if she has an answer, not for the truth of the matter

9    asserted, but why she believes -- or what her source of

10   information is.  Not for whether it's true or false, you'll

11   decide that.  But why she is of this view.

12           But note the objection, also.

13   BY MS. PROVINZINO:

14   Q.  And Iris, I may not be asking these questions well, who

15   is this woman?

16   A.  Which woman that you said?

17   The woman that had attempted to run away or escape from M?

18   A.  Her name was Pu.

19   Q.  And did she tell you about her circumstances?

20   A.  No.  No, it wasn't.

21   Q.  Who did you learn it from?

22   A.  The person who knew Pu couldn't -- couldn't get in

23   touch with Pu, so she called me and asked me if I had

24   seen Pu.

25   Q.  And at that point in time, had you been in contact with

1    Pu?

2    A.  No, there was not.

3    Q.  Were you able to contact Pu?

4    A.  No, I could not.

5    Q.  Was Pu gone?

6    A.  She was disappearing for a week.

7    Q.  So she was gone for a week?

8    A.  Yes.

9    Q.  And at some point she returned?

10   A.  Yes.

11   Q.  Now we've talked a lot about M.

12   A.  Yes.

13   Q.  And she's the one you owed your debt to, right?

14   A.  Yes.

15   Q.  And you were with her for that extended period of time

16   in Chicago 2009, is that right?

17           MR. ENGH:  Objection.  Asked and answered about

18   five times.

19           THE COURT:  Well, the -- if this is a transitional

20   question to the next question, I'll permit it.

21   BY MS. PROVINZINO:

22   Q.  Iris, when did you see M?

23   A.  I saw her the first day when I came to America the

24   first day.

25   Q.  Okay.  And that was in San Francisco?

1    A.  Yes.

2    Q.  And we talked about the time in Chicago?

3    A.  Yes.

4    Q.  Were there any others?

5    A.  There was.

6    Q.  And when was that?

7    A.  After M was arrested, she traveled to Houston.

8         We met in Houston.  And later on she followed to

9    California.

10   Q.  Okay.  And what timeframe was this?

11   A.  During the time that I had been in America for three

12   months.

13   Q.  Okay.  So this -- at this point in time, you were still

14   under debt, is that right?

15   A.  Yes.

16   Q.  So during that time, you were under debt, what houses

17   did you work at?

18   A.  As far as I remember, I worked for M's house in

19   Chicago, in San Francisco, in Washington D.C., and in

20   Atlanta, Orange County, and Sacramento.

21   Q.  And at those locations, who sent you to them?

22   A.  M did.

23   Q.  And I'm showing you what's been already admitted as

24   Government Exhibit 320.  And at the top this appears to be a

25   Southwest Airlines ticket --

1   A.  Yes.

2   Q.  -- for December 30, 2009.  So you're still under debt,

3   right?

4   A.  Yes.

5   Q.  And the ticketless confirmation has your name?

6   A.  Yes.

7   Q.  And you see this gangsmoo@hotmail.com?

8   A.  Yes.

9   Q.  Did you know who that is?

10  A.  I do.

11  Q.  And who is that?

12  A.  Moo.

13  Q.  And who is Moo?

14  A.  This is the person who booked me the ticket.

15  Q.  And it appears to be a ticket for you from

16  Minneapolis/St. Paul through Chicago onto Washington Dulles.

17  Do you see that?

18  A.  Yes.

19  Q.  And that was one of the houses you worked at while under

20  debt?

21  A.  Yes.

22  Q.  And describe Moo to the jury?

23  A.  Moo has short hair.  She's a little bit chubby.  Like

24  a tomboy.  She's like a tomboy.  Friendly.

25  Q.  So I'm showing you Government Exhibit 1065, which has

```
 1    already been admitted.  Who's that?
 2    A.  It's Moo.
 3    Q.  And what role did M play in the organization -- or Moo,
 4    I'm sorry.  Moo play?
 5    A.  So she would be the person who booked the tickets for
 6    people to go to different states.
 7              Also she would booked the hotel and also pick
 8    up -- pick up people at the airport and sent money for M.
 9    Q.  And did you work with Moo on those different things, the
10    tickets, the hotels and moving money for M?
11    A.  Yes.
12    Q.  So during that time you were in debt, you mentioned a
13    string of different cities you worked at, including Orange
14    County?
15    A.  Yes.
16    Q.  And who sent you to Orange County?
17    A.  M did.
18    Q.  And what house did she send you to work at?
19    A.  At Maya's house.
20    Q.  And did you know Maya?
21    A.  I don't know.
22    Q.  Do you know someone named Bill, Iris?
23    A.  Yes, I do.
24    Q.  And who was that?
25    A.  He is a white guy.
```

1    Q.  And what role did he play?

2    A.  So when I went to work at Maya's house in the early

3    of 2010.  I had met a person named Bill.  He came to

4    greet me and made me steak.

5    Q.  Okay.  And so that was early 2010?

6    A.  Yes.

7    Q.  And you were under debt to M at the time?

8    A.  Yes.

9    Q.  And do you see this person you identified -- or as

10   you're describing as Bill here in the courtroom?

11   A.  I do.

12   Q.  And can you point to him or identify what he's wearing?

13   A.  Uncle Bill is wearing a black T-shirt, shirt.  He's a

14   white guy.  Has no hair.

15           MS. PROVINZINO:  Let the record reflect that the

16   witness has identified Michael Morris, who she references as

17   Uncle Bill in the courtroom.

18           THE COURT:  So reflected.

19   BY MS. PROVINZINO:

20   Q.  And was Bill a member of the criminal organization?

21           MR. RIVERS:  Objection.  Vague.

22           THE COURT:  If she understand the question, I'll

23   -- I'll allow her to answer.  The objection goes to the

24   weight, depending upon her basis for her answer, if she

25   understands it.

```
 1    BY MS. PROVINZINO:

 2    Q.  Was Bill a member of the criminal organization?

 3              THE COURT:  Note the objection.  You may answer.

 4    A.  Yes, he is.

 5    BY MS. PROVINZINO:

 6    Q.  What did he do for the organization?

 7    A.  He opened a house, a working house.

 8    Q.  And where did he open a working house?

 9    A.  Orange County.

10    Q.  Did he work with anyone else?

11    A.  I don't know.

12    Q.  And at the house in Orange County, who sent you there?

13    A.  M did.

14    Q.  And how long were you there?

15    A.  Two weeks.

16    Q.  What do you remember about that time and this -- was it

17    working with Bill and Maya?

18    A.  I -- for one hour, the price was 180.  And the house

19    fee was 80.  Yes.

20    Q.  And what were the services required for one hour?

21    A.  If the customer comes, I have to take a shower with

22    the customer, have sex with them, massage them and do my

23    best work.

24    Q.  And when you went to Orange County, who picked you up in

25    Orange County?
```

```
 1    A.  There was nobody did.

 2    Q.  Okay.  Who would come and collect money?

 3    A.  Maya did.

 4    Q.  And did Maya or Bill give you any instructions on how

 5    you could pay off the debt faster?

 6              MR. SICOLI:  Objection, Your Honor.  She said she

 7    only went to Maya's house, not Bill's house.  And she's

 8    trying to conflate the jury.

 9              THE COURT:  I'll let the jury decide as to which

10    house she testified to.  Why don't we rephrase the question,

11    break it down.

12    BY MS. PROVINZINO:

13    Q.  Did you get any instruction on what you could do to pay

14    off the debt faster?

15    A.  Yes.  There was.

16    Q.  And what was the instruction?

17    A.  To keep good service to customer, and to do

18    everything to make the customer happy.

19    Q.  And was there any information for -- when you were

20    working at Orange County on a website?

21    A.  I'm thought sure if there was any review.  I didn't

22    know anything.

23    Q.  Was there any information about the services that would

24    occur at the house in Orange County?

25    A.  No.  There's none.
```

1    Q.  So you're told to do good service, which you've

2    identified, as shower, sex, massage, and doing your best, is

3    that right?

4    A.  Yes.

5    Q.  Were there any acts you -- sex acts that you had to

6    perform, or were required to perform?

7    A.  So I only work as something basic.  I couldn't do

8    anything special at all.

9    Q.  And when you were in Orange County, is it fair that you

10   spoke with Maya more because you would speak in Thai with

11   her?

12   A.  Yes.

13   Q.  And did she tell you anything about what kind of oral

14   sex you had to perform?

15   A.  Yes, she did.

16   Q.  And what was the rule on that?

17   A.  There was really no rule, but she said if I wanted to

18   make extra money, I should be able to do a blow job

19   without condoms.

20   Q.  And at that point in time, so early in 2010, how well

21   could you speak English?

22   A.  I couldn't speak English at all.

23   Q.  While you were working in Orange County could you set

24   your schedule?

25   A.  No, I could not.

```
 1    Q.  Could you choose your customers?

 2    A.  No, I could not.

 3    Q.  Could you have left?

 4    A.  No, I could not.

 5    Q.  So you were talking a little bit about Uncle Bill.

 6         Tell the jury what you remember of Uncle Bill

 7    during your time in Orange County?

 8    A.  As far as I remember, I don't remember how many days

 9    I had worked at Maya's house.  But there was one day

10    where Uncle Bill came over and introduced himself and

11    that he made me a steak for dinner.

12         The next morning he also took me to buy makeup

13    and -- in his sport car, an open roof.  I don't remember

14    what color it was.  But I remember he was really kind.

15    Q.  And what was the interaction you observed between Bill

16    and Maya?

17    A.  They were friends.

18    Q.  Did they work together?

19    A.  At that time I think so.

20    Q.  And now you've worked very closely with M from the time

21    you came into the country until you were arrested, is that

22    true?

23    A.  Yes.

24    Q.  And what was M's relationship with Uncle Bill?

25    A.  There was no relationship.
```

```
 1    Q.  What would M do with the girls under her tax in relation

 2    to Bill?

 3    A.  I don't know.

 4    Q.  And I guess I'm asking the question in a bad way.  Was

 5    Uncle Bill's house one that M would frequently send girls

 6    under debt?

 7              MR. SICOLI:  Your Honor, this has been now

 8    answered three times.

 9              THE COURT:  I'll let the jury decide if this is

10    the second, or third, or fourth time or whatever.

11              But if she understands the question, Uncle Bill's

12    house and the question, note the objection.  I'll let her

13    answer.

14              MR. RIVERS:  Your Honor, I think it's also

15    leading.

16    BY MS. PROVINZINO:

17    Q.  I think there's confusion.  There's no familial or other

18    between M and Uncle Bill.  So I'm asking about any kind of

19    business relationship?

20    A.  Yes.

21    Q.  And what was that?

22    A.  Sometimes -- sometime M would send the girls to work

23    at Uncle Bill's.

24              THE COURT:  If we can find it -- it doesn't have

25    to be this moment, but a logical place to take our afternoon
```

 1   recess.

 2            MS. PROVINZINO:  I was just looking at my outline,

 3   so I'm happy to take a break at this moment, Your Honor.

 4            THE COURT:  All right.  Folks, we'll take an -- at

 5   least a 15-minute recess here.  So let's rise for the jury,

 6   please.

 7            (Jurors excused at 2:46 p.m.)

 8            THE COURT:  So we'll see everybody in about 15.

 9            (In open court at 3:05 p.m.)

10            THE COURT:   As soon as the jury is ready, you may

11   continue, Counsel.

12            MS. PROVINZINO:  Thank you, Your Honor.

13   BY MS. PROVINZINO:

14   Q.  Iris, at the end of your 15 days working in Orange

15   County, who took you to the airport?

16   A.  I took taxi.

17   Q.  And then you had -- you continued to work under M while

18   you were in debt, is that right?

19   A.  Yes.

20   Q.  And that was for another half a year until the 15 months

21   were up?

22   A.  Yes.

23            MS. PROVINZINO:  May I approach with Government

24   Exhibit 241?

25            THE COURT:   You may.

1    BY MS. PROVINZINO:

2    Q.  Iris, I'm handing you an exhibit, that's an e-mail

3    between catcat_ty and Asia Club Now relating to Pu's pics.

4    And I'm just wondering if that was the same Pu you would

5    been spoken earlier about?

6    A.  This is not Pu.

7    Q.  That is not the Pu that had run from M?

8    A.  No, she's not.

9    Q.  Do you know that Pu?

10   A.  This person named Pu.

11   Q.  And was Pu one of M's girls?

12   A.  Yes.

13   Q.  And it appears that in that chain, it's from catcat to

14   an e-mail future-3333.  Do you know who that is?

15   A.  I don't know.

16   Q.  So catcat we've established is M, is that right?

17   A.  Yes.

18   Q.  Do you know who Asia Club Now is?

19   A.  I don't know.

20   Q.  But those are the images of Pu?  That was one of M's

21   girls?

22   A.  Yes.

23          MS. PROVINZINO:  The Government moves the

24   admission of Exhibit 241.

25          MR. GERDTS:  Can I see it Ms. --

 1          MS. PROVINZINO:  I have a copy of it with the

 2     witness.

 3          MR. GERDTS:  Well, Your Honor, I would object on

 4     foundation grounds to the communication and relevance to

 5     this case.

 6          THE COURT:  Any other Defense Counsel want to be

 7     heard before I hear from Government Counsel?

 8          MR. SICOLI:  No.

 9          MS. PROVINZINO:  There will be additional

10     foundation laid.

11          The witness has identified that Pu is one of M's

12     girls and under debt to M that was sent.  And there will be

13     testimony from additional witnesses that Asia Club Now is an

14     e-mail that Michael Morris, or Bill had.

15          THE COURT:  The primary -- as a primary purpose at

16     this stage, limited for the limited purposes showing the

17     identity of the person?

18          MS. PROVINZINO:  The identity of the person is

19     somebody under debt to M.

20          THE COURT:  So what I'm saying is, for the purpose

21     of the photograph, I will provisionally permit it without

22     reference to the e-mail addresses.

23          MS. PROVINZINO:  Thank you, Your Honor.

24          And I believe that our witness from the other day,

25     Noppawan Lersluchachai, known as Moo, had identified the

```
 1    Asia Club Now as an e-mail handle belonging to Michael

 2    Morris or Bill.

 3             But for limited purposes, we'll show Government

 4    Exhibit 241 to the jury.

 5             THE COURT:  And that's -- and then without

 6    referencing anything but the photograph, is that correct?

 7             MS. PROVINZINO:  At this point, yes, Your Honor.

 8             THE COURT:  All right. And then I'll receive it

 9    provisionally with that understanding.  And then I'll hear

10    from anyone if it's admitted for any other purpose other

11    than the paragraph itself, separate from the e-mail issue.

12             So with that understanding we'll continue.

13    BY MS. PROVINZINO:

14    Q.  And Iris, just to clarify, there was a different person

15    named Pu that had run away from M, is that right?

16    A.  Yes.

17    Q.  But that's not the Pu in this photograph, is that right?

18    A.  No.  This person her name was Pu?

19    Q.  And who was this Pu?

20    A.  She's M's girl.

21    Q.  And speaking of M, we haven't had an opportunity to

22    identify her for the jury yet.

23    A.  Yes.

24    Q.  I'm handing you Exhibit 1012.  Take a look at these

25    photographs.
```

1           Do you identify the people in those photographs?

2    A.  Yes, I do.

3    Q.  And who is it?

4    A.  M is wearing a black t-shirt, short.  And M is

5    wearing a long-sleeved red shirt.  Opal is wearing a

6    long-sleeved shirt.  Many colors.

7           MS. PROVINZINO:  The Government moves the

8    admission of Exhibit 1012.

9           MR. GUERRERO:  No objection.

10          MR. GERDTS:  No objection.

11          THE COURT:  Received.

12   BY MS. PROVINZINO:

13   Q.  All right.  Lily, let's make this visible to the jury.

14   And you are identifying the people in this photo.  And you

15   can actually touch the screen.

16          All right.  And you're in the middle, is that

17   right?

18   A.  Yes.

19   Q.  All right.  And who is M?

20   A.  She's wearing a black T-shirt with short hair.

21   Q.  All right.  And do you want to touch the screen and

22   identify where she is in the picture?

23   A.  That's M.

24   Q.  And I'll have you touch the screen so the jury can

25   actually see where you're at.  Oh, you got it.  I can't see

1    it on my screen in front of me.  There it is.

2            Okay.  And then who's the other individual on your

3    other side?

4    A.  She's Opal.

5    Q.  Okay.  And who is Opal?

6    A.  She's M's friend.

7    Q.  Okay.  And how did they get to know each other?

8    A.  She used to tell me that they had known each other

9    from England.

10   Q.  And where was this photograph taken?

11   A.  At a hotel Comfort Inn in Bloomington at the

12   restaurant Outback.

13   Q.  And why did you take that photograph?

14   A.  After three months that I had been in America, I

15   never saw her again until she came here to visit.  And so

16   I took the picture for memento.

17   Q.  But there was a period of time you hadn't seen M?

18   A.  Yes.

19   Q.  Like 2009, is that right?  And when -- when did you take

20   this photo?

21   A.  I'm not sure.  It's probably from 2012 to early 2013.

22   Q.  And if M wasn't here in Minnesota, where was she?

23   A.  I was not sure where she really was.  She told me

24   sometimes in Canada, sometimes in England, sometimes in

25   California, sometimes in Thailand.  So I'm not sure where

1    she was.

2    Q.  And during that time when she wasn't in Minnesota, how

3    would you communicate with her?

4    A.  By phone.

5    Q.  Now after you had paid off the debt, you still continued

6    to work in commercial sex, is that right?

7    A.  Yes.

8    Q.  Why did you continue to do that?

9    A.  I was still having to take care of my mother.  And

10   also taking -- sending her money to see the doctor.  And

11   I also had to help the family with their debt.

12   Q.  And during this time when you weren't under debt

13   anymore, did the work change for you?

14   A.  Yes, it did.

15   Q.  How did it change?

16   A.  I was able to go to work anywhere I wanted, or I

17   could take days off when I wanted.  And I need not to be

18   under anyone's control.

19   Q.  So that wasn't the case when you were under debt to M,

20   is that right?

21   A.  Yes.

22   Q.  So at some point in time did you decide to continue to

23   help M?

24   A.  Yes.

25   Q.  And tell the jury about that?

1    A.  I helped M by I -- I introduce the girls by going to

2    the back, and introduced them to how to buy food and how

3    to call taxi.

4    Q.  All right.  So how would you help with calling a taxi?

5    A.  I would give them the phone number.

6    Q.  And were there any individuals in M -- in Minnesota that

7    helped the organization as a taxi?

8    A.  There were.

9    Q.  Who were those people?

10   A.  A customer named John.

11   Q.  And Iris, I'm showing you what's already been admitted

12   as Government's Exhibit 1039.  And was this the customer

13   John you were referring to?

14   A.  Yes.

15   Q.  So what did he do for the organization?

16   A.  As far as I know, he had been old-time customer from

17   the beginning to the end.  Later on he became a taxi for

18   M.  Take the girls to buy food and to the bank.  And

19   sending money at the bank.

20   Q.  And you indicated you helped with food, as well.  What

21   would you do in that role?

22   A.  So we would go together to buy food during the time

23   that M let us take the time off and during that hour.

24        So I would tell them, Oh, this is where the Thai

25   food is, something like that.

1   Q.  And would you go with the women under debt?

2   A.  Yes.  We went together because I had to buy food,

3   too.

4   Q.  You also mentioned you helped M with banking.

5   A.  Yes.

6   Q.  And what did you do to help with banking?

7   A.  I sent money to M.

8   Q.  And what money would you send to M?

9   A.  After I paid off my debt, I would send her the house

10  fee.

11  Q.  What about the house fees from the other women working?

12  A.  We would each send our own house fee individually.

13  Q.  And what about those who were still under debt to M?

14  How would they get that money back to her?

15  A.  The girls would send money to California to someone

16  named Moo.  And then the money would be passed on to a

17  person named Arm.

18  Q.  And you indicated that Arm and Moo, where were they

19  located?

20  A.  You mean now?

21  Q.  I'm sorry.  Where were they located when they were

22  helping M get money back to her?

23  A.  They were in California.

24  Q.  Who would do scheduling when you were at M's houses?

25  A.  M did.

1    Q.  Who would do advertising?

2    A.  I don't know.

3    Q.  Where there occasions when you would help M get tickets

4    to women working?

5    A.  I had never booked tickets to girls.

6    Q.  But you didn't book, but would there times she'd send

7    you e-mails and ask you to help get tickets or other

8    information to the girls in the house?

9    A.  Yes.

10   Q.  And who would book to see tickets for M?

11   A.  Moo did.

12   Q.  Now I'm approaching with Government Exhibit 492.  And

13   I'll have you take a look at the top of that exhibit.

14          And can you identify the e-mail on the to line,

15   the pet1138@gmail.com?

16   A.  It is my own e-mail.

17   Q.  So that's an e-mail that M sent to you?

18   A.  Yes.

19          MS. PROVINZINO:  The Government moves the

20   admission of Exhibit 492.

21          THE COURT:  Any objections?

22          MR. GERDTS:  Just a moment, Your Honor.

23          THE COURT:  All right.

24          MR. GERDTS:  No objection.

25          MR. SICOLI:  No objection.

1            THE COURT:  That's received.

2    BY MS. PROVINZINO:

3    Q.  All right.  Iris, we'll show that the jury.  We'll make

4    that a little bit alleger.

5            So we've identified catcat as M's e-mail, is that

6    right?

7    A.  Yes.

8    Q.  All right.  And you're pet1138@gmail.com?

9    A.  Yes.

10   Q.  And it looks like M is forwarding you an eticket

11   confirmation?

12   A.  Yes.

13   Q.  And there's a name listed here, Yadaporn Panngoen.  Do

14   you know who that is?

15   A.  No, I don't know.

16   Q.  Now I'm approaching with Government Exhibit 306.  And

17   this appears to be another e-mail to you at the pet1138.  Do

18   you recognize that e-mail?

19   A.  I do.

20           MS. PROVINZINO:  The Government moves the

21   admission of Exhibit 306.

22           MR. GUERRERO:  No objection.

23           MR. GERDTS:  No objection.

24           MR. ENGH:  No objection.

25           MR. RIVERS:  No objection.

```
 1                    MR. SICOLI:  No objection.

 2                    THE COURT:  Received.

 3    BY MS. PROVINZINO:

 4    Q.  All right.  Iris, I'm putting Exhibit 306 on the screen.

 5    So you're the pet1138 who is this Loren Cahlander?

 6    A.  This person was customer.

 7    Q.  And did he send you frequent communication?

 8    A.  Yes.

 9    Q.  And in one of those e-mails, he asks you, "Can you find

10    out from Joy when she is sending some more ladies to

11    Minnesota?"

12    A.  Yes.

13    Q.  And who is the Joy he's referring to here?

14    A.  That referred to M.

15    Q.  And what would you do when a customer asked about more

16    women coming to Minnesota?

17    A.  Sometimes I would call M and asking her why there was

18    no more girl coming here to Minnesota.  Sometimes M would

19    pick up the phone, sometimes she didn't.

20    Q.  So were there periods of time when you weren't in

21    communication with M?

22    A.  Yes.

23    Q.  But was M calling those shots about who was being sent

24    to Minnesota?

25    A.  Yes.
```

```
 1    Q.  And you said at times you would help M get the cash back

 2    to her, is that right?  From you or from the working women?

 3    A.  Yes.

 4    Q.  Now I'm showing you Government Exhibit 504, which is an

 5    e-mail from M to you.  I'll have you look at that and see if

 6    you can identify it.

 7          And would this be an example of a type of way you

 8    would help M and moving money and banking?

 9    A.  Yes.

10          MS. PROVINZINO:  The Government moves admission of

11    Exhibit 504.

12          MR. GERDTS:  No objection Your Honor.

13          MR. SICOLI:  No objection.

14          THE COURT:  That's received.

15          MS. PROVINZINO:  We'll quickly show that to the

16    jury.

17    BY MS. PROVINZINO:

18    Q.  And, again, at the top, that's an e-mail from M to you

19    with -- there's some Thai words here, does that say account

20    number?

21    A.  Yes.

22    Q.  And then in the body of that, it appears to be a

23    forwarded e-mail from natty.cute22@gmail.com.  Do you know

24    who that is, Iris.

25    A.  I don't know.
```

1    Q.  And then do you recognize these names here associated

2    with Wells Fargo Bank accounts?

3    A.  I don't know.

4    Q.  I'm going to approach with Government Exhibit 1038.  See

5    if you can recognize that exhibit.

6    A.  Yes.

7    Q.  And what does that exhibit show?

8    A.  The locations that M had sent women to sell sex.

9              MS. PROVINZINO:  Government moves admission of

10   Exhibit 1038.

11             MR. GERDTS:  Objection, Your Honor.  It's not a

12   piece of evidence, it's a demonstrative chart made by

13   somebody, I don't know who.

14             MS. PROVINZINO:  The witness is able to identify

15   all these locations as houses of prostitution that were run

16   by M, but locations that she also helped facilitate the

17   organization.

18             THE COURT:  Anything further, Mr. Gerdts?

19             MR. GERDTS:  Your Honor, it's just a demonstrative

20   chart.

21             THE COURT:  What I'll do is for the purpose of

22   direct and cross-examination by all lawyers, depending on

23   the questions, I'll provisionally receive it.

24             And then I'll reserve the right to hear any

25   additional argument by Counsel.  After I see the purpose of

1    which it's been used an how it's, if at all, assisted the

2    witness currently on the stand.

3              MS. PROVINZINO:  Thank you, Your Honor.  The

4    Government will publish for the jury, Exhibit 1038.

5    BY MS. PROVINZINO:

6    Q.  Now Iris, how did M run her current business here in

7    Minnesota?

8    A.  I don't understand the question.

9    Q.  So let's focus on where -- where did M have her houses

10   for working people here in Minnesota?

11   A.  Okay.

12   Q.  And can you describe that to the jury?

13   A.  Yes.

14   Q.  So let's focus on -- let's start with the Comfort Inn?

15   A.  Is this the hotel?

16   Q.  And tell the jury about this particular hotel?

17   A.  This is the first hotel that I stay when I arrived

18   and where I worked when I came to this state.

19   Q.  And you were under debt at that time?

20   A.  Yes.

21   Q.  And it was M that sent you there?

22   A.  Yes.

23   Q.  Now is this the same location connected to the Outback

24   Steakhouse?

25   A.  Yes.

1    Q.  Let's focus on the next one, Iris.  There is a La

2    Quinta?

3    A.  Yes.  This is another hotel that M had sent women to

4    work to sell sex.

5    Q.  Is that one you worked out of?

6    A.  I did.

7    Q.  What about the Quality Inn?

8    A.  I had gone to work there, as well.

9    Q.  Did M send other people there?

10   A.  Yes, she did.

11   Q.  And the Park Plaza Hotel?

12   A.  Yes.

13   Q.  Did you work there?

14   A.  I did.

15   Q.  And are all of these locations close to the airport?

16   A.  Yes.

17   Q.  Do you know why M chose those locations to run her

18   business?

19   A.  Because it's convenient to travel to the airport.

20   Q.  And then at some point in time, M decided to move from

21   hotels into apartments, is that right?

22             THE COURT:  Mr. Gerdts?

23             MR. GERDTS:  Objection.  Leading, Your Honor.

24             THE COURT:  I'll sustain as to the form of the

25   question.  I'll allow the inquiry.  She'll put a new

1    question in front of you.

2    BY MS. PROVINZINO:

3    Q.  In addition to the hotels, where else did M operate her

4    business in Minnesota?

5    A.  There were two apartments.

6    Q.  And can you tell the jury about those apartments.

7              I'll pull Genesee Apartments up, first.

8    A.  How do I read it?

9    Q.  Oh, describe -- so was this an apartment that M used?

10   A.  Yes.

11   Q.  And can you tell the jury about that?

12   A.  This apartment is what M rented for working women.

13   Q.  And do you know where that was located?

14   A.  I do.

15   Q.  And where -- where is that apartment?

16   A.  It's in area of Bloomington.

17   Q.  And what about the York Plaza Apartments?

18   A.  This apartment was rented by M for working women, as

19   well.

20   Q.  Where is that apartment located?

21   A.  Is in Edina.

22   Q.  Edina?

23   A.  Something like that.

24   Q.  And Iris, did you work out of this apartment?

25   A.  Yes, I did.

1   Q.  And were there other people that M sent to work out of

2   this apartment and the Genesee Apartments?

3   A.  Yes, there were.

4   Q.  So it sounds like you worked out of all of these places,

5   is that right?

6   A.  There was one place that I didn't go.

7   Q.  You didn't work out of Genesee, is that right?

8   A.  That's correct.

9   Q.  Did you help M supervise work out of all of those hotels

10  or apartments?

11  A.  I did.

12  Q.  Now after debt, was it common for members of the

13  organization to continue to work in commercial sex acts?

14  A.  Yes.

15  Q.  And that was one of the roles you played, is that right?

16          MR. ENGH:  Excuse me.  Again leading.

17          THE COURT:  Sustained as to the form.  I'll allow

18  the inquiry, but we'll put a new question.

19  BY MS. PROVINZINO:

20  Q.  How would a person get to a, house to a house as part of

21  this organization?

22  A.  They would fly.

23  Q.  And who would organize it?

24  A.  If you paid off your debt you could manage the ticket

25  yourself.

1   Q.  And if you hadn't paid off your debt, who would organize

2   it?

3   A.  M would be the person who paid for the ticket, but

4   Moo would be the one who booked the ticket.

5   Q.  And so there would be a -- you would need to have a

6   ticket involved, is that right?

7   A.  Yes.

8   Q.  It would be -- would it be common for the organization

9   to send pictures?

10  A.  Yes.

11  Q.  And so if somebody was under debt, who would those

12  photographs come from?

13  A.  It came from Moo.

14  Q.  Okay.  And if you weren't in debt anymore, who would

15  send the pictures?

16  A.  After I paid off my debt, I was still using Moo for a

17  year.  And then I got married, and I had my husband

18  helped me booking the tickets.

19  Q.  So you got married.  Tell the jury a little bit about

20  how you met your husband?

21  A.  When I was still -- when I was still paying my debt,

22  M had sent me to work at Atlanta, Georgia where I had met

23  my husband, who was also my customer.

24          After we were going out for one year, we fell in

25  love and we decided we would get married.

1    BY MS. PROVINZINO:

2    Q.  Now I'm approaching with Government Exhibit 1024.

3              And Iris, do you recognize the person in that

4    photograph?

5    A.  Yes, I do.

6    Q.  And who is that?

7    A.  My husband.

8              MS. PROVINZINO:  The Government moves the

9    admission of Exhibit 1024?

10             MR. RIVERS:  Can I see 1024?  It's in --

11             MS. PROVINZINO:  No objection.  The Government

12   moves admission of 1024.

13             THE COURT:  It's received.

14   BY MS. PROVINZINO:

15   Q.  All right.  Well, let's show the jury.

16             So, Iris, you identified that as your husband?

17   A.  Yes.

18   Q.  Tell the jury about your husband?

19   A.  My husband has been a big help to me.  He is a good

20   man.  He helped my family, too.  We both really love each

21   other.

22   Q.  And at some point -- the help your husband gave to you,

23   did he become part of the organization as a coconspirator?

24   A.  Yes.

25   Q.  And he's already pled guilty to that, is that right?

```
1    A.  Yes.  (In English) I'm sorry.

2    Q.  Do you need a Kleenex?

3    A.  (In English) I'm sorry.

4    Q.  And Iris, can you tell the jury about what your husband

5    did to help the organization?

6    A.  My husband had helped me by take me to work and

7    helping me send the money back to Thailand so that I

8    could help my family.

9    Q.  He did that.  Did he help other women who were under

10   debt to M?

11   A.  Yes, he did.

12   Q.  How did he help them?

13   A.  The incident happened here in -- in this state when M

14   had closed the house and she disappeared.

15            There were two women who were here for two,

16   three months.  They worked and they sent all the money to

17   M and didn't have money with them.

18            I had asked my husband to help them out and buy

19   ticket to send them back to Thailand.

20   Q.  And who were those women, Iris?

21   A.  One girl's name's Bu and another named Ne.

22   Q.  And were those girls under debt to them?

23   A.  Yes.

24   Q.  And when did M's house close?

25   A.  I remember it was about 2015 in April.
```

1    Q.  And why did M's house close?

2    A.  M said that nobody was handling the ad.

3    Q.  And what does that mean?

4    A.  Nobody would post the advertising.

5    Q.  Was there any reason the house closed?

6    A.  That's what M said.

7    Q.  And so at that point in time, there were two women

8    stranded here?

9    A.  Yes.  Included me, too.

10   Q.  Was there anywhere for those women to go?

11   A.  No.  They couldn't go anywhere because nobody bought

12   them tickets and they had no money at all.

13   Q.  So it was at that point where you said you and your

14   husband helped them?

15   A.  Yes.

16   Q.  And where are those women now?

17   A.  I'm not sure if they are still in Thailand.  Because

18   after I bought them the ticket to Thailand, I hadn't

19   haven't had any contacts with them.

20   Q.  What about after M's house closed here?  Did you

21   continue to have contact with M?

22   A.  No.

23   Q.  And why not?

24   A.  M had disappeared.

25   Q.  And describe for the jury what you mean by M had

1    disappeared.

2    A.  I couldn't get ahold of her at all and her phone

3    number was shut down.  But I was able to contact with Tu,

4    who's her boyfriend.

5    Q.  And what did you learn in contacting Tu?

6    A.  This I don't really remember.

7    Q.  But since that date, when the Minnesota house is closed,

8    you said that was April of 2015?

9    A.  Yes.

10   Q.  You haven't had communication with M?

11   A.  No.

12   Q.  Let's talk about the last time you worked out of M's

13   house here in Minnesota?

14   A.  Yes.

15   Q.  I'm going to approach with Government's Exhibit 501,

16   1250, which is a certified business record, and 1200.

17           MR. RIVERS:  You said 1250 and what was the other

18   one?

19           MS. PROVINZINO:  501, 1250 and 1200.

20   BY MS. PROVINZINO:

21   Q.  Can I have you look at Government Exhibit 501, first?

22   A.  Yes.

23   Q.  Do you see that?

24   A.  Yes.

25   Q.  And do you recognize the photos in that exhibit?

1    A.  Yes, I do.

2    Q.  And those are photos of you?

3    A.  Yes.

4    Q.  And sent by M, August 16th of 2014?

5    A.  Yes.

6          MS. PROVINZINO:  The Government moves the

7    admission of Exhibit 501.

8          MR. SICOLI:  No objection.

9          MR. GERDTS:  No objection, Your Honor.

10          THE COURT:  Received.

11   BY MS. PROVINZINO:

12   Q.  I'm just making that a little bit bigger for the jury.

13   And that's you, as Lily.  And there are two attachments,

14   Chaba, photos of you, is that right?

15   A.  Yes.

16   Q.  We'll focus on the second page of that.  Where was that

17   photo taken, Iris?

18   A.  In Thailand.

19   Q.  And was that the one you said you took at Toilet?

20   A.  Yes.

21   Q.  And then do you see Government Exhibit 1200 in front of

22   you?

23   A.  I do.

24   Q.  And what is that?

25   A.  It was my working picture.

1    Q.  Okay.  And is that your working picture on an ad for

2    sex?

3    A.  Yes.

4    Q.  For October 5th of 2014?

5    A.  Yes.

6              MS. PROVINZINO:  The Government moves the

7    admission of Exhibit 1200.

8              MR. SICOLI:  No objection.

9              MR. ENGH:  No objection, Your Honor.

10             THE COURT:  Received.

11   BY MS. PROVINZINO:

12   Q.  Iris, let's walk the jury through this.  You're familiar

13   with backpage ads, is that right?

14   A.  Yes.

15   Q.  So this one is listed for Minneapolis St. Paul, is that

16   right?

17   A.  Yes.

18   Q.  And there's a -- who's in this photo on the first page?

19   A.  It's my picture.

20   Q.  And where is that picture taken?

21   A.  In LA.

22   Q.  Who did you take that picture with?

23   A.  A photographer.

24   Q.  And did anyone take you to get that picture taken?

25   A.  Yes, there was.

```
 1    Q.  And who took you get that photograph taken?

 2    A.  Moo did.

 3    Q.  And so the ad has additional photos of you, is that

 4    right?

 5    A.  Yes.

 6    Q.  And where was this photo in the black dress taken?

 7    A.  Also taken in LA, as well.

 8    Q.  And then this one looks familiar here, is that right?

 9    A.  Yes.

10    Q.  And that was the one at Toilet in Thailand?

11    A.  Yes.

12    Q.  And there's a description.  I want to ask you a few

13    questions about this.

14            Was this how a typical ad at one of M's house

15    would read?

16    A.  Yes.

17    Q.  And there's a reference here to donation, 170 an hour?

18    A.  Yes.

19    Q.  What does that mean?

20    A.  Customer for one hour they pay $170.

21    Q.  And lists the open times from 9:00 a.m. to 11:00.  Was

22    that the typical hours you would work here?

23    A.  Yes.

24    Q.  If we go down to Page 5.  Information about how the ad

25    is posted.
```

```
1              So and it was posted from the e-mail

2    sandy.namfon@gmail.com.  Do you see that?

3    A.  Yes.

4    Q.  And do you recognize that e-mail?

5    A.  I don't know this e-mail at all.

6    Q.  And there's a recent name listed that says a Soysuda

7    Siangdang.  Do you recognize that?

8    A.  I do.

9    Q.  Who was that?

10   A.  It's Soy.

11   Q.  And who is Soy?

12   A.  Soy is another girl who was arrested as well, that I

13   met in Sherburne.

14   Q.  And did Soy assist M with her houses in Minnesota?

15              MR. GERDTS:  Objection, Your Honor.  Foundation.

16   She met her in Sherburne.

17              THE COURT:  Well, I'll -- I'll allow the inquiry.

18   But ask you to rephrase the question.

19   BY MS. PROVINZINO:

20   Q.  Soy's name is listed on this backpage ad of you?

21   A.  Yes.

22   Q.  Do you know what role Soy played?

23   A.  I just know now.

24   Q.  And what is it?

25              THE COURT:  Well, source of information, and
```

 1   timing of when she -- when it was received.

 2   BY MS. PROVINZINO:

 3   Q.  When did you learn that information?

 4   A.  Just when the Government showed me.

 5   Q.  And when you were working for M, who posted

 6   advertisements?

 7   A.  I don't really know.

 8   Q.  So you didn't know that during the time you were working

 9   for M?

10   A.  Yes.

11   Q.  But that wasn't something that you did, is that right?

12   A.  Yes.

13   Q.  So that would be something that M or another member of

14   the organization would do?

15   A.  Yes.

16        MS. PROVINZINO:  And permission to approach with

17   Government Exhibit --

18        THE COURT:  You may --

19        MS. PROVINZINO:  -- 1013.

20   BY MS. PROVINZINO:

21   Q.  And do you recognize the individual in the photograph in

22   Government Exhibit 1013?

23   A.  I do.

24   Q.  And who is that?

25   A.  It's Soysuda.

 1          MS. PROVINZINO:  The Government moves admission of

 2    Government Exhibit 1013.

 3          MR. GERDTS:  I object on relevance grounds.

 4          MR. GUERRERO:  Same objection.

 5          THE COURT:  I'll provisionally receive until I've

 6    heard direct and cross on the relevance of the individual in

 7    the photo.

 8    BY MS. PROVINZINO:

 9    Q.  So making this larger for the jury.  Iris, this is an

10    individual you've identified as Soy?

11    A.  Yes.

12    Q.  Do you know what Soy did for the organization?

13          THE COURT:  Just -- I guess we should establish

14    when she found out and from what source.

15          MS. PROVINZINO:  Okay.  I'm satisfied with where

16    we're at on that, Your Honor.

17          THE COURT:  All right.

18    BY MS. PROVINZINO:

19    Q.  The last one, I think there might be an exhibit in front

20    of you that's identified as Exhibit 1250.

21          MS. PROVINZINO:  And these are a certified

22    business records.  I move the admission under that ground.

23          MR. GERDTS:  As far as I can tell, Your Honor it's

24    completely irrelevant.

25          THE COURT:  Is there --

1          MS. PROVINZINO:  Your Honor, this relates to the

2     count relating to the Mann Act.  And this is the actual

3     purchase of the flight for this witness to come to Minnesota

4     to engage in commercial sex acts that ties up with the

5     backpage ad just admitted as Government's Exhibit 1200.

6          MR. GERDTS:  Well, that's a nice explanation, but

7     no, that's not true.

8          THE COURT:  Well, separate from that, whether --

9     is there going to be any inquiry of this -- of this witness

10    on this exhibit?

11         MS. PROVINZINO:  To establish the name and the

12    e-mail account associated with it.

13         THE COURT:  Well, before it's offered, why don't

14    we just -- I'll allow some inquiry of this witness.  And

15    then we'll go from there before I rule, with input from

16    Counsel.

17         MS. PROVINZINO:  Okay.

18    BY MS. PROVINZINO:

19    Q.  And Iris, then directing your attention to the top left

20    under passenger information, and there's a name listed?

21    A.  Yes.

22    Q.  And whose name is that?

23    A.  That's my name.

24    Q.  And this is for a ticket on October 3rd of 2014 on

25    American Airlines, is that right?

1    A.  (In English) I'm sorry.  (Through Interpreter)  Can

2    you say again?

3    Q.  Yes.  At the very top of the record, it just says

4    American Airlines, right?

5    A.  Yes.

6    Q.  So this is an American Airlines record for a ticket for

7    you, is that right?

8            MR. GUERRERO:  Objection to form.

9            THE COURT:  And the name on the ticket is?

10   BY MS. PROVINZINO:

11   Q.  And let's focus on that.  On the top left it says,

12   Flanigan Chabaprai?

13   A.  Yes.

14   Q.  And who is that?

15   A.  It's my name and my husband last name.

16   Q.  And so is that your married name?

17   A.  Yes.

18   Q.  So is this ticket for you?

19   A.  Yes.

20           MS. PROVINZINO:  The Government moves the

21   admission of that as a certified business record.

22           MR. GERDTS:  No objection, Your Honor.

23           MR. SICOLI:  No objection.

24           MR. GUERRERO: No objection.

25           THE COURT:  Received.

```
1    BY MS. PROVINZINO:

2    Q.  And Iris, this doesn't look like the way we buy tickets,

3    does it?

4    A.  I don't understand the question.  I'm sorry.

5    Q.  This is a business record, not the way an airline looks

6    to you or me, is that right?

7    A.  That's correct.

8    Q.  But I just want to confirm on here that Chabaprai

9    Flanigan on the top of this record, that's you, is that

10   right?

11   A.  Yes.

12   Q.  Now while you were out of debt, in addition to working

13   in Minnesota, you worked in other cities, is that right?

14   A.  Yes.

15   Q.  And what cities did you work in?

16   A.  In Atlanta.  Minnesota.  California.  Houston.

17   Austin.

18   Q.  All right.  And when you worked in California, who did

19   you work for?

20   A.  I worked with Vietnamese person.

21   Q.  And you worked in Houston.  Who was that with?

22   A.  It was a Thai house belonged to a person named Pla

23   and Du.

24   Q.  How about in Austin?

25   A.  I went there.
```

```
 1     Q.  And how did you go there?

 2     A.  Kung, Saowapha.

 3     Q.  And who is Kung?

 4     A.  She's sitting here.

 5     Q.  And can you identify her for the jury?

 6     A.  Yes.

 7     Q.  Could you either describe what she's wearing or point to

 8     her for the jury?

 9     A.  Yes.

10     Q.  And I'll allow you to do that now.

11     A.  Kung is wearing a long-sleeved.  Gray long-sleeved

12     and wearing glasses.

13          MS. PROVINZINO:  Let the record reflect that the

14     witness has identified who she knows to be Kung.  Defendant

15     Saowapha Thinram here in the courtroom.

16          THE COURT:  So reflected.

17     BY MS. PROVINZINO:

18     Q.  How did you find out about Kung's house?

19     A.  There was a woman named Edna introduced me.

20     Q.  And when did you go to plan to work for Kung?

21     A.  I remember really it was in July of 2016.  But I

22     don't recall the date.

23          MS. PROVINZINO:  May I approach with Government's

24     277 and 276?

25          THE COURT:  Yes.
```

```
 1    BY MS. PROVINZINO:

 2    Q.  And I'll give you a movement to look at those

 3    Government's Exhibit 276, and 277.

 4             You've had a moment to review them?

 5    A.  Yes.

 6    Q.  And what are these two exhibits, Iris?

 7    A.  I had sent an e-mail to sexynancyaustin@gmail.com.

 8    Q.  And who is sexynancyaustin@gmail.com?

 9    A.  It's Khun Kung.

10    Q.  And why did you send the e-mail?

11    A.  I wanted to go to work at her house.

12             MS. PROVINZINO:  Government moves the admission of

13    Government Exhibits 276 and 277.

14             MR. ENGH:  No objection.

15             THE COURT: Received.

16    BY MS. PROVINZINO:

17    Q.  We'll show the first, 277.  We'll make this a little

18    larger to see.  So the pet1138, is that your e-mail, Iris?

19    A.  Yes.

20    Q.  And you remember the date to be in July, is that right?

21    A.  Yes.

22    Q.  Looks like 201, is that right?

23    A.  Yes.

24    Q.  And sexynancyaustin@gmail.com, that's the e-mail that

25    Kung uses, is that right?
```

1     A.  Yes.

2     Q.  And Ploy, that's one of your nicknames?

3     A.  Yes.

4     Q.  And you sent a photo?

5     A.  Yes.

6     Q.  So let's talk about your time in Austin.  Tell the jury

7     what you remember about that?

8     A.  Okay.  So I had booked the job at Khun Kung's house

9     in Austin.

10            When I arrived there, her husband picked me up.

11    When I went there the house was an apartment with two

12    bedroom.  Was on the first floor.  I only went there for

13    five days and I had to leave.

14    Q.  Now you said Kung's husband picked you up at the

15    airport?

16    A.  Yes.

17    Q.  And did you deal with him during the time you were in

18    Austin?

19    A.  He sent me customers.  He also took me to buy food

20    stuff.

21    Q.  I'm showing you what's already an admitted as Government

22    Exhibit 1068.

23            And I'll make that larger for you to see, Iris.

24    Who is that in Government Exhibit 1068?

25    A.  This is the man who is husband to Khun Kung and also

1    who picked me up at the airport.

2    Q.  And what did you call him?

3    A.  I called him Gregg something like that.

4    Q.  Gregg?

5    A.  Yes.

6    Q.  So he picked you up at the airport and bought food for

7    you.  And took you to the apartment, is that right?

8    A.  No.  He picked me up at the airport and then dropped

9    me off at the apartment.  After that, a couple days, then

10   he took me to buy food.  I'm not sure whether it was a

11   couple days or one day.

12   Q.  Thank you for clarifying that.

13         And during the time you were at the apartment, you

14   saw customers, is that right?

15   A.  Yes.

16   Q.  And tell the jury about your experience with customers

17   there.

18   A.  So I went to work there only for four days.  The

19   fifth day I decided to leave.

20         The first day that I was there, I was worked

21   and having seven customers.  The next morning the review

22   came up and it was bad.

23         And the following days I did not have any

24   customers.  So I asked to go to leave.

25   Q.  And tell the jury about that the bad review, or the

1    experience that led to that?

2    A.  So the house owner had notified me that the review

3    was not good.  I was like somebody who had stretch marks,

4    as if somebody who had pregnant before.  But I didn't

5    access the review and looked at it because I didn't know

6    how.  But the house owner had notified me that's how I

7    knew.

8            And then after that, the next morning, Khun Kung's

9    husband had come in and wanted to take a look.

10   Q.  But what -- you had an unusual experience with a

11   customer, is that right?

12   A.  Oh, yes, yes.

13   Q.  And tell the jury about what that customer wanted you to

14   do?

15   A.  So the customer was a regular customer at Kung's

16   house, that he came the first morning.  And that we were

17   taking a bath.  After that he pour oil all over me.  And

18   I wanted to have me lie down on the bathtub and having

19   sex there.

20           And I told him I couldn't do this, because it's

21   not safe.  Let's go do it on the bed.

22   Q.  And what happened?

23   A.  So in the evening the customer had written the bad

24   review for me and, therefore, that made me for no more

25   customers coming in.

1   Q.  And so how did Kung or her husband respond to that bad

2   review?

3   A.  So he came in the next morning and to see if it was

4   true what was written.

5          In the morning, I was wearing the bikini to show

6   him that it's not -- it was not like what it was written as

7   customer had said.

8   Q.  Did he take photographs of you?

9   A.  Khun Kung's husband didn't take pictures of me.  I

10  asked the girl who was working at the time with me to

11  take pictures instead.

12  Q.  So who was the girl working with you at that time?

13  A.  Her name was Jom.

14  Q.  And who was Jom?

15  A.  She was M's girl.

16  Q.  And was she -- when you say she was M's girl, was she

17  under debt at that time?

18          MR. ENGH:  Objection.  Leading.

19          THE COURT:  Sustained as to the form.

20  BY MS. PROVINZINO:

21  Q.  When you say Jom was M's girl, can you describe what

22  that means?

23  A.  M's girl meaning she had to come and pay the debt

24  back to M.

25          MS. PROVINZINO:  I'm going to approach with

```
1    Government Exhibit 304.

2    BY MS PROVINZINO:

3    Q.  It's an e-mail with a collection of photographs.  I want

4    to see if you recognize those.

5            And do you know, do you recognize the individual

6    in those photographs?

7    A.  Yes, I do.

8    Q.  And who is it?

9    A.  Jom.

10           MS. PROVINZINO:  The Government moves admission of

11   Exhibit 304.

12           MR. ENGH:  No objection.

13           THE COURT:  Received.

14   BY MS. PROVINZINO:

15   Q.  All right.  We'll just make this a little bit bigger for

16   the jury to see.

17           So that's an e-mail sent to catcat that's M, is

18   that right?

19   A.  Yes.

20   Q.  Subject is Jom, the girl we're talking about?

21   A.  Yes.

22   Q.  Did you know this e-mail, this tonbm@hotmail.com is?

23   A.  I don't know.

24   Q.  There appears to be e-mails from Toilet Studio.  Do you

25   see that?
```

1   A.  Yes.

2   Q.  That's the same place your photos were originally taken,

3   is that right?

4   A.  Yes.

5   Q.  Okay.  And we'll scroll to Page 2.  Who is that in the

6   photo?

7   A.  It's Jom.

8   Q.  What happened regarding that bad experience you had at

9   Kung's house?

10  A.  So I felt bad, because I wasn't able to make any

11  money for Khun Kung and myself so I asked to go home on

12  the fifth day.

13          Khun Kung was really nice.  She understands and

14  she was okay with it.

15  Q.  And so then what happened?

16  A.  So I went back home and I thought I wouldn't go work

17  anywhere else anymore.

18          I was having the intention to go study English

19  so that I could find a different -- another job, a new

20  job.  And I had opened up a house in Atlanta at the --

21  during that time.

22  BY MS. PROVINZINO:

23  Q.  Now you mentioned the reason you went to Pi Kung's place

24  was to connect with someone named Anna, right?

25  A.  Yes, so we could meet.

1    Q.  Did you end up meeting her?

2    A.  No, I did not.

3    Q.  I'm going to approach with Government Exhibit 16B, which

4    is already admitted into evidence.

5         I was going to have you take a look at the photos

6    on the right of that exhibit?

7    A.  Yes.

8    Q.  And who was that?

9    A.  That's Anna.

10   Q.  I'm publishing for the jury -- the photos on the right.

11   You said that's Anna?

12   A.  Yes.

13   Q.  And who's Anna?

14   A.  She was a girl who came to work to pay off debt to M,

15   as well.

16   Q.  Was she able to pay off her debt?

17   A.  Yes, she did.

18   Q.  And did she continue to work for the organization?

19   A.  Yes.

20   Q.  What did she do?

21   A.  She was helping taking care of the girls for M.

22   Q.  And so you talked about not wanting to work commercial

23   sex acts to go from house to house after Austin, is that

24   correct?

25   A.  Yes.

```
1    Q.  And going back to Atlanta?

2    A.  Yes.

3    Q.  And opening a house?

4    A.  Yes.

5    Q.  Tell the jury about that?

6    A.  So after I came back from Khun Kung's house, I went

7    home for about one or two months.  And then I was

8    thinking I did not want to travel and work anymore.  I

9    wanted to go back and study English so I can find a

10   different job.

11           So I opened up a working house so I could work

12   after class.  Because I wanted to help -- help my husband's

13   burden sending money back to my family.

14   Q.  How did you open a house?

15   A.  There was a Vietnamese man who helped me.

16   Q.  And who was that person?

17   A.  His name was Ahthi.

18   Q.  I'm approaching with Government Exhibit 1031.  And as I

19   do that, explain for the jury how Ahthi helped you.

20   A.  Yes.

21   Q.  And do you recognize the individual in Government

22   Exhibit 1031?

23   A.  Yes.

24   Q.  And who is that?

25   A.  He's Ahthi.
```

```
 1              MS. PROVINZINO:  The Government moves the
 2      admission of 1031.
 3              MR. GUERRERO:  No objection.
 4              MR. SICOLI:  No objection.
 5              MR. GERDTS:  No objection.
 6              THE COURT:  Received.
 7      BY MS. PROVINZINO:
 8      Q.  So that's the individual you worked with as a co-house
 9      boss in Atlanta, is that right?
10      A.  Yes.
11      Q.  And what role was Ahthi going to play?
12      A.  Ahthi was going to pick up the phone and send
13      customers over to the apartment.
14      Q.  Who was going to place ads?
15      A.  I hired somebody to do it.  I put the ad in the
16      Mexican -- in a Mexican newspaper.
17      Q.  And what role were you going to play?
18      A.  I was a house owner.
19      Q.  And as a house owner, what did you do?
20      A.  I would collect the house fee from the girls, $40 per
21      one customer.
22      Q.  And would you keep the full house fee?
23      A.  No, it's not.
24      Q.  And tell the jury what --
25      A.  I had divided $20 to Ahthi and I would keep $20.
```

1          And I would use this money to pay for the

2     apartment rent and buy the stuff and food for the girls at

3     the house.

4     Q.  Who worked at your house?

5     A.  Will there were Anna, Lulu, Jom, Jane.  I couldn't

6     recall all of them.

7     Q.  And how did you know the women?

8     A.  When we worked, we met each other.  And Anna was my

9     good friend.

10    Q.  And were those individuals still under debt?

11    A.  All of them had paid off their debt.

12    Q.  And who did they owe their debt to?

13    A.  As far as I had mentioned, Anna was in debt to M.

14    Lulu was in debt to M.  And Jom was in debt to M.  And

15    that's all I remember.

16    Q.  Did you also continue to provide commercial sex services

17    at your house?

18    A.  I did it every once in a while.

19    Q.  And why did you do it every once in a while?

20    A.  Because I went to study.  When I -- by the time I

21    came home, it was already in the afternoon.  There would

22    be no customers.  But if there were customer I would give

23    them to my -- to the working girls at my house.

24          MS. PROVINZINO:  Now approaching with Government

25    Exhibits 36, A, B and C.

1          First, I'll have you take a look at Government

2     Exhibit 36 and see if you recognize that.

3     A.  This was my password -- this was my password for my

4     phone.

5     Q.  And you can open the case up and see if you recognize

6     what's in there.

7     A.  It is my -- it was my phone.

8     Q.  That was your phone.  Okay.  And you allowed the

9     Government to -- you gave us consent to review it, is that

10    right?

11    A.  Yes.

12          MS. PROVINZINO:  The Government moves admission of

13    Exhibit 36.

14          MR. GERDTS:  No objection.

15          MR. SICOLI:  No objection.

16          THE COURT:  Received.

17     BY MS. PROVINZINO:

18    Q.  And we were able to pull some records off that phone, is

19    that right?

20    A.  Yes.

21    Q.  And I'll focus your attention on Government Exhibit 36C.

22    And is that a screen capture on your phone?

23    A.  Yes.

24    Q.  And that was on -- that's on your phone for a Days Inn

25    of Eagan near Mall of America, is that right?

 1   A.  Yes.

 2             MS. PROVINZINO:  The Government moves admission of

 3   Exhibit 36C.

 4             MR. SICOLI:  No objection.

 5             MS. PROVINZINO:  All right.

 6             THE COURT:  Pro -- or received.

 7             MS. PROVINZINO:  Thank you, Your Honor.

 8   BY MS. PROVINZINO:

 9   Q.  And this is for a Days Inn with a check-in date of

10   July 13th and a checkout of July 20th, 2015, is that right?

11   A.  Yes.

12   Q.  And who was working at the Days Inn for that week?

13   A.  It was me.  I had gone there to visit with John and I

14   had booked the hotel for working for myself.

15   Q.  Okay.  And do you see Government Exhibit 36B in front of

16   you?

17   A.  Yes, I do.

18   Q.  And is that a photograph you took of two receipts?

19   A.  Yes.

20             MS. PROVINZINO:  Government moves the admission of

21   36B.

22             MR. GUERRERO: No objection.

23             MR. SICOLI:  No objection.

24             MR. GERDTS:  No objection.

25             THE COURT:  Received.

1    BY MS. PROVINZINO:

2    Q.  These are Wells Fargo receipts.  I just want to focus

3    your attention on the date here, what date was that?

4    A.  It's on the 17th of July on 2015.

5    Q.  And is that the same on the other receipt?

6    A.  Yes.

7    Q.  And what's the quantity -- or the amount?

8    A.  $2,030.

9    Q.  And is there anything significant about that amount,

10   Iris?

11   A.  I don't remember whose accounts I had deposited the

12   money in.  But I remember that it had divided into two

13   accounts in the same equal amount.

14   Q.  Okay.  And when you say two accounts -- just so we're

15   focusing on here, one account ending in 0646 and one ending

16   in 7883?

17   A.  Yes.

18   Q.  And why did you do it that way?

19   A.  Because the accounts owner wanted me to send the

20   money, $2,030 into the account.  The person didn't want

21   me to send 4,000 all at once into one account.

22   Q.  And who was it that asked you to put it into two

23   different accounts?

24   A.  It's the account owners, but I don't remember who

25   that person is.

1    Q.  And do you see Exhibits 36A in front of you?  Which is

2    some of your text messages.

3    A.  Yes.

4    Q.  And did you have a chance to review all the translations

5    of those?

6    A.  Yes, I did.

7    Q.  And from the Thai into English, are those accurate,

8    Iris?

9    A.  Yes, correct.

10           MS. PROVINZINO:  The Government moves the

11   admission of Exhibit 36A.

12           MR. ENGH:  No objection.

13           MR. GERDTS:  No objection.

14           THE COURT:  Received.

15           MR. SICOLI:  No objection.

16   BY MS. PROVINZINO:

17   Q.  All right.  And we'll just walk the jury through a few

18   of those records.

19           All right.  And here we see a few of the people

20   you're communicating with.

21   A.  Yes.

22   Q.  Who is Lulu?

23   A.  She was a girl who came to work off to pay the debt

24   to M.

25   Q.  And is this Ann the person we've already talked about

1    that you've identified in the photos?

2    A.  Yes.

3    Q.  And there are a few things over here, including, let's

4    look at this exhibit?

5    A.  Yes.

6    Q.  And there's a name, Pornthep Sukprasert.  Do you know

7    who that is?

8    A.  Yes.

9    Q.  And a Bank of America account number?

10   A.  Yes.

11   Q.  And a reference to $9,000.  Do you remember that?

12   A.  I don't remember.

13   Q.  And let's look at this reference here.

14          And that translates, "This is P'Kung's phone

15   number.  I already sent a message to her.  Will call back."

16   Is that right?  And I'll blow that whole --

17          And was that time you went to at P'Kung in Austin?

18          MR. ENGH:  Objection as to leading.

19          THE COURT:  Sustained as to form.

20   BY MS. PROVINZINO:

21   Q.  And what was the reference to P'Kung's phone number?

22   A.  I think that Anna had sent me the phone number of

23   P'Kung to me.

24   Q.  Let's jump over to the next page.  All right.  There's

25   another reference to a bank account at Wells Fargo set for

1    Sawitree Manorat.  Do you know who that is?

2    A.  No, I don't.

3    Q.  Now you've already identified Anna.

4    A.  Yes.

5    Q.  Now I'm going to approach with Government Exhibit 1014.

6            And do you recognize the individual in the

7    photograph for Government Exhibit 1014?

8    A.  I do.

9    Q.  And who is that?

10   A.  It's Lulu.

11           MS. PROVINZINO:  Government moves admission of

12   Exhibit 1014.

13           MR. SICOLI:  No objection.

14           THE COURT:  Received.

15   BY MS. PROVINZINO:

16   Q.  All right.  And so that's that individual Lulu that you

17   were in text communication with?

18   A.  Yes.

19   Q.  And who did Lulu owe her tax to?

20   A.  It was M.

21   Q.  Now Iris, after you met with the Government, did you

22   have any concerns for yourself or your family?

23   A.  Yes, there was.

24   Q.  And can you explain that to the jury?

25           MR. GERDTS:  Objection on relevance grounds, Your

1    Honor.

2              THE COURT:  Overruled.  I'll admit -- I'll allow

3    it.  You may answer.

4    A.  After I met with the Government for the first time,

5    there was police come over to look for my father in the

6    at the province in Thailand.

7    Q.  And what happened?

8              THE COURT:  Mr. Gerdts?

9              MR. GERDTS:  Objection on foundation, and probably

10   hearsay grounds.

11             THE COURT:  Okay.  Counsel?

12             MS. PROVINZINO:  It's not offered for the truth of

13   the matter, but it goes to state of mind and the impact on

14   the witness.

15             THE COURT:  I'll permit with an instruction to the

16   jury, unrelated to any ruling I make, we've had my Court

17   Reporter and interpreter and everybody else in here for

18   about an hour and 35 minutes.  So, I don't know if there's a

19   logical place to break.

20             And then, of course, then we have the issue of --

21   if we're going to take a 15-minute break, then we probably

22   might as well -- unless you're saying, well, just give me a

23   few more minutes and I'm done, with the -- I just want to

24   find -- well, first let me make a ruling.

25             Members of the Jury, I'm going to allow her to

1    make a response, apart from what she learned, whether it was

2    entirely true or entirely false, or something in between.

3            I will allow it for the limited purpose of saying,

4    Well, why was she thinking or feeling the way she was?

5    Whether -- regardless of what she was told whether it was

6    true or false.

7            So it's not allowed for whether it's true, because

8    it may be true, or false.

9            But I'll -- I'll permit it with that limited

10   direction to you by the Court.

11           You may have to rephrase the question.

12   BY MS. PROVINZINO:

13   Q.  And why were you concerned for your father at that

14   time?

15   A.  Because the police went over to looking for my dad,

16   even though before -- before this happened, nobody ever

17   come look for me or my father.

18           During the time that my police came look for my

19   father, they -- they couldn't find him because my father

20   traveled to Bangkok to visit with my sister.

21           The head of the village had called my father.

22           MR. ENGH:  Can we have a standing objection to

23   this, Your Honor?

24           THE COURT:  Yes, you know.  Yes.  Standing

25   objection.  And with the same instruction to the jury,

 1     separate from whether it's true or whether it's false, why

 2     she is stating that she was concerned.  I'll allow it.

 3     A.  So the police had contacted the head of the village

 4     to have him call my father to come back to the village

 5     the same day.

 6          My father had traveled from Bangkok to Buriram

 7     on that day and met with the police at a gas station.

 8          What I was worried about was the police was not

 9     wearing uniform and he took a lot of pictures of my

10     father.  And that's what my father told me, the story.

11     Yes.

12          MS. PROVINZINO:  At this point, Your Honor, we'll

13     yield a break to the interpreter and to your Court Reporter.

14     And then I will defer to the Court as to whether we resume

15     yet today or come back tomorrow morning.

16          THE COURT:  Well, it seems to me that even thought

17     it might not be the perfect spot to -- rather than complete

18     the direct, that if we took a legitimate break, it's going

19     to be then close to 5:00.

20          We promised the jury we'd try to recess at 5:00.

21          So, will that work for everybody, including

22     Defense Counsel?

23          MR. RIVERS:  Yes, Your Honor.

24          THE COURT:  Now the schedule says 10:00 tomorrow

25     morning, because of a commitment I have, not the lawyers.

```
 1              But if I change that to say we'd start at 9:30

 2      instead of 10:00, would that work for everybody here?

 3              I haven't asked the lawyers yet, so I'll have to

 4      ask them, too.  So I apologize to everyone for this

 5      last-minute possible change.

 6              But would that work for everybody here?

 7              THE JURORS:  Yes.

 8              THE COURT:  Would that work for Counsel here?  Or

 9      because you may have legitimately relied on that schedule

10      everybody got three weeks ago that said 10:00 tomorrow

11      morning.

12              Does 9:30 work for everybody?

13              MR. SICOLI:  It does for me.

14              MR. GUERRERO: It does for me.

15              MR. RIVERS:  Yes, Your Honor.

16              MR. GERDTS:  Yes.

17              MS. PROVINZINO:  It works for the Government, Your

18      Honor.

19              THE COURT:  All right.  So what we'll do, Members

20      of the Jury, and if you recall the -- we'll be down because

21      of the Thanksgiving weekend on Wednesday, Thursday, Friday.

22      That won't be changing.

23              And then we'll be discussing tomorrow a little

24      bit, even though I think we're substantially on schedule.

25      We'll -- from that, there is no calendar you received,
```

1    during jury selection.

2           We'll discuss whether -- whether it's a half day

3    or a full day, or once I've had a chance to consult with

4    Counsel, whether, if we scheduled not this week, but

5    schedule a half day or full day, and a couple days there,

6    where it says we would be off either part of the day or all

7    day.

8           We'll see if that works.  Because I'm in the

9    process of looking at that schedule just to give us those

10   options, if it works for everyone here, including the 15 of

11   you.

12          So with that, safe travels.  And we'll stand in

13   recess until 9:30 tomorrow morning.  Stand in recess.

14          (Jurors excused at 4:45 p.m.)

15          THE COURT:  Do you have ballpark idea about when

16   you might complete your direct.

17          MS. PROVINZINO:  Probably -- it would have pretty

18   close, probably 15, 20 minutes.

19          THE COURT:  All right.  We'll proceed on then with

20   examination then.

21          And then I'm not going to ask Defense Counsel what

22   their estimates are for cross.

23          Then you have the -- the other witness that you

24   gave us the --

25          MS. PROVINZINO:  Sawitree Manorat.

 1            THE COURT:  Yes.  Tomorrow.  We're in the process

 2      of contacting additional attorneys on a couple of these

 3      dates to see if we can capture an additional day where we're

 4      down or a half a day and convert it to a full day.

 5            But I won't do any of that until I get

 6      confirmation with Ms. Sampson.  We'll discuss that sometime

 7      tomorrow.  If not sooner, than noon -- over the noon hour at

 8      some point.

 9            And I couldn't tell Mr. Engh, if you were going to

10      head to the podium?

11            MR. ENGH:  Yes.

12            THE COURT:  All right.

13            MS. PROVINZINO:  May we excuse the witness, Your

14      Honor?

15            THE COURT:  Yes.  Yes.

16            MR. ENGH:  I'll wait until she's gone.

17            THE COURT:  Okay.

18            (Witness excused at 4:47 p.m.)

19            THE COURT:  Mr. Engh.

20            MR. ENGH:  Your Honor, the Defense renews the

21      hearsay objection to the witness's testimony as to the Thai

22      police incident with her father.

23            With all due respect, again, I believe the Court

24      has committed error.  This evidence was offered for the

25      truth of the matter.

1          But moreover and more critically, there is no

2    tie-in between the stoppage of the father by the Thai police

3    in this case.

4          And what the evidence does instead is create an

5    inference -- an adverse inference where the Defendants --

6    that somehow her cooperation caused the Thai police to act

7    the way they did.

8          And there's absolutely no proof, nor will there

9    ever be any proof of a tie-in with this case, at least in my

10   the reading of all the records here.

11         So I believe that you committed error.

12         And, again, in all due respect.  And the remedy

13   for the error is to strike the testimony.  I move to strike

14   the testimony.  Or in the alternative I move for a mistrial.

15         This is -- it's just egregious evidence that is

16   highly damaging to us.  And it has no foundation in the

17   case.

18         MS. PROVINZINO:  Well --

19         MR. RIVERS:  I would join, Your Honor.

20         THE COURT:  All right.  Mr. Gerdts?

21         MR. GERDTS:  Your Honor, I would join.

22         And I would point out that Counsel, when she asked

23   about this, specifically asked, Well, did something happen

24   after you cooperated?  Suggesting some logical relationship

25   in a -- in an in a directed question.

1          But, I mean, Aristotle, that long ago, already

2     told us that the post hoc propter hoc logic is fallacious.

3     And the witness did not even tell us, even in the hearsay,

4     when this thing took place.

5          So there's no -- even if it had some relevance, or

6     not terribly prejudicial, it's not -- it's not tied up.

7          MR. SICOLI:  Your Honor, we would also join.

8          THE COURT:  All right.

9          MR. GUERRERO:  As we would, as well, judge.

10          MS. PROVINZINO:  There is no error.  And this is

11     directly related.

12          First, the Court was careful to give a limiting

13     instruction and to note the Government's not offering this

14     for the truth of the matter, that's an exception to hearsay.

15          It's relevant because time and again Defense

16     Counsel have inquired of witnesses as to whether they're

17     afraid, as to whether they have fear.

18          And that's part of the element of the sex

19     trafficking crime itself, force, threats of force, fraud and

20     coercion.

21          We've heard lots of testimony from the expert

22     about the very real -- the corruption in the police.  The

23     fact that there are extra legal and extra judicial means to

24     go after individuals.

25          This certainly is a threat and a fear that

1    witnesses do have.

2        I would submit in the disclosures made by the

3    Government, there were translations of documents into Thai

4    by the Thai Government specifically relating to this case.

5    Including of the Defendants who have been charged.

6    Particularly in the United States versus Sumalee

7    Intarathong.  That's been in disclosures to Defense Counsel.

8        In addition, the witness herself, approached the

9    Government after her initial proffer with the Government

10   through her Counsel Steve Wolter to disclose information she

11   had learned from her family about the police or an extra

12   legal entity coming after and approaching her father.

13       And it was directly tied to the timing of when she

14   had last proffered with the Government.

15       So I would submit all of this has been available

16   to Defense Counsel.  There is no error in the Court's

17   ruling.  It wasn't offered for the truth of the matter.

18       And it's directly relevant to the element of the

19   sex trafficking offense itself.

20       THE COURT:  What -- what else is she going to say,

21   Counsel?

22       MS. PROVINZINO:  There will be no further inquiry

23   into -- it was simply a question about whether she had

24   concerns for herself or her family.

25       MR. GERDTS:  Your Honor, I think Counsel just

1    explained that it's not relevant to this case.

2          Whether there was force, fraud or coercion used in

3    the sex trafficking to compel sex trafficking has nothing to

4    do whether there was some threat because somebody's

5    cooperating with the Government.  This is completely after

6    the fact and has nothing to do with the -- if it were true,

7    has nothing, at all, to do with whether anybody was

8    compelled to engage in sex work.

9          And so I -- it's -- it's a suggestion that may be

10   the Thai Government is trying to obstruct justice in some

11   way.  But I don't see how that ties into any element of this

12   offense.

13         MS. PROVINZINO:  And thank you, Your Honor.

14         The witness when she testified today, said about

15   four months into repaying her bondage debt to her trafficker

16   M -- she approached M and asked -- said she wanted to leave.

17   She wanted to quit, she wanted to walk away.

18         And at that point M said so her, that if you do

19   that without paying your debt, we will send people to

20   threaten your family in Thailand.

21         And I would suggest that Defense Counsel have

22   repeatedly asked of our witnesses questions about whether

23   they have exaggerated that fear for themselves of either

24   returning to Thailand or continuing to be part of the

25   organization.

1          And that's directly one of the elements, the force

2     and the threats of force, that compel someone to continue to

3     do the commercial sex acts of sex trafficking.

4          They even ask Mr. Alexander questions about fear

5     of returning to Thailand today.  And they're -- so this is

6     directly relevant, both to this witness and to the whole

7     scope of this case, as it relates to the sex trafficking

8     counts.

9          THE COURT:  Mr. Engh, or Mr. Gerdts or anyone

10    else?

11         MR. ENGH:  In our view it's improper to create an

12    inference without a fact.

13         And the -- what they've created, as articulated

14    now, is an inference of fear and a link to the case -- of

15    this case, to the Thai police.

16         And they have no fact to prove the conduct of the

17    police was related to her cooperation.  They have an

18    inference without a fact.  If they have a wiretap for M, if

19    they have an exact for M, with Thai police or an e-mail,

20    fine, show it to us.  But they're creating something out of

21    fiction here.  And that's why it's so egregious and wrong.

22         THE COURT:  Well --

23         MR. ENGH:  And it is offered for the truth of the

24    matter, in my view, my respectful view, and I know we

25    disagree on other things, too, over the years.  But this one

1    I think you may be really wrong about, again, in all due

2    respect.

3            THE COURT:  So we'll see if Government Counsel --

4    I'm assuming that they're going to say is, it was the --

5    apart from whether it was one of these Defendants, since

6    everybody keeps repeating -- emphasizing how there's all

7    these other individuals, known or unknown, how large the

8    organization is.

9            But I assume they're going to say, separate from

10   her testimony, that your client was very kind to her when

11   she was working there.

12           In light of what they said earlier, they went to

13   quote M, and she said, "Well, look at.  If you go back

14   without paying your debt, your family could be in danger."

15           I'm assuming they're going to say, Well, it's the

16   timing of it that is the relevance, because I don't think

17   they claim they have a wiretap or anything else.

18           But saying, Well, it isn't fortuitous that shortly

19   after this happened the -- for the first time in the -- in

20   the life of this witness, the police wandered into their --

21   started asking questions of her father.

22           MR. ENGH:  Well, you'd have to -- you'd have to

23   prove, it seems to me, that M knew that she was cooperating

24   or meeting with the police.  And there's no evidence of

25   that.

1          THE COURT:  I'll hear from Government and then

2     back to any Defense Counsel, and make a ruling.  And then

3     we'll go.

4          MS. WILLIAMS:  And as long as we're kind of

5     playing popcorn here.

6          Just to be clear, I think the Court is right to

7     note that the Government has not linked this improperly with

8     these Defendants.

9          I think the only two Defendants she's talked about

10    she's said were kind and nice, so -- so I think that -- that

11    is probably clear.

12         I also don't think the Government is saying this

13    was per se the Thai Government.  I think the witness's

14    testimony stands on her own, which is she doesn't really

15    know what this is.  It was weird and it makes her fearful.

16         But I would note, this issue of fear is something

17    that the Defense has infused into this case again, and

18    again, and again.

19         We haven't had a substantiative witness, Ms.

20    Sonprasit, Gangsmoo, Boonluea, even Mr. Alexander this

21    morning, which was a little absurd, because he's obviously

22    an American without family over there.

23         The witnesses have been asked very directly, well,

24    either you don't have a fear, or you're exaggerating your

25    fear.  And fear isn't true and this fear isn't reasonable.

1    That's something that the Defense infused into the case.

2            And we're not saying that these Defendants are

3    threatening this witness.  I don't think there's any

4    evidence of that.

5            But the Defense put it at issue.  It's relevant,

6    not that it happened, but does she have fears in this case

7    and reasonably why.  It's not been improperly linked to

8    these individuals.  And seems totally responsive to what the

9    Defense is doing and the doors they've opened.

10           THE COURT:  Anything else by Defense Counsel?

11           MR. GERDTS:  I have a separate issue not on this,

12   though.

13           THE COURT:  All right.  Well, first the Court will

14   respectfully -- well, a couple things.  It's going to come

15   up after the cross-examination's over.

16           But the Court will respectfully deny the motion

17   for a mistrial.

18           Let the record speak for itself of -- in terms of

19   what the relevance, probative value is, if any.  And whether

20   that has been substantially outweighed by any unfair

21   prejudice in light of what's been said.  With or without my

22   limiting instruction with respect to whether it was entirely

23   true or false.

24           And then I'll revisit the issue on my own, with or

25   without request for additional relief, depending on what, if

1    anything, is asked by Defense Counsel at the end of her

2    testimony.  And then reserve the right, with or without

3    objection or request, to hear any additional request or

4    motions.

5          And to give -- reserve the right to strike the

6    testimony, deny to do that, give an additional limiting

7    instruction, depending on the position of the -- of the

8    parties.

9          So, unless there's a request for clarification,

10   I'll probably check in with Counsel at the end of the -- the

11   cross of this witness, whether or not there's been any

12   further inquiry by Defense Counsel.

13         Any request for clarification other than note the

14   objection by Defense Counsel of the Court's ruling?

15         MS. PROVINZINO:  No further requests for

16   clarification.

17         THE COURT:  Then realizing now I've had my

18   reporter in here for close to two hours, you, Mr. Gerdts,

19   said there was another issue -- separate issue you wanted to

20   raise?

21         MR. GERDTS:  Yes, Your Honor.  I object to, for

22   the record, and I would ask the Court to instruct Counsel

23   that it's inappropriate.

24         When I, for example, make an objection of

25   relevance or foundation to an exhibit that's not yet been

1    admitted.  And Counsel's response in front of the jury is,

2    well, Your Honor, this is an e-mail for another trafficker

3    and what we think is going to happen is X, Y, and Z.

4          And so what Counsel does is makes this long

5    argument in front of the jury that has not yet been proved

6    up, just suggesting what she thinks might be proved in the

7    future and why the document might therefore become relevant

8    in the future.  Or why the foundation might be laid.

9          That if she want to do that, explain to the Court

10   how she thinks it will become relevant, I don't object to

11   that.  It's just doing it in front of the jury is

12   inappropriate, and introduces things into the case that are

13   not appropriately before the jury, at least at that point in

14   time.

15               THE COURT:  Ms. Provinzino?

16               MS. PROVINZINO:  I believe this is a two-way

17   street, Your Honor.

18          And Mr. Gerdts is making speaking objections and

19   putting information in front the Court.

20          We'll defer to how this Court wants to handle

21   that, whether we do that through sidebar or otherwise.

22          But I don't think I'm alone in making a response

23   to narrative objections in a narrative fashion.  And before

24   the --

25               THE COURT:  Well, I think part of what could be

1    part of this issue, because maybe, in the interest of trying

2    to minimize sidebars, obviously I don't think -- I think the

3    lawyers know that speaking objections are not proper,so I

4    don't think that's anything.

5         And so that, perhaps, then depending upon the

6    circumstances, it's just that with some of these exhibits,

7    sometimes they have a connection to some other exhibits, and

8    that's worked out, sometimes not.

9         But -- in either way, I'll probably encourage --

10   rather than try to minimize a sidebar, if somebody feels in

11   the fairness to their client, and the evidence, whether it's

12   Government or Defense lawyers, then we'll have the sidebar.

13   And I'll make sure -- that's my responsibility in the eyes

14   of the jury.

15        So we'll -- we will -- we'll do that, in addition

16   to checking in in the morning and during recesses about any

17   anticipated issues, so.

18        MS. PROVINZINO:  That would be fine, Your Honor.

19        THE COURT:  So can we get together about 9:25

20   tomorrow?

21        And I'll send Ms. Sampson down here earlier than

22   that in case I'm not back, but I should be before then to

23   say, Well, do you need to see the Judge before we continue

24   on with this witness?

25        Will that work for everyone ?

1          MS. WILLIAMS:  Yes, Your Honor.

2          THE COURT:  All right.  So we shall see you in the

3     a.m., so?

4          (Court adjourned at 5:01 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
2

3   ------------------------------------------------------------
                                    )
    United States of America,       )   File Nos.
4                                   )   17CR107(1)(4)(5)(16)
            Plaintiff,              )   (20)
5                                   )              (DWF/KMM)
    vs.                             )
6                                   )
    Michael Morris, Pawinee         )   St. Paul, Minnesota
7   Unpradit, Saowapha Thinram,     )   November 20, 2018
    Thoucharin Ruttanamongkongul    )   9:32 a.m.
8   and Waralee Wanless,            )

9           Defendants.
    ------------------------------------------------------------
10        BEFORE THE HONORABLE DONOVAN W. FRANK AND A JURY
               UNITED STATES DISTRICT COURT JUDGE
11           (TRIAL TESTIMONY OF CHABAPRAI BOONLUEA)

12  APPEARANCES
      For the Plaintiff:         United States Attorney's Office
13                               Laura Provinzino, AUSA
                                 Melinda Williams, AUSA
14                               300 S 4th Street, Suite 600
                                 Minneapolis, Minnesota 55415
15
      For Defendant Michael      Sicoli Law, Ltd.
16    Morris:                    Robert Sicoli, ESQ.
                                 333 South Seventh Street
17                               Suite 2350
                                 Minneapolis, MN 55402
18
      For Defendant Pawinee      Daniel L. Gerdts, ESQ.
19    Unpradit:                  331 Second Avenue South
                                 Suite 705
20                               Minneapolis, MN 55401

21    For Defendant Saowapha     Paul C. Engh, ESQ.
      Thinram:                   200 South 6th Street
22                               Suite 420
                                 Minneapolis, MN 55402
23
      For Defendant              Meshbesher & Spence, Ltd.
24    Thoucharin                 Daniel Guerrero, ESQ.
      Ruttanamongkongul:         1616 Park Avenue South
25                               Minneapolis, MN 55404
```

```
 1        For Defendant Waralee      Rivers Law Firm
          Wanless:                   Bruce Rivers, ESQ.
 2                                   701 4th Avenue South
                                     Suite 300
 3                                   Minneapolis, MN 55415

 4        Court Reporter:            Lynne M. Krenz, RMR, CRR, CRC
                                     Suite 146
 5                                   316 North Robert Street
                                     St. Paul, Minnesota 55101
 6
          Interpreters:             Phouratsaphone (Paul) Littana
 7                                   Nokon (Bee) Nimit
                                     Chetlue Vang
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

(Defendants present)

(Jurors excused at 9:32 a.m.)

THE COURT:  Just briefly, before the jury comes

in, sometime today I'll discuss with the jury, Ms. Sampson

has talked to you -- it seems like, because I was able to

move a couple things, so we could plan to go all day on

December 4th.

And I had -- even though I could make some changes

for that Friday, November 30th, we'll probably leave it as

it is.  And I was concerned, even if it worked out for

everybody but the jury, often times jurors will say in a

longer case, Well, our employer was counting on us being

there on a Friday.  And that's kind of built into the

schedule.  But the -- so I'll -- we'll just firm some of

those things up later today.

And then we'll talk, if not at the morning break,

at somewhere in the noon hour about the -- once and for all

about the seating chart issue with the jury.

But all the jurors are here, so we'll proceed.

Witness can come in if you like?

MS. WILLIAMS:  We have one issue, Your Honor.

THE COURT:  All right.

MS. WILLIAMS:  For the witness that's on the stand

1   currently, I had talked to Mr. Sicoli.  I think he's the

2   only one that this concerns.

3           But I understand he's not going to go into the

4   specifics of Count 2, which involve this witness.

5           Certainly, the underlying facts, but not tie it

6   specifically into the indictment at this point in Count 2.

7   And we would seek that -- we would seek that for everyone.

8   I don't know that anyone's planning to do it, I think it

9   really only deals with Mr. Sicoli.

10          But -- and then I also wanted to alert the Court

11  to two scheduling matters.

12          First of all, Investigator Steve Baker with DOJ,

13  who's at the Government's table, has to catch a flight

14  tonight to get home for the holidays.  So with the Court's

15  permission, he'll be gone after the last break of today.

16          THE COURT:  All right.

17          MS. WILLIAMS:  I just wanted to let the Court know

18  that.

19          And then also our afternoon witness, and I was

20  talking to Mr. Engh and Mr. Sicoli, who I think that witness

21  mostly concerns.  I think we probably need to have a

22  discussion about some threats regarding that witness

23  potentially with the Court before she testifies.

24          And so what we would ask is, we think, kind of

25  looking at our timing, that this witness is going to take us

 1      around to the lunch break.

 2              But whenever that is, if we could take our lunch

 3      break then, so then we'll have time to discuss it before the

 4      afternoon witness gets on.

 5              THE COURT:  In other words, it looks like what

 6      would serve everybody's interest is that, wherever the break

 7      comes, that discussion should be had before she takes the

 8      stand?

 9              MS. WILLIAMS:  Precisely.

10              And we -- we would request, I think we're going to

11      need a little break before she gets on the stand.  We -- we

12      would -- assuming the timing works out, even if we have to

13      take a slightly early lunch.

14              THE COURT:  That would be fine.

15              MS. WILLIAMS:  Okay.  Thank you.

16              THE COURT:  Does that work for all Defense Counsel

17      as well?

18              MR. SICOLI:  Yes.

19              THE COURT:  All right.

20              MS. WILLIAMS:  Thank you.

21              (In open court at 9:36 a.m.)

22              THE COURT:  As then soon as the jury's ready, you

23      may proceed, Counsel.  We'll wait for the interpreter to

24      come up.

25              MS. PROVINZINO:  Thank you, Your Honor.

 1   BY MS. PROVINZINO:

 2   A.  Hello.  Judge Frank.  Respectfully, greeting you.

 3   Hello jury, respectfully greeting you.  And hello

 4   everybody in here.

 5   Q.  Good morning.

 6   A.  (In English) Good morning.

 7   Q.  Iris, I looked over my outline from yesterday, and I

 8   think we hit on almost everything.  But I have a few more

 9   questions for you.

10   A.  Yes.

11   Q.  You testified yesterday that it took 15 months to pay

12   off your debt to M, is that right?

13   A.  Yes.

14   Q.  And based on what you know, was this a short or a long

15   time to pay off the debt?

16   A.  It's very long.

17   Q.  And can you tell the jury about that?

18   A.  I never had experience in selling sex prior to that.

19   So when I came -- when I came here, I went to places I

20   hardly get jobs.  So M sent me to Minnesota and I had to

21   stay here for a while.

22   Q.  And so why did it take so long?

23   A.  I hardly got customers.

24   Q.  And was this the type of work you wanted to do, Iris?

25   A.  No, I did not.

1    Q.  And why didn't you get customers, Iris?

2    A.  Can you ask me again, please?

3    Q.  You answered that it took so long because you hardly got

4    any customers?

5    A.  Yes.

6    Q.  Why is that?

7    A.  Because I had to be with new girls all of the time.

8    Customer usually pick new girls.

9    Q.  You talked a lot yesterday about when you're under debt,

10   not having the choice of the customer you would see.

11        Can you tell the jury about the effect this work

12   had on your body and on your mind?

13   A.  Because I had never worked like this before.  While I

14   was under debt with the M or house owner sending me

15   customer, I had to took them all because I wanted to pay

16   off my debt as soon as possible.

17   Q.  Was this hard work, Iris?

18   A.  It was very hard for me.

19   Q.  And why was it so hard?

20   A.  Because I had -- I never had this kind of experience

21   before.  Some customer wanted me to suck and have it

22   really deep into my throat.  Some customer wanted me to

23   finish in my mouth.  Some people wanted to do from

24   behind.  This kind of things I couldn't do it and I

25   didn't want to do it.

```
 1              MS. PROVINZINO:  Nothing further.

 2              THE COURT:  Defense Counsel may inquire, if you

 3     wish.

 4              C R O S S - E X A M I N A T I O N

 5     BY MR. SICOLI:

 6     Q.  Good morning, Ma'am?

 7     A.  Good morning.

 8     Q.  Now I want to first start with when you met your

 9     husband, Mr. Flanigan, okay?

10     A.  Yes.

11     Q.  Now, if I understood the testimony, you came over here

12     in June of 2009, is that correct?

13     A.  Yes.

14     Q.  And you finished paying your debt in September of 2010,

15     is that correct?

16     A.  Yes.

17     Q.  Now near the end of when you ended up paying off your

18     debt, that's about the time you met Mr. Flanigan, is that

19     correct?

20     A.  Yes.

21     Q.  And did you meet him at a Thai restaurant?

22     A.  At Thai restaurant, too.  And also at where I worked

23     in Atlanta.

24     Q.  Okay.  He was a customer of yours, is that correct?

25     A.  Yes.
```

```
1    Q.  Now, you actually married him shortly after you met him,

2    is that correct?

3    A.  We were dating for a year.

4    Q.  Okay.  So when did you get married then?

5    A.  On the 28th of June, 2011.

6    Q.  And then right after you got married, you filed in July

7    for permanent residence status, is that correct?

8    A.  Yes.

9    Q.  And it's literally less than a month after you married

10   him that you actually filed for permanent residence status

11   then, is that correct?

12   A.  Can you repeat the question again?

13   Q.  Sure.  It was about a month or a little less than a

14   month after you married him that you filed for permanent

15   resident status in the United States, correct?

16   A.  When I started to get married, I already -- I had

17   started filing.

18   Q.  And part of the reason you got married is so that you

19   could actually file for permanent resident status, is that

20   true?

21   A.  It's not true.

22   Q.  All right.  Well, let's talk a little bit about that.

23   Permanent resident status is something you can file when you

24   get married to somebody, is that correct?

25   A.  Yes.
```

1   Q.  And that allows you then to stay in the United States,

2   is that correct?

3   A.  Yes.

4   Q.  At this point in July of 2010, were you still on your

5   Visa in the United States or did that expire?

6   A.  It was expired.

7   Q.  So you were here illegally at that time, correct?

8   A.  Yes.

9   Q.  And the only way that you could stay in the United

10  States is if you married somebody and you ended up getting

11  permanent resident status, is that correct?

12  A.  Yes.

13  Q.  Now, on the permanent residence status application --

14  first of all, you signed this under oath, is that correct?

15  A.  Yes.

16  Q.  And you swear that the information that you are

17  providing is true and accurate, is that correct?

18  A.  Yes.

19  Q.  Just like you swore in court before you came in and

20  testified and you said, I swear to tell the truth, is that

21  correct?

22  A.  Yes.

23  Q.  And on the application in Paragraph 3A it actually asks

24  you within the past ten years, have you been a prostitute,

25  or procured anyone for prostitution or intend to engage in

1  such activities in the future, isn't that true?

2  A.  I don't remember that question.

3         MR. SICOLI:  May I approach the witness, Your

4  Honor?

5         THE COURT:   You may.

6  BY MR. SICOLI:

7  Q.  And if this needs to be translated, then the interpreter

8  can do that, as well.

9         Do you recognize that document?  And page through

10  it if you can, just to make sure your signature is on there,

11  as well.

12  A.  Yes.

13  Q.  And that is the petition that you filed, is that

14  correct?

15  A.  Yes.

16  Q.  And if you turn to Page 3, Question 3A.  And if you need

17  that translated, doesn't Question 3A ask you if you have

18  ever engaged in prostitution within the last ten years, and

19  whether you intend to engage in prostitution in the United

20  States?

21  A.  At the time I answered no.

22  Q.  Right.  You -- and you knew that question was asking you

23  if you'd ever engaged in prostitution, and you said no, is

24  that correct?

25  A.  Yes.

1    Q.  And you knew that that was a lie, correct?

2    A.  Yes.

3    Q.  But you wanted to stay in the United States, is that

4    correct?

5    A.  I wanted to remain here because I got married to my

6    husband and we both were in love.

7    Q.  And you'd do almost anything to stay here because you

8    wanted to stay with your husband, is that correct?

9    A.  Yes.

10   Q.  And that includes lying, is that correct?

11   A.  Yes.

12   Q.  And also turning to Page -- it's still Page 3, Question

13   3C, it also asks you whether you entered the U.S. illegally

14   or helped then somebody enter the U.S. illegally, is that

15   correct?

16          THE INTERPRETER:  The interpreter one more time?

17          MR. SICOLI:  Sure.

18   A.  I never had encouraged, or induced or assisted anyone

19   to come here.

20   Q.  Well, you came here illegally because your application

21   for the Visa was false, isn't that correct?

22   A.  It was a real Visa.

23   Q.  Well, you got a Visa, but it was based upon false or

24   fraudulent information, isn't that true?

25   A.  Yes.

1    Q.  And for instance, you said that you had a -- that you

2    were married.  And that was a fake marriage, is that

3    correct?

4    A.  Yes.

5    Q.  And you also said that you were coming to the United

6    States for some other reason other than prostitution, which

7    was a false answer, as well, correct?

8    A.  Yes.

9            MR. SICOLI:  May I approach and grab the --

10           THE COURT:  You may.

11           MR. SICOLI:  Thank you, Your Honor.

12   BY MR. SICOLI:

13   Q.  Now, I want to go back to sort of how you ended up

14   getting into the United States in the first place.

15           I think you testified that you were working in

16   real estate for approximately 13 years, is that correct?

17   A.  I was selling a housing complex.

18   Q.  Sure.  You were doing documents and making sure that

19   everybody had the right documents in helping sell houses, is

20   that correct?

21   A.  Yes.

22   Q.  And you did that until you were about 35, until the

23   2009, is that correct?

24   A.  I had to work there since I was 22 until 35.

25   Q.  Right.  And then you decided that you needed more money,

1    correct?  Because there was a problem with -- your mother

2    had to have a surgery on her heart, is that correct?

3    A.  Yes.

4    Q.  And you ended up getting, I think you testified that you

5    ended up using some farmland -- your family used some

6    farmland as collateral for a loan, is that correct?

7    A.  Yes.

8    Q.  And how much was the -- and were you able to get a loan,

9    your family?

10   A.  I was not the one who received that money.  It was my

11   family, my parents, who took that loan.  I don't remember

12   exactly what's the number was at the time.  It's been a

13   long time.  And I think it was probably about 300,000 to

14   500,000 baht.

15   Q.  Is that like about $9,000 to approximately $15,000 U.S.

16   dollars?

17   A.  Yes.

18   Q.  And I think you told the Government before, I don't

19   think you testified to this, but you told the Government

20   before that the reason you needed to come to the United

21   States to pay -- is to help the pay the high interest of the

22   loan.  Because the loan was already gotten, so you were able

23   to pay -- the family was able to pay the medical expenses,

24   but the family couldn't pay the interest on the loan, is

25   that correct?

1    A.  No, that's not true.

2    Q.  So you did not have -- you did not have a problem paying

3    the interest on the loan, is that what you're saying?

4    A.  It's not like -- it's not like that.

5    Q.  Okay.  So what were the expenses that you needed to

6    still pay, since you already got -- your family already got

7    a loan to pay the expenses?

8    A.  My main purpose to come here is to making money so

9    that I could take care of my mother's sickness.  And also

10   paying off that debt that they were still in debt -- in

11   debt at that time.

12   Q.  And I assume there was an interest on the debt, correct?

13   A.  Yes.

14   Q.  Okay.  And you had to pay interest on that?

15   A.  Yes.

16   Q.  And that was part of the debt that you wanted to pay

17   off?

18   A.  Yes.

19   Q.  Now, you first tried to go to Spain, but that didn't

20   work out, correct?

21   A.  Yes.

22   Q.  And then a Visa was completed to try to get into the

23   United States, correct?

24   A.  Yes.

25   Q.  And that's where on the Visa application, which is

1   Exhibit 105 -- that's where you put down the fake marriage

2   with Pradit Yooyen, is that correct?

3   A.  Yes.

4   Q.  Now, you told the jury that you had to -- you were told

5   to walk your passport, which was traveling to Hong Kong,

6   China, and Maucau, is that right?

7   A.  Yes.

8   Q.  Now, you've given a lot of statements over the year and

9   a half or so to the Government.

10          And the first time you ever mentioned about

11  walking your passport was in your November 16th, 2018,

12  statement, just a couple days ago, is that correct?

13  A.  Yes.  Yes.  Because the Government had just asked me

14  at that time.

15  Q.  Now in your statement, though, just a couple days ago.

16  You also said that you traveled to Cambodia and Vietnam, as

17  well.  Didn't you tell the Government that?

18  A.  Yes.

19  Q.  Okay.  And so you didn't testify to those two going --

20  going to those two countries, but you did go to those other

21  two countries, as well, correct?

22  A.  Yes.

23  Q.  And you gave a statement in December of 2016, is that

24  correct?

25          THE INTERPRETER: Can you repeat the date, again,

```
1    please?

2                MR. SICOLI:  Sure.

3    BY MR. SICOLI:

4    Q.  In December of 2016.

5    A.  Yes.

6    Q.  And you gave -- and I'm not going to go through every

7    one.  But you gave probably, is it fair to say, at least

8    half a dozen -- at least six or seven statements to the

9    Government prior to your November 16th statement?

10   A.  Can you repeat the question again?

11   Q.  Sure.  And, again, this is just a ballpark, but you gave

12   at least six or seven statements to the Government prior to

13   November 16th of 2018, correct?

14   A.  Yes.

15   Q.  And never in any of those statements did you mention

16   traveling to these other countries, is that correct?

17   A.  Yes.

18   Q.  Did that come up in your interview with the Government

19   because the Government asked you if you traveled to other

20   countries?  Or how did that come up?

21   A.  The Government had asked me.

22   Q.  And remember you're under oath when you answer this

23   question, but are you saying that you did not engage in any

24   prostitution when you were in these other countries?

25   A.  Yes.  I never did prostitution.
```

1    Q.   Okay.  Well, let's talk a little bit about what you said

2    about the debt.

3              When you were talking to the people in Thailand,

4    you said that they told you that the debt was $60,000 and

5    that you would be able to keep $80 for food, is that

6    correct?

7    A.   Yes.

8    Q.   And I believe you testified that you traveled in June of

9    20 -- 2009 and that you divorced Pradit Yooyen before you

10   left for the United States, is that correct?

11   A.   Yes.

12   Q.   Isn't it true that you actually told the Government on

13   December 14th of 2016 that you actually flew to the U.S.

14   with Pradit and Tu?

15   A.   September 14th, that's not correct.

16   Q.   On December -- December 14th of 2016 one of the first

17   statements you gave to the Government, you actually told

18   them that Pradit Yooyen traveled with you to the United

19   States.  That you found out that he was gay when you came to

20   the United States, and that you divorced him after you were

21   in the United States?

22   A.   Can you repeat the question, again, please?

23   Q.   Sure.  And it was a compound question.

24             But isn't it true that you told the Government on

25   December 14th, 2016 -- and I can show you the Government

1   report if you want to.  And you basically told them that you

2   traveled to the United States with Mr. Yooyen and Tu.  And

3   that was actually confirmed by airline tickets showing that

4   that happened.  Do you remember telling them that?

5   A.  I remember that.

6   Q.  So it isn't true that you divorced him beforehand, he

7   actually came with you to the United States, correct?

8   A.  I divorced him before I came here.

9   Q.  Okay.  So if it's in the report that you divorced him

10  afterwards, that would be wrong?

11          MS. PROVINZINO:  Objection.  Mischaracterizes

12  what's in the report.

13          MR. SICOLI:  Look on the next page.  That's fine.

14  BY MR. SICOLI:

15  Q.  Would it help you to look at the statement?  Or would

16  that refresh your recollection?

17  A.  Yes.

18          MR. SICOLI:  May I approach, again, Your Honor?

19          THE COURT:  You may.

20  BY MR. SICOLI:

21  Q.  At the bottom of Page 2, and then the top of Page 3, can

22  you read that to yourself and see if that refreshes your

23  recollection?

24  A.  I cannot read.

25  Q.  Well, she can translate it for you.

1   A.  Yes.

2   Q.  Does that refresh your recollection?

3   A.  I never had given that statement.

4   Q.  All right.  And did you say that you married Pradit for

5   the purposes of obtaining a Visa and traveling to the United

6   States?

7   A.  Yes, I did.

8   Q.  That you were married for two months -- or just as long

9   as it took to obtain a valid Visa into the United States?

10  A.  That part I don't remember.

11  Q.  Okay.  Do you remember saying -- After she was married

12  she was approved for a Visa to the United States.  Do you

13  remember that?

14  A.  Yes.

15  Q.  Do you remember saying that you flew to the U.S. with

16  Pradit and Tu?

17  A.  Yes, I do.

18  Q.  And then saying, Shortly thereafter Lily learned that

19  Pradit was gay?

20  A.  I have learned that he was gay since I was in

21  Thailand.

22  Q.  Well -- and then after you said that statement to the

23  deposit, then you say they divorced -- in other words, you

24  divorced him after you found out he was gay after you came

25  to the United States, is that correct?

1          MS. PROVINZINO:  Objection.

2          THE COURT:  Separate from what's in the report.

3     I'll ask the question if that's what she told the officer,

4     or whoever interviewed her.

5     BY MR. SICOLI:

6     Q.  Is that what you told the officer?

7     A.  I divorced him before I came to the U.S.

8     Q.  But you came to the U.S. then?

9     A.  Yes.

10    Q.  If you divorced him, why did you come to the U.S. with

11    him?

12    A.  To enter the United States easily.

13    Q.  All right.  Let's go on then.  You testified that there

14    was a $60,000 debt, is that correct?

15    A.  Yes.

16    Q.  And when you -- isn't it true that when you got to the

17    U.S. and you met with M that she reduced debt to $55,000

18    from $60,000, isn't that correct?

19    A.  After I had been paying off my debt for $50,000, then

20    she notified me she was reducing the debt to $55,000.

21    Q.  In September 24th of 2018, in a statement to the

22    Government, did you tell the Government that after you

23    entered the U.S. you were told by M, after you met with her,

24    that your debt would be reduced to $55,000?

25    A.  At first she didn't tell me that until I was paying

1   my off -- that I was almost done.  Then she told me that

2   she would reduce the debt.

3   Q.  All right.  So either way it goes though, the debt was

4   not $60,000, it was $55,000, is that correct?

5   A.  I paid off my debt $55,000.

6   Q.  Now, when you got to the United States, you went to San

7   Francisco first, is that correct?

8   A.  Yes.

9   Q.  And you weren't very good at doing sex work, is that

10  correct?

11  A.  Yes.

12  Q.  And I just want to make sure we clear this up, because

13  it's a little bit confusing.

14          But you said that you had to take all the

15  customers that were given to you and that there were a lot

16  of customers.  But you've also testified that you weren't

17  getting customers because you weren't any good.  Which one

18  is it?

19  A.  Yes.  I had to take on all the customer who were sent

20  to me.

21  Q.  Right.  It sounds, though, like there wasn't that many

22  that were sent to you, at least initially, because you

23  weren't very good at it, was your testimony, is that

24  correct?

25  A.  Yes.

1   Q.  And at that point in time, no one forced you to take on

2   other clients.  They were fine with the fact that you

3   weren't getting a lot of customers, isn't that true?

4   A.  Yes.

5   Q.  And then you ended up -- eventually after you stopped

6   off at Chicago and went other places, you ended up working

7   at Maya's house Orange County, is that correct?

8   A.  No, it wasn't.

9   Q.  Well, at some point in time you worked at Maya's house

10  in Orange County, is that right?

11  A.  Yes.

12  Q.  And it was only for 15 days, is that correct?

13  A.  Yes.

14  Q.  And you mentioned that Maya had mentioned to you that

15  you could make more money to pay off your debt if you did

16  some extras, like having a blow job without condom, that

17  kind of thing, is that correct?

18  A.  Yes.

19  Q.  And you were free to say, I don't want to do those

20  things, even though I would get more money, correct?

21  A.  Can you repeat again, please?

22  Q.  Sure.  You were free to say, No, I don't want to do

23  that.  I won't make more money.  I just won't do that kind

24  of stuff.  You were free to do that, right?

25  A.  Yes.

1    Q.  And, in fact, you did say, No.  I'm not going to do

2    that, right?

3    A.  Yes.

4    Q.  And you were also free to go out when you were in

5    California?  If you wanted to go to the store, you were free

6    to do that, correct?

7    A.  Yes.

8    Q.  And how were?what were the hours that you had to be

9    available to work at that time?

10   A.  At Maya's house, I don't really remember the timing,

11   the working time.  Because it had been eight to nine

12   years.  I can't really recall, I'm sorry.

13   Q.  Sure.  And the average time, sometimes you'd have a

14   span -- would it be fair to say at a lot of houses would it

15   be at 9:00 -- 9:00 in the morning to 9:00 in the evening or

16   10:00 in the evening?  Would that be fair?

17   A.  I don't think that Maya's house opened that early.

18   While I was there, it was probably sometimes between

19   10:00 to 10:30.

20   Q.  10:00 to 10:30 in the morning it would open up?

21   A.  It's 10:00 to 10:30 in the morning.  I don't remember

22   the exact work hours.

23   Q.  And I assume even if it's 10:00 to 10:30, it doesn't

24   mean you're working all those hours, correct?

25   A.  Can you repeat one more time?

 1    Q.  Sure.  Let's say -- let's use the hours of 10:00 in the

 2    morning until 10:00 in the evening.

 3            If you're available for those hours, that doesn't

 4    mean you're working with customers every hour of that time

 5    period, is that correct?

 6    A.  Yes.

 7    Q.  I'm correct in that, right?

 8    A.  Yes.

 9    Q.  All right.  Now I believe you testified that you -- when

10    you were at Maya's house, you only met Uncle Bill one time,

11    is that correct?

12    A.  Yes.

13    Q.  And he was very kind to you, is that correct?

14    A.  Yes.

15    Q.  He cooked you up a steak, is that correct?

16    A.  Yes.

17    Q.  Okay.  And I assume the steak was good, you liked it?

18    A.  I liked it a lot.  That was the first time that I

19    ever had such steak, as far as I remember.

20    Q.  Okay.  And he did that with -- he didn't get any money

21    for that, obviously.  He did that to help you, is that

22    correct?

23    A.  Yes.

24    Q.  And then he also took you out shopping, I think you said

25    in his convertible, to help you buy makeup?

```
1    A.  Yes.

2    Q.  And then you also kept some of the money that you earned

3    from prostitution.  It didn't all go to M, is that correct?

4    A.  That's not correct.

5    Q.  Well, you originally testified that you got to keep $80

6    for sure, right?

7    A.  That is what M has to pay for my food per week.

8    Q.  And you also, though, you were the person that decided

9    what money was going to go back to M, though.  I mean, it

10   wasn't any of the people that ran the houses, is that

11   correct?

12   A.  Yes.

13   Q.  Now, you've testified to this jury that you really

14   didn't want to do the work.  That it was something that you

15   didn't want to do, is that correct?

16   A.  Yes.

17   Q.  But you continued to work after you paid off the debt in

18   September of 2010, correct?

19   A.  Yes.

20   Q.  And that was because you were earning a lot of money, is

21   that correct?

22   A.  If it compared with other people, I only made a

23   little.

24   Q.  Well, you made more than you ever could make in

25   Thailand, is that correct?
```

1    A.  Yes.

2    Q.  And you were sending money back to your family in

3    Thailand, is that correct?

4    A.  Yes.

5    Q.  And I want to -- this is the picture, it's Exhibit 1012.

6    It's already been admitted.

7            THE COURT:  For the record, not to interrupt, I'm

8    going to go down to the other light setting, too.  Not to

9    emphasize one exhibit, but as we put it down for all the use

10   of the screen here.

11           Go ahead, Mr. Sicoli, continue.

12           MR. SICOLI:  Thank you, Your Honor.

13   BY MR. SICOLI:

14   Q.  So this picture was taken in Minnesota, is that correct?

15   A.  Yes.

16   Q.  And this was actually in 2013, is that correct?

17   A.  I had said that it was approximately between 2012 or

18   to 2013, I can't recall exactly.

19   Q.  So this was a picture that was taken when you were

20   already off of debt, is that correct?

21   A.  Yes.

22   Q.  And I think you identified this person as -- as M, is

23   that correct?

24   A.  Yes.

25   Q.  So you were still doing work in Minnesota with M, is

1    that correct?  At that time?

2    A.  Yes.

3    Q.  And showing you what's already been admitted as

4    Exhibit 1200, this is an ad that was actually placed in --

5    and that's you, correct?

6    A.  Yes.

7    Q.  And this is an ad that was placed in 2014, is that

8    correct?

9    A.  Correct.

10   Q.  And, again, you're not on debt, is that correct?

11   A.  Yes.

12   Q.  And you're seeing customers, correct?

13   A.  Yes.

14   Q.  And still showing you a part of that exhibit, it says

15   that the time that you're open is 9:00 a.m. to 11:00, is

16   that correct?

17   A.  Yes.

18   Q.  So you're working on your own now, even though you're

19   going through M to sort of advertise, and you're advertising

20   that you're available from 9:00 a.m. to 11:00 p.m., is that

21   correct?

22   A.  I didn't work fully for me, because I had to come and

23   work at M as a working women and paying her house -- the

24   house fee.

25   Q.  Right.  But you were off of debt, correct?

1    A.  Yes.

2    Q.  So you could choose where you wanted to go, correct?

3    A.  Yes.

4    Q.  You could choose your working hours, correct?

5    A.  Yes.

6    Q.  And you still chose to come to Minnesota to work with M

7    at her house, is that correct?

8    A.  Yes.

9    Q.  And you chose the hours of 9:00 to 11:00 -- 9:00 a.m. to

10   11:00 p.m. as hours you would be available, correct?

11   A.  Yes.

12   Q.  And remember, this is a job you told the jurors you hate

13   to do, right?

14   A.  Yes.

15   Q.  But you're continuing to do it voluntarily, is that

16   correct?

17   A.  Yes.

18   Q.  Now -- and the reason, again, is because you're making

19   money and you want to support your family and help them, is

20   that correct?

21   A.  Yes.

22   Q.  Now, so you pay off the debt to M in 2010.  You actually

23   work as a prostitute all the way, in essence, through 2016

24   when you're arrested, is that correct?

25   A.  Yes.

1    Q.  So that's about six years, is that correct?

2    A.  Yes.

3    Q.  And from 2012 to 2014, you actually paid off all of your

4    -- the family debt, of your family in Thailand, is that

5    correct?

6    A.  My family's debt actually was paid off in 2013.

7    Q.  All right.  So -- and do you remember how much money you

8    sent back to pay off the debt?

9    A.  I don't remember because there was not only the money

10   that I had -- I had to pay back to the bank for putting

11   the lending to them, but there was the debt outside of

12   loan system, as well.

13   Q.  Outside of what?  I didn't understand the last part.

14   A.  The loan system.

15   Q.  The load system?

16   A.  Loan system.

17   Q.  Loan system.  Okay.  So there was some other family debt

18   that you needed to pay?

19   A.  Yes.

20   Q.  And so you paid that off, in essence, in two-and-a-half

21   years, approximately?

22   A.  Yes.

23   Q.  And that was all from prostitution earnings, is that

24   correct?

25   A.  Yes.

1    Q.  Now, in addition to that, though, you also bought a

2    house in Thailand for your family, is that correct?

3    A.  Yes.

4    Q.  And the cost for that house was $50,000 U.S. dollars, is

5    that correct?

6    A.  In Thai money it was about 1,700,000 baht.  I'm not

7    sure how much that is in U.S. dollars.

8    Q.  All right. So let's say if it's 1 million baht, is that

9    $30,000 in U.S. dollars?

10   A.  Yes.

11   Q.  And so, in addition to paying off all of the debt, you

12   were also able to pay $30,000 from prostitution earnings to

13   buy a house in Thailand?

14   A.  Yes.

15   Q.  And your sister actually lives in that house, is that

16   correct?

17   A.  Yes.  My whole family.

18   Q.  Okay.  So you've been supporting -- you've done a good

19   job for your family, you've supported them?

20   A.  Yes.

21   Q.  And it's all from the prostitution earnings?

22   A.  Yes.

23   Q.  Now, in addition to that, didn't you buy your family

24   also a rice farm in Thailand?

25   A.  Yes.

1    Q.  And the cost for that was also another 30,000 in U.S.

2    dollars, approximately, isn't that correct?

3    A.  Yes.

4    Q.  And that came from prostitution -- the majority of that

5    came from prostitution earnings, is that correct?

6    A.  Yes.

7    Q.  So if there's -- paying off the debt, do you know if the

8    debt that you paid off was more than 10,000 U.S. dollars or

9    do you have a ballpark figure?

10   A.  I don't remember the exact number, but I know it was

11   a lot of money in Thai baht.

12   Q.  So we know, though, that you have approximately 30,000

13   in U.S. dollars for the house, correct?

14   A.  Yes.

15   Q.  And another 30,000 for the rice farm?

16   A.  Yes.

17   Q.  And so that's 60,000 just from those two, is that

18   correct?

19   A.  Yes.

20   Q.  And does that rice farm helping your family continue to

21   earn money?  Because of the rice farm?

22   A.  Yes.  We used that rice farm to grow rice for our own

23   consumption.

24   Q.  So it helps with feeding the family?

25   A.  Yes.

1    Q.  Okay.  And how many people are supported by that rice

2    farm, as far as feeding the family?

3    A.  There are my younger sister, my father, my brother,

4    my nieces and nephew, four of them, and also my sister's

5    husband.

6    Q.  So you support a lot people or help support a lot of

7    people in Thailand?

8    A.  Yes.  All of the -- all of them in my family.

9    Q.  Now, in addition to sending that money back, I assume --

10    did you have someplace that you were living when you were in

11    the United States after you were off of debt?

12    A.  I did.

13    Q.  Okay.  And so did you rent an apartment or what did you

14    do?

15    A.  I stayed at my husband's house.

16    Q.  All right.  And did he own that?  Or did you guys have

17    rent on that?  Or what did you have?

18    A.  My husband owned that house.

19    Q.  And did you have other expenses you had to pay like

20    food?

21    A.  Where did you mean?

22    Q.  When you were in the United States, when you were off

23    the debt, did you have other expenses that you had to cover?

24    A.  Yes.  There are -- there were.

25    Q.  Okay.  And some of those expenses, at least -- I know

1   you had your husband, as well, but some of those expenses

2   were covered by prostitution earnings, is that correct?

3   A.  My husband did not take my prostitution money to use

4   as expense.

5   Q.  So you're saying you didn't use any of the prostitution

6   money for your own expenses?

7   A.  I send that money back to my family and I save some

8   for my personal use.  But as far as the household

9   expenses, he did not take this money to spend.

10  Q.  So you saved some money, as well, correct?

11  A.  A little bit.

12  Q.  Okay.  How much?  Did you put it in a bank?  What did

13  you do with it with it?

14  A.  It was in the bank in Thailand.

15  Q.  Do you remember how much?

16  A.  About 35 -- hold on.  350,000 baht.

17  Q.  So that's somewhere around 10,000?  I might get that

18  wrong.  How much is that in U.S. dollars, would you say?

19  A.  It's probably not more than 15,000 U.S. dollars.

20  Q.  Okay. Now when you would actually be off of debt and you

21  ended up working, like for M in Minnesota, where did you

22  stay in Minnesota?

23  A.  At the hotel.  There were -- there were also

24  apartments sometime.

25  Q.  Okay.  So when you -- did you stay where you were doing

1    the sex acts?  Or did you stay someplace separate when you

2    were doing that?

3    A.  It was the same place that I used as working.

4    Q.  All right.  So -- and even when you were off of debt,

5    when you're doing your work, you would actually sleep in the

6    same place that you had sex with customers?

7    A.  Yes.

8    Q.  And that obviously didn't present any problems for you,

9    right?

10   A.  Yes.

11   Q.  I'm correct in that, right?

12   A.  Yes.  It's not the problem.

13   Q.  Just so we understand from a summary standpoint, so you

14   -- you engaged in prostitution because you wanted to come to

15   the United States, correct?

16   A.  Yes.

17   Q.  You performed what we would probably call normal sex

18   acts like intercourse and blow jobs with condom, correct?

19   A.  Yes.

20   Q.  You refused to do any extras that could give you more

21   money, correct?

22   A.  There was one thing that I could perform for extra,

23   that is a blow job without condoms.

24   Q.  And you would do that sometimes so that you could make

25   more money?

1   A.  Yes.

2   Q.  Then you paid the debt in 15 months, correct?

3   A.  Yes.

4   Q.  But you continued to engage in prostitution for another

5   six years, is that correct?

6   A.  Yes.

7   Q.  You bought a house in Thailand for your family for

8   30,000?

9   A.  Yes.

10  Q.  And a rice farm for another 30,000, correct?

11  A.  Yes.

12  Q.  Now you have actually told other people -- or told

13  people before that if you knew that you could make that much

14  money in the United States with prostitution you would have

15  come earlier, haven't you said that?

16  A.  Yes.

17  Q.  Because it's a lot of money?

18  A.  Yes.

19  Q.  Now, I want to -- the last thing, and I spent a lot of

20  time with you, but the last thing I want to talk to you

21  about is your plea agreement.  If I could just for a moment.

22  Okay?

23  A.  What's plea -- what's plea agreement?

24  Q.  Well, you entered an agreement with the Government to

25  plead guilty in this case, is that correct?

1    A.  Yes.

2    Q.  And thanks for letting me know you didn't understand.

3    Sometimes lawyers talk in lawyer's speak, so if you don't

4    understand just let me know, okay?

5    A.  Yes.  Yes, thank you.

6    Q.  All right.  So, under the plea agreement with the

7    Government, you pled guilty to conspiracy to commit sex

8    trafficking, is that correct?

9    A.  Yes.

10   Q.  And that's by force, fraud or coercion, is that correct?

11   A.  Nobody forced me.

12   Q.  Nobody forced you to engage in prostitution, is that

13   correct?

14   A.  No.  There's nobody.

15   Q.  You did it on your own free will, correct?

16   A.  Yes.

17   Q.  And you certainly never forced anybody to engage in

18   prostitution, is that correct?

19   A.  Yes.

20   Q.  And you never coerced anybody into prostitution, is that

21   correct?

22   A.  I never did that.

23   Q.  And you never agreed with anybody to do that, correct?

24   A.  Sorry.  Can you repeat one more time?

25   Q.  You never agreed with anybody to be part of a conspiracy

1    to traffic women by force, fraud or coercion?

2    A.  Yes.

3    Q.  And in addition to pleading guilty to conspiracy to sex

4    trafficking, you also pled guilty to money laundering, is

5    that correct?

6    A.  Yes.

7    Q.  And under the plea agreement, you know that you're

8    looking at possibly 292 months to 365 months in prison.  Do

9    you understand that?

10   A.  I understand.

11   Q.  And so that's -- that's almost 25 years to 30 years, is

12   that correct?

13   A.  Yes.

14   Q.  But you have an agreement with the Government that if

15   you cooperate with the people at this table, and the

16   prosecution of the people at this table, that the Government

17   then will make determination that they would ask the Court

18   for a motion for downward departure based upon your

19   substantial assistance to the Government, is that correct?

20   A.  The Government did not offer me anything.

21   Q.  Well, the Government hasn't made any promises to you, is

22   that correct?

23   A.  No.

24   Q.  But the Government has told you, when you've entered

25   into a cooperation agreement with the Government, that if

1    the Government feels that you assisted them in the

2    investigation and the prosecution, that the Government will

3    decide whether they will make a motion to get you below the

4    292 to 365 months, is that correct?

5    A.  The Government did not notify me anything.  Did not

6    offer me anything.

7    Q.  Well, you -- you signed a plea agreement with the

8    Government, correct?

9    A.  Yes.

10   Q.  And you were respected by attorney Steven Wolter, is

11   that correct?

12   A.  Yes.

13   Q.  And then you also signed what's called a Cooperation

14   Agreement saying that you would cooperate with the

15   Government in the prosecution, is that correct?

16   A.  Yes.

17   Q.  And under the Cooperation Agreement, you agreed to talk

18   to the Government and tell them what you know, correct?

19   A.  Yes.

20   Q.  And if you continue to corporate with the Government,

21   and you render what the Government determines to be

22   substantial assistance to the Government, then the

23   Government will move for a downward departure from the

24   guidelines.  Isn't that what the agreement says?

25   A.  This I don't know anything.  This is -- depends on

1    the Government.

2           I have given my cooperations based on my desire to

3    speak the truth to everybody here in this court, and to

4    Judge Frank and to the jury to hear the truth.

5    Q.  And how old are you now?

6    A.  44 year old.

7    Q.  And so if you've got 25 to 30 years, that would be -- in

8    prison, that would be most of the rest of your life, is that

9    correct?

10   A.  Yes.

11   Q.  And you want to get back to your family in Thailand, is

12   that correct?

13   A.  Yes.

14   Q.  And you also want to be with your husband, is that

15   correct?

16   A.  Yes.

17   Q.  And you know under the agreement that the only way you

18   can get less than that is if you cooperate with the

19   Government, is that correct?

20   A.  I had said earlier that the Government did not offer

21   me anything.  I just wanted to speak the truth without

22   hiding anything back.

23   Q.  Well, let's put it this way.  You're hoping you get a

24   sentence much lower than 292 months, isn't that correct?

25   A.  Yes.

```
1    Q.  And you're hoping that what you're doing today and what

2    you did yesterday will help you get that sentence lower than

3    292 months, correct?

4    A.  Yes.

5              MR. SICOLI:  Thank you.  I have no further

6    questions.

7              THE COURT:  I think we'll take our morning recess

8    here, Counsel.

9              We'll take 15 minutes, unless the Marshal service

10   needs a bit more.  Rise for the jury, please.

11             (Jurors excused at 10:47 a.m.)

12             (In open court at 11:04 a.m.)

13             THE COURT:  As soon as the jury is ready Defense

14   Counsel can inquire if they wish.

15                 C R O S S - E X A M I N A T I O N

16   BY MR. ENGH:

17   Q.  Good morning.

18   A.  Good morning.

19   Q.  I want to ask you some questions about Austin, Texas and

20   your visit there in July of 2015.

21   A.  Yes.

22   Q.  That was the first and last time you had been to Austin?

23   A.  Yes.

24   Q.  You had found out about Austin through your friend Anna?

25   A.  Yes.
```

1    Q.  She told you about what a nice place it was?

2    A.  Yes.

3    Q.  She suggested you go there?

4    A.  Yes.

5    Q.  She knew Ms. Thinram, as far as you know?

6    A.  Yes.

7    Q.  She, meaning Anna, had been there before?

8    A.  Yes.

9    Q.  And by this time in your journey here in the United

10   States, you had paid your debt?

11   A.  Sorry.  Can you repeat your question, again?

12   Q.  By 2015, when you went to Austin, you had your debt

13   paid?

14   A.  Yes.

15   Q.  Okay.  By the way, did you have a separate agreement

16   with M where you would share 50 percent of what you earned

17   with her over time?

18   A.  No, there was not.

19   Q.  There is no such agreement that you split 50/50 the

20   proceeds that you earned from prostitution with M while you

21   were under her debt?

22   A.  No, there was not.

23   Q.  In any event, you made plans to go to Austin, Texas and

24   flew in, right?

25   A.  Yes.

1    Q.  And when you arrived, you had no fear of Ms. Thinram

2    whatsoever?

3    A.  No.

4    Q.  Nor of her husband Gregg?

5    A.  No.

6    Q.  I take it you would not have gone there had you been

7    fearful?

8    A.  Yes.

9    Q.  So it was your decision to go to Austin?

10   A.  Yes.

11   Q.  No one made you do it?

12   A.  No.

13   Q.  Okay.  No one coerced you into going?

14   A.  No.

15   Q.  You arrived at the airport and were met by someone?

16   A.  Yes.

17   Q.  That was Gregg, her husband?

18   A.  Yes.

19   Q.  You had not met him before?

20   A.  No.

21   Q.  Okay.  He greeted you at the airport and was polite to

22   you?

23   A.  Yes.

24   Q.  And your original plan was to stay three or four days?

25   A.  I didn't plan to be there for three to four days, but

1    I was able to be there for three to four days.

2    Q.  And eventually you weren't there very long at all?

3    A.  Yes.

4    Q.  And no one made you stay longer than you wanted to?

5    A.  Yes.

6    Q.  And you mentioned yesterday when you left that Ms.

7    Thinram was quite nice about it, really nice about it, is

8    that right?

9    A.  Yes.

10   Q.  While you were at the apartment in Austin, you saw Mr.

11   Kimmy around, did you not?

12   A.  I don't know who Kimmy is.

13   Q.  Gregg.  I tell you his name is Gregg Kimmy, I'll call

14   him Gregg for our purposes.  Fair enough?

15   A.  Okay.

16   Q.  Now while you were there, Gregg was at the apartment or

17   nearby, is that right?

18   A.  Yes.

19   Q.  And you understood that Gregg and Ms. Thinram are

20   married?

21   A.  Yes.

22   Q.  And it's a legitimate marriage?

23   A.  Yes.

24   Q.  They loved each other?

25   A.  Yes.

1    Q.  And while you were there, Gregg took you shopping, as I

2    understand it?

3    A.  Yes.  We went to buy food.

4    Q.  And you indicated that was the first day you were there?

5    A.  I don't remember whether it was on the second day or

6    third day that we went to buy food.

7    Q.  Okay.  You asked him for food and he helped you get

8    some?

9    A.  There was a lot of food at home but they wanted to

10   have more food.  So that's when he took me to buy more

11   food.

12   Q.  Did you ask him or did he suggest you go?

13   A.  He took me himself.

14   Q.  Okay.  What happened in Austin is that you arrived and

15   you had several customers?

16   A.  The first day when I got there I didn't work.  I

17   worked the next day.  And I had all seven -- I had

18   customer, all of them seven people.

19   Q.  Okay.  And those had been lined up by Gregg, is that

20   right?

21   A.  Yes.

22   Q.  Okay.  One of the customers was difficult, as I

23   understand it?

24   A.  He was nice.  But I felt like he was not normal.

25   Q.  All right.  And this was -- this was the customer with

1     the oil in the bathtub, am I right about that?

2     A.  Yes.

3     Q.  In the course of your career, you've had other difficult

4     customers, I assume?

5     A.  Yes.

6     Q.  Okay.  And you can't always predict which ones will be

7     difficult and which ones will be really nice?

8     A.  Yes.

9     Q.  What happened here is that he asked you to do something

10    in the bathtub and you declined?

11    A.  So what happened was I had done -- I had given him a

12    blow job and he wanted to be putting me in the bathtub

13    with the oil on me, but I felt like that was not safe.

14    So I asked him to go to the bed instead.

15    Q.  And what's happened.  You had sex on the bed then, is

16    that correct?

17    A.  Yes.

18    Q.  Then what occurred is he wrote a bad review for you?

19    A.  That's what the house owner notified me.

20    Q.  Okay.  And you had no evidence that Gregg wrote a bad

21    review for you, obviously?

22    A.  No.

23    Q.  And there was mention in the bad review that you had

24    stretch marks when you had none, is that right?

25    A.  That's what -- what's what the house owner notified

 1    me of how the review was written, but I didn't really

 2    have the stretch marks.

 3    Q.  Okay.  You never read the review, I take it?

 4    A.  I never did.

 5    Q.  It's just what Gregg said the review said to you, is

 6    that right?

 7    A.  Yes.

 8    Q.  Then Gregg made an effort to correct the review by

 9    asking for photographs so that you could refute the stretch

10    mark accusation, is that right?

11    A.  Yes.

12    Q.  Okay.  And you didn't want Gregg to take the pictures,

13    so someone else at the house wound up taking the pictures to

14    show you didn't have stretch marks, is that right?

15    A.  Yes.

16    Q.  Okay.  And Gregg was fine with having someone else take

17    the pictures, is that right?

18    A.  Yes.

19    Q.  Okay.  Do you know if those pictures were posted or not?

20    A.  I don't know.

21    Q.  But what occurred is that after that review was posted,

22    no customer wanted to hire you personally, for as unfair as

23    that may have been?

24    A.  Yes.

25    Q.  And you realized at that point that you would have to go

1    or leave?

2    A.  Yes.

3    Q.  And you left voluntarily?

4    A.  Yes.

5    Q.  No one controlled your movement?

6    A.  No.

7    Q.  You told Gregg that you were going to fly out and leave

8    and he didn't talk you out of it, is that right?

9    A.  Yes.

10   Q.  And no one -- no one in Austin ever made you do ten

11   customers a day?

12   A.  No.

13   Q.  Okay.  Or day after day with ten people?

14   A.  I only had customer for the first day that I was

15   there.  I would never able to take customer -- ten

16   customer a day.

17   Q.  And no one cheated you in Austin out of what you

18   deserved and out of what you earned?

19   A.  Nobody.

20   Q.  No one took your passport?

21   A.  Nobody.

22   Q.  Okay.  No one forced you to be there?

23   A.  No one did.

24   Q.  You were a willing participant?

25   A.  Yes.

1   Q.  Is your testimony that you saw Nancy or Ms. Thinram that

2   last day before you left?

3   A.  No.  I never saw Nancy in Austin.

4   Q.  Okay.  Did you see Anna in Austin either?

5   A.  No, I did not.

6   Q.  Let me show you Exhibit 203(sic).  Can you see 302?

7   A.  Yes, I do.

8   Q.  There's an e-mail in the middle of the page from Nancy

9   Sweet do you see that?

10  A.  Yes, I do.

11  Q.  And do you understand that that's dated 2009?  It looks

12  like July 14th, 2009.  Do you see that?

13  A.  Yes, I do.

14  Q.  And that the address for the e-mail is

15  sexysweetnancy@googlemail.com, do you see that?

16  A.  Yes.

17  Q.  Is it your testimony or was it your testimony yesterday

18  that Ms. Thinram sent that e-mail?

19  A.  It was not this e-mail.

20  Q.  Do you know when Ms. Thinram ever came -- or came to the

21  United States?

22  A.  I do not know.

23  Q.  Do you know whether this e-mail that's attributable to

24  her was sent before she ever arrived here?

25          MS. PROVINZINO:  Objection.  There's no

1   attributions.  I think the witness already identified that

2   it was --

3           MR. ENGH:  Object to the narrative objection, too.

4           THE COURT:  I'll just ask that you rephrase it.

5   BY MR. ENGH:

6   Q.  Well, are you aware that Ms. Thinram arrived after this

7   e-mail was sent in 2011 or 2012, long after this e-mail was

8   sent?

9   A.  I do not know that.

10  Q.  Okay.

11          MR. ENGH: No further questions.  Thank you.

12          THE COURT:  Additional Defense Counsel may inquire

13  if you wish.

14          C R O S S - E X A M I N A T I O N

15  BY MR. GUERRERO:

16  Q.  Good morning, Ms. Boonluea.

17  A.  Good morning.

18  Q.  I just have a real brief inquiry.  You were an

19  independent working girl for close to six years?

20  A.  Yes.

21  Q.  Was it a common practice for independent working girls

22  to talk amongst each other to -- as to where they might go?

23  Different houses to go to?

24  A.  Yes.

25  Q.  Certain houses had better reputation than others?

1   A.  Yes.

2   Q.  And it's important for you to feel safe where you're

3   going?

4   A.  Yes.

5   Q.  And you knew that certain people that had apartments

6   would do a better job of keeping that place safe?

7   A.  Yes.

8   Q.  Sometimes they'd do a better job like screening clients?

9   A.  Yes.

10  Q.  And would you tell the person who had the apartment if

11  you didn't like somebody?  Bad customer?

12  A.  Yes.

13  Q.  And would there be some people that would make sure that

14  that customer didn't come back?

15  A.  Yes.

16  Q.  All right.  Thank you, Ms. Boonluea?

17  A.  Thank you.

18          THE COURT:  Mr. Gerdts?

19             C R O S S - E X A M I N A T I O N

20  BY MR. GERDTS:

21  Q.  Good morning.

22  A.  Good morning.

23  Q.  My name is Daniel Gerdts.  I represent Ms. Unpradit.

24  A.  Yes.

25  Q.  You had never met Ms. Unpradit before you were arrested,

1    correct?

2    A.  No.  I had never met her.

3    Q.  You testified that your family had some debt that was

4    outside of the loan system.  Do you remember that?

5    A.  Yes, I do.

6    Q.  And by that you mean that it was not a loan from a bank,

7    is that correct?

8    A.  It's separated from the banking.

9    Q.  So it's not from a bank, correct?

10   A.  That's correct.

11   Q.  Your family had already taken a loan from a bank, true?

12   A.  Yes.

13   Q.  And they had already pledged their property as

14   collateral, right?

15   A.  Yes.

16   Q.  So they got additional money from somebody else, is that

17   correct?

18   A.  Yes.

19   Q.  And could you just explain to the jury the arrangements

20   for how that loan worked?

21   A.  Did you mean the -- the banking loan?  Or the loans

22   outside the system?

23   Q.  The loan that was outside of the banking system?

24   A.  So it was my either my family or I would borrow money

25   from a person who loaned money to general population.

1     The interest would be 10 percent or 20 percent sometimes.

2     Q.  Sometimes the interest would be very high, right?

3     A.  Yes, very high.

4     Q.  But if you're a relatively poor person in Thailand,

5     sometimes that's the only way you can get credit, correct?

6     A.  Yes.

7               MR. GERDTS: Thank you, Your Honor.

8               THE WITNESS:  Thank you.

9               THE COURT:  Mr. Rivers?

10              MR. RIVERS:  No questions.

11              THE COURT:   Redirect, if Counsel wishes.

12              R E D I R E C T   E X A M I N A T I O N

13    BY MS. PROVINZINO:

14    Q.  All right.  So you were asked a couple guess about

15    Kung's home in Austin.  Do you remember those?

16    A.  Yes, I do.

17    Q.  And at that point you were done with your debt, is that

18    right?

19    A.  Yes.

20    Q.  So at that point you could choose when you would work,

21    is that right?

22    A.  Yes.

23    Q.  So you were free to go there and work in prostitution if

24    you wanted?

25              MR. GUERRERO:  Objection as to the form.

1           THE COURT:  Sustain as to the form.

2    BY MS. PROVINZINO:

3    Q.  So you couldn't make that choice if you wanted to go to

4    Austin or not, is that true?

5    A.  Yes.

6    Q.  But what about before when you were under debt?  Could

7    you choose where you worked?

8    A.  I could not.

9    Q.  When you were under debt, were you free to walk away

10   from it?

11   A.  No, I could not.

12   Q.  Defense Counsel asked you about Kung's e-mail.  And I'm

13   showing you Government Exhibit 277 from yesterday.

14   A.  Yes.

15   Q.  Do you see that in front of you?

16   A.  Yes, I do.

17   Q.  And that would an e-mail sent from you, pet1138, is that

18   right?

19   A.  Yes.

20   Q.  And who did you send that e-mail to?

21   A.  Sexynancyaustin@gmail.com is Kung.

22   Q.  Bless you.  Now you were asked lots and lots of

23   questions about your fake marriage in Thailand, is that

24   right?

25   A.  Yes.

1    Q.  And that was to Pradit Yooyen?

2    A.  Yes.

3    Q.  And do you remember the date of your divorce?

4    A.  I do not.

5              MS. PROVINZINO:  May I approach, Your Honor --

6              THE COURT:    You may.

7              MS. PROVINZINO:  -- to refresh her recollection?

8    BY MS. PROVINZINO:

9    Q.  And I'm showing you a registration of divorce, which has

10   been translated, certified translation from the Thai to the

11   English.

12   A.  Yes.

13   Q.  And there's a listed date of the marriage?

14   A.  Yes.

15   Q.  And that was -- do you see the date?

16   A.  Yes, I do.

17   Q.  And there was a date of divorce?

18   A.  Yes, I do.

19   Q.  And does this refresh your recollection as to the date

20   of the divorce?

21   A.  Yes.

22   Q.  So Iris, when did you enter into this fake marriage?

23   A.  It was in June, 2009.

24   Q.  Okay.  And that's the actual date you divorced, is that

25   right?

1    A.  The divorce day was June -- the 9th of June 2009.

2    Q.  And when did you enter the United States?

3    A.  On the 16th of June, 2009.

4    Q.  So that was the divorce, is that right?

5    A.  Yes.

6    Q.  Now Defense Counsel asked you about the money you made

7    from being part of this organization.  Do you remember those

8    questions?

9    A.  Yes, I do.

10   Q.  And that was money from the commercial sex?

11   A.  Yes.

12   Q.  And at some point, Iris, you told the jury that you

13   became a house boss in Atlanta, right?

14   A.  Yes.

15   Q.  And as a house boss in the sex trafficking organization,

16   you made a lot of money, fair?

17   A.  I didn't make much money.

18   Q.  Well, you made a lot more money than you would have made

19   in Thailand, is that right?

20   A.  Yes.

21   Q.  And that was the point of why people belonged to this

22   conspiracy?

23   A.  Yes.

24   Q.  And you knew what you did was wrong?

25   A.  Yes.

1   Q.  And because of that, you were charged and you pled

2   guilty to it, right, to being involved in the sex

3   trafficking conspiracy?

4            MR. GUERRERO:  Again, Your Honor.

5            THE COURT:  I'll sustain as to the form.

6   BY MS. PROVINZINO:

7   Q.  Well, did you plead guilty to being part of the sex

8   trafficking conspiracy?

9            MR. ENGH:  This is still leading.  I still object.

10           THE COURT:  I request a more open-ended question.

11  BY MS. PROVINZINO:

12  Q.  And what you plead guilty to, Iris?

13  A.  Sex trafficking and money laundering.

14  Q.  And as a result of those charges, do you understand you

15  could be facing a lot of prison time?

16  A.  Yes.

17  Q.  And your husband, too, is that right?

18  A.  Yes.

19  Q.  Iris, you mentioned that you never had steak before

20  Uncle Bill provided steak to you.

21  A.  Yes.

22  Q.  Can you tell the jury a little bit about the poverty

23  your family experienced in Thailand?

24  A.  (In English) Sorry.  (Through Interpreter)  I

25  remember since I was born my family was poor.  (In

1    English) Okay.  I'm sorry.

2              (Through Interpreter)  I remember that my

3    family was very poor.  My family sometimes didn't have

4    money to buy food.  But the way that we were able to

5    live, because we were living in the provinces -- in other

6    province, we would collect and forage vegetable, fry

7    fish, crab and we would also grow our own rice.

8    Q.  Now, Bill's Counsel asked you whether he got any money

9    from providing you that steak meal, is that right?

10             THE INTERPRETER:   I'm sorry.  Could you repeat

11   that?

12   BY MS. PROVINZINO:

13   Q.  Bill's Counsel asked you if he got any money for

14   providing that steak meal, is that right?

15   A.  No, he didn't.

16   Q.  And he said that Bill just did that to help you.  Do you

17   remember that question?

18   A.  Yes.

19   Q.  But was Uncle Bill just some random stranger who stopped

20   by that house of prostitution?

21   A.  Yes, he was.

22   Q.  And so he was there to provide -- was he there with

23   Maya?

24   A.  When he went there, there was no P'Maya with him.

25   Just Uncle Bill himself.

1    Q.  So Bill was there without Maya, is that right?

2    A.  No.  There was -- she was not there.

3    Q.  And you talked about a time he took you to the store, is

4    that right?

5    A.  Yes.

6    Q.  And why did he take you to the store?

7    A.  I wanted to buy cosmetics.

8    Q.  And what were the cosmetics for, Iris?

9    A.  To use for working.

10   Q.  And when you say to use for working, can you explain

11   that for the jury?

12   A.  I wanted to buy powder, lipstick or perfume to make

13   me look better so that I could work as selling sex.

14   Q.  And Bill knew that's what you were buying it for, is

15   that right?

16   A.  Yes, he knew.

17   Q.  And when you were working in Orange County, could you

18   have just gone to the store on your own?

19   A.  No, I could not.

20   Q.  You had to get permission or someone to take you, is

21   that true?

22           MR. SICOLI:  Objection.  Leading.

23           THE COURT:  Sustain as to the form.

24   BY MS. PROVINZINO:

25   Q.  Why couldn't you just go to the store on your own?

1    A.  Because I never -- I didn't know where it was, and I

2    didn't speak English and so I didn't know where to go.

3    Q.  And so that was another way that Uncle Bill helped you,

4    is that right?

5    A.  Yes.

6    Q.  Now, Iris, you've talked about the working relationship.

7    Can you tell -- describe for the jury if there was any

8    partnership and anything that happened to break up the

9    relationship between Uncle Bill and Maya?

10             MR. SICOLI:  Objection, Your Honor.  There's never

11   been any testimony about a partnership between them with

12   this witness.

13             THE COURT:  Well, as long as she has firsthand

14   knowledge as to -- I'll let her answer the -- answer the

15   question.

16             Separate from whether there's been testimony or

17   not, I'll leave that for the jury.

18             But if she understand the question, if she has

19   firsthand knowledge, she may answer.

20   A.  I don't understand the question.  What did you mean

21   by the relationship stopped?

22   BY MS. PROVINZINO:

23   Q.  Okay.  You have told the Government when you met with us

24   that Uncle Bill and uncle Maya ran the apartment together?

25             MR. RIVERS:  Objection, leading.

1          THE COURT:  Sustained as to the form.

2     BY MS. PROVINZINO:

3     Q.  Did Uncle Bill and Maya -- tell the jury what you know,

4     if anything, about any partnership and any separation of the

5     partnership between Uncle Bill and Maya?

6     A.  When I was working at Maya, Uncle Bill came, not as a

7     customer.  At the time I thought if he wasn't her close

8     friend, then he would probably be a partner.

9     Q.  And that's what you observed when you were working in

10    Orange County?

11    A.  Yes.

12    Q.  And stepping back, being part of the organization for

13    many years, did you learn anything more about any

14    partnership or separation of a partnership between Uncle

15    Bill and Maya?

16    A.  That's what I heard.

17    Q.  And so -- to be clear for the jury, Uncle Bill wasn't

18    there as a customer when you were working in Orange County?

19    A.  No, he was not.

20    Q.  And he knew it was a house of prostitution?

21    A.  Yes.

22    Q.  And, Iris, you were asked a lot of questions about the

23    law.  Are you a lawyer?

24    A.  No, I am not.

25    Q.  Do you have any legal training?

1    A.  No, I do not have.

2    Q.  How far did you go in school, Iris?

3    A.  I finished the 9th grade in Thailand.

4    Q.  But you do have a lawyer here in the courtroom, is that

5    right?

6    A.  Yes.

7    Q.  And he advised you about the law as to sex trafficking

8    and money laundering, is that true?

9    A.  Yes.

10   Q.  And I'm not going to ask you about your conversations

11   with your lawyer.  Because at the end of all of this, Judge

12   Frank is going to instruct the jury on what sex trafficking

13   is and what money laundering is.

14   A.  Yes.

15               MR. GERDTS:  Objection, Your Honor.  It's not a

16   question, it's a statement.

17               THE COURT:  Well, if you put a question in front

18   of the --

19               MS. PROVINZINO:  All right.

20   BY MS. PROVINZINO:

21   Q.  So let's stick with the facts and what you did.

22               THE COURT:  I'll sustain the objection but we'll

23   proceed.

24   BY MS. PROVINZINO:

25   Q.  So let's stick with the facts and what you did.

1    A.  Yes.

2    Q.  Now, you came to the United States under debt, is that

3    right?

4    A.  Yes.

5             MR. GERDTS: Objection, leading.

6             THE COURT:  Sustained as to the form.

7    BY MS. PROVINZINO:

8    Q.  Who did you owe your debt to?

9    A.  To M.

10   Q.  And how long did it take to you pay off the debt?

11   A.  15 months.

12   Q.  And did you have to pay off the debt?

13   A.  Yes.

14   Q.  Could you have walked away from the debt?

15   A.  Yes.

16            MR. GUERRERO:  Objection.  Asked and answered.

17            MR. ENGH:  Objection.  Leading every question.

18            MR. RIVERS:  Your Honor, can we approach, Your

19   Honor?

20            THE COURT:  We can approach, briefly.

21            (Side bar at 11:46 a.m.)

22            MR. RIVERS:  You know how on Sunday when you watch

23   football and there's holding on every play and they don't

24   catch it all the time?  Well, they're leading questions.

25   Almost every single question.

1       And then when we object -- and we're not objecting

2   to every single one, and then when we object, the answer's

3   already out there.

4       So we would ask Counsel to quit asking leading

5   questions.

6       MS. PROVINZINO:  And may I respond?

7       The last couple questions were how long did it

8   take to you pay off the debt?  Could you have walked away?

9   Those don't imply or suggest answers.

10      MR. ENGH:  Well, this is an endemic problem with

11  the case.

12      Every question is, Isn't it right?  Is this fair?

13  Isn't this correct?

14      These are totally improper questions from the

15  Prosecution.  All they have to do is direct testimony in the

16  right way by nonleading questions.  And this is a problem

17  that's taken --

18      THE COURT:  Multiple -- most of the questions have

19  been leading.

20      MR. ENGH:  It's wrong.  And it's error for her to

21  keep doing it.

22      And we'd like some kind of prophylactic -- that's

23  the wrong word in this case, but we'd like some kind of

24  remedy here, so we don't have to keep jumping up and down.

25      THE COURT:  It is, Counsel.  Most of the questions

1          have been leading.

2                    The last two, were not.  But most of them have

3          been.

4                    MR. ENGH:  It's -- you know, if you could listen

5          to your tape, and I don't want to talk to you personally,

6          but we can't continue this.  This is just wrong.

7                    MS. PROVINZINO:  There were a series of questions

8          that were improper about the law that were asked on

9          cross-examination.  And I'm attempting to respond by asking

10         and eliciting facts from this witness as to the force --

11         threats of force, fraud and coercion.

12                   THE COURT:  We can do that.  But we have to

13         minimize the leading questions where the answer's in the

14         question.

15                   MS. WILLIAMS:  But certainly, Could you have

16         walked away?  That doesn't imply an answer.

17                   MR. ENGH:  But this is a two-week problem.

18                   THE COURT:  I just said the last two questions

19         haven't been.

20                   MS. PROVINZINO:  We can proceed.

21                   THE COURT:  All right.  Well -- and one thing,

22         I've had, separate from the position of these parties --

23         I've had some concerns, not unique to a case like this, if

24         because of the interpretation, well, are they truly

25         understanding?

1          MS. PROVINZINO:  That's been a challenge.

2          THE COURT:  -- the questions, some of the

3   definitions of the words.  But I'll guess I'll leave that to

4   Counsel, all right.

5          (In open court at 11:49 a.m.)

6          THE COURT:  Again, Members of the Jury you've

7   obviously heard me say this before.  The lawyers have acted

8   consistent with the rules.  Because as you've heard me say

9   before, contrary to the movies, and other things you see in

10  TV where everybody can just address the Court, say what they

11  want, whether it's facts or law, or following the rules,

12  that doesn't happen in real courtrooms in real life.

13          I know that's what you see on TV.  But my point is

14  the lawyers have -- by approaching the bench, that's what

15  the rules require.

16          And as I've told you about, that's no, that's not

17  an accident then that we have a microphone up here, where

18  the sound comes on and nobody can hear, except those up here

19  and my Court Reporter, who can take everything down.

20          So if you have a concern, that should rest on my

21  shoulders, not on the lawyers.

22          So, we'll continue, consistent with our

23  discussion here.

24  BY MS. PROVINZINO:

25  Q.  And while you were under debt, Iris, was there a point

```
1     that you wanted to leave?

2     A.  Yes, there was.

3     Q.  And tell the jury about that?

4     A.  When I had been here in the U.S. for three, four

5     months, I was thinking to myself, I would never pay off

6     this debt because so far I had paid off less than

7     $10,000.  And so I asked that -- I wanted to go back home

8     to Thailand.

9     Q.  Did you speak with M about that?

10    A.  Yes, I did.

11    Q.  And what did you tell her?

12    A.  I told her I couldn't -- I couldn't work here any

13    longer.  I wanted to go back to Thailand.

14    Q.  How did she respond?

15    A.  She said, Yes, I could go home.  But she wouldn't

16    guarantee my -- the safety of my family if I wouldn't

17    come back to pay off the debt.

18    Q.  Iris, how long would it have taken you to pay off that

19    debt if you had gone back to Thailand?

20    A.  I couldn't give you the approximation as to this

21    amount of money, because this is a very -- this is a very

22    high -- this is a lot of money in Thailand.

23    Q.  After you paid off your debt, did you continue working

24    for the organization?

25    A.  Yes, I did.
```

```
1    Q.  And what did you do?

2    A.  I sell sex.

3    Q.  What else did you do?

4    A.  What else?  I didn't do anything else.

5    Q.  You talked yesterday about your work in relation to M,

6    is that right?

7    A.  Yes.

8    Q.  What did you do for M?

9    A.  I gave -- I introduced the girls about how to bank,

10   how to go buy food at the supermarket and how to get

11   taxi.

12   Q.  Are those things that helped the organization?

13   A.  Yes.

14   Q.  And then you even took another step and did something in

15   Atlanta, is that right?

16            MR. GERDTS:  Objection, leading.

17            THE COURT:  Sustained as to the form.

18   BY MS. PROVINZINO:

19   Q.  And what else did you do for the organization?

20   A.  I had -- my husband helped me in buying plane tickets

21   for the girls to go back to Thailand.

22   Q.  So you bought tickets?

23   A.  My husband did.  I didn't buy it.

24   Q.  And at some point you opened your own house, is that

25   right?
```

```
 1                MR. GERDTS:  Objection, leading.

 2                THE COURT:  I'll sustain as leading.  Allow the

 3     inquiry.

 4     BY MS. PROVINZINO:

 5     Q.  And what are the different roles people play in the

 6     organization, Iris?

 7     A.  I don't understand the question.

 8     Q.  Let's focus on Minnesota and the operation here.

 9     A.  Okay.

10     Q.  Who had the debt?  Who was the ma-tac?

11     A.  I was in debt.  M was my ma-tac.

12     Q.  Who was the house boss?

13     A.  M was.

14     Q.  Did anyone help M?

15     A.  There was.

16     Q.  And would was that?

17     A.  There were me and there's another customer named

18     John.  There was some time Opal came in to help.

19     Q.  And when you talk about John, what did he do?

20     A.  John had helped the women to go to the bank and to

21     buy food.

22     Q.  And those were all members of the conspiracy, is that

23     right?

24                MR. GERDTS:  Objection, leading.

25                THE COURT:  Sustained.
```

1    BY MS. PROVINZINO:

2    Q.  And in addition to those people, are there others you

3    don't know involved in this?

4         MR. GERDTS:  Objection on foundation grounds.

5         THE COURT:  Okay.  If she understand the question,

6    I'll allow her to answer this.

7    A.  Yes, there were.

8    BY MS. PROVINZINO:

9    Q.  And you done know everyone, is that right?

10   A.  Yes.

11   Q.  And while people were under debt, what did they have to

12   do?

13        MR. GERDTS:  Your Honor, I object under 403 as

14   cumulative.  We've gone over this before.

15        THE COURT:  Well, in light of the direct, we've

16   been -- it's to an extent, but I'll permit it.

17        I'll permit it in context.  You may answer it if

18   you understand the question.

19   A.  They had to work off that debt.

20        MS. PROVINZINO:  No further questions.

21        THE COURT:  Any additional cross?

22        MR. SICOLI:  This will take just a minute, Your

23   Honor.

24        THE COURT:  All right.

25        R E C R O S S   E X A M I N A T I O N

```
 1    BY MR. SICOLI:

 2    Q.  Good morning, again.

 3    A.  Good morning, again.

 4    Q.  When you were in -- when you were in Orange County,

 5    Uncle Bill was there for one day, is that correct?

 6    A.  I met him on the day he made me a steak.  And then

 7    again the next morning when he took me to buy cosmetics.

 8    Q.  So it's that night the steak, then the next day to buy

 9    cosmetics and that's it, right?

10    A.  Yes.

11    Q.  You were asked questions on redirect that you were

12    wanting to leave, like when you were maybe four months into

13    debt, you wanted to leave but didn't leave, is that

14    correct?

15    A.  Yes.

16    Q.  And because you stayed on, you paid off your debt to M,

17    correct?

18    A.  Yes.

19    Q.  You continued to work after you paid off the debt,

20    correct?

21    A.  Yes.

22    Q.  You made more money, correct?

23    A.  Yes.

24    Q.  You paid off your family debt, correct?

25    A.  Yes.
```

1    Q.  You bought a house in Thailand, correct?

2    A.  Yes.

3    Q.  You bought a rice farm in Thailand, correct?

4    A.  Yes.

5    Q.  All for the benefit of your family, correct?

6    A.  Yes.

7    Q.  And you would have come to the United States earlier if

8    you knew you were going to make so much money, correct?

9    A.  Yes.

10              MR. SICOLI:  Thank you.

11              THE WITNESS:  Thank you.

12              THE COURT:  Mr. Engh?

13              MR. ENGH:  I have no further questions.

14              R E C R O S S   E X A M I N A T I O N

15   BY MR. GUERRERO:

16   Q.  Ms. Boonluea, I have the sense, and you can correct me

17   if I'm wrong, but you had a pretty good relationship with M?

18   A.  Yes, it was good.

19   Q.  And you were close with her?

20   A.  At some level.

21   Q.  You consider her a friend?

22   A.  No, she was not.

23   Q.  Did you have discussions with her about which houses you

24   could go to?

25   A.  Yes, there was.

1   Q.  And so if you wanted to go someplace or you had certain

2   suggestions, she would allow you to do that?

3   A.  Yes.

4   Q.  And even after you paid off your debt, you still went

5   back to some of the houses you worked while you were under

6   debt?

7   A.  Yes.

8           MR. GUERRERO:  Thank you.

9           THE COURT:  Mr. Gerdts or Mr. Rivers, anything

10  additional?

11          MR. RIVERS:  No questions.

12          MS. PROVINZINO:  I don't have any further

13  questions, Your Honor.

14          THE COURT:  You may step down.  Thank you.

15          THE WITNESS:  Thank you everyone.

16          THE COURT:  Members of the jury, we will stand in

17  recess until 1:15.  The time now is 12:00 or 12:01.  So

18  please rise for the jury.

19          (Jurors excused at 12:00 p.m.)

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2

3

                 I, Lynne M. Krenz, do certify the foregoing
4    pages of typewritten material constitute a full, true and
     correct transcript of my original stenograph notes, as they
5    purport to contain, of the proceedings reported by me at the
     time and place hereinbefore mentioned.

6

7                        /s/Lynne M. Krenz
                         Lynne M. Krenz, RMR, CRR, CRC
8
     Date: November 23, 2018
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25