1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2

3     ------------------------------------------------------------
                                        )
      United States of America,         )   File Nos.
4                                       )   17CR107(1)(4)(5)(16)
            Plaintiff,                  )   (20)
5                                       )           (DWF/KMM)
      vs.                               )
6                                       )
      Michael Morris, Pawinee           )   St. Paul, Minnesota
7     Unpradit, Saowapha Thinram,       )   November 27, 2018
      Thoucharin Ruttanamongkongul      )   1:52 a.m.
8     and Waralee Wanless,              )

9           Defendants.
      ------------------------------------------------------------
10        BEFORE THE HONORABLE DONOVAN W. FRANK AND A JURY
                UNITED STATES DISTRICT COURT JUDGE
11             **(TRIAL TESTIMONY PANTILA RODPHOKHA)**

12    APPEARANCES
      For the Plaintiff:          United States Attorney's Office
13                                Laura Provinzino, AUSA
                                  Melinda Williams, AUSA
14                                300 S 4th Street, Suite 600
                                  Minneapolis, Minnesota 55415
15
      For Defendant Michael       Sicoli Law, Ltd.
16    Morris:                     Robert Sicoli, ESQ.
                                  333 South Seventh Street
17                                Suite 2350
                                  Minneapolis, MN 55402
18
      For Defendant Pawinee       Daniel L. Gerdts, ESQ.
19    Unpradit:                   331 Second Avenue South
                                  Suite 705
20                                Minneapolis, MN 55401

21    For Defendant Saowapha      Paul C. Engh, ESQ.
      Thinram:                    200 South 6th Street
22                                Suite 420
                                  Minneapolis, MN 55402
23
      For Defendant               Meshbesher & Spence, Ltd.
24    Thoucharin                  Daniel Guerrero, ESQ.
      Ruttanamongkongul:          1616 Park Avenue South
25                                Minneapolis, MN 55404

```
 1      For Defendant Waralee      Rivers Law Firm
        Wanless:                   Bruce Rivers, ESQ.
 2                                 701 4th Avenue South
                                   Suite 300
 3                                 Minneapolis, MN 55415

 4      Court Reporter:            Lynne M. Krenz, RMR, CRR, CRC
                                   Suite 146
 5                                 316 North Robert Street
                                   St. Paul, Minnesota 55101
 6
        Interpreter:               Alex Lee
 7                                 Phouratsaphone (Paul) Littana
                                   Kanokon (Bee) Nimitbunan
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **I N D E X**                    **Page**

2     **GOVERNMENT'S WITNESS PANTILA RODPHOKHA**
      Direct Examination by Ms. Williams.....................  5
3     Cross-Examination by Mr. Guerrero.....................114
      Cross-Examination by Mr. Rivers.......................135
4     Cross-Examination by Mr. Sicoli.......................153
      Cross-Examination by Mr. Gerdts.......................157
5     Redirect Examination by Ms. Williams..................159
      Recross Examination by Mr. Rivers.....................177
6     Redirect Examination by Ms. Williams..................180
      Recross Examination by Mr. Rivers.....................180
7     Redirect Examination by Ms. Williams..................181

8     **GOVERNMENT EXHIBITS**                          **RECEIVED**
      Exhibits 8BM & CN.....................................112
9     Exhibit 243........................................... 72
      Exhibit 428........................................... 49
10    Exhibit 431........................................... 73
      Exhibit 433........................................... 44
11    Exhibit 435 and 436................................... 60
      Exhibits 584 & 585.................................... 41
12    Exhibit 845........................................... 49
      Exhibit 998..........................................175
13    Exhibit 999..........................................172
      Exhibit 1415 and 1416................................. 76

14

15

16

17

18

19

20

21

22

23

24

25

1            **P R O C E E D I N G S**

2                **IN OPEN COURT**

3        (Defendants present)

4        (Witness testifying through Thai Interpreter Nokon

5    Nimit)

6              THE COURT:  Whenever you're ready, Counsel.  You

7    may call your next witness.

8              MS. WILLIAMS:  Yes, Your Honor, the Government

9    calls Pantila Rodphokha, a/k/a Noon.  And she's in custody

10   so it will take just a moment.

11             THE COURT:  And before you sit down, Ma'am, you

12   want to raise your right hand.

13        (Sworn.)

14             THE WITNESS:  Yes.  Yes, I do.

15             THE COURT:  All right.  If you'd please have a

16   seat in the larger chair behind the microphone.

17             And then as I tell every witness, you'll have to

18   sit fairly close to the microphone, along with the

19   interpreter, so everybody can hear.

20             If you would please state your full name and spell

21   your last name.

22             THE WITNESS:  Pantila Rodphokha.  P-A-N-T-I-L-A,

23   R-O-D-P-H-O-K-H-A.

24             THE COURT:  You may inquire, Counsel.

25             MS. WILLIAMS:  Thank you.

```
 1                   D I R E C T   E X A M I N A T I O N

 2    BY MS. WILLIAMS:

 3    Q.  Good afternoon.  Ms. Rodphokha, do you have a nickname

 4    that you go by?

 5    A.  Noon.

 6    Q.  Noon is that N-O-O-N?

 7    A.  Yes.

 8    Q.  Okay.  And can I you Noon for purposes of court here

 9    today?

10    A.  Yes.

11    Q.  Noon, where are you originally from?

12    A.  From Thailand.

13    Q.  You speak pretty good English, is that right?

14    A.  A little bit.

15    Q.  Okay.  Your first language is what, though?

16    A.  Thai language.

17    Q.  So we like all the witnesses to testify in the language

18    they're most comfortable.

19            So we're going to have you testify through an

20    interpreter in Thai today, okay?

21    A.  Okay.

22    Q.  And Noon, can I ask you to pull that microphone a little

23    bit closer to you?

24    A.  Yep.

25    Q.  There you go.  Noon, you are here to testify about a sex
```

1    trafficking conspiracy, is that right?

2    A.  Yes.

3    Q.  To be clear, were you, yourself, a member of this

4    conspiracy?

5    A.  Yes.

6    Q.  What was your role in the conspiracy?

7    A.  I opened houses and I brought women for prostitution.

8    Q.  And when you say you opened houses, you're talking about

9    houses of prostitution?

10   A.  Yes.

11   Q.  Where did you open houses of prostitution?

12   A.  In Chicago.

13   Q.  Did you also for a small time have a house in Dallas?

14   A.  Yes.

15   Q.  You said you brought here -- women here for purposes of

16   prostitution.  Does the conspiracy have a word for that?

17   A.  It's mother-tacs.

18   Q.  And can you explain mother-tacs to the jury?

19   A.  It would be like I own the woman, the women.  The

20   women have to come to pay off their debt.

21   Q.  How many women did you own, either the full woman or

22   part of the woman, about how many?

23   A.  About 10 to 12.

24   Q.  And how many apartments did you have, houses of

25   prostitution in Chicago?

1   A.  Three places in Chicago.

2   Q.  What years were you involved in the organization when

3   you started until when you finished?

4   A.  2012 to 2015.

5   Q.  In October 2016, what happened to you?

6   A.  I was arrested.

7   Q.  Where were you arrested?

8   A.  In Chicago.

9   Q.  And I see you have orange on today.  You're currently

10  residing in jail?

11  A.  Yes.

12  Q.  Have you been in jail continuously from being arrested

13  in October of 2016 until today?

14  A.  Yes.

15  Q.  After you were arrested in Chicago, where were you

16  brought?

17  A.  I was brought here.

18  Q.  And were you the only one who had been arrested and

19  charged out of Minnesota?

20  A.  There were a lot of people.

21  Q.  You were charged with what?

22  A.  Sex trafficking and money laundering.

23  Q.  Did you do those things?  Were you guilty?

24  A.  Yes, I did.

25  Q.  After you were brought to Minnesota, did you very early

1    on agree to sit down with the Government, with myself, with

2    our agents and cooperate?

3    A.  Yes, I did.

4    Q.  What was your job in cooperating?

5    A.  Tell the truth.

6    Q.  Tell the truth about some things or tell the truth about

7    everything?

8    A.  Everything.

9    Q.  Tell the truth when it makes you look good or also when

10   it makes you look bad?

11   A.  All the truth, everything.

12   Q.  Now, there are five people who are on trial today.  And

13   we'll talk a little bit more about that later.

14          Is this criminal conspiracy that you've testified

15   you were a part of, is it bigger than that?  Bigger than

16   five people?

17   A.  Yes.  There are more.

18   Q.  In Thailand and the United States, how big do you think

19   the conspiracy is?

20   A.  There are a lot of people.  I have never counted

21   them.

22   Q.  Do you know everyone?

23          THE COURT:  Mr. Gerdts?

24          MR. GERDTS:  Your Honor, the witness is very

25   soft-spoken.  Could we have her lean into the microphone a

1    little more.

2              THE COURT:  Okay.  All right.

3              MS. WILLIAMS:  Could you pull it --

4              THE COURT:  All right.

5              MS. WILLIAMS:  -- just pull it closer?

6              THE COURT:  Yeah, because they're not the very

7    fancy mics.  So, if you're not very close, it will not pick

8    you up, so.

9    BY MS. WILLIAMS:

10   Q.  We were just talking about the conspiracy.  Do you know

11   everyone who was involved?

12   A.  I don't know everyone.

13   Q.  Do you know quite a few people though?

14   A.  Yes, I know some.

15   Q.  And Noon, you've sat down with the Government -- we've

16   sat down a lot at the beginning to talk about everyone you

17   know, is that right?

18   A.  Yes.

19   Q.  Okay.  Today we're going to focus your testimony mostly

20   on what you did and what you know the Defendants sitting

21   here did, okay?

22   A.  Yes.

23   Q.  Now at some point you said you were guilty.  Did you

24   plead guilty?

25   A.  I did.

```
1    Q.  What did you plead guilty to?

2    A.  Did you mean the charge that I plea?

3    Q.  Yes.

4    A.  Sex trafficking and money laundering.

5    Q.  Why did you plead guilty?

6    A.  Because I did something wrong.

7    Q.  And there's -- there's been a lot of talk about what sex

8    trafficking means.  Are you a lawyer, Noon?

9    A.  No, I am not.

10   Q.  Force, threats of force, fraud, coercion.  Do you have

11   a -- do you know exactly what all those things mean legally?

12   A.  No, I don't.

13   Q.  Let's stay away from the law.  Let's talk about the

14   facts.

15           What did you do that you, in your view, made you

16   guilty of sex trafficking?

17   A.  I opened working houses and I brought women from

18   Thailand to have them pay off the debt.

19   Q.  And while they were paying off the debt, who owned those

20   people?

21   A.  It was me who owned them.

22   Q.  You said you pled guilty, who did you plead guilty in

23   front of, to which Judge?

24   A.  Judge Frank.

25   Q.  And who will sentence you in this case?
```

```
1    A.  Judge Frank.

2    Q.  As part of your plea agreement, did you agree to

3    continue to cooperate with the Government?

4    A.  Yes, I agreed to cooperate.

5    Q.  Are you looking at a lot of time in prison?

6    A.  Yes.

7    Q.  What are you hoping will happen at sentencing?

8    A.  I'm hoping for the least sentence as much as I could

9    receive.

10   Q.  Have I promised you that you're going to get a lesser

11   sentence or what that sentence will be?

12           MR. GERDTS:  Objection to the form, Your Honor.

13   BY MS. WILLIAMS:

14   Q.  Have we, the Government, promised you that you will get

15   a lesser sentence or what that sentence will be?

16   A.  No, never.

17   Q.  Could we make that promise if we wanted to?

18   A.  No -- no you couldn't.

19   Q.  Why not?

20           MR. RIVERS:  Objection, foundation.

21           THE COURT:  If she has an understanding, she may

22   give it.

23           If you understand the question, you may answer it.

24   If you don't understand it, you should say so.

25   A.  Because the person who sentence me is Judge Frank.
```

```
 1    BY MS. WILLIAMS:
 2    Q.  As a part of your cooperation with the Government, what
 3    do you understand is your one job?
 4    A.  To speak the truth.
 5    Q.  And as a part of your cooperation, if you speak the
 6    truth, what does the Government do for you?
 7    A.  That the Government would tell everything about the
 8    good thing, the bad thing that I've done to Judge Frank
 9    to hear.
10    Q.  And are there bad things that you've done in this case?
11    A.  Yes.
12    Q.  And are you hoping that your truth is a good thing that
13    we can tell Judge Frank?
14    A.  Yes.
15    Q.  Okay.  Let's talk a little bit about the criminal
16    conspiracy.
17              Before we do that, I'd like the jury to get just a
18    little bit of background on you.
19              Can you tell us where you grew up in Thailand and
20    how you grew up?
21    A.  I grew up in Bangkok.  When I was a child, my parents
22    divorce.  I went back and forth between my parents a
23    couple times a month.  And both of my parents were
24    remarried.
25    Q.  And I want to talk about your mom's husband in
```

1    particular, your stepfather.  Does he have a lot of money?

2    A.  Yes.  Kind of.

3    Q.  As a result, did you have money growing up?

4    A.  Yes.  When I was with my stepfather, I had money to

5    spend.

6    Q.  Noon, when did you come to the United States?

7    A.  2009.

8    Q.  Why did you come to the United States?

9    A.  At the time I got into a fight with my stepfather.

10   And I also wanted to spend my life in foreign country.

11   Q.  And when you say you got in a fight with your

12   stepfather, we don't have to linger on it, but was there

13   some sexual abuse that went on?

14   A.  So it was like my stepfather asked to have something

15   with me, but I didn't want it to happen.  And I told my

16   mom, but my mom did not believe me.  So we got into a

17   fight.

18   Q.  You say you came into the United States in 2009.  Just

19   to be clear for the jury, were you involved in commercial

20   sex?  Were you work a working woman?  Did you come here

21   under debt or anything like that?

22   A.  No.

23   Q.  Why did you come here?

24   A.  As I mentioned earlier, that I had a fight with my

25   stepfather.  And my mom said I could just come here, and

1    spend some time here, and wait until things calmed down

2    and then I could go back.  But then I ended up staying

3    here a long time and I worked at a Thai restaurant.

4    Q.  Where are the different places in the United States that

5    you lived?

6    A.  In Chicago and Dallas just a little bit.

7    Q.  How long were you in Dallas?

8    A.  Not a year.

9    Q.  Was that not a year, was that when you first came here?

10   A.  No.  It's not.  It was about in 2012.

11   Q.  And otherwise, have you lived in Chicago since you've

12   been here?

13   A.  Yes.

14   Q.  Let me take you to 2011.  Did you first -- did you meet

15   a woman -- a woman named O, just the letter O in 2011?

16   A.  O, yes.

17   Q.  And was O your first involvement in this criminal

18   organization?

19   A.  I don't understand.  Can you repeat?

20   Q.  Was she the person who introduced you to all of this?

21   A.  Yes.

22   Q.  Okay.  Before we get into the details of your exact

23   involvement and what you did, I'd like to talk generally

24   about how this conspiracy worked.

25            You were a part of it, is that right?

1    A.  Yes.

2    Q.  You told us that you bought women and you sold them at

3    your houses?

4    A.  Yes.

5    Q.  Take the jury all the way back to Thailand and tell them

6    how this whole thing worked?

7    A.  So in Thailand, it would be different people

8    different groups of people that would handle document

9    administration, fraud Visa, fraud statements, everything

10   fake.

11   Q.  When you say Visa fraud, who were the women that were

12   brought over here?  Can you describe those women for the

13   jury?

14   A.  So they would come from poor family and mostly

15   uneducated.

16   Q.  Who would find the women?

17   A.  The people in Thailand.

18   Q.  Can you name some of those people in Thailand that you

19   knew?

20   A.  Mammy and J-Joo were the two people as far as I had

21   done business with.

22   Q.  And Mammy, M-A-M-M-Y, and J-Joo, J-J-O-O, for the

23   record.  Those are the two people that you did business with

24   personally?

25   A.  Yes.

```
 1    Q.  Were there others that knew about but you didn't

 2    personally do business with?

 3    A.  Yes, there were.

 4    Q.  Who were those people?

 5    A.  Odd and Keang.

 6    Q.  Odd, O-d-d, and Keang, K-E-A-N-G?

 7    Q.  Did you hear a person named M?

 8    A.  I had just heard about this name when I already got

 9    in jail.

10    Q.  What about -- you said that the organization used fraud

11    documents, Visa fraud documents.  Were there people that

12    helped with that?

13    A.  Yeah.  There were people who helped this group of

14    people, as far as I know.  People who work at the tour

15    company.

16    Q.  Can you name some of the people who were involved in the

17    Visa fraud?

18    A.  The name is S.

19    Q.  S like the letter S?

20    A.  Yes.

21    Q.  Did you also know a person in Thailand named Noiy,

22    different from the Noiy sitting here?  We'll call her

23    Thailand Noiy just to be very clear.

24    A.  Yes.

25    Q.  What was Thailand Noiy's role?
```

```
1    A.  As far as I know she was a business partner of J-Joo.

2    Q.  You talked about the women had to repay a debt.  Tell

3    the jury about the debt.

4    A.  Did you mean the debt that they would have to come

5    work for me and make money from customers?

6    Q.  Yeah.  How big was the debt is what I'm asking?

7    A.  $55,000 per person.

8    Q.  And you're from Thailand.  You said most of these women

9    were poor.  $55,000 for a poor woman in Thailand, how much

10   money is that?

11   A.  It's a lot of money.

12   Q.  The $55,000, was that loaned to the women or was that

13   just made up?  How did that figure come to be?

14   A.  It was not borrowed money that I gave them.  But it

15   was the amount that made it up so that they can pay me

16   off.

17   Q.  Now let's stay in Thailand for a moment.

18            You said Mammy and J-Joo and the others would find

19   the women.

20            What were the women told about coming to the

21   United States?

22   A.  So Mammy said they could come here and work off their

23   debt in two to three months.  They would be living here

24   in a beautiful apartment with fitness and swimming pool.

25            After they paid off their debt they can save up
```

1     money for their own.

2     Q.  So let's -- let's take that in a few different pieces.

3     You said that Mammy would tell the girls they could pay off

4     their debt in two or three months.  Was that true?

5     A.  It's not true.  It doesn't happen often.

6     Q.  How long would it usually take women that you bought to

7     pay off their debt?

8     A.  The soonest -- the soonest was probably about eight

9     months or longer.

10    Q.  So two to three months, Mammy's tricking them?

11    A.  Yes.

12    Q.  The beautiful life in the United States.  I want to

13    focus on the period of debt.

14            Was the -- were the lives of these women during

15    the period of their debt, were they beautiful?

16    A.  Do you mean while they were paying me the debt?

17    Q.  While they were paying you the debt.

18    A.  So, they would not have money to spend because the

19    money that would be made would be paid to me.  They would

20    have be working to pay me the money until they paid off

21    their debt.   Then they could have their own money.

22    Q.  So let me ask, again, during the period of their debt,

23    did they have beautiful lives?

24    A.  No.

25    Q.  I want to talk about what happened to the women when

1    they came to the United States.

2           But first, can you explain to the jury how you

3    would buy the women from Mammy and from J-Joo?

4    A.  So I would pay $22,000.  That amount was not included

5    breast augmentation, or surgery or nose job.

6    Q.  So you would pay $22,000 to who?

7    A.  To Mammy and J-Joo.

8    Q.  And what do you get for your $22,000?

9    A.  Then I would collect from the women $55,000.

10   Q.  And we're talking about U.S. dollars, right?

11   A.  Yes.

12   Q.  What would Mammy and J-Joo do for the $22,000?

13          Would that -- I guess what I'm asking, would that

14   include airfare, photos, Visa, all of this?

15   A.  Yes.

16   Q.  Would it include -- you just talked about plastic

17   surgery.

18          Tell the jury a little bit about why the women

19   would get plastic surgery and who would be paying for that?

20   A.  So they would have breast augmentation to make

21   themselves look better.

22   Q.  Would that be included in the $22,000 that you paid to

23   Mammy and J-Joo?

24   A.  No, it's not.

25   Q.  So we'll look at the math in a little while.

1          But the $22,000 that Mammy and J-Joo got, was that

2     anywhere close to what it cost them to send the women here?

3     A.  No.

4     Q.  Were they making a lot of profit?

5     A.  Yes.  A lot of profit.

6     Q.  Okay.  So a women that you're buying comes to the United

7     States.  What happens when that woman gets here under debt

8     to you?

9     A.  They would have to come and pay off their debt.

10    Q.  Where did they physically go?  What city?

11    A.  Chicago.

12    Q.  And you said you were also -- you had houses of

13    prostitution, you were a house boss in Chicago.  Would you

14    put them in your own houses?

15    A.  Yes.

16    Q.  Why would you do that?

17    A.  Because I want to make money.

18    Q.  You get then the debt and the house fee if they're in

19    your house?

20    A.  Yes.

21    Q.  Okay.  Tell us a little bit about the apartments you had

22    in Chicago.

23    A.  I had three apartments.

24    Q.  And where did the women live?

25    A.  In that working houses.

1  Q.  And I think you just answered my question, but where did

2  they work?

3  A.  At the working houses, too.

4  Q.  And where did they sleep?

5  A.  At the working houses.

6  Q.  About how often in one week would the women who were

7  under debt be able to leave the apartment?

8  A.  So I would let them to go by stuff at the market once

9  a week.

10  Q.  And when you said you would let them, who's choice was

11  it to go?  Was it your choice or their choice?

12  A.  What do you mean?

13  Q.  I mean, could they just come and go?  Or was that your

14  choice when they would leave?

15  A.  Mostly it would be just on Sunday I would let them go

16  buy stuff with taxi.

17  Q.  What you say taxi, what do you mean by taxi, who's the

18  taxi?

19  A.  The taxi that I trusted -- trusted to let them go

20  with him.

21  Q.  So when you're talking about taxi, you're talking about

22  a person?

23  A.  Yes.

24  Q.  What was that person's name?

25  A.  Sammy.

1    Q.  Who did Sammy work for?

2    A.  For me.

3    Q.  And what was Sammy's job when he took the women to the

4    market?

5    A.  To help take care of them and to keep an eye on them.

6    Q.  Okay.  So help take care of them.  Let's focus on that

7    first.

8             How was the -- how was the English of the women

9    who came over here?

10   A.  So, not very good.

11   Q.  And to your knowledge, did these women who came here,

12   did they know people in the United States?  Did they have

13   places to go?

14   A.  No, they didn't.

15   Q.  Now you said Sammy's other job, in addition to helping

16   them, was to keep an eye on them.  Explain that to the jury.

17   A.  So it would be like, not to let the girls run away.

18   Q.  Was that a concern that the girls would run away?

19   A.  Well, if they ran away, it wouldn't be good for the

20   business.

21   Q.  And is that just for you or is that for all ma-tac?  Is

22   it always bad for business for women to run away?

23   A.  Everyone.

24   Q.  What happens if girls just start running away?

25   A.  I wouldn't make money that I should have received.

```
 1    Q.  Let's talk about the commercial sex that happened in the

 2    apartments.

 3              How often -- first of all, what were the women

 4    doing in the apartments?

 5              THE INTERPRETER:  Would you please repeat your

 6    last question?

 7    BY MS. WILLIAMS:

 8    Q.  Were the women having sex in the apartments?

 9    A.  Yes.

10    Q.  Tell us a little bit about how much they would make with

11    one customer?

12    A.  So while the girl is paying off their debt, the rate

13    would be 160 for one customer.  The $100 would go to pay

14    off their debt and the $60 would go for the house fee.

15    All of this money, I would be the one who collect it.

16    Q.  Okay.  So the $60 house fee, that portion of it doesn't

17    even go to pay down this $55,000 debt, is that right?

18    A.  That's correct.

19    Q.  Did the women get to keep any money?

20    A.  While they were paying my debt, all of that money

21    belonged to me.

22    Q.  Who scheduled the sex buyers to come and see the women?

23    A.  I was the one who picked up the phone.

24    Q.  How often, let's say on a busy day, would a woman have

25    sex?
```

```
1    A.  So it would -- goes from zero to 9 to 10 people.  But

2    for 10 people that didn't happen often, but that

3    happened.

4    Q.  And were some women more popular than others?  More

5    customers than others?

6    A.  Yes.

7    Q.  Who decided who the women would have sex with?

8    A.  I was the person who picked up the phone and sending

9    them the customers.

10   Q.  Would the women get to choose their customers?

11   A.  No, they couldn't.

12   Q.  Who choose where the women would have sex?

13   A.  What do you mean?

14   Q.  That's a bad question.  You said you had several houses

15   of prostitution.  Who decided which house the women would be

16   in?

17   A.  So it would be like rotation.  This person would be

18   this house for a month and then they would rotate every

19   month.

20   Q.  Why would you do that?

21   A.  So the customer would get different faces of the

22   women.

23   Q.  While the women were under debt, who owned their bodies?

24   A.  I was.

25   Q.  While the women were under debt, were they free?
```

1    A.  No.

2    Q.  When did they become free?

3    A.  After they paid off their debt.

4    Q.  After they paid off the debt, could they choose who they

5    had sex with and if they would work?

6    A.  Well, then, at the time it would be up on their

7    decision whether or not they would rest, they would quit.

8    And all up to them.

9    Q.  Let's talk about that $55,000.  You told us that for a

10   women in Thailand, a poor woman in Thailand, that was a lot

11   of money.

12          Let's talk about these women once they came to the

13   United States.

14          First of all, when they got here, could they just

15   change their mind?  Let's say on day two, I don't like this

16   anymore, I don't want to have sex anymore, could they change

17   their minds?

18   A.  No.  They couldn't change their mind.

19   Q.  Could they change their minds after a week, or a month

20   or two months?

21   A.  No.

22   Q.  When were they free?

23   A.  After they paid off their debt.

24   Q.  Once they're in the United States, these women, did they

25   have a way to pay the debt other than sex, $55,000?

1    A.  No.

2    Q.  You said that escaping the organization was bad for

3    business.

4            Were there things you did to make it less likely

5    that they would try and escape?

6    A.  Did you mean when the women escaped?

7    Q.  Well, let me -- let me narrow it a little bit.  Did you

8    take their passports?

9    A.  Yes, I did.

10   Q.  Tell the jury about that?

11   A.  So if I keep -- so if I keep their passport with me,

12   it would mean that they would go places more difficult,

13   leaving more difficult.

14   Q.  And did that make you different than other people in the

15   conspiracy?  Or would other people also hold passports?

16   A.  There were some people that did that, too.

17   Q.  Did you ever discount the $55,000 debt?

18   A.  So most of them, I just fix the price at $55,000.

19   But once they paid off $50,000, I -- I gave up the

20   remaining and I would give up the breast augmentation

21   expense.

22   Q.  So you're reducing it from $55,000 to $50,000.  Are you

23   doing that just because you're a kind person or is that part

24   of your business model?

25   A.  Both.

1    Q.  And Noon, why were you involved in all of this?  Why

2    were you doing this?  What was your motivation?

3    A.  At the time I didn't think of anything much except

4    that the money was easy to make.

5            And at the time my ex-boyfriend was addicted to

6    gambling and different factors.

7    Q.  Did all those factors basically come down to money at

8    the end of the day?

9    A.  Yes.

10   Q.  Did women escape or try to escape?

11   A.  Yes, there were.

12   Q.  What would you do at that point?

13   A.  So I would send a message to scare them.

14   Q.  To scare them to do what?

15   A.  I wanted them to come back and pay off the debt.

16   Q.  And did you threaten them?

17   A.  I would send a text message to make them worry.

18   Q.  When you say make them worry, do you mean scare them?

19   A.  Yes.

20   Q.  And was that to get them to come back to work?

21   A.  Yes.

22   Q.  And, again, does that make you different than anybody

23   else?  Or was that something other people would do, too,

24   when there were runaways?

25           MR. GUERRERO:  Objection, foundation.

```
 1              THE COURT:  I didn't hear.  Repeat your objection,
 2      Counsel?
 3              MR. GUERRERO:  Objection, foundation.  Source of
 4      knowledge.
 5              THE COURT:  Okay.  If you -- if you have
 6      first-hand knowledge and understand the question, you may
 7      answer it.  And if you don't, then you should say so.
 8      A.  I have heard that someone also was looking for
 9      runaway girls by sending texts as well.
10      BY MS. WILLIAMS:
11      Q.  Have you ever see anyone --
12              MR. RIVERS:  I would object to the answer as
13      vague.
14              THE COURT:  The jury will evaluate it based upon
15      the examination of the witness and her source of
16      information.
17              I'll let the answer stand and have the jury
18      evaluate it accordingly.  We've move on.  Note the
19      objection.
20      BY MS. WILLIAMS:
21      Q.  When women would run away, do you know of any efforts
22      that people in the conspiracy would take to blackball them
23      from working?
24      A.  Yes.
25      Q.  Tell the jury about that.
```

1              MR. GUERRERO:  Objection.  Foundation, again.

2              THE COURT:  Again, if she can name a person that

3     she heard it from and when, I'll allow it.

4              Otherwise, if it's just, I heard, and she doesn't

5     have more specifics, then I'll sustain the objection.

6              If you want to rephrase the question.

7              MS. WILLIAMS:  Let me rephrase it.

8     BY MS. WILLIAMS:

9     Q.  Would you try and blackball women who ran away from

10    working?

11    A.  Obviously, I don't remember if I have done that.  But

12    what I remember, I used to talk to someone who owned a

13    house in Chicago, telling that person that if this girl

14    is coming to your house, don't take her in because she

15    hadn't paid off my debt.

16    Q.  Okay.  And this organization that you were a member of,

17    did you ever hear about anybody branding a girl a police

18    spy?

19    A.  I have heard of that.

20    Q.  And what was the purpose of that?

21    A.  I don't think that they really -- I don't think that

22    that person was really a spy.  But that they were having

23    problems, maybe something like the girl didn't pay off

24    the debt.

25    Q.  Now, Noon, I don't know if we've got into this yet.  I

1    can't remember if I asked you, honestly.

2            But were you using drugs during a large period of

3    this time that we're going to talk about?

4    A.  Yes.

5    Q.  And would you give the women under your debt drugs to

6    use while they were working?

7    A.  Some of them.

8    Q.  Why would you do that?

9    A.  It would be, like they said, it was -- it made them

10   working more smoothly.

11   Q.  Was, in your observation, was this -- was this easy work

12   having sex with up to ten men a day?

13   A.  No, it's not.

14           MS. WILLIAMS:  Your Honor, I have a breaking

15   point.  I don't know if you want to take an afternoon break

16   or if we're a little early for that.

17           THE COURT:  Well, it's been -- yeah, we can take

18   our afternoon recess here, 15 minutes, folks.  It's -- it's

19   2:50.  We'll -- on my watch, we have different watches here

20   and clocks.  So we'll break until 3:05, rise for the jury,

21   please.

22           (Jurors excused at 2:49 p.m.)

23           (In open court at 3:07 p.m.)

24           THE COURT:  As soon as the jury's ready, you may

25   proceed, Counsel.

```
 1    BY MS. WILLIAMS:

 2    Q.  Okay, Noon.  I think we had just finished talking about

 3    how the organization worked broadly.

 4    A.  Yes.

 5    Q.  You had previously given us a list of some of the

 6    traffickers in Thailand.

 7              I'd like to ask you about ma-tac here in the

 8    United States.

 9              Did you know of other people like yourself who

10    were ma-tac here in the United States?

11    A.  There were other people.  Do you want me to list the

12    name, right?

13    Q.  I do, yes.

14    A.  As far as I know, the main person was Unrean.

15    Q.  Unrean, U-N-R-E-A-N.  Does she also going by Un?

16    A.  Yes.

17    Q.  U-n.  And then I think you said, Tan, T-a-n?

18    A.  Tan.

19    Q.  Where was Un out of?  What city?

20    A.  Seattle.

21    Q.  What about Tan?

22    A.  Phoenix, Arizona.

23    Q.  Who else?  Who else was ma-tac here in the United

24    States?

25    A.  Pim, Pan.
```

1    Q.  Pim, P-I-M.  And then a second person Pan, P-A-N, do I

2    have that right?

3    A.  Yes.

4    Q.  Where was Pim out of?

5    A.  Chicago.

6    Q.  What about Pam?

7    A.  Chicago, too.

8    Q.  Other ma-tacs?

9    A.  As far as I know, there's other many people.

10   Q.  Okay.  Did you know everyone in the organization?

11   A.  No, I did not.  No, I don't know everyone.  Sometimes

12   I would hear the names but don't know their face.

13   Q.  And to add to that list, we'll get to this in a moment.

14   But you did co-own a person named Joom?

15   A.  Yes.

16   Q.  Who did you share Joom with?

17   A.  P'Wan.

18   Q.  What you see P'Wan in the courtroom today?

19   A.  Yes.

20   Q.  Could you please identify her and say an item of

21   clothing that she's wearing?

22   A.  She's sitting there with the black shirt.

23           MS. WILLIAMS:  Let the record reflect an in-court

24   identification as Waralee Wanless as Wan.

25           THE COURT:  So reflected.

1     BY MS. WILLIAMS:

2     Q.  So you owned Joom with Wan.  Was Wan also ma-tac?

3     A.  Yes.

4     Q.  We'll get into this in a moment, but was Joom the only

5     person that Wan owned?

6     A.  She shared with me just one person.

7     Q.  I'm talking about people she owned not with you,

8     separately.

9     A.  Yes, there were.

10    Q.  There were others?

11    A.  Yes.

12    Q.  Okay.  So we talked about ma-tac in the United States.

13            What about house bosses in the United States?

14    Could you give the jury a list of house bosses that you can

15    think of?

16    A.  Did you mean all the house owners in the United

17    States?

18    Q.  Yep.

19    A.  So there were Tan.

20    Q.  And if you can remember where their houses were, if you

21    could say that when you say their name?

22    A.  Tan and her house was in Phoenix.

23    Q.  Tan, T-A-N?

24    A.  Nok.

25    Q.  Nok, N-O-O-K?

```
 1    A.  N-O-K.

 2    Q.  N-O-K.

 3    A.  There's another Nok in Chicago.

 4    Q.  N-O-C-H?

 5    A.  N-O-K.

 6    Q.  Another N-O-K.

 7    A.  Maya.

 8    Q.  Where was Maya out of?

 9    A.  California.

10    Q.  Anywhere else?

11    A.  Also in Chicago.

12    Q.  Did you know of any business partners that Maya had?

13    A.  I have heard the name.

14    Q.  And what is that?

15            MR. SICOLI:  Objection.  Lack of foundation.

16            THE COURT:  I'll let her give the name.  And then

17    request the source of information be explained.  You may

18    give the name.  Note the objection.

19    BY MS. WILLIAMS:

20    Q.  So tell us who the name is and where you heard it from?

21    A.  The name was Bill.  And I got it from the girls who

22    traveling around long time ago.

23    Q.  The working women?

24    A.  Yes.

25    Q.  Just to be clear, did you personally have business
```

```
 1    dealings with Bill that you were aware of?

 2    A.  I never knew -- I never known him.  I just have heard

 3    of his name.

 4    Q.  Okay.  Other house bosses in the United States.  Keep

 5    going.

 6    A.  O, Du, May.

 7    Q.  Okay.  So three different people?  O?

 8    A.  Du.

 9    Q.  Du?

10    A.  May.

11    Q.  May.  Where is O out of?

12    A.  All these three names were in Chicago.

13    Q.  Okay.  And Du, D-U?

14    A.  Yes.

15    Q.  Anyone else out of Chicago?

16    A.  Noiy.

17    Q.  And you just looked over, do you see the Noiy who was a

18    house boss in Chicago here in the courtroom today?

19    A.  Yes.

20    Q.  Could you please point to her and identify an item of

21    clothing that she's wearing?

22    A.  She's wearing a red shirt.

23              MS. WILLIAMS:  And let the record reflect that the

24    Defendant(sic) has identified Ms. Ruttanamongkongul as Noiy.

25              THE COURT:  So reflected.
```

```
1     BY MS. WILLIAMS:

2     Q.  You earlier mentioned Pim and Pan as being ma-tac in

3     Chicago.  Did they also have houses?

4     A.  Yes.

5     Q.  Okay.  And did you know every single house boss in the

6     United States?

7     A.  I don't know all of them.  Sometimes I only heard of

8     their names.

9     Q.  Okay.  Okay.  Noiy -- okay, Noiy -- okay, Noon.

10         Let me take you back.  We had started this

11    discussion talking about meeting a woman named O in 2011 who

12    introduced you to this organization.

13         Is this the same O that you talked about as being

14    a house boss in Chicago?

15    A.  Yes.

16    Q.  Tell us about meeting O and how you got involved?

17    A.  So I got to know P'O and -- we met in a Thai

18    restaurant.  We started to hang out.  We went to play

19    cards together.  We went to casino.

20         And then she went back to -- I started to pick up

21    phone for her.  And I would make $10 for per one call.

22    Q.  When you said you started to pick up phones for her, are

23    you talking about picking up phones like sex buyers?

24    A.  Yes.

25    Q.  Tell the jury a little bit about Noon's apartments.
```

```
 1    Where were they?  How often would the girls change?  What
 2    your role was, all of that?
 3              THE INTERPRETER:  Could you repeat that question?
 4              MS. WILLIAMS:  Yeah, that's a long question.
 5    MS. WILLIAMS:
 6    Q.  Were where O's apartments?
 7    A.  Is in Chicago by O'Hare.
 8    Q.  And when you say you picked up the phone, just describe
 9    what that was -- what you would do day-to-day for the jury?
10    A.  So I would pick up the phone and scheduling for the
11    customer.
12    Q.  How much would you make to schedule one customer?
13    A.  At the time she gave me $10 per call.
14    Q.  Did you see and meet some of the women that were working
15    in the houses?
16    A.  Yes, I did.
17    Q.  And were many of these woman working under debt as you
18    described earlier?
19    A.  Some of them were under debt, some of them didn't.
20    Q.  The ones that were under debt, how did O get these
21    girls?  Where did she get them from?
22    A.  P'O wasn't a ma-tac, but I meant that she take in
23    women from Unrean.
24    Q.  Okay.  So the ma-tac was Unrean or Un who you mentioned
25    earlier?
```

1  A.  Yes.

2  Q.  Do you remember some of the names of some of the women

3  who worked in O's house while you were picking up phones?

4  A.  There's Sao, Rak, Goi, Tun, Ying, Bak.

5  Q.  Many women?

6  A.  Yes.

7  Q.  How often would the women change out of the apartment?

8  A.  At that time they were switching every two weeks.

9  Q.  Now, how did you first meet Noiy, the Noiy that's in the

10  courtroom?

11  A.  We had been friends before I came in this business.

12  Q.  And did Noiy also get involved in the business?

13  A.  Yes.

14  Q.  Tell us about Noiy's involvement in the business.

15  A.  At the time I knew that P'O was a partner with

16  P'Noiy.

17  Q.  You said that at one point O, P'O, left for Thailand.

18  Can you tell the jury about that?

19  A.  So at the time P'O went back to Thailand because her

20  mother had cancer, and also her girlfriend also went

21  back.  So that she had P'Noiy run the business after she

22  left.

23  Q.  And did you continue to work with P'Noiy or did you

24  start your own house?  How did that work?

25  A.  No.  I -- no, I opened up my own house.  I had never

1    been a business partner with P'Noiy.

2    Q.  What was the relationship -- so you said P'Noiy was a

3    house boss and you were a house boss in Chicago, what was

4    your relationship with each other?

5    A.  After I came in this business fully, it was like we

6    hardly talked.  We didn't talk at all.

7    Q.  Were there sometimes when you would do business with one

8    another, share girls, that sort of thing?

9    A.  So it would be like after the girls came to Chicago,

10   they would have to go to my house or -- and then P'Noiy's

11   house, because they would travel around to make their

12   tickets money worth the trip.

13   Q.  So were there times when women you owned -- you had them

14   working in P'Noiy's house?

15   A.  There were ones that P'Karn worked there at P'Noiy's

16   house.

17   Q.  Karn, K-A-R-N, is that right?

18   A.  Yes.

19   Q.  And we'll talk about Karn in a little while.

20          Did you ever know Noiy, again, Noiy in the

21   courtroom, to be ma-tac?

22   A.  No.  I never heard that she was ma-tac.

23   Q.  You explained that you were never a working girl.  Was

24   Noiy ever a working girl?

25   A.  No, she never did.

1    Q.  Do you know how she came to the United States?

2    A.  If I remember correctly, she came as an au pare to

3    baby -- to nanny kid in the first place.

4    Q.  Now you mentioned some other Chicago house bosses, Pan

5    and Pim and some others.  What was the relationship between

6    the other Chicago house bosses, Pim, Pan, you and Noiy, that

7    you know of?

8    A.  Most of the time I didn't talk to anyone.  But there

9    was a time when P'Pim gave the girl to work at my house.

10   Q.  P'Pim sent a girl to work at your house.  Was that a

11   girl that P'Pim owned?

12   A.  Yes.

13   Q.  Do you remember the name of that girl?

14   A.  Piano, Aud, Nong, three of them that I remembered.

15   Q.  Piano, P-I-A-N-O.

16   A.  Yes.

17   Q.  How would you spell the second, do you know?

18   A.  Aud, A-U-D.

19   Q.  And Nong, N-O-N-G?

20   A.  Yes.

21   Q.  And because we're talking about Piano, this is a good

22   time.

23          MS. WILLIAMS:  Approaching with Government's 585

24   and 584.

25          May I approach?

1          THE COURT:   You may.

2   BY MS. WILLIAMS:

3   Q.  Showing you e-mails, two e-mails with photos attached.

4   Do you recognize who is in these photos?

5   A.  This picture is Piano.

6          MS. WILLIAMS:  Government moves Exhibits 585 and

7   584 into evidence.

8          MR. RIVERS:  No objection.

9          MR. GUERRERO:  No objection.

10         THE COURT:  Those are received.

11  BY MS. WILLIAMS:

12  Q.  Let's take a look first at Government's 585.

13         It's an e-mail that starts out off the Toilet

14  Studio, May 13th, 2015, with the subject, Piano, the Toilet

15  Studio.  Are you familiar with the Toilet Studio?

16  A.  I know this e-mail Toilet Studio there, a photo shop

17  in Thailand.

18  Q.  Did you contact the Toilet Studio at one point

19  concerning your women?

20  A.  I have sent an inquiry once asking about information

21  and the detail of the costs, how much the expenses, just

22  for my future reference.

23  Q.  And we'll see that in just a minute.

24         I'm going to go to the top of this e-mail, where

25  it says, "Forward Piano."  And it's from ooddy1963@gmail.com

1    to pimpimlun@gmail.com.  Do you know what ooddy1963 is?

2    A.  So I really don't know this to e-mail address, who it

3    belong to.  But as far as I know, Pim used to tell me

4    that Piano was her girl and that was sent by Odd.  Odd

5    was the one who handled the Visa for this girl.

6    Q.  Do you know who Pim would get most of her girls that she

7    bought, who she would get them from?

8    A.  As far as I know, the girls were from Hia Odd and

9    J-Joo.

10   Q.  And you just said Hia Odd.  I don't know if we've had

11   testimony about that, that prefix yet, H-I-A.  Can you

12   explain to the jury what that means?

13   A.  This is a Chinese word that referring to a brother, a

14   big brother, something like that.  And also J-Joo, J is

15   another one, means sister.

16   Q.  Do you know if Odd only sent girls to the United States

17   or if this were other countries he would send women to?

18   A.  As far as I know, I think he sent to other countries,

19   too.

20   Q.  Do you know which other countries?

21   A.  If I remember it correctly, P'Noiy told me that Odd

22   had sent her to Korea before she came to came to America.

23   Q.  And who is that a picture of?

24   A.  It's Piano.

25   Q.  Let's pull up the next one, Government's 584, which is

1    similar.  I don't think we need to go through it.

2              We see that same -- that same May -- well, we see

3    a May 14, 2015, from Odd to pimpim.  And then I want to

4    concentrate what's on the top here.

5              It says, "Forward Piano pimpimlun@gmail.com to Ann

6    which says cutiekate94@hotmail.com."

7              Do you know Noiy -- the Noiy who's in the

8    courtroom to go by any other nicknames?

9    A.  I have heard girls call her Ann.

10   Q.  And do you know of any relationship between Noiy and

11   Pim?

12   A.  They were friends.

13   Q.  Did Noiy ever do work with Pim, is what I'm asking?

14   A.  As far as I know, she picked up the phone for Pim for

15   some period while Pim went to beauty school.

16   Q.  And when you say picked up the phone, do you mean

17   scheduling sex buyers?

18   A.  Yes.

19   Q.  And then is that the same photo that you identified as

20   Piano?

21   A.  Yes.

22   Q.  Now would you ever pay Noiy to do anything for you?

23   A.  So there was one time that Piano had picked up the

24   phone and send customer to my house in Skokie because her

25   house was busy or something.

```
1    Q.  How much did you pay Noiy to do that?

2    A.  At the time -- at the time I gave her $25 per one

3    call.

4    Q.  And we had talked about an e-mail you sent to the Toilet

5    Studio.

6              MS. WILLIAMS:  As long as we're talking about it,

7    permission to approach?

8              THE COURT:   You may.

9    BY MS. WILLIAMS:

10   Q.  I'm showing you Government's 433.  Is that the e-mail

11   you just referenced regarding the Toilet Studio?

12   A.  Yes.

13             MS. WILLIAMS:  Government moves 433 into evidence.

14             MR. RIVERS:  No objection.

15             MR. GUERRERO:  No objection.

16             THE COURT:  Received.

17   BY MS. WILLIAMS:

18   Q.  Okay.  We'll start at the top, MK missdrunker@gmail.com,

19   who is that?

20   A.  It's my e-mail.

21   Q.  Okay.  And you sent an e-mail -- this is on January

22   the 9th of 2015, asking, "Hello.  So I want to book a photo

23   shoot.  Can I have Toilet Shop's phone number.  Thank you."

24   A.  Yes.

25   Q.  Toilet Studio sends you a phone number and you write
```

1   back, P' can I ask you you pricing?  I'm going to book it

2   for a friend.  How do you charge for the photographing?  How

3   much for a set?  How many pictures in a set?"

4   A.  Yes.

5   Q.  And just explain to the jury, what -- what are you doing

6   here?  Why are you conducting Toilet Studio?

7   A.  Actually, I just wanted to find out how much the

8   expense for making one girl.  I just wanted to know how

9   much it costs for photographing.

10  Q.  So when you say making one girl, are you talking about

11  how much it's costing the traffickers in Thailand to

12  actually get the girl to you?

13  A.  Yes.

14  Q.  Okay.  So you're -- you're trying to do the math,

15  basically?

16  A.  Yes.

17  Q.  Because how much are you paying for one girl?

18  A.  $22,000, excluded breast augmentation.

19  Q.  And for that $22,000, what are the expenses that the

20  trafficker is incurring?  What are the things they're paying

21  for?

22  A.  So they would pay for the -- the flight.  Pay for the

23  photographers.  Pay for the Visa application.  And also

24  give some pocket money for the girl.

25  Q.  All right.  And what you learn?  Toilet Studio writes

1    back and says, "Set, the price is at 1500.  Can wear two

2    different outfits.  There are eight pictures.  And also

3    provide you with CD and mail.  Please have makeup and hair

4    readily done."  Can you explain that to the jury?

5    A.  So this would be the pictures for the girls to take

6    to use here for working.

7              Mostly they would take picture for four

8    outfits.  So the total would be around 3,000 that they

9    have to pay.

10   Q.  All right.  So 1500.  Is that dollars or baht?

11   A.  It's Thai baht.

12   Q.  Okay.  And if you want four outfits, you're going to

13   have to double that, so it's going to be 3,000 baht?

14   A.  Yes.

15   Q.  And do you know how much 3,000 baht -- can you convert

16   that to dollars for us?

17   A.  About $100.

18   Q.  Okay.  So the photos cost about 100 bucks.  What about

19   the flight to the United States?  Do you know about how much

20   that would cost?

21   A.  So you'd have to buy roundtrip ticket, otherwise the

22   immigration wouldn't let you in.

23              As far as I know, the cheapest ticket would be

24   around 40,000, and to 60,000 to 70,000, depending on the

25   high season or not.

```
1    Q.  So let's take the worst-case scenario with the high

2    season.  60,000 or 70,000 baht, how much is that is in U.S.

3    dollars?

4    A.  Can you think for me?

5    Q.  Can I get out my calculator?  We use an exchange rate of

6    what, 30?  Does 30 sound about right, Noon?

7              So at it's very highest I've got about $2,300 for

8    roundtrip?

9    A.  23,000 US dollars?

10   Q.  $2,300.  Does that sound about right?

11   A.  Yes.  Yes.

12   Q.  And we're going to see a little bit later exactly how

13   much the Visa costs.

14             But as you're doing the math, is it clear to you

15   that the traffickers are making a lot of money?

16   A.  Yes.

17   Q.  Okay.  Let's talk a little bit about your houses in

18   Chicago.  Where were your houses?

19   A.  So there were Pavilion, Optima and Gunnison.

20   Q.  These were the names of the buildings?

21   A.  These were the names of the apartments.  The last one

22   is Mont Clare.

23   Q.  And were these small apartment buildings or big

24   apartment buildings?

25   A.  Some of them were big.
```

1    Q.  Why did you choose big ones?

2    A.  So that it would be crowded.

3    Q.  What do you mean?  Explain that.  Why is good to be

4    crowded?

5    A.  Because when -- when customer shows up, there would

6    be people walking all over place, so nobody would notice.

7    Q.  I'm going to show you what's already been admitted into

8    evidence as Government's 1034.  What is that a picture of?

9    A.  This is my apartment that I open up a working house.

10   Q.  This is -- it says Pavilion.  Is this the Pavilion you

11   were just talking about?

12   A.  Yes.

13   Q.  Were you the only Chicago house boss that had a house of

14   prostitution in the Pavilion?

15   A.  No.  There were others.

16   Q.  Did you have a business partner in your house at the

17   Pavilion?

18   A.  The working house in Pavilion was only mine.  No

19   partners.

20   Q.  What about the one -- you said, I can't remember.  Did

21   you say Gunnison.  What did you call it?

22   A.  Mont Clare.

23   Q.  Did you have a business partner at the Mont Clare house?

24   A.  I used to be a partner with P'Wan.

25   Q.  The P'Wan sitting here in court today was your business

1     partner?

2     A.   Yes.

3     Q.   The lease at Mont Clare, who's name was that lease in?

4     A.   P'Wan's ex-husband.

5              MS. WILLIAMS:   Approaching with Government's 845,

6     and 428.  May I approach?

7              THE COURT:   You may.

8     BY MS. WILLIAMS:

9     Q.   I'm showing you Government's 845.  What is that?

10    A.   Yes.  This -- this is the lease that P'Wan's

11    ex-husband signed.

12    Q.   And 428 is -- whose name is in that e-mail?

13    A.   This is the name and last name of P'Wan's ex-husband.

14             MS. WILLIAMS:   Government moves 845 and 428 into

15    evidence?

16             MR. RIVERS:   No objection.

17             THE COURT:   Those are received.

18    BY MS. WILLIAMS:

19    Q.   Now, how did you primarily indicate with Wan?  Was it

20    primarily by e-mail?

21    A.   Mostly it would be text messaging or calls, not so

22    much for e-mail.

23    Q.   Okay.  But we will look at Government's 428.  It's a

24    blank e-mail sent May 15th, 2013, from missdrunker, who

25    you've already identified as you, to P'Wan.  And it says

1    duartejosh@yahoo.com.  Do you recognize that name, Duarte

2    Josh?

3    A.  That's P'Wan's Josh.

4    Q.  Her ex-husband, the one you were just talking about?

5    A.  Yes.

6    Q.  Okay.  Showing you Government's 845.  You said this was

7    a lease.

8              It's in the same of Josh Duarte.  Is that the same

9    Josh Duarte who you identified as P'Wan's ex-husband?

10   A.  Yes.

11   Q.  And 7171 West Gunnison Street, Apartment 0506, Harwood

12   Heights, Illinois 60706.

13             Was that the house of prostitution that you were

14   just talking about that you co-owned with P'Wan?

15   A.  Yes.

16   Q.  And to be clear, was Chicago the only place where P'Wan

17   had houses of prostitution?

18   A.  Yes.  That we were partners.

19   Q.  What about in where you were not partners?  Did she have

20   other houses?

21   A.  For me or for her?

22   Q.  For her.

23   A.  As far as I know, there was one in Dallas.

24   Q.  Anywhere else?

25   A.  Maybe D.C., too.

```
1     Q.  Why do you say maybe D.C.?

2     A.  Because this I'm not sure.  I only heard from working

3     girls.

4     Q.  Are you sure about the one in Dallas?

5     A.  Yes.  Because I've been there.

6     Q.  Tell us -- let's take a step back for a moment.  Tell us

7     how you met P'Wan?

8     A.  Because P'Wan used to work at my house in Chicago and

9     she was referred to my house by P'Sao.

10    Q.  So she was a working woman?

11    A.  Yes.

12    Q.  That you know about, did she have debt?

13           THE INTERPRETER:  Can you repeat that?

14    BY MS. WILLIAMS:

15    Q.  Did you know about, did she come here under debt?

16    A.  This I had never asked her.

17    Q.  You just talked about a woman named P'Sao.

18           MS. WILLIAMS:  Permission to approach, Your Honor?

19           THE COURT:  You may.

20    BY MS. WILLIAMS:

21    Q.  Approaching with Government Exhibit 425.

22           It's an e-mail to you with escort-style photos

23    attached.  Do you know who's in those escort-style photos?

24    A.  It's P'Sao in the picture.

25           MS. WILLIAMS:  Move -- Government moves 425 into
```

```
 1    evidence.
 2              MR. RIVERS:  No objection.
 3              THE COURT:  That's received.
 4    BY MS. WILLIAMS:
 5    Q.  Okay.  So this is Government's 425.
 6              So the original e-mail is older.  It's a
 7    September 26, 2009, e-mail from damir@damirk to
 8    maya_1966@yahoo.com.  Do you know who Damir is?
 9    A.  I don't know him.
10    Q.  Do you know who maya_1966@yahoo.com is?
11    A.  It's P'Maya.
12    Q.  Is that the same P'Maya who you said was a house boss in
13    California and Chicago and you heard was partners with Bill?
14    A.  Yes.  Yes.
15    Q.  And the forward comes much later in 2011, when I think
16    you said you got involved in the organization from Maya to
17    you, is that right?
18    A.  Yes.
19    Q.  And it says, "Subject Sao."  And who is in these
20    pictures?
21    A.  It was P'Sao.
22    Q.  Is that the same P'Sao who recommended P'Wan to you?
23    A.  Yes.  It's the same Sao.
24    Q.  So you said P'Maya was working in your house.  Did you
25    become friends?  Or P'Wan -- I said P'Maya.  P'Wan was
```

1   working in your house.  Did you become friends?

2   A.  Yes.

3   Q.  And tell us how it happened that you went into business

4   together?

5   A.  So after P'Wan went back, we called and we talked,

6   and we became friends.  And actually there were also

7   another person, P'Luk, who would come in and enjoy being

8   partners together.

9         And we would talk about open a house and also buy

10  girls together.

11  Q.  Okay.  P'Luk, L-U-K?  Do I have that right?

12  A.  Yes.

13  Q.  And did you and Wan, in fact, open a house together?

14  Pulling up Government's 845, again.

15  A.  Yes.

16  Q.  And did you and P'Wan, in fact, buy a girl together?

17  A.  Yes.

18  Q.  And let's finish off the lease.  I think we see it

19  starts December 7th, of 2011.  Oops.

20        And our last entries are in May of 2012, which is

21  a security deposit refund.

22        Tell us what happened with this house.

23  A.  So actually this house was closed before the lease

24  was expired because the -- because the apartment asked us

25  to move out.

```
 1              The reason was there was someone who went -- so
 2    it was like the girls would travel -- the traveling girls
 3    asked to use this address to open up a bank account.  The
 4    banks saw that there was many people living at this
 5    address, so we were asked to move out from this
 6    apartment.
 7    Q.  Okay.  And there's a few things going on there, so let's
 8    break it down.
 9              You said the traveling girls asked to use this as
10    an address to open up bank accounts.
11              When you say traveling girls, did they have a
12    home?  Did they have a real address to use to open up bank
13    accounts?
14    A.  Most of them didn't have a house.
15    Q.  Was this an operational house?  Did you run girls out of
16    here?
17    A.  Yes.
18    Q.  And were those girls including girls that were under
19    debt?
20    A.  Yes.
21    Q.  Under debt to who?
22    A.  Also the debt to me.
23    Q.  And once this house closed -- and I'm going to see if I
24    can get greedy here.  This is not -- I can see it on my
25    paper, it's hard to see here.  Do you see the name -- oh,
```

```
 1    it's terrible there.  Can you see it in front of you the

 2    name that's listed as the emergency contact there?

 3    A.  I couldn't read it.

 4    Q.  Let's try one more time.  Can you read it?

 5    A.  Waralee?

 6    Q.  Do you know whose name is Waralee is?

 7    A.  It's P'Wan.

 8    Q.  Have you ever known P'Wan to go by Waralee Duarte?

 9    A.  Yes.  That was her ex-husband's last name.

10    Q.  And why did her ex-husband, Josh Duarte, why did he sign

11    the lease?  Why didn't you or P'Wan sign the lease?

12    A.  At the time for me I couldn't sign any contract

13    because I don't have Social Security Number.

14    Q.  Okay.  And I don't think we need to go down this road

15    too far.

16            But at various times were you illegally present in

17    the country?

18    A.  Did you mean my Visa expired?

19    Q.  Yeah.

20    A.  Yes.

21    Q.  And you married?

22    A.  I just got married.

23    Q.  You married to a U.S. citizen?

24    A.  Yes.

25    Q.  You have kids together?
```

1    A.  Yes.

2    Q.  How old?

3    A.  A little over two years.

4    Q.  As part of your plea agreement, does it say that you may

5    be deported as a part of all this?

6    A.  Yes.

7    Q.  After this house closed down, did you partner with P'Wan

8    with any other houses of prostitution?

9    A.  Yes.

10    Q.  Tell the jury about that?

11    A.  So we would find another person to sign a house in

12    Skokie, who's a photographer.  But I'm not sure if he

13    also opened at Gunnison for us, but for sure it's at

14    Skokie.

15    Q.  How many houses of prostitution did you and P'Wan

16    partner on together?

17    A.  Two places.  At Gunnison and Optima in Skokie.

18    Q.  And how -- how did that partnership work?  Where did

19    P'Wan physically live?  What City?

20    A.  She lived in Texas.  Dallas, Texas.

21    Q.  So how would the profit sharing work?

22    A.  This is -- this is the house that we have three

23    partnerships, included P'Luk also.

24    Q.  And how would the money be split?

25    A.  Divided by three.

```
 1    Q.  You were sending money -- let's talk about the money for
 2    just a moment.
 3              First of all, were you making a lot of money?
 4    A.  Well, while I was having the girls paying me the
 5    debt, I would make I would like $30,000 a month.
 6    Q.  $30,000 U.S. dollars a month?
 7    A.  Yes.
 8    Q.  And this was a cash business?
 9    A.  Yes.
10    Q.  And you needed to pay your partners.  And you already
11    told us you were buying girls in Thailand.  How would you
12    move money?
13    A.  I would send through Bhan Kanom Thai in LA and also
14    through MoneyGram
15    Q.  And Bhan Kanom Thai in LA, I can't recall if we've
16    talked about that.  What kind of place is that?
17    A.  It was a bakery store that also handling sending
18    money as well.  And most of Thai people know this place.
19    And they know that this was a place where you could send
20    money.
21    Q.  Would you also use money movers in Chicago?
22    A.  Yes.  There was someone who used to sending money in
23    Chicago.
24    Q.  And I want to ask you about the ways the working women
25    would send the money.  Did you know a person named Mas,
```

1     M-A-S?

2     A.  Yes.

3     Q.  Who's Mas?  Who is she?

4     A.  She's an ex-girlfriend of P'Noiy.

5     Q.  And what kind of business did Mas have?

6     A.  It was a video store where the store would be selling

7     Thai dessert, Thai CDs, Thai movies and also sending

8     monies.

9     Q.  Was that a place that the working women would use to

10    send money to Thailand?

11    A.  Yes, some of them.

12    Q.  And circling back to Noiy for just a moment.  We talked

13    about Noiy's house boss activity in Chicago.  Did Noiy have

14    houses anywhere else in the United States?

15    A.  As far as I have heard, she had a partner in DC.

16    Q.  Who did you hear this from?

17    A.  From from her partner named Li.

18    Q.  Tell us about Li?

19    A.  Li was a working girl.  She used to be P'Un's girl

20    before.

21    Q.  P'Un, you mean she owed debt to P'Un, who was a ma-tac

22    out of Seattle?

23    A.  Yes.

24    Q.  And what about Li tell you about her business with Noiy

25    in D.C.?

1    A.  Well, she didn't say much.  She just said that they

2    used to own a house together and that they no longer in

3    business together.

4    Q.  Did she tell you why they're no longer in business

5    together?

6    A.  There was probably some problem, but I didn't want to

7    say, because I only heard about it.  So I wasn't sure of

8    it.  It seemed like someone cheating money out of

9    someone.

10   Q.  Okay.  But Li told you that she and Noiy had a house

11   together at some point, didn't she?

12   A.  Yes.

13   Q.  You said that you and Wan, in addition to owning houses

14   together, owned a girl together, is that right?

15   A.  Yes.

16   Q.  I want to talk about that woman.  What was her name,

17   again?

18   A.  You mean Joom?

19   Q.  Yes, I do.  How do you spell that?

20   A.  J-O-O-M.

21          MS. WILLIAMS:  Approaching with Government's

22   Exhibits 435 and 436.  May I approach, Your Honor?

23          THE COURT:  You may.  You may.

24   BY MS. WILLIAMS:

25   Q.  Showing you two e-mails with attached escort-style

```
 1    photos.  Do you recognize the woman in those photos?

 2    A.  It's Joom.

 3              MS. WILLIAMS:  Government moves Exhibits 435 and

 4    436 into evidence.

 5              MR. RIVERS:  Counsel, can I take a look at them?

 6              MS. WILLIAMS:  Sure.  I've gone over them a few

 7    times.

 8              MR. RIVERS:  No objection.

 9              THE COURT:  Received.

10    BY MS. WILLIAMS:

11    Q.  Okay.  Do you know about what year you brought Joom

12    over?

13    A.  2012.

14    Q.  Okay.  So these e-mails, we'll start with 435, are from

15    later.

16              There's an e-mail that says, "My picture."  And

17    it's from winnie.xoxo25@gmail.com., from

18    asianclubnow@gmail.com, May the 24th of 2014.

19              Do you know who winniexoxo25 is?

20    A.  If I have to guess it would belong to Joom, because I

21    know that Joom used this name for working.  But I don't

22    know who Asian Club Now is.

23    Q.  And I don't want you to guess, but then let's -- when

24    you say Joom used this name for working, do you mean this

25    name, Winnie, W-I-N-N-I-E?
```

```
1    A.  Yes, Winnie.

2    Q.  And we're going to hear the story of Joom in a moment.

3              But after Joom was done with her debt, did she

4    continue to be a working girl?

5    A.  Yes.

6    Q.  After women were done with their debt, could they choose

7    whether or not they wanted to work?

8    A.  Yes.  They could choose.

9    Q.  Did many of them keep working?

10   A.  Yes.

11   Q.  Did some of them stop?

12   A.  Maybe.

13   Q.  The women who were here, did you know them to have a lot

14   of skills other than sex work?

15   A.  Some of them that I have heard, they went to work in

16   a Thai restaurant.

17   Q.  Okay.  The women who came here under debt, did their

18   Visas expire?

19   A.  Most of them they were expired.

20   Q.  So they would have been illegally present at that point?

21   A.  Yes.

22   Q.  You said most of these women were poor, uneducated women

23   from Thailand, is that right?

24   A.  Yes.

25   Q.  Did you know a lot of them to be supporting families
```

1    back in Thailand?

2    A.  Yes.

3    Q.  Who's that?

4    A.  It's Joom.

5    Q.  I'll look at the second e-mail, again.  A much later

6    e-mail, again, Winnie picture from Mary Jane, which is

7    winniexoxo25 to Asian Club Now.

8            And this one is a month later, June 30th of 2014.

9    Did I read that right?

10   A.  Yes.

11   Q.  And are these the same photos that you just testified

12   was Joom?

13   A.  Yes.

14   Q.  Tell us about buying Joom with Wan?

15   A.  So she came from Mammy and we would pay $22,000.

16   That's not included breast -- boob job.

17   Q.  Did Wan -- or did Joom get breast augmentation, a boob

18   job?

19           THE INTERPRETER:  I'm sorry, can you repeat?

20   BY MS. WILLIAMS:

21   Q.  Did Joom get a boob job?

22   A.  Yes.

23   Q.  How much did that cost?

24   A.  It was about 30,000 to 40,000.  I don't remember

25   exactly how much it was.

1    Q.  Baht?

2    A.  Yes, baht.

3    Q.  So that's about 1,000 to 1200 USD?

4    A.  Yes.

5    Q.  And does Mammy pay for that, or is that part of your

6    expense?

7    A.  For the breast augmentation, I was the one that had

8    to pay.

9    Q.  And it might be obvious, but why are the women getting

10   breast augmentation?  And why are you paying for it?

11   A.  So it would be normal.  Like these women would want

12   to call attention to their customer.  It's understandable

13   that their shape, that the way they looks, should look

14   okay.

15   Q.  So you're trying to make them more appealing to the

16   customer, is that fair to say?

17   A.  Yes.

18   Q.  How important was it in this business to keep the

19   customer happy?

20   A.  So if we can keep customer happy, then the customer

21   would come back and then the customer would become a

22   regular customer of that girl.

23   Q.  And is that good for business?

24   A.  Yes.

25   Q.  Is there -- are there reviews that happen by customers,

1   reviews of the different women?

2   A.  Yes.

3   Q.  Tell us about that and how important they were?

4   A.  Well, review is very important because if the review

5   is good for some customer who had never met the girls

6   before, when they read the review it made them wanting to

7   come see the girl.

8   Q.  You said that you and Wan purchased Joom from Mammy for

9   $22,000.  Do I have that right?

10  A.  Yes.  22,000 US dollars, yes.

11  Q.  Plus the price of the boob job?

12  A.  Yes.

13  Q.  Mammy you had talked about was one of the very first

14  traffickers you had worked with in Thailand.  What did Mammy

15  tell the girls about how quickly they could pay off their

16  debt?

17  A.  So she would say, Well, when they come, in two, three

18  months, they would pay off their debt.

19  Q.  Okay.  And I think you told the jury that wasn't true.

20  Do you remember how long it took Joom to pay off her debt?

21  A.  About eight months.

22  Q.  Where did Joom come first?  What city?

23  A.  When Joom arrive, I think she came first to

24  California, before she would fly to Chicago.  But her

25  immigration checkpoint was in California.

1    Q.  She started work in Chicago, though?

2    A.  Yes.

3    Q.  At one of your houses?

4    A.  Yes.

5    Q.  And we've touched on this a little bit, but just to be

6    clear, this work that the women under debt did, it was

7    this -- to your observation, was this enjoyable, easy work?

8    A.  No, it's not.

9    Q.  Did Joom have a health issue on her first day of work?

10   A.  Yes, there was maybe.

11   Q.  Tell the jury what happened?

12   A.  So it was like she was hurt because she had never

13   worked with white men before.  So her vagina ripped

14   apart.

15   Q.  Did she tell you about this?

16   A.  Yes.

17   Q.  Did she ask for some sort of medication?

18   A.  Yes.

19   Q.  Did it take you a few days to get it to her?

20   A.  Yes.

21   Q.  Did she have to keep working?

22   A.  Yes.

23   Q.  Did Joom have a choice about having sex once she was

24   here?

25   A.  It was the customer that I have -- I had sent her,

```
 1    all of them.

 2    Q.  And did Joom have to keep having sex?

 3    A.  Yes.

 4    Q.  Even though her vagina had been ripped?

 5    A.  Yes.

 6    Q.  Who owned Joom's body?

 7    A.  When Joom was not yet paid off her debt, it was me.

 8    Q.  And who else?

 9    A.  Wan.

10    Q.  Did you take Joom's passport?

11    A.  Yes.

12    Q.  Did you take all their passports?

13    A.  Yes.

14    Q.  Why?

15              MR. GUERRERO:  Objection.  Asked and answered.

16              THE COURT:  Well, in this context, it has been

17    asked before, but I'll -- I'll let you answer the question.

18    A.  Why would I held their passport?

19    BY MS. WILLIAMS:

20    Q.  Why would you hold Joom's passport?

21              THE COURT:  Note the objection.  You may answer.

22    A.  Because I didn't want her to run away.

23    BY MS. WILLIAMS:

24    Q.  Did Joom try and run away?

25    A.  Yes.
```

1    Q.  Tell the jury the story.

2    A.  So I drove the car to Dallas to open up a house with

3    Joom and with two other girls because I wanted to open up

4    a house, but it didn't work out.  Maybe because I didn't

5    know the business well.  The business was not turn out as

6    well as I thought.

7               So I closed up -- so I closed down the house and I

8    had to send the girls back to Chicago.  I then dropped the

9    girls at the airport, but none of them went back to Chicago.

10   Q.  So you drove a car from Chicago to Dallas to open up a

11   house in Dallas.  Did you do that?  Did you open up a house

12   in Dallas?

13   A.  I did.

14   Q.  How long was it open?

15   A.  A couple months.

16   Q.  Who was your partner in the Dallas house?

17   A.  My ex-boyfriend.

18   Q.  And this -- is it fair to say this later caused a rift

19   between you and Wan, a problem?

20   A.  Yes, something like that.

21   Q.  And why was that?

22   A.  It was my fault that P'Wan learned about my opening a

23   house in Dallas.  And she would ask why -- why I didn't

24   tell her honestly that I would open up a house.  It was

25   my own fault for not telling her first.

1    Q.  Because she had a house in Dallas, so they would be in

2    competition?

3    A.  Something like that.

4    Q.  You said you drove the car to Dallas with three women in

5    the car.  Who was in the car?

6    A.  There was Joom, Tek and Ann.

7    Q.  Tek and Ann, were these other women that you owned?

8    A.  Tek was another girl that I partner with P'Luk.  And

9    Ann, I made percent commission from Mammy.

10   Q.  And this might be a good time to talk about it, I think

11   we made reference in the beginning, owning a whole person, a

12   half a person.  And you just introduced this idea of making

13   a commission.  Could you explain that to the jury?

14   A.  So it would be like I would partner with someone for

15   some girl, like I would be partner with P'Wan for Joom.

16   And for Tek, I would be partner with P'Luk.  And some

17   other people I would be owning them all by myself.  And

18   for some girls, I also made commission from Mammy.

19   Q.  Explain the commission to the jury.  How did that work?

20   A.  So Mammy would send the girls to work at my house.

21   Then I would have 30 percent commission per one girl.

22   There were only two girls came from Mammy that I made

23   commission out of.

24   Q.  So you -- when you say 30 percent commission, 30 percent

25   out of $55,000?

```
 1    A.  Yes.

 2    Q.  And what are you doing for Mammy to earn that

 3    30 percent?

 4    A.  So it would be like, I would take care of the girls

 5    and send the money back to Mammy, collecting money and

 6    send it back to Mammy.

 7    Q.  So when you say take care of, you mean make sure they

 8    pay their debt?

 9    A.  Yes.

10    Q.  Why did you take Joom, and Tek and Ann in the car from

11    Chicago to Dallas instead of just flying?

12    A.  There are two reasons.  The first one was I'm afraid

13    they would run away.

14              The second one was I had to drive because if I

15    didn't drive, I would not have a car to drive in Dallas.

16    Q.  Did you have them working at your house in Dallas?

17    A.  Yes.

18    Q.  And you said but when it didn't work out, you were going

19    to send them back to Chicago?

20    A.  Yes.

21    Q.  Okay.  Now this whole time, who has their passports?

22    A.  I did.

23    Q.  But you put them on a plane?

24    A.  Yes.

25    Q.  So did you have to give their passports back?
```

1   A.  Yes.

2   Q.  Okay.  And tell us what happened when you did that?

3   A.  So I would drop them off at the airport to have them

4   fly back to Chicago.  But none of them went back to

5   Chicago because they didn't want to go back to Chicago.

6   Q.  What did they do?

7   A.  They took the taxi to the spa.

8   Q.  And I want to focus on Joom in particular.  Because you

9   co-owned her with Wan.

10          Did you try and watch her get on the airplane?

11  A.  So I would send her off until she walked past the

12  gate.  After she walked in the gate, then I left.

13  Q.  And where did she go?  Where did she run to?

14  A.  Then she took -- then they took taxi to the spa.

15  Q.  When you say the spa, are you talking about a spa in

16  Dallas?

17  A.  Yes.

18  Q.  And describe -- are you familiar with spas as houses of

19  prostitution?

20  A.  I think it is a house of prostitution.

21  Q.  And are spas nice places to work?

22  A.  No.

23  Q.  Do you know why Joom ran to another place of

24  prostitution instead of going somewhere else?

25  A.  Because she didn't know anybody else somewhere else.

 1    Q.  Wasn't because she just liked having sex so much?

 2    A.  Maybe because it was her reason not wanting to have

 3    sex anymore.

 4    Q.  How did you find out she was at the spa in Dallas?

 5    A.  I don't know remember whether or not she was the one

 6    who called me, or when she -- or I called her when I got

 7    back to Chicago.

 8    Q.  When you found out she had gone to the spa in Dallas,

 9    you told us you co-owned her with Wan, your business

10    partner.  Did you tell your business partner about it?

11    A.  I did.

12    Q.  What was Wan's reaction?

13    A.  P'Wan said, Well, I will talk to her.

14    Q.  What did P'Wan do?

15    A.  So she talked to Joom and asked her, What happened?

16    Why didn't you go back to Chicago?  Something like that.

17    Q.  And where did P'Wan take Joom to finish off her debt?

18    A.  At her house in Dallas.

19    Q.  Is that the same house you talked about you had been to?

20    A.  Yes.

21    Q.  I want to get through this today.  Who was Pang?

22    A.  There's so many Pangs.

23         MS. WILLIAMS:  Approaching with Government's 243.

24    May I, Your Honor?

25         THE COURT:  You may.

```
 1    BY MS. WILLIAMS:
 2    Q.  This is an e-mail with an escort-style photo.  Who's
 3    e-mail is this?
 4    A.  Did you mean the picture?
 5    Q.  The picture.
 6    A.  Pang.  It's Pang.  It's UnRean's girl.
 7              MS. WILLIAMS:  Government moves to admit
 8    Exhibit 243.
 9              THE COURT:  Received.
10    BY MS. WILLIAMS:
11    Q.  We're not going to go through everybody, but tell us
12    about Pang?
13    A.  Pang is P'Un's girl.
14    Q.  And did she work in Chicago?
15    A.  Yes.  I got to know her the first day that she worked
16    at P'O's.
17    Q.  And when you say worked at P'O's house, is this the
18    house that P'O and Noiy were partners in?
19    A.  No.  This is only P'O's house.
20    Q.  This is before -- or this is a different one.
21    A.  Well, P'O had her own house all alone.  And then
22    another house she co-owned with P'Noiy.  And Pang went to
23    work at just P'O's house.
24    Q.  Got it.  And I'm looking at the e-mail here.  Again, we
25    see maya_1966@yahoo.com.  Is that the same Maya that you
```

1    identified as a house boss in California and Chicago who was

2    partners with Bill?

3    A.  Yes.  It's Maya.

4    Q.  I want to ask you about one final woman.  You had talked

5    earlier about P'Karn, as someone who you had sent to work in

6    P'Noiy's house, is that right?

7    A.  Yes.

8              MS. WILLIAMS:  Permission to approach with

9    Government's 431?

10             THE COURT:  You may.

11   BY MS. WILLIAMS:

12   Q.  Showing you a picture of Government's 431, there's

13   escort-style photos attached to this e-mail with your e-mail

14   on it.  Who is in those escort-style photos?

15   A.  It's P'Karn.

16             MS. WILLIAMS:  Government moves 431 into evidence.

17             MR. RIVERS:  No objection.

18             THE COURT:  Received.

19             MR. GUERRERO:  No objection.

20             MS. WILLIAMS:  Okay.

21   BY MS. WILLIAMS:

22   Q.  This e-mail, Keang from the Toilet Studio to

23   eekkil.kingkong@outlook.com, do you know who that is?

24   A.  I don't know who this is.

25   Q.  And missjunker@gmail.com, who is that?

1    A.  It's my e-mail.

2    Q.  And who is that?

3    A.  P'Kwan.

4    Q.  Who owned P'Kwan?

5    A.  I was.

6    Q.  And pulling up the date, again, do you remember about

7    when P'Kwan came to the United States when you owned her?

8    A.  That was 2014.

9    Q.  Where did P'Karn work?  What houses?

10   A.  At Pavilion and Optima.

11   Q.  And you said you also -- you sent her to Noiy's?

12   A.  I just want to say that I -- I just want to say that

13   I didn't -- I wasn't the one who sent her over there.

14   But P'Keang asked for making traveling around for work.

15   I'm not sure how she contacted her, but it was like she

16   just booking a schedule to to go there.

17   Q.  So P'Karn went to Noiy's house?

18   A.  Yes.

19   Q.  She was unhappy at your house, is that fair to say?

20   A.  Something like that.

21   Q.  Did P'Karn run away from you?

22   A.  Yes.

23   Q.  To your knowledge, were you the only person in the

24   organization that people ran away from?  Or did runaways

25   happen?

1          MR. GUERRERO:  Objection, foundation.

2          THE COURT:  I'll allow her to answer.  You may --

3     you may answer it and if you have firsthand knowledge.

4     A.  Can you repeat the question one more time?

5     BY MS. WILLIAMS:

6     Q.  Were you the only person that girls ran away from?  Or

7     this conspiracy that you were apart of, would girls run away

8     from different people?

9          THE COURT:  Note the objection.  If she has

10    firsthand knowledge, if she understands the question, you

11    may answer.

12    A.  There were a lot of ma-tacs whose girls ran away from

13    them.

14    BY MS. WILLIAMS:

15    Q.  Is allowing a girl to run away good for business?

16    A.  No.

17    Q.  Okay.  And what's the point of doing all of this?

18    What's the goal?

19    A.  Because of money.

20    Q.  What did you do when P'Karn ran away from you?

21    A.  I sent a message to scare her.

22         MS. WILLIAMS:  May I approach with Government's

23    1415 and 1416?

24         THE COURT:  You may.

25    BY MS. WILLIAMS:

```
 1    Q.  I'm showing you Facebook messages.  Are these the
 2    messages that you're talking about that you sent to P'Karn
 3    to scare her?
 4    A.  Yes.
 5             MS. WILLIAMS:  Government moves 1415 and 1416 into
 6    evidence.
 7             MR. RIVERS:  No objection.
 8             THE COURT:  No objections, I'll receive 1415 and
 9    1416.
10    BY MS. WILLIAMS:
11    Q.  There's a Facebook message, who's that?
12    A.  It's my Facebook.
13    Q.  And I think we saw those pictures from the Toilet Studio
14    just a moment ago from May of 2014.
15             And these messages are in November of 2014.  So --
16    so June, July, August, September, October, November.  So
17    about six months later.  Do I have that right?
18    A.  Yes.
19    Q.  And Karn still hasn't paid off her debt, six months
20    later?
21    A.  Yes.
22    Q.  Okay.  And these are messages that you sent to her to
23    scare her, is that right?
24    A.  Yes.
25    Q.  How badly were you trying to scare her?
```

1    A.  I wanted to -- I wanted to scare her so that she

2    would come back and work.

3    Q.  And it says.  "Minor male."  And then it has a name.

4    "Is this her son?  Student I.D. number.  Don't worry about

5    your kid, sister, Noon, I, will help take care of him while

6    you're away."  Explain that to the jury.

7    A.  At the time I was very angry.  It was just a fresh

8    thought at the time, because I was also using drugs.  I

9    was very angry that she ran away.  I just wanted her to

10   come back and work and pay off the debt.

11   Q.  Noon, we're going to read through these.  Are you proud

12   of what you did here?

13   A.  No, I am not.  I feel guilty about it.

14   Q.  Okay.  Well, you need to tell the jury.  What were you

15   threatening to do here?

16   A.  I just wanted her to come back to work.

17   Q.  What were you threatening to do by giving the name and

18   the student I.D. of her son?

19   A.  I wanted to make it seems like her son was not in a

20   good place.

21   Q.  Like her son was not safe?

22   A.  Yes.

23   Q.  You would hurt her son if she didn't get back to work?

24   A.  Something like that.

25   Q.  And you're a mom?  Can you think of a scarier threat

1    than, I'm going to hurt your kid?

2    A.  Yes, I know.

3    Q.  And this is a kid in Thailand?

4    A.  Yes, in Thailand.

5    Q.  And you hire people to kill people in Thailand, is that

6    a thing you can do?  And I don't mean you personally.  I

7    just mean, is that something that can be done in Thailand?

8    A.  Yes.  It could be that easy.  But for me, I just

9    wanted to scare her.  But it's not something I would have

10   done.

11   Q.  But is this a scary, real threat?

12   A.  Yes.

13   Q.  I'll read through this.  "Go ahead, block my Facebook.

14   I, Noon, added friends from your Facebook already, every one

15   of them, see you."

16            THE INTERPRETER:  Could you blow up a little,

17   please?

18   BY MS. WILLIAMS:

19   Q.  "P'Karn, this will be the last message to send you.  The

20   very last messages before I, Noon, will make decision to do

21   something.  I, Noon, give you two days to come back to work

22   and everything will be normal.  Nobody will dig old stories

23   to talk about.  You can believe me at that.  So you will

24   walk on this path comfortably.  No need to hide from anyone.

25   I, Noon, will send you to Phoenix, my own house.  I,

1     Noon are going to open --

2               MR. RIVERS:  Your Honor, I'm going to object.

3     There's no question that she's asking.  And she's just

4     testifying.  Leading.

5               MS. WILLIAMS:  I'm reading a document.

6               THE COURT:  I'll let her read the document and ask

7     if that's what she said.  And then leave any -- if there's

8     issues with the translation, I'll leave that to Counsel and

9     the jury.

10    BY MS. WILLIAMS:

11    Q.  "I, Noon, will send you to Phoenix, my own house.  I,

12    Noon, am going to open a house there.  Don't be afraid that

13    the job will be difficult.  Even if it's more difficult than

14    Chicago, but it's my own house.  You know that I don't force

15    you or blame you.  I, Noon, guarantee you will pay off your

16    debt in two to three months or faster.  Think carefully and

17    make your decision."  Did I read that right?

18    A.  Yes.

19    Q.  "How you want your life to be here, you want to hide or

20    be patient a bit longer, but everything will be okay.  You

21    choose.  You know, right, if I, Noon, will open a house in

22    Phoenix, who would be my backup?  Otherwise I wouldn't dare

23    to open it.  Go check the background of my new backup.  He

24    is the biggest person in this business.  I can guarantee

25    that no one will want to have a problem with him."  Did I

```
 1    read that right?

 2    A.  This is -- I meant P'Tan in Phoenix.

 3    Q.  Okay.  "Everyone in this business knows him well.  Noon,

 4    I, give you 'til Sunday to come back.  If after Sunday

 5    night, Noon, I --

 6              THE INTERPRETER:  Counsel, may I interrupt?

 7              MS. WILLIAMS:  Yes.  She just pointed out to me

 8    that the word him is actually a her, because it's a woman,

 9    which is P'Tan.

10    BY MS. WILLIAMS:

11    Q.  Okay.  So we're talking about her here?

12    A.  Yes.

13    Q.  Okay.  And when you're talking about -- I know the

14    pronouns are a little different in Thai.

15              When you're talking about P'Tan, is that the same

16    P'Tan you identified as a house boss in Phoenix?

17    A.  Yes.

18    Q.  And you're saying, I'm going to partner with this

19    person, and this person is scary, basically?

20              MR. GUERRERO:  Objection, leading.

21              THE COURT:  Sustained as to the form.

22    BY MS. WILLIAMS:

23    Q.  What are you saying?

24    A.  At the time it was -- P'Tan was about about to sell

25    me the list of the customer to me.  It's not that we
```

1   would become partner.

2   Q.  Let's keep reading.  "If after Sunday night, Noon, I,

3   don't see you at the house, my backup person has volunteered

4   to go find you for me.  Follow you to Thailand to your

5   house.

6            He asked me to send your passport picture to him.

7   Noon, I, haven't sent it, because I don't want you, sister,

8   to be in trouble.  This is from my sincere heart.

9            Lastly, I will wait until Sunday.  If after

10  midnight, I apologize, if everything's too late.  This is my

11  last message for real from Noon, me."  Did I read that

12  right?

13  A.  Yes.

14  Q.  What are you trying to do?

15  A.  I just wanted her to come back.

16  Q.  And how are you trying to get her back?

17  A.  So that she could come back and paid off her debt.

18  Q.  And how are you trying to get her back?  What are you

19  doing to get her back?

20  A.  I'm threatening her.

21  Q.  There's an address in Austin, Texas.  And it says, "Is

22  it comfortable there, sister?  The spa is hot.  Beware,

23  father would go in there.  I'm just concerned, Khun

24  Jennifer."  Could you explain that to us?

25  A.  So this is the spa that -- this is the spa that she

 1    went to work after she ran away.  There was somebody who

 2    let me know that she went there to work.

 3           So I texted this to her to let her know that I

 4    know where she is.  And I know that she used the name to

 5    work there as Jennifer.

 6    Q.  So was there a -- was there a network in this

 7    organization if a girl worked to say, Oh, she's over here.

 8    She ran away.  Did that happen?

 9    A.  Something like that happened.  But in this case, the

10    girl who worked there at the same time as her, they might

11    have had some kind of problem.  So she called me and let

12    me know that, Hey, your girl is here.

13    Q.  And pictures.  What's -- what's in those pictures?

14    A.  This is the picture of that address where I search

15    the Google.  And so I sent her the pictures to her that

16    this is the address of where she is.  It's Google Earth.

17    And that belonged to that address.

18    Q.  And you say, "I'm about to go up there.  Is it Room 205,

19    sister?"  What does that mean?

20    A.  So it was like the information from that girl who

21    told me about this.  So I kind of just send it over to

22    scare her that I was about to come over.

23    Q.  "Forgot to tell you, Chinese house, Vietnamese house.

24    I, Noon, know many places.  I'm not only popular in Chicago,

25    I'm Noon, popular at other places, too."  What do you mean

1    Chinese houses and Vietnamese houses?

2    A.  It meant that that house belonged to a Vietnamese

3    person.

4    Q.  And you used the word sister here.  Are you using that

5    word because you're in a loving sisterly relationship with

6    this woman?

7    A.  No.  It's a Thai way.  Anybody who's older than us we

8    call them sister.

9    Q.  And what is your relationship with this woman?  Do you

10   own this woman?

11   A.  Yes.

12            THE COURT:  If you could find a place to sum up

13   here.

14            MS. WILLIAMS:  I think I have one page left.  I'll

15   stop right at 5:00.

16            THE COURT:  All right.

17   BY MS. WILLIAMS:

18   Q.  "P'Karn, I, Noon, am about to ask my mother to press

19   charges on you and your friend for cheating, because every

20   month you borrowed money to transfer to your friend's

21   account."  And it has a name and an account in Thailand.

22            "The past two months my mother transferred money

23   into your Krung Thai bank account, for more than 700,000

24   baht, almost 800,000 baht.  My mother keeps all the

25   transaction slips.  She is about to press charges on you

```
 1    this Monday.  And the police will issue a subpoena to you.

 2    If you and your friend don't go as scheduled, the arrest

 3    warrant will be issued immediately.  And this arrest warrant

 4    will be sent to every Thai consulate in America."  Can you

 5    explain that?

 6    A.  So it was like every month I would send money for her

 7    son through this account name number as so.

 8          My mother would be the person who would send the

 9    money and she would keep all the receipts to show that that

10    has been done.

11    Q.  So you're threatening to sue her in Thailand and get a

12    warrant and send it to America?

13          MR. GUERRERO:  Objection, leading.

14          THE COURT:  Sustained as to the form.

15    BY MS. WILLIAMS:

16    Q.  Are you threatening to sue her in Thailand?

17    A.  I'm just threatening her.

18    Q.  And then this is the last two.  "You, sister, and your

19    friend didn't show up as scheduled.  There will be an arrest

20    warrant issued immediately.  And this warrant would be sent

21    to every Thai consulate in America so that other arrest

22    warrant could be issued to arrest you here.

23          You borrowed money with people but not paying

24    back.  You should get consequences.  Otherwise, you, sister,

25    wouldn't feel responsible, go on to do such a bad thing
```

1    again.  You go ask P'Noiy, the person who sent you here,

2    about I, Noon, sent the right-hand of J-Joo to jail already,

3    the same case as yours, her name is O."  Can you explain

4    that?

5    A.  All of the things that I have done here, is just to

6    scare her to come back and pay off her debt.

7             All of the things here, I never thought I would be

8    doing.

9    Q.  And then finally --

10             THE COURT:  We need to --

11             MS. WILLIAMS:  Yeah.  This is the last one.

12             THE COURT:  Can you hurry?

13   BY MS. WILLIAMS:

14   Q.  You sign off, "You, sister, and your friend will receive

15   the arrest warrant from police soon.  See you."  Did I read

16   that right?

17   A.  Yes.

18             MS. WILLIAMS:  That's the end of the exhibit.

19             THE COURT:  We'll stand in recess, Counsel.

20             And Members of the Jury, we'll see you in the

21   morning at 9:00.  Have a good evening.  And safe travels to

22   your bus, sir.

23             And we're in recess until 9:00 a.m. in the

24   morning.  Please rise for the jury.

25             (Jurors excused.)

```
1              THE COURT:  Couple questions for Counsel.  We can
2    wait, I can check in with you in morning.
3              Whether or not Defense Counsel will be asking for
4    any limiting instruction on the testimony on the grant of a
5    plea agreement.  And then the fact of the plea of guilty can
6    only be used -- the fact of a plea of guilty can only be
7    used on -- not against one of the Defendants here.
8              I can check in with you in the morning and see if
9    one or all of you want that and the timing of it, as well,
10   so.
11             MR. ENGH:  Well, we requested it already.
12             MS. WILLIAMS:  That's fine.
13             THE COURT:  So we will -- we'll -- I'll just check
14   in with you tomorrow maybe when to do it.  And we'll see you
15   in the morning.
16             I'll check with you in the 8:30 category and then
17   we'll see you in the morning.
18             MS. WILLIAMS:  Thank you.
19             THE COURT:  And let's hope our juror doesn't
20   miss -- he was in good spirits when he knows -- and Ms.
21   Sampson contacted him and said we've arranged for payment of
22   your taxi, and so he seemed to be just fine, so.
23             (Court adjourned at 5:03 p.m.)
24
25
```

<pre>
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2

 3      ------------------------------------------------------------
                                       )
 4      United States of America,      )  File Nos.
                                       )  17CR107(1)(4)(5)(16)
 5            Plaintiff,               )  (20)
                                       )            (DWF/KMM)
 6      vs.                            )
                                       )
 7      Michael Morris, Pawinee        )  St. Paul, Minnesota
        Unpradit, Saowapha Thinram,    )  November 28, 2018
 8      Thoucharin Ruttanamongkongul   )  8:24 a.m.
        and Waralee Wanless,           )
 9                                     )
              Defendants.
10      ------------------------------------------------------------
            BEFORE THE HONORABLE DONOVAN W. FRANK AND A JURY
11               UNITED STATES DISTRICT COURT JUDGE
                 (TRIAL TESTIMONY OF PANTILA RODPHOKHA)
12
        APPEARANCES
13      For the Plaintiff:         United States Attorney's Office
                                   Laura Provinzino, AUSA
14                                 Melinda Williams, AUSA
                                   300 S 4th Street, Suite 600
15                                 Minneapolis, Minnesota 55415

16      For Defendant Michael      Sicoli Law, Ltd.
        Morris:                    Robert Sicoli, ESQ.
17                                 333 South Seventh Street
                                   Suite 2350
18                                 Minneapolis, MN 55402

19      For Defendant Pawinee      Daniel L. Gerdts, ESQ.
        Unpradit:                  331 Second Avenue South
20                                 Suite 705
                                   Minneapolis, MN 55401

21      For Defendant Saowapha     Paul C. Engh, ESQ.
        Thinram:                   200 South 6th Street
22                                 Suite 420
                                   Minneapolis, MN 55402
23
        For Defendant              Meshbesher & Spence, Ltd.
24      Thoucharin                 Daniel Guerrero, ESQ.
        Ruttanamongkongul:         1616 Park Avenue South
25                                 Minneapolis, MN 55404
</pre>

```
1      For Defendant Waralee        Rivers Law Firm
       Wanless:                     Bruce Rivers, ESQ.
2                                   701 4th Avenue South
                                    Suite 300
3                                   Minneapolis, MN 55415

4      Court Reporter:              Lynne M. Krenz, RMR, CRR, CRC
                                    Suite 146
5                                   316 North Robert Street
                                    St. Paul, Minnesota 55101
6
       Interpreter:                 Phouratsaphone (Paul) Littana
7                                    Chetlue Vang
                                     Kanokon (Bee) Nimitbunan
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **P R O C E E D I N G S**

2                     **IN OPEN COURT**

3          (Defendants present)

4              THE COURT:  Before we begin, I'll just indicate

5     if some of you were wondering if it seems -- maybe it hasn't

6     gotten "crazy" out in the lobby, and so forth, but there's

7     two naturalization ceremonies today.

8              Usually they're in here, so they've been moved to

9     the jury assembly room on this floor over in that far

10    corner.  So if you're wondering why there's lots of folks

11    around, that's why.

12             So Ms. Sampson said one or more Counsel wanted to

13    talk to the Court or raise an issue?  Or so we'll soon find

14    out.

15             MS. WILLIAMS:  We don't have any issues for the

16    Government.  I just wanted to update the Court on the timing

17    of our case.

18             So we will be finishing with Ms. Rodphokha this

19    morning.

20             We are likely going to call Manuel Guzman, who's a

21    witness relevant to Noiy, and that will be fairly short.

22             And then we're going to call Special Agent Tschida

23    back up to the stand, as promised, to go through all the

24    digital devices.  We think that will take us into tomorrow.

25             We are nearing the completion of the Government's

1     case.

2              We've been cutting down our witnesses furiously

3     behind the scenes.

4              We have another cooperator that we anticipate

5     putting on on Monday.  She has out-of-town counsel.  So we

6     wouldn't be in a position -- who's flying in to be present

7     for the testimony.  We wouldn't be in a position to put her

8     on tomorrow.  And then I think we have a final summary

9     witness.  But that will be pretty much it.

10             So I want to kind of update the Court and Defense

11    Counsel that we certainly could be looking at resting the

12    Government's case as early as -- oh, and the interpreter,

13    thank you -- as early as Tuesday, so just so everybody has

14    notice and can prepare.

15             And also, given that schedule, and the

16    cooperator's attorney issue, we -- we had more witnesses,

17    and we're trying to be thoughtful about how much to dump in

18    front of the jury at this point.

19             If we -- we may end up finishing up a little early

20    tomorrow with Special Agent Tschida.  If nobody has any

21    objection, we would ask to, at that point, recess for the

22    day?

23             MR. SICOLI:  Who is the cooperator?

24             MS. WILLIAMS:  Pim.

25             MR. SICOLI:  Pim?

```
 1                  MS. WILLIAMS:  Pim.

 2                  THE COURT:  All right.  Mr. Gerdts or Mr. Engh?

 3                  MR. ENGH:  We mentioned this at the end of the

 4      day, but I renew my request for that cautionary instruction,

 5      as you have given it before the other witnesses.

 6                  THE COURT:  Let me ask two quick questions for

 7      that.

 8                  We'll actually -- maybe let me just -- I could

 9      have made copies.  But Lori, rather than have me read this,

10      I'll just send this down for everybody on both sides to take

11      a look at.

12                  It doesn't mean I'm going to hand it out to the

13      jury, but just so you have an idea what will the Judge read

14      to the jury.  And then once you're done with it, you can

15      have Government --

16                  MS. WILLIAMS:  Can I look on with you, Mr. Engh?

17                  MR. ENGH:  Yes.

18                  THE COURT:  This one is just a minor variation of

19      the last one, because there's no mandatory minimum on this

20      witness, like -- like under the plea agreement, as I read it

21      here, so.

22                  MS. WILLIAMS:  I think that works good.

23                  MR. ENGH:  This would work for me.

24                  THE COURT:  It has also the instruction on the --

25                  MR. RIVERS:  If Mr. Engh says it's okay, it's
```

```
 1    okay.

 2              MS. WILLIAMS:  I think this works for everyone.

 3              MR. ENGH:  I appreciate the deference.

 4              THE COURT:  It also has the plea of guilty aspect

 5    and the plea agreement, so.

 6              I think -- I think Ms. Sampson said Mr. Gerdts,

 7    did you want to address the Court?

 8              MR. GERDTS:  Well, Your Honor, that -- one of the

 9    things I wanted to mention was that I had -- I have conflict

10    on the 12th of December.

11              Counsel may have just made that a nonissue with

12    their schedule.

13              But I have an oral argument at 9:30 on the 12th

14    with the Minnesota Court of Appeals that I don't think

15    statutorily they can move.  But as -- it may not become an

16    issue, but just --

17              THE COURT:  And what time is that?

18              MR. GERDTS:  9:30.

19              THE COURT:  9:30.  And is that here in St. Paul?

20              MR. GERDTS:  Yes, yes.

21              THE COURT:  Okay.

22              MR. GERDTS:  So I will certainly be available for

23    the afternoon.

24              THE COURT:  And --

25              MR. GERDTS:  I'm sorry.
```

1          THE COURT:  Go ahead.

2          MR. GERDTS:   And I wanted to bring something else

3    to the Court's attention that may affect the schedule

4    slightly.

5          So in the last two days the Government has

6    provided four separate computer disks with 4.7 gigabytes of

7    information on it and 785 files.  Almost 100 of which are

8    revised exhibits or new exhibits, some of which are very

9    lengthy.

10          They also have this -- this protective order that

11    they requested that prevents me from printing anything out

12    and giving it to my client for her to attempt to review

13    while I'm not there, which makes it all very difficult for

14    my client to participate in this proceeding.

15          And I -- I bring that to the Court's attention,

16    because after one or more of these witnesses are done

17    testifying, I'm going to need to ask the Court for time to

18    meet with my client with an interpreter.  Because I can't do

19    it during the trial, she's obviously housed in Sherburne

20    County, which is 45 minutes away.  And I can't talk

21    substantively without an interpreter being present.

22          So it's probable given the -- all the information

23    that's being -- and we got another disk today, I have no

24    idea what's on there.

25          So we get this information, it's scrubbed clean,

1    so it's not searchable.  I got to make it searchable.  Then

2    I put it in my computers and -- but I can't talk to my

3    client about it.

4           So I'm going to probably ask for time, a

5    substantial amount of time, to talk to my client with an

6    interpreter after one or more of their witnesses get done

7    testifying, depending upon what gets into evidence, I guess

8    I can't say at this point.  I'm just alerting the Court that

9    what will probably happen.

10          THE COURT:  And before I'll hear from Government's

11   Counsel -- or then, I'll just say this, then I'll hear from

12   them and then we'll hear from any other Counsel, if there's

13   any way -- apart from everyone sees this to -- is there any

14   way, since we're in trial to, with or without agreement, and

15   the -- without creating an issue if there isn't one, with

16   respect to any modification of the order, but I'll hear from

17   -- a response to, initially from Government?

18          MS. WILLIAMS:  Certainly.  Had Counsel requested a

19   modification of the protective order, we would not have

20   opposed it.  This is the first we're hearing of it.

21          We don't oppose a modification of the protective

22   order to allow all Defendants in this case to take with them

23   items of disclosure in the case.

24          We would request, given that this contains

25   personal information of victims -- photographs of victims,

1    that that material be collected by Counsel at the end of the

2    case.

3              But we don't oppose that.  That seems like a

4    reasonable accommodation.

5              In terms of -- there was a lot that just went in

6    there, so if I could maybe address them one at a time.

7              We've heard this allegation that we are scrubbing

8    our materials again and again.  I'm happy to -- I -- I'm

9    happy to even bring them down.  But I can certainly

10   represent, we talked to our IT folks about that.  We haven't

11   scrubbed anything in the case.  We have given it to the

12   Defense as it comes to us.  So there's no truth to that.

13             The -- the idea that the disk that we handed this

14   morning Counsel has no idea what's on that.  Well, that's

15   not true, because we told him.  We have ongoing discovery

16   obligations.  We have trial subpoenas out there, mostly for

17   leases that we've been trying to obtain.  And when that

18   comes in, we certainly have an obligation to give it to the

19   Defense, and we did.

20             And the computer disks that they're receiving

21   we -- first of all, there have been revisions to the

22   exhibits, mostly at the prompting of Mr. Gerdts.  So we have

23   this whole issue with the electronic devices where we had

24   not slapped a sticker on the extraction report, but we --

25   especially for the more voluminous items, we had put that in

1    a format that was readable for the jury.  Mr. Gerdts had an

2    issue with that.

3            So to respond to that issue, we put the extraction

4    report behind what we did.  So it's directly responsive to

5    an objection that Mr. Gerdts has raised during trial.

6            An objection that I don't think has a whole lot of

7    merit, but just to cut through the issue.

8            We also have been reproviding our exhibits

9    basically constantly because people keep saying that they

10   don't have things that they have, so.

11           Also his ability to communicate with his client.

12   It seems a little preposterous that -- that we're going to

13   take a break from trial so he can go out to the jail with an

14   interpreter to communicate with his client.

15           While I certainly agree with the notion that

16   everyone should communicate in the language that they're

17   most familiar with.

18           I'm holding in my hand 61 pages of text messages

19   between Fon and Mr. Morris all in English.  His client

20   certainly has command of the English language.

21           But that set aside, I don't understand why we

22   would need to take a break and why these aren't issues that

23   could have been handled ahead of time?

24           I mean, we're all -- this is trial, we're all in

25   the same position.  It's completely expected what's

1    happening in trial.

2              Also, I should put on the record that we have been

3    going through jail calls.  We've been producing jail calls

4    throughout the case as we've been getting them.

5              We located a jail call from Mr. Gerdts' client and

6    had our interpreter, when she was not in the courtroom,

7    finalizing a transcript of that jail call.

8              We gave that out this morning.  It's an issue

9    probably for next week.  But we will likely be seeking to

10   admit, what I think amounts to confession from Ms. Unpradit,

11   in a jail call next week.

12             So I wanted to also put that on the Court's radar.

13             THE COURT:  Mr. Gerdts?

14             MR. GERDTS:   So the record is clear, Your Honor,

15   my client doesn't speak English.

16             She speaks enough English to send text messages

17   about getting soup at a restaurant and things of that

18   nature.

19             You don't have to read very many of the text

20   messages to know that she's not very competent in English.

21             And I cannot communicate with her competently

22   about the issues in this case without having an interpreter

23   present, because I've tried, quite a few times.

24             I don't have any -- I don't have anything else to

25   add, Your Honor.

1          They've agreed that they've dumped a whole bunch

2     of stuff on us.  They can't dispute that.

3          I know that their IT department -- I've asked -- I

4     asked for -- it's on the record, I asked for the exhibits

5     when they reproduced them last time to be provided to me in

6     a searchable format and they were not.  I know they have the

7     capacity to do that, because I can do it.  It just takes a

8     lot of time and computer time.

9          So it is what it is.

10          MS. WILLIAMS:  Sometimes exhibits are scrubbed.

11     We -- in other cases we specifically -- I specifically asked

12     our IT director Mark Zeitz last time this issue was raised.

13     And I think his response was something along the lines of,

14     "that's ridiculous."

15          And we've just been sending them over in the

16     manner we received them.  Some of them come in a searchable

17     manner and some of them don't, in which case Counsel needs

18     to put them in a searchable manner.  I don't know what more

19     to say about that.

20          THE COURT:  Anything else from other Defense

21     Counsel?

22          What I'll do is, I will probably check in with you

23     during different breaks today and just to see what the

24     options are, regardless of any rulings I make or the

25     position of the parties, absent agreement.

 1          Of course, my goal will be to be, not just be fair

 2    with everyone here, but to minimize disruption for the

 3    juror's sake, but we'll take that up to look and see what

 4    the requests are, what the options are as it comes up.

 5          One other quick question before we kind of very

 6    temporarily recess and bring the jury in at 9:00.

 7          Would the parties agree or have other requests

 8    that after the direct is done of Ms. Noon, as I'll refer to

 9    her, or this witness, if I then read the -- what's often

10    times referred to as the cautionary and limiting

11    instruction?  Is that timing --

12          MS. WILLIAMS:  I would just ask that the Court do

13    it at the outset.

14          THE COURT:  Right before you begin?

15          MS. WILLIAMS:  Yeah.

16          THE COURT:  Is that -- if I do that?

17          MR. ENGH:  I defer to your abundant discretion.

18          THE COURT:  I'll get that in quotes, abundant

19    discretion.  I don't know if the Eighth Circuit would agree

20    with that.

21          But the -- so then I'll -- when the when the jury

22    comes in, I will read that instruction to them.

23          The -- and so the -- I guess we'll leave it there.

24    Mr. Guerrero?

25          MR. GUERRERO:  Judge, I just had one question with

1      respect to scheduling.

2                  THE COURT:  Yes.

3                  MR. GUERRERO:  Had you made a decision about

4      Tuesday the 4th?  I know we had a half a day, but you --

5                  THE COURT:  We -- I think we had told the

6      jury that -- and then absent conflict with Counsel that -- I

7      changed that -- things come in streaks.

8                  So last night I was here, because I had to do an

9      immediate TRO, because the plane is leaving tomorrow for

10     Somalia.  So I either had to say yes or no on deportation.

11                 But the preliminary injunction case that was set

12     for the morning of December 4th, I've moved that.  And so

13     I've got all day available.

14                 And I think we told the jury that --

15                 MS. SAMPSON:  Yes.

16                 THE COURT:  -- last week.

17                 And now -- here.  And then we weren't going to --

18     and then we also discussed at the same time, and we won't be

19     doing that, because I had the potential to leave this Friday

20     open, but then there were other conflicts with different

21     people.  So, no, we'll be down on Friday.

22                 So, yes, the full day is available on the 4th.

23                 Now on the 5th, that schedule is 9:00 to 11:00 and

24     2:00 to 5:00.  And I can't change that because many -- you

25     might know, once a year they have an organization of all --

1    the Conference of -- a majority of developmentally disabled

2    people get together for a conference.  And I'm -- and I and

3    Judge Davis are the speakers over the noon hour to talk

4    about the Declaration of Human Rights.

5            And I really -- this trial comes first, but I -- I

6    agreed to this months and months ago.  And it's -- so that's

7    why that's there.

8            Other than that, I think we're -- the schedule is

9    as it is there, so.

10           And if you have that calendar in front of you and

11   the jury has that too, so.

12           So it's -- it's exactly as it appears here, with

13   the exception of December 4th will be all day, so.

14   Everything else, I think, there's no changes, so.

15           With that -- and I'll check in with you, of

16   course.  As -- and then we'll -- I've got that on the

17   schedule for December 12th.

18           And just a reminder for Mr. Gerdts, and just a

19   reminder, if you see lots of people out here, there's two

20   naturalization ceremonies going on, even though -- a bit of

21   trivia for you.

22           In the history of the State of Minnesota, there's

23   never been such a backlog on -- there's 7,000 people waiting

24   for their interviews.  And if you call today, the soonest

25   you'll get in is 14 months so -- yeah, 14 months.  We will

1      stand in recess.  Oh, I'm sorry?

2              MS. WILLIAMS:  I'm sorry.  It just occurred to me

3      to put one more thing on the record.

4              I told Defense Counsel this, but I don't intend in

5      Noon's direct -- I appreciate the permission of the Court to

6      elicit the statements of Noiy and Ms. Wanless to the

7      witness.

8              I'm not going to do that in direct.  I think we're

9      going to be -- we're going to restrain ourselves from that.

10     However, if her credibility is questioned on cross, I

11     imagine it will come up on redirect.

12             THE COURT:  And so then we might -- if we get to

13     that point, then probably the -- without suggesting the

14     rules mandate it, it probably would be best to -- to alert

15     the Court outside the presence of the jury before the

16     redirect comes up.  But I'll make any additional rulings, or

17     just to make --

18             MS. WILLIAMS:  Sure.  I'm happy to do that.

19             Though, my understanding of the Court's ruling is

20     that it is presumptively admissible.

21             THE COURT:  Two out of the three -- there were

22     three areas.

23             MS. WILLIAMS:  Right.  Right.  And I would only --

24     I would do precisely what we discussed.

25             THE COURT:  All right.

1          MS. WILLIAMS:  Which is lead her through those

2     permissible areas.

3          THE COURT:  All right.  Well, let's take --

4     acknowledging, as Mr. Sicoli did yesterday, that that clock

5     is a little slow, and I've told them that.  And we've had

6     some issues.

7          I've been checking with the jury -- I'll spare my

8     criticism of GSA and how they heat and turn down things, up

9     and down throughout the building, it's not unique to this

10    courtroom and the jury room back there.  It's an issue that

11    comes up frequently in federal buildings.

12         But we'll stand in recess until 9:00 a.m. and

13    we'll have -- all come in together.

14         (Recess at 8:56 a.m.)

15         (In open court at 9:03 a.m.)

16         THE COURT:  Before we begin, Members of the Jury,

17    first of all, I'll remind the witness that you remain under

18    oath from yesterday.  So I won't readminister the oath.

19         THE WITNESS:  Yes.

20         THE COURT:  I'm sorry?

21         THE INTERPRETER:  She just said yes, Your Honor.

22         THE COURT:  Members of the Jury, you have heard

23    evidence yesterday from this witness that she hopes to

24    receive a reduced sentence pursuant to a plea agreement she

25    has made with the Government in this case.

1          She has entered into an agreement with the

2    Government which provides in exchange for cooperating with

3    the Government, the Government will consider recommending a

4    reduction in her sentence.

5          If the Government, through the U.S. Attorney's

6    Office, recommends a reduction of sentence, then it's up to

7    the Judge, in this case myself, to decide whether to reduce

8    the sentence at all.  And if so, how much to reduce it by.

9          You may give the testimony of this witness such

10   weight as you think it deserves.  Whether or not the

11   testimony of a witness may have been influenced by their

12   hope of receiving a reduced sentence is for you, the jury,

13   to decide.

14         The witness' guilty plea cannot be considered by

15   you as any evidence of any Defendants' guilt.  The witness'

16   guilty plea can be considered by you, only for the purpose

17   of determining how much, if at all, to rely upon the

18   witness' testimony.

19         With that, we will proceed with the direct

20   examination of this witness.

21         MS. WILLIAMS:  Thank you, Your Honor.

22   BY MS. WILLIAMS:

23   Q.  Good morning.

24   A.  Good morning.

25   Q.  When we left off yesterday -- and I just have a little

1   bit more for you.

2          But when we left off yesterday, we were looking at

3   the text messages you had sent to Karn to scare her back to

4   work, is that right?

5   A.  Yes.

6   Q.  Okay.  And I just have a few clarifying questions about

7   that.

8          But before we get there, Noon, yesterday, I had

9   asked you, if you had come over here pursuant to debt and

10  worked for the organization as a sex worker.  Do you

11  remember that question?

12  A.  I do.

13  Q.  And had you come over here pursuant to debt and worked

14  as a sex worker?

15  A.  Did you mean why I came here?

16  Q.  Well, what I mean is, was it true yesterday when you

17  said you did not come over here pursuant to debt to be a sex

18  worker?

19  A.  I didn't intend to do that.

20  Q.  Okay.  And so did you have debt when you came over here?

21  I'm probably making this more difficult than it needs to be.

22  A.  No, I'm not.

23  Q.  And when -- what I'm trying to clarify is, later was

24  there a time in your life where you participated in

25  commercial sex activities?

```
 1    A.  Yes.

 2    Q.  Okay.  Tell the jury about that?

 3    A.  So did you mean how I get involved with this thing?

 4    Q.  I mean, was there a time of your life where you

 5    prostituted your own body at one point?

 6    A.  Well, actually, in -- in 2011, there was some time

 7    that I had done that.  But I just want to say, I came

 8    here without debt.  I came here -- I never done this.  I

 9    had never done this in Thailand or intended to do this

10    when I came here.

11         What happened was my ex-boyfriend was in debt and

12    he was a gamble, and that's the reason that he was in debt

13    with other people.  And so I decided to do this for a couple

14    months, two to three months, so that I can pay off his debt.

15         Even though I didn't really -- wasn't really in

16    love with him that much, but I didn't want anybody else to

17    look like I cheated on people.

18    Q.  Okay.  So to be clear, when you made -- when you did

19    that, were you under debt yourself or were you free?

20    A.  I was free.  I was not in debt with anyone.  I just

21    wanted to pay off the debt for my ex-boyfriend who was in

22    debt to the casino.

23    Q.  So that was your choice at that point?

24    A.  Yes.

25    Q.  Okay.  Let's go back to the text messages that we were
```

```
 1    looking at yesterday.  This is Government's 1415, already in

 2    evidence.

 3              THE COURT:  And I'm going to, again, with

 4    apologies to the jury and Counsel, I'm going to turn down

 5    the lights without emphasizing one exhibit over another.

 6    BY MS. WILLIAMS:

 7    Q.  And Noon, I don't think we don't need to go through

 8    these again, I think we saw them yesterday.  But I did want

 9    to make one point of clarification.

10              You -- there's a reference to P'Noiy here.  Do you

11    see that?

12    A.  Yes.

13    Q.  We talked about two P'Noiys.  We've talked about P'Noiy

14    who's here in the courtroom, who's a house boss in Chicago.

15    And we talked about Thailand P'Noiy who was a trafficker in

16    Thailand.  I just want to clarify, which P'Noiy are we

17    talking about here?

18    A.  This is -- I'm talking about P'Noiy in Thailand who

19    was also a partner of J-Joo who had sent P'Karn over

20    here.

21    Q.  Okay.  So we're talking about Thailand Noiy here?

22    A.  Yes.

23    Q.  Okay.  Now there's a second exhibit that goes with those

24    Facebook messages that was put in evidence yesterday, but we

25    didn't see, which is Government's 1416, which is a photo
```

 1      that was sent.

 2              I'm going to make it a little smaller so we can

 3      see the type better.  Explain this to the jury.

 4      A.  This is P'Karn's passport.  I took the picture of the

 5      -- of the Visa page and send it to her.

 6      Q.  Okay.  So whose thumb with the blue fingernail?  Who's

 7      that?

 8      A.  Mine.

 9      Q.  And you took this picture?

10      A.  Yes.

11      Q.  And you sent it to P'Karn with those Facebook text

12      messages?

13      A.  I'm not sure if I had sent this through the line app

14      or message on Facebook.  I'm not sure.

15      Q.  But you sent this to her at the same time you sent the

16      threatening messages?

17      A.  This I'm not really sure, but I know that I had sent

18      this to her.

19      Q.  Why are you sending this to her?  Is really the

20      question.

21      A.  Actually, she knew that her passport was with me.  I

22      don't really remember why I would have sent this to her.

23      Q.  Well, are you showing her, I have your passport?

24      A.  Something like that.

25      Q.  Okay.  And did you have her passport?

1    A.  Yes.

2    Q.  So you're sending her messages threatening to kill her

3    kid and saying I have your passport because she ran away?

4    A.  Yes.  Something like that.

5    Q.  Well -- and just to clarify something like that, I want

6    to be real clear here, Noon, are you threatening her to get

7    her back to work?

8    A.  Yes.

9    Q.  Just a few more questions.  And it's fair to say, we're

10   not going to keep the jury here all day, but we've talked

11   about, when you've sat down with the Government, all sorts

12   of people in this conspiracy, is that right?

13            MR. GERDTS:   Objection to the form of the

14   question, Your Honor.

15            THE COURT:  Well, I'll sustain as to the form as

16   to leading.

17   BY MS. WILLIAMS:

18   Q.  Have we talked many times?

19   A.  Yes.

20   Q.  And have we just talked about the five people sitting

21   here today or about a lot more people?

22   A.  We talked about a lot of people.

23   Q.  Okay.  And have we told this jury in the past, oh, about

24   half a day, everything you know about this case?

25   A.  Yes.

```
1    Q.  Or have we focused on the people here?

2    A.  I spoke about everything.

3    Q.  Okay.  I guess what I'm saying is, we haven't gone

4    through in detail everything you know about Pim, and Pan and

5    all the other people who aren't sitting here today, is that

6    fair to say?

7    A.  Yes.

8    Q.  Okay.  I do want to ask you just, finally, a little bit

9    about your arrest.  When were you arrested?

10   A.  October, 2016.

11   Q.  Do you remember the date?

12   A.  The 4th.

13   Q.  October the 4th of 2016?

14   A.  Yes.

15   Q.  Now, this business you were involved in, this -- was

16   this business legal or illegal?

17   A.  Illegal.

18   Q.  Okay.  And did you personally, and do you have knowledge

19   of other people in the conspiracy, keeping tabs on who was

20   getting arrested and what was happening with law

21   enforcement?

22   A.  I don't understand that question.

23   Q.  Well, would you keep an eye on who the police were

24   arresting so as not to get caught?  Would you pay attention

25   if women in Chicago were arrested, or something like that?
```

     1    A.  It was more like words of mouth.  People tell the

     2    story to each other.  It's not that I would pay so much

     3    attention to it.

     4    Q.  Would there be a word of mouth that people would talk

     5    about it, though?

     6    A.  Yes.

     7    Q.  Okay.

     8             MS. WILLIAMS:  Permission to approach with

     9    Exhibits 8CN and 8BM, Your Honor?

    10             THE COURT:  You may.

    11    BY MS. WILLIAMS:

    12    Q.  Now Noon, I'm showing you two phone extraction reports.

    13    And I don't expect you to know anything about extraction

    14    reports.  I'm just showing you two photos.  I want you to

    15    tell me who's in those two photos?

    16    A.  One is my picture when I was arrested.

    17    Q.  What about this?

    18    A.  This was at the apartment the day that I was

    19    arrested.

    20    Q.  Okay.  And is that also you?

    21    A.  Yes.

    22             MS. WILLIAMS:  Government moves to provisionally

    23    admit Exhibits 8BM and 8CM -- CN, subject to tying them up

    24    with Special Agent Tschida a little bit later today to show

    25    the witness her photo.

```
1                    MR. SICOLI:  No objection.

2                    MR. GUERRERO:  No objection.

3                    MR. GERDTS:   No objection to the photograph, Your

4        Honor.

5                    THE COURT:  Okay.

6                    MR. GERDTS:  I object to everything else.

7                    MS. WILLIAMS:  Well, I'm just going to show the

8        page with the photographs.

9                    THE COURT:  Those are provisionally received for

10       the purposes of showing the photograph at this time.

11       BY MS. WILLIAMS:

12       Q.  Okay.  I'm going to first go to Government 8BM.

13                   And, again, this is an extraction report with a

14       date of October 6th, 2016.

15                   So if you were arrested on the 4th, that's two

16       days after you were arrested?

17       A.  Is this from my phone?

18       Q.  I don't expect you to recognize this extraction report.

19       But is this two days after you were arrested?

20       A.  Yes.  I was arrested on the 4th.  After that the

21       police took all my -- my phone.  And after that I

22       wouldn't know what -- what had happened after that.

23       Q.  I get that.  I'm just asking you about the date.  Is

24       this two days after you were arrested?

25       A.  Yes.
```

1    Q.  Okay.  And this is why I'm showing it to you.  Who's

2    that a photo of?

3    A.  It's me.

4    Q.  Then let's take a look at Government's 8CN.  And this is

5    a chat that starts in April of 2014 going to December,

6    2016 --

7             MR. GERDTS:  Your Honor, I -- I thought the

8    Court -- the ruling of the Court was she can show the

9    photographs.  And what we're going into is everything else.

10            THE COURT:  I'm assuming it's for the limited

11   purpose of establishing a date for the photo?

12            MS. WILLIAMS:  Well -- and think I can do that.  I

13   was just trying to orient.  But I will go -- the Court's

14   indulgence.  There we are.

15   BY MS. WILLIAMS:

16   Q.  Okay.  So it's this that I'm going to ask you about.

17            And, again, Noon, I don't need you to comment

18   where this is from, I don't expect you to know that.

19            But do you see on 10/6, 2016, a photo attachment,

20   which is blown up here?  What's that a photo of?

21   A.  This is a picture that I was arrested at my apartment

22   on the 4th of October, 2016.

23   Q.  In this case?

24   A.  Yes.

25            MS. WILLIAMS:  No further questions at this time.

```
 1              THE COURT:  We can proceed with cross-examination
 2      whenever Counsel's ready.
 3                   C R O S S - E X A M I N A T I O N
 4      BY MR. GUERRERO:
 5      Q.  Good morning, Ma'am.  How do you pronounce your last
 6      name?
 7      A.  Rodphokha.
 8      Q.  Good morning, Ms. Rodphokha.  I'm Dan Guerrero.  I
 9      represent Thoucharin, the woman you know as Noiy.
10      A.  Yes.
11      Q.  So you testified yesterday that you are a mother-tac, a
12      ma-tac?
13      A.  Yes.
14      Q.  And that means you owned the debt for some women that
15      worked for you?
16      A.  Yes.
17      Q.  And you also bought debt from other women in Thailand at
18      a discount?
19      A.  What do you mean by discount?
20      Q.  Well, you paid $22,000 to a woman in Thailand to take on
21      the debt for these women?
22      A.  Yes.
23      Q.  And then you expected to receive up to $55,000 for --
24      from the girl, the working girl?
25      A.  Yes.
```

1    Q.  Now back in 2011-2012 when you were doing this, did you

2    tell the girl, the working girl that you owned their body?

3    A.  Did you mean I told them that I own your bodies?

4    Q.  Yeah.  Did you specifically say that to them?

5    A.  No, I did not.

6    Q.  Did you tell your friends in Chicago in the community

7    that you owned bodies?

8    A.  I never said that.

9    Q.  Okay.  Where did this language come from, owning bodies?

10   A.  I've heard it here.

11   Q.  And did you hear -- and here, could you be more

12   specific, where did you hear that from?

13   A.  The word owning someone's body?

14   Q.  Correct.

15   A.  Government.

16   Q.  Okay.  So the people at this table talked to you about

17   owning people's body?

18   A.  Yes.

19   Q.  And that's the language you were using yesterday

20   pursuant to Ms. Williams questions, correct?

21           MS. WILLIAMS:  Objection.  Misstates -- misstates

22   the testimony.

23           THE COURT:  I'll let the jury decide -- recall

24   what, if anything, is misstated, the testimony.  I'll permit

25   the question.

```
 1              MR. GUERRERO:  Well, that's all right.  I'll move
 2    on, Your Honor.
 3    BY MR. GUERRERO:
 4    Q.  I'd like to talk to you a little bit now about your drug
 5    usage.
 6              It's fair to say you had a fairly bad drug problem
 7    a few years back?
 8    A.  If you ask me if I continually used the drug, I could
 9    say that I used it and stopped, used it and stopped.  I
10    only used it when I had friends.  I did not use it in
11    consecutively in that time.
12    Q.  How many years did you use drugs?
13    A.  So I -- I started using in 2012 before I gave birth
14    to my first child.  After -- after -- after I was
15    pregnant, I stopped using.  And then after giving birth I
16    came back to use it three, four months after I gave birth
17    because I just wanted to get skinny.
18    Q.  And this was methamphetamine?
19    A.  It's -- it's called meth or in Thailand we called it
20    Ice.  I don't know what it's called here.
21    Q.  Were you smoking it?
22    A.  Yes.
23    Q.  Were you snorting it?
24    A.  I lit the light.
25    Q.  And were you also doing crack cocaine?
```

```
 1    A.  No.  I just used this drug alone.

 2    Q.  But you -- you testified yesterday that you also shared

 3    it with some of the working girls?

 4    A.  Yes.  Some of them.

 5    Q.  And where would you do this with them?

 6    A.  Sometimes they would come to my house, the house that

 7    I lived.  Sometimes after they got off work, I would -- I

 8    would go in and we would use drug together.

 9             So the people who I used the drug with, it wasn't

10    that they they never used drug before, they had used drug

11    prior before they got to know me.

12    Q.  So you didn't necessarily introduce them to drugs, but

13    you used with them on occasion?

14    A.  Yes.

15    Q.  At both your house and the working girls' apartments?

16    A.  Yes.

17    Q.  Did you drink, too?  Did you like to drink alcohol?

18    A.  Not really.

19    Q.  And were you selling this to the girls?  Or were you

20    just giving them the drugs?

21    A.  I did not sell them.  I bought them myself.

22    Q.  And Karn, the girl you testified about who went back to

23    Thailand, she's one of the girls that you used meth with,

24    correct?

25    A.  Did you mean Karn went back to Thailand?
```

1    Q.  Well, the Karn who -- who left?

2    A.  Yes.  We used it together.

3    Q.  And you used after you were -- after you had your baby

4    because you wanted to get skinny.  Did you continue to use

5    then beyond that?

6    A.  Yes, I did.

7    Q.  And were you using up and until the point where you were

8    arrested in October of 2016?

9    A.  Yes.

10   Q.  And you were making approximately $30,000 a month, so

11   you you had some discretionary money to spend, right?

12   A.  Yes.  That money that's what I had made, but it was

13   not -- it was not what deducted, the expenses.

14   Q.  But you used some of that money to buy meth?

15   A.  Yes.

16   Q.  Now the -- the Facebook message that we saw yesterday,

17   did you actually say anywhere in there that you were going

18   to kill a child?

19   A.  The word kill I didn't use.  I said that I would take

20   -- I would take care the child for her beautifully, but

21   the meaning was to scare her.  I didn't use -- although I

22   didn't use the word kill.

23   Q.  And I think you testified yesterday that you were angry

24   at Karn for -- for leaving?

25   A.  Yes.

```
1    Q.  And that's because you had paid $11,000 to another woman

2    in Thailand to secure Karn's debt, right?

3    A.  $22,000.

4    Q.  $22,000.  And, in fact, rather than actually harming

5    somebody, you had your mother file a lawsuit in Thailand to

6    try to get that money back from her?

7    A.  Those are the things that I wrote but I never did any

8    of those.

9    Q.  So did your mother ever file a lawsuit?

10              THE INTERPRETER:  May I repeat your question one

11   more time?

12   A.  Did you mean that I -- that did my mom press charge

13   as I wrote to scare people in there?

14   BY MR. GUERRERO:

15   Q.  Well, didn't you tell the Government at one point that

16   you had your mother file a legal lawsuit to try to get the

17   money back?

18   A.  She did sue someone but she didn't get the money

19   back.

20   Q.  Was she suing Karn?

21   A.  No.

22   Q.  Who was she suing?

23   A.  It was another person named O.

24   Q.  And that was to try to get the money back that you had

25   paid for Karn?
```

Cross Examination 1... Donachan 1... 12/07/18 ...od Page 1

```
 1    A.  No.  That incident had nothing to do with Karn.

 2    Q.  So you testified that you did hold passports to some of

 3    these working girls, correct?

 4    A.  Yes.

 5    Q.  And were you mean to some of these girls?

 6    A.  If you ask me if I held the passport, I did.  But I

 7    was never cruel to anyone or harm anyone.

 8    Q.  Okay.  But there were other girls besides Karn that

 9    walked away, correct?

10    A.  Yes.

11    Q.  And you had a woman named Koone, K-O-O-N-E, who walked

12    away?

13    A.  It was Kung, yes.

14    Q.  And you had a name Ple, P-L-E, she walked away?

15    A.  Yes.  It was actually P-L-E.

16    Q.  And Da, D-A.

17    A.  D-A, yes.

18    Q.  She walked away?

19    A.  Yes.

20    Q.  She walked away?

21    A.  Yes.

22    Q.  And then you had a woman named Tip, she walked away?

23    A.  Yep.

24    Q.  And you had a working girl Noiy walk away?

25    A.  Noiy?
```

```
1    Q.  You don't remember her?

2    A.  Noiy?

3    Q.  Not this Noiy, a different Noiy.

4    A.  There was no such name of my working girls that named

5    Noiy or Noiy.

6    Q.  How about Pang?

7    A.  Pang?

8    Q.  P-A-N-G?

9    A.  Yes.

10   Q.  And she walked away?

11   A.  No, she did not.

12   Q.  How about Ann?  She walk away?

13   A.  No, she didn't.

14   Q.  But there were a lot of girls that just walked away

15   before they paid the debt, correct?

16   A.  Yes.

17   Q.  And you testified before the grand jury in this case?

18   A.  Do you mean the day that I did the grand jury?

19   Q.  Correct.

20   A.  Yes.

21   Q.  And you came in and took an oath like you did today to

22   tell the truth?

23   A.  Yes.

24   Q.  And you testified to the grand jury that -- that these

25   girls left not necessarily because they didn't like the
```

1    work, but because they just didn't want to pay the tax?

2    A.  Yes.

3    Q.  That's true, right?

4            MS. WILLIAMS:  Counsel, where are you looking?

5            MR. GUERRERO:  I'm sorry.  Grand jury, Page 16.

6    BY MR. GUERRERO:

7    Q.  And some of these girls also left because there just

8    wasn't a lot of work.  Is that fair to say?

9    A.  Yes.  Because my house do not take in new customers.

10   So it would take them longer time to pay off their debt.

11   So some of them might feel hopeless before they could pay

12   off their debt.  And they wanted to make money so that

13   they can save money up for themselves.

14   Q.  Some of these women actually asked you if they could go

15   to other women's houses, correct?

16   A.  Yes.  Most of the houses were the house -- the houses

17   that I knew in Chicago.

18   Q.  And your girls would say -- they would ask you, Can we

19   go somewhere else?  Right?

20   A.  Yes.  That's what they asked.

21   Q.  And that's because they just wanted to be at a different

22   apartment?

23   A.  It was also because they just want to change the area

24   so that they had new customers with new faces.

25   Q.  Because your houses weren't very busy?

1   A.  It depends -- it depends from time to time when it's

2   busy or not.

3           But it also depends on whether or not the girls

4   worked well or not if they would be able to retain regular

5   customer.  Sometimes customer did come back.

6           For example, if there were two girls in a house,

7   one of them would probably have three, four customer, one of

8   them may not have customer at all because the other girl had

9   a regular customer who keep coming back to see her.

10  Q.  Well, wouldn't you book these customers for these women

11  so that they were busy all day?

12  A.  I would be the person who pick up the phones from the

13  customer.  But if the customer specified who they need, I

14  would have to send them to that person.

15  Q.  And some of these girls that move from house to house,

16  were girls under debt, too?

17  A.  Yes.

18  Q.  And they would ask permission and they would be able to

19  move?

20  A.  Yes.

21  Q.  Now yesterday you indicated that if -- if a girl -- you

22  didn't really have the option to choose the man that she had

23  sex with.

24          But you told the Government in an earlier

25  statement that if a woman didn't want to see a particular

```
1    client because the man wasn't nice or if he wanted -- wanted
2    to have sex without condom, you'd make a note about that,
3    right?
4    A.  Yes.  If the -- if the girl told me later on that if
5    the -- if the customer were not good, then I would mark
6    that memory -- mark the name on my -- the memory and put
7    down like 'FFF' indicating that I would not take that
8    customer again.
9    Q.  So you -- you had some ability to screen the clients to
10   make sure that the girls were safe?
11   A.  Well, it was like, most of them were already my
12   regular customer anyway, because I hardly take in new
13   customers.  So I did not have to do much of the
14   screening.
15   Q.  And also, when you testified at the grand jury --
16            MR. GUERRERO:  Page 15, Counsel.
17   BY MR. GUERRERO:
18   Q.  You testified that the girls can "Pick and choose"
19   because if, "if they met a customer who they did not like,
20   and they come back in the future, I would make a mark and
21   that person would not be okay."  Is that -- that that person
22   would not be okay for the girl.  Correct?
23   A.  Yes.  Just like what I have explained just now.
24   Q.  Now, you were never a working girl, correct?  Under debt
25   I should say?
```

1      A.  Yes.

2      Q.  You just disclosed yesterday that you were a working

3      girl -- independent working girl, correct?

4      A.  If you ask me if I was a working girl, I'm -- I had

5      never done that job before.  I only did it for two, three

6      months, because I had necessity to pay off the debt for

7      my boyfriend.

8      Q.  But you had never told the Government that you had done

9      this for your boyfriend up until yesterday, correct?

10     A.  Because I thought it was not necessary to tell this

11     thing.  The reason that why I was arrested was because I

12     was opening -- opening houses.  It was not because of

13     what I did that.

14             The reason that I told my lawyer yesterday is

15     because I didn't want anyone to be surprised after all.

16     Q.  Did you -- did your boyfriend know that you were doing

17     this?

18     A.  He didn't.  Another reason that I didn't want to talk

19     about that is because I didn't want my husband to know

20     about it.  I didn't I didn't want my mother to know about

21     it.  Anyone in my family, I didn't want them to know.

22     Q.  So but you never had -- if you weren't -- never came

23     over under debt, you never had any discussions with a ma-tac

24     about -- personally about expectations or promises that they

25     made to you to come to this country, correct?

```
1    A.  No.  I never did discuss that.

2    Q.  Now, have you ever met Mammy?

3    A.  I have never met Mammy, personally.  I only talk to

4    her line application.

5    Q.  Have you ever met J-Joo?

6    A.  No, never did.

7    Q.  In these conversations that they had with the working

8    girls before they arrived in the United States, they all

9    took place in Thailand, correct?

10   A.  Did you mean what Mammy talked to the girls?

11   Q.  Correct.

12   A.  Yes.

13   Q.  And you weren't present during those conversations,

14   right?  So you don't know --

15              THE INTERPRETER:  May I?

16   BY MR. GUERRERO:

17   Q.  Sorry.

18   A.  No.  I only heard things from the working girls.

19   Q.  So these aren't things that you heard from Mammy or

20   J-Joo?

21   A.  What did I -- what did you say I just heard?

22   Q.  You did not hear -- J-Joo or Mammy did not tell you what

23   they were talking to the girls about, correct?

24   A.  No, I didn't.

25   Q.  Now, between -- between December 8th, 2016, and
```

```
 1     November 1st, four days before this trial started,

 2     November 1st, 2018, you sat down with the Government on at

 3     least eight different occasions, correct?

 4     A.  Eight times?

 5     Q.  Eight times.  Will you take my word for it?

 6     A.  Eight times?  You mean they call me out eight days?

 7     Q.  Correct.

 8     A.  Not that many.

 9     Q.  Did you meet with them on December 8th, 2016?

10     A.  I don't remember the dates, but as far as I counted,

11     it would be about three to four times.  That's all.

12     Q.  Okay.

13     A.  Every time that you met with me, sister, do you

14     remember?

15          THE INTERPRETER:  I'm sorry.  She made

16     conversation with the interpreter.  So I had to interpret

17     everything that she said.

18     BY MR. GUERRERO:

19     Q.  Okay.  Maybe we can get that through a different

20     witness, but you met with them a number of times, correct?

21     A.  So, three, four times.

22     Q.  And some of these interviews were quite extensive, long

23     periods of time?

24     A.  Yes.  Many hours.

25     Q.  And Bee, the interpreter, was always there?
```

```
1    A.  Yes.

2    Q.  And Ms. Williams or Ms. Provinzino was always there?

3    A.  Most of the time it would be Melinda, but sometimes

4    Tonya -- sometimes switch with Ms. Provinzino.  But Tonya

5    would always be there.

6    Q.  And you're referring to the agent, Agent Price?

7    A.  Yes.  That person.

8    Q.  Agent Tonya Price?

9    A.  Yes.

10   Q.  And your lawyer would always be there?

11   A.  If my lawyer wouldn't be there, she would be on the

12   phone all the time, so she would hear everything that we

13   talked about.

14   Q.  Do you remember talking about an e-mail

15   catcat_ty@live.com?

16   A.  Do you mean catcat_ty.

17   Q.  Correct.

18   A.  Yes.

19   Q.  And at some point you attributed that e-mail to Noiy,

20   correct?

21   A.  May I explain to you?

22   Q.  Well, I'm just -- I'll get to it.  Did you attribute

23   that to Noiy?

24   A.  I used to think that that e-mail belonged to P'Noiy,

25   but I had find out that it was not.
```

```
 1    Q.  Okay.  And one of the reasons.

 2    A.  And I had to -- and I had to tell the lawyer at the

 3    Government.

 4    Q.  You had to tell them --

 5    A.  The correction.

 6    Q.  Okay.  And did you -- did you correct that?

 7    A.  Yes, I did.  They did.

 8    Q.  And one of the reasons you attributed -- or I think the

 9    primary reason you attributed it to her is because somebody

10    else told you that was Noiy's e-mail, correct?

11    A.  Yes.

12    Q.  And that was a woman by the name of Soysuda?

13            MS. WILLIAMS:  Object.

14            THE COURT:  I'll allow it, apart from whether it's

15    true or false why she has an opinion she does about the

16    e-mail.  I'll allow it.  Not for whether whatever she was

17    told was true or false, Members of the Jury.  But whatever

18    she was told, why she thinks what she does now or changed

19    her mind.  You may answer if you understand the question.

20    A.  May I explain it to you?

21    BY MR. GUERRERO:

22    Q.  Well, I just want to know if Soysuda told you that that

23    was Noiy's e-mail?

24            MR. RIVERS:  Objection.  Narrative, Your Honor.

25            THE COURT:  I don't know what the narrative is.
```

```
1              MR. RIVERS:  I don't either.

2              THE INTERPRETER:  May the interpreter interpret

3    what she said, Your Honor?  Or?

4              MS. WILLIAMS:  She should be allowed to answer the

5    question?

6              MR. GUERRERO:  I just asked her if she got that

7    information from Soysuda.

8              THE COURT:  Well, the -- you may -- you may

9    answer.  I'll note the objection, because whether it comes

10   in now or through Government's Counsel it's -- I'll let you

11   say what she said.  Note the objection.

12   A.  So the reason that I thought that the e-mail belonged

13   to P'Noiy because the Government had asked me repeatedly

14   whose that e-mail that belonged to, and I was not sure

15   who that e-mail belonged to.

16             But because I send this e-mail with P'A's

17   picture that she had scheduled to P'Noiy's house right

18   afterwards, so I thought that's what I sent to her.

19             But when I went back to Sherburne County Jail,

20   I asked Soysuda and asked her, do you know whose e-mail

21   this belongs to catcat?  And she said to me, oh, maybe

22   catcat_ty.  And so I had told the Government, oh, I

23   thought that was P'Noiy's e-mail.

24   Q.  So did Soysuda tell you it was Noiy's e-mail or not?

25   A.  Well, Soysuda told me it was catcat at the time, but
```

1    then after -- afterwards, she told me, again, that it's

2    catcat_ty something.  It looked similar to her.

3    Q.  Now yesterday you testified that women -- the soonest

4    that the women would pay off their debt is eight months.  Do

5    you remember that testimony?

6    A.  Yes.

7    Q.  In an earlier statement to the Government, you indicated

8    that here in the United States the woman would pay off the

9    debt more quickly because they could charge more here.  Do

10   you remember saying that?

11   A.  I don't understand your question.

12   Q.  Well, didn't you tell the Government that some girls

13   paid off their $55,000 debt in three months?

14   A.  This is what -- this is what Mammy said to the girls.

15   Q.  What -- did you say --

16              MR. GUERRERO:  Could I approach, Your Honor?

17              THE COURT:  You may.

18              MS. WILLIAMS:  What are you approaching with?

19              MR. GUERRERO:  ROI from 4/27/17, Page 3.

20   BY MR. GUERRERO:

21   Q.  I'm just going to ask you if you can read this to

22   yourself.  This paragraph here.

23   A.  This is what the -- this is what the statement that

24   Mammy talked to the girls.

25   Q.  Doesn't it say here that Noon --

1          THE COURT:  Can you go to the microphone so

2     everybody can hear, Counsel?  If you don't mind.

3          MR. GUERRERO:  Sure.

4     BY MR. GUERRERO:

5     Q.  This says that Noon said that some girls can pay off

6     $55,000 in about three months.  Is that what this report

7     says?  Is this inaccurate?

8     A.  This is what Mammy said to the girls.  I had that

9     knowledge through the girls who told me what Mammy said

10    to them.

11    Q.  Okay.  So but that -- this report does not say that

12    Mammy said that, this says Noon said that, correct?

13    A.  How would I say that?  Because I didn't know that

14    information.  I knew that information after the girls

15    arrived here.

16    Q.  So you never said that the women could pay off their

17    debt in three months?

18    A.  I never said that.

19    Q.  Now I think you indicated yesterday that that you -- you

20    and Noiy stopped talking after you got your own places?

21    A.  Yes.

22    Q.  And you never heard about her owning any other girl,

23    correct?

24    A.  I never have heard that.

25    Q.  And you indicated -- and you -- you indicated in one of

```
1    your statements that when O went back to Thailand, Noiy went

2    on her own?

3    A.  She opened up her own house.

4    Q.  By the way, these -- the Facebook message that you sent,

5    Noiy had no part of that message, correct?

6    A.  No, she didn't.  She was not.

7    Q.  She didn't know that you were even sending that,

8    correct?

9    A.  She didn't know that.

10   Q.  And none of the others accused in this alleged

11   conspiracy, they didn't know about that alleged Facebook

12   message, did they?

13   A.  Nobody did.

14   Q.  And you testified yesterday that you and Mammy would

15   look for poor girls?

16   A.  This is what Mammy did.  I had no involvement in

17   Thailand.

18   Q.  So you didn't look for poor girls?

19   A.  So I would know these girls when I saw the Visa or

20   the passports sent to me.  Mammy would tell me this

21   girl -- oh, sorry, I only saw the working pictures of

22   these girls after the Visas had passed.  And Mammy would

23   say, This girl is coming.  Are you interested?  I only

24   saw their pictures.  I never knew the backgrounds.  I

25   never knew the history.
```

1    Q.  And some of these women came over with the intent to

2    stay past their Visa?

3    A.  Yes.

4    Q.  They wanted to come to the United States to stay,

5    correct?

6    A.  Yes.

7    Q.  And I want to talk to you just a little bit about your

8    plea agreement.  You do have -- I'm sorry, go ahead.

9    A.  Yes.

10   Q.  You have both what's called a cooperation agreement and

11   then you have a plea agreement with the Government, correct?

12   A.  Correct.

13   Q.  And you're hoping your cooperation with the Government

14   will help with your sentence, get a reduced sentence?

15   A.  Yes.

16   Q.  And you know that the count -- pleading guilty to the

17   Count 1 of the indictment carries a maximum sentence of life

18   in prison?

19   A.  Yes.

20   Q.  And Count 4 the money laundering count has a maximum

21   sentence of 20 years?

22   A.  Yes.

23   Q.  You've consented to a money judgment for $1 million?

24   A.  Yes.

25   Q.  And a guideline range, the sentencing guideline range in

 1    this case is 292 to 365 months, correct?

 2    A.  Yes.

 3    Q.  And so under the guidelines you're looking at a sentence

 4    between 24 and 30 years?

 5    A.  Yes.

 6    Q.  How old are you?

 7    A.  33.

 8    Q.  And you know as part of your cooperation agreement that

 9    while the ultimate sentence is up to Judge Frank, it's --

10    it's the Government, and not Judge Frank, who will decide

11    whether you've provided what's called substantial

12    assistance.  Do you understand that?

13    A.  Yes.

14    Q.  And it's only then will the Government decide whether or

15    not to file a motion that will allow the Judge to sentence

16    you below the guidelines?

17    A.  Yes.

18              MR. GUERRERO:  Thank you, Ms. Rodphokha.

19              THE COURT:  Move on to the next Defense Counsel.

20                 C R O S S - E X A M I N A T I O N

21    BY MR. RIVERS:

22    Q.  You had talked a little bit about word of mouth?

23    A.  Yes.

24    Q.  The Thai community is a fairly tight community, I take

25    it?

```
 1    A.  Yes.

 2    Q.  People talk?

 3            THE COURT:  Are those mics on?

 4            MR. RIVERS:  Yeah.

 5            THE COURT:  Because they're not the best mics.  So

 6    if you're not fairly close, they won't pick you up.  And we

 7    want everyone to hear, so.

 8    BY MR. RIVERS:

 9    Q.  People talk?

10    A.  Yes.

11    Q.  And the girls talk, right?  I mean, they're not girls at

12    all, are they?

13    A.  Yes.

14    Q.  And the women -- and they talk amongst themselves,

15    right?

16    A.  Yes.

17    Q.  And, in fact, in the houses of prostitution that you

18    ran, they had -- some of the girls, or some of the women,

19    sorry, some of the women were under debt and some were not,

20    right?

21    A.  Yes.

22    Q.  And the women who were not under debt could see the

23    women who -- or the women who were under debt could see the

24    women who were not under debt and see the difference,

25    right?
```

```
1    A.  Yes.

2    Q.  And so they could see at the end of the rainbow that

3    they could make a lot of money, right?

4    A.  Yes.

5    Q.  And they -- and they knew that -- they know this

6    Thailand, too, because word travels, correct?

7    A.  Yes.

8    Q.  So when somebody comes here from Thailand, they're not

9    coming just with what Mammy is saying, right?

10   A.  Yes.

11   Q.  So they -- they have not only what Mammy or whoever is

12   setting them up to come over here, they also have friends

13   that maybe have already come here, correct?

14   A.  Yes.

15   Q.  So they have an expectation and an idea before they get

16   here of -- of the idea that they're going to be under debt

17   for a while and -- to get established and then they can make

18   a lot of money, isn't that true?

19   A.  Yes.

20   Q.  Now, you came from privilege, correct?

21   A.  Yes.

22   Q.  You have a degree in hospitality, right?

23   A.  Yes.  Management.

24   Q.  And your father, stepfather, made a lot of money, right?

25   A.  Yes.
```

1   Q.  And when you got out of the business, they gave you

2   $100,000, right?

3   A.  Did you say baht?

4   Q.  When you say they, I mean your parents, 100,000 American

5   dollars?

6   A.  After I quit the business?

7   Q.  Well, did they give you $100,000 at some point?

8   A.  Yes.  To open up a restaurant.

9   Q.  And you did that, right?

10  A.  Yes.  After I left that business.

11  Q.  And -- but you were still doing drugs at the time,

12  correct?

13  A.  After -- after I gave birth.

14  Q.  And, in fact, in your picture, that arrest picture that

15  we saw, you've got a lot of acne.  Was that from the

16  methamphetamine, pretty much?

17  A.  Normally I have acne happen to me normally, even when

18  I'm not using meth.  I still having acne right now.

19  Q.  Okay.  You ran three houses, right?

20  A.  Yes.

21  Q.  And the three houses you ran had a lot of expenses,

22  correct?

23  A.  Yes.

24  Q.  So even though you were taking $30,000 a month, that

25  $30,000 a month dwindled over time, isn't that fair to say?

```
 1   A.  Yes, a lot.

 2   Q.  Because you had to pay rent for at least three places,

 3   correct?

 4   A.  Yes.

 5   Q.  Pay for the supplies for all three places?

 6   A.  Yes.

 7   Q.  You have two to three women working at each place,

 8   right?

 9   A.  Yes.

10   Q.  And when a woman went on her period, you paid her $50,

11   right?

12           THE INTERPRETER:  I'm sorry?

13   BY MR. RIVERS:

14   Q.  For that week, when a woman went on her period you

15   didn't make her work, right?

16   A.  I -- I let them advance the money $150 a week, no

17   matter -- no matter they on period or not.

18   Q.  So they got to keep $50 a week regardless, right?

19   A.  It was $150.  And that money was for food.

20   Q.  When you say $150, are you saying $50 or?

21   A.  (In English) $150.

22   Q.  $150.  Okay.

23   A.  And also I would let them send the money, $1,000 a

24   month to Thailand.  This is also my expense.

25   Q.  All right.  So you let them send money home?
```

1    A.  Yes.  To their family.

2    Q.  And isn't that one of the main reasons that most of

3    these women get involved in this to begin with is because of

4    -- they want to help their family and support their family?

5    A.  Yes.  Most of the women who came here already worked

6    like this in Thailand or other countries before they came

7    here.

8    Q.  And they come here because they can make 200 times more,

9    or even more than that, than they can make in Thailand,

10   correct?

11   A.  Yes.

12   Q.  So in -- now you owned three houses.  And two of them --

13   I think one of them was for a very short time, is that fair

14   to say?

15   A.  Yes.

16   Q.  And that was the one you owned with Ms. Wanless,

17   correct?

18   A.  Yes.  But after that -- there was somebody who

19   re-signed the contract.

20   Q.  Right.  And that was Casey Benson, right?

21   A.  Yes.

22   Q.  And then once that lease was up, you never -- that was

23   the end of the business relationship, is that fair to say?

24   A.  Yes.

25   Q.  She did her own thing in Texas, and you did your own

```
 1    thing up here, right?

 2    A.  Correct.

 3    Q.  Now, we talked a little bit about the women that had

 4    left, that walked away.

 5              They paid some of the money that they owed, but

 6    then they walked away, right?

 7    A.  Yes.

 8    Q.  For example, Karn only paid $6,000 and she walked away,

 9    right?

10    A.  Yes.

11    Q.  And she never came back, did she?

12    A.  No, never.

13    Q.  And Koone never came back, right?

14    A.  Yes.

15    Q.  Ple never came back?  Right?  Never came back?

16    A.  The name again?

17    Q.  Ple, P-L-E?

18    A.  No, she didn't come back.

19    Q.  I'm sorry, my Thai diction is not good.

20              And one of the things that you had testified to,

21    is that you weren't taking new customers, right?

22    A.  I never taken new customer.

23    Q.  And that's because you had a lot of regulars, right?

24    A.  Yes.  Because I also didn't want to take a risk with

25    robbers or police who come over to my house.
```

1    Q.  So for new girls -- women, sorry, for new women, it was

2    difficult for them to get business, right?

3    A.  Do you mean the new -- new women?

4    Q.  Right.  Someone that would come over that would be

5    new -- because if somebody preferred a particular woman, you

6    would grant that request of the customer, correct?

7    A.  So it would be like if there's new face of women

8    coming in, when the advertisement put on the website,

9    when the customer called in for that girls, if they

10   worked well, then the customer keep coming back to them.

11   Q.  Now, you talked about holding people's passports.  Go

12   ahead.

13          Holding Karn's passport in your hand didn't do

14   anything to keep her here, did it?

15   A.  No.

16   Q.  And, in fact, you can get a new passport just by going

17   to the Consulate, can't you?

18   A.  And I was the one who took P'Karn to do a new

19   passport.

20   Q.  So she had a passport in addition to the one that you

21   held in your hand, right?

22   A.  Yes.

23   Q.  And like you said, a lot of these women have traveled

24   around the world doing this kind of work, correct?

25   A.  Yes.  Many countries.

1   Q.  And -- and so they're well-versed in what it needs to

2   mean -- or let me start over.

3           They're well-versed in knowing what it takes to go

4   get a passport.  It's not that complicated, right?

5   A.  Yes.  And I also told them, don't worry about the

6   passport.  You can make a new passport at Thai Consulate

7   at any time.

8   Q.  Okay.  And let me ask you about the language barrier a

9   little bit.  All these women had cell phones, right?

10  A.  Yes.

11  Q.  And did any of them have an app that helped them

12  translate into English?

13  A.  Yes.  Some of them also can communicate in English.

14  Q.  And so when you have a customer who likes a particular

15  lady, and she doesn't speak that great of English, she can

16  just use his phone to tell him about what's going on at home

17  or create small talk, right?

18  A.  Yes.

19  Q.  Now let me jump around a little bit.

20  A.  Yes.

21  Q.  Now Ms. Wanless only came to Chicago sporadically?  In

22  other words, just a few times, right?

23  A.  Yes.

24  Q.  And at the time the note went out, that was in 2014,

25  correct?  And when I say note, I mean the threat you made

```
 1        to Karn.
 2        A.  I'm sorry, she said 2014?
 3        Q.  Right.  2014, that's correct, right?
 4        A.  Yes.
 5        Q.  And your business relationship with Ms. Wanless had
 6        ended about a year and a half before that, correct?
 7        A.  Yes.
 8        Q.  And would -- the thing about Karn is, you paid $22,000
 9        to get her here, correct?
10        A.  Yes.
11        Q.  And you charged her $50,000, right?
12        A.  $50,000.
13        Q.  Right.  And -- but you put up $11,000, right?
14        A.  So I paid $11,000 upfront.  But when Karn arrived
15        here and stayed until the ending of the month, I paid
16        another remaining amount.
17        Q.  Right.  But wasn't it your mother who paid another
18        $11,000?
19        A.  My mother was the one who send money for me in
20        Thailand.
21        Q.  All right.  And whenever anybody ever paid their debt,
22        you would discount it once they got up to $50,000, you said,
23        okay, that's enough?
24        A.  Yes.
25        Q.  Now, you had rules in your house, right?
```

```
 1    A.  Yes.

 2    Q.  Work until the debt was paid.  That's one of your rules,

 3    right?

 4    A.  Yes.

 5    Q.  Get time off if you're on your period, right?

 6    A.  Yes.

 7    Q.  If you -- if you had an issue or you had an illness,

 8    you'd take them to the doctor, right?

 9    A.  Correct.

10    Q.  And if there was some guy that was smelly, or big, or

11    abusive, or whatever, and they didn't want to see that guy

12    again, you wouldn't make them, would you?

13    A.  No.

14    Q.  And I think by our count, there's at least six or seven,

15    maybe even eight women that walked away, isn't that true?

16    A.  As far as I remember, that I listed, five people.

17            THE COURT:  Counsel, depending on the length here,

18    it doesn't have to be this moment, but we'll probably find a

19    logical place to take our morning break.  It doesn't have to

20    be right now.

21            MR. RIVERS:  I just have a couple more questions,

22    Your Honor.

23            THE COURT:  Well, okay.

24            MR. RIVERS:  So, I'll wrap it up, as they say in

25    Hollywood.
```

```
 1                 THE COURT:  Okay.
 2      BY MR. RIVERS:
 3      Q.  Now you indicated that you let the women send some money
 4      back home, right?
 5      A.  So I would send the money for them every month.  And
 6      if they wanted to add a tip to send that over, it's fine
 7      with me.
 8      Q.  And when you say tip, what are you talking about?
 9      A.  It -- it's like the extra money that they made from
10      the customer, they would save those.
11      Q.  And did that happen often?
12      A.  Yes, it happened.
13      Q.  Like, give me an example of the most extravagant tip you
14      can think of?
15      A.  So there were two, three people who came to the
16      house.  When they arrived, they would just put down $700
17      and say they would be there for two hours.
18      Q.  And the women can keep that gift, right?
19      A.  Yes.
20      Q.  And one of the ways you advertise is through websites,
21      right?
22      A.  Correct.
23      Q.  And you know there's a lot of websites out there, right?
24      A.  I only use two websites in Chicago.
25      Q.  Right.  But you know there's a lot of websites out
```

```
 1    there?

 2    A.  Yes.

 3    Q.  Even though you only used two, you can find a woman that

 4    you're looking for by going on one of these websites, right?

 5    A.  Yes.

 6    Q.  Like the Erotic Review?

 7    A.  Yes.

 8    Q.  The Erotic Monkey?

 9    A.  What's that?

10    Q.  You're not familiar with the Erotic Monkey?

11    A.  No.

12    Q.  Might be a new one.  How been the Eccie, E-C-C-I-E?

13    A.  That I have heard.

14    Q.  Eros?

15    A.  Yes.

16    Q.  And one of the things you can do is you can look up --

17    like if I'm looking for somebody like Winnie, for example --

18    do you know who Winnie was?

19    A.  Winnie, it might have been Joom.  Joom used to use

20    that name.

21    Q.  Right.  Let's say if I was a regular customer of hers

22    and wanted to figure out where she was.  It would be pretty

23    easy to do through those websites, right?

24    A.  Yes.  If she still uses the same name.

25    Q.  So you look up Winnie and you put that in.  All of a
```

1    sudden it pops up.  And there would probably be more than

2    one Winnie, right?

3    A.  Yes.

4    Q.  And then you look at the e-mail address that's

5    associated with, and it's probably somebody that's you've

6    communicated with before, so you know that's the right one,

7    correct?

8    A.  I don't understand the question.  What you do mean?

9    Q.  So when you pull up the website, it gives you contact

10   information for the person like e-mail and telephone,

11   correct?

12   A.  You mean the website to sell sex?

13   Q.  Right.  So like when you look up their ad -- so I go to

14   the Erotic Monkey, or one of these other websites, and I

15   look up Winnie.  And the Winnies pop up.  And all of a

16   sudden I find the Winnie that I'm looking for.  And it's got

17   her telephone number, and probably an e-mail, too, so you

18   can text her or arrange an appointment, right?

19   A.  That might be true, but I don't know these websites.

20   Q.  All right.  But even on your -- the websites that you

21   used, they had reviews, didn't they?

22   A.  Yes.

23   Q.  And when you find that girl that you're looking for, you

24   can tell how recent their activity is by how recent the

25   reviews are, right?

```
1     A.  Yes.
2     Q.  So if a woman had a review from five years ago, she's
3     probably not using that site, or the phone number, or she's
4     not even in the business anymore.  Is that probably fair to
5     say, right?
6     A.  Well, it's also possible that if they had bad
7     reviews, they would change their name.
8     Q.  Right.  And conversely, if they had good reviews, like
9     say one from November, 2018, she's probably pretty active
10    still, correct?
11    A.  Yes.
12    Q.  And if someone's house was -- or if someone was arrested
13    in 2000 -- well, if someone owed -- let's just say someone
14    owed debt.  And they paid it off and then they continued to
15    work for another five years, they did it because they're
16    making good money, right?
17    A.  Most of the time it's like that.
18    Q.  And it's because they make a choice to do that.  Just
19    like you made the choice to engage in prostitution to get
20    you over a hump, right?
21    A.  Yes.
22              MR. RIVERS:  Nothing further, Your Honor.
23              THE COURT:  Members of the Jury, we'll take our --
24    our morning break of 15 minutes.  Please rise for the jury.
25              (Jurors excused at 10:37 a.m.)
```

 1                MS. WILLIAMS:  I just wanted to notify the Court,

 2      and this seems easier than coming to the bench, that I do

 3      intend to elicit those statements from Noiy and Wan that the

 4      Court had ruled, just the ones that, of course, that the

 5      Court had ruled were admissible.

 6                I would -- I would simply note that, for whatever

 7      reason, Defense Counsel chose to question the witness about

 8      the size of the tips.  And literally that is information

 9      that was the subject of what Ms. Wanless basically suggested

10      to her to lie about.

11                So I'm -- I'm going to redirect on those points.

12                THE COURT:  Does other Counsel -- Mr. Rivers?

13                MR. RIVERS:  That is just a remarkable statement

14      that Ms. Wanless asked her to lie.  That's not even close to

15      what the ROI says, or anything.

16                But anyway, she had talked herself about tips and

17      I just asked her to explain what the most -- I guess -- went

18      on with her answer.

19                And I don't think -- if she wants to ask about it,

20      then we might have to come back for another hearing.

21                MR. GUERRERO:  Well, I would just say with respect

22      to my examination of the witness, I did not broach any

23      subjects that would be proper for her to now suggest my

24      client made any influencing comments to this witness.

25                So I would ask that on behalf of Ms.

1   Ruttanamongkongul that that -- that that type of testimony

2   not be allowed as it relates to her.

3              MS. WILLIAMS:  And if I may, Your Honor, I think

4   it would be allowed as to Noiy.  But, you know, you're

5   right.  You didn't talk about that.  So I'm not going to

6   elicit it as to Noiy, only as to Wan.

7              THE COURT:  Yes -- excuse me?

8              MS. WILLIAMS:  Only as to Ms. Wanless.  I think

9   that's -- again, it's presumptively admissible.  But I think

10  the cross-examination certainly put that at issue with

11  regards to Ms. Wanless.

12             I -- you know what, I think Counsel for Noiy

13  didn't do the same thing, so I'm not going to do that.

14             MR. SICOLI:  Not on this issue, I just like to let

15  the Court know I have less than five minutes of

16  cross-examination.

17             THE COURT:  Okay.  Anybody else going to volunteer

18  their ballpark time?

19             MR. ENGH:  I have -- I won't have any cross.  But

20  I do renew my objection to a jail threat as hearsay to my

21  client and ask for that cautionary instruction if you're

22  going to admit it.

23             MR. SICOLI:  And I would also ask for the

24  cautionary instruction.

25             THE COURT:  And by cautionary instruction, let me

1     suggest this.

2              Are you talking about -- and let's assume that I

3     allow it, over the objection of Mr. Rivers.  And until

4     somebody else approaches the Court about, well, something

5     else has happened, so here's where we want to go with this.

6              But I assume what you're meaning is, "You may

7     consider this evidence only against," in this case, I

8     believe if it doesn't change, "only against Defendant

9     Wanless.  You must not consider the evidence when you are

10    deciding, if the Government has proven its case beyond a

11    reasonable doubt against the other Defendants in the case."

12    Is that -- is that the instruction?

13             MR. ENGH:  That's correct.

14             THE COURT:  All right.

15             MS. WILLIAMS:  And we certainly wouldn't oppose

16    that.

17             THE COURT:  Mr. Rivers?

18             MR. RIVERS:  And before -- then I would like to

19    ask two more questions of this witness prior to the

20    cross-examination -- or redirect.

21             THE COURT:  All right.

22             MS. WILLIAMS:  Well, I mean, it depends on what

23    those questions are eliciting.  His own client's statements

24    would be hearsay.  So that might not be proper.  I think we

25    should air that out now.

```
 1              MR. RIVERS:  I'm not going to tell her what I'm
 2     going to ask.  She can object at the time.
 3              THE COURT:  We'll take it up as it -- we'll take
 4     it up as it comes, so.  All right.
 5              I'm not sure what the questions are going to be,
 6     but we will -- we'll take them up, so.
 7              And whether the door gets opened further, I guess
 8     I'll hear from Counsel, so.
 9              MS. WILLIAMS:  Yes.
10              THE COURT:  All right.  We'll see you in 15.
11              (Recess at 10:42 a.m.)
12              (In open court at 11:01 a.m.)
13              THE COURT:  As soon as the jury's ready.  Mr.
14     Rivers, you have some followup questions?
15              MR. RIVERS:  Your Honor, I didn't have any
16     followup questions.
17              THE COURT:  Mr. Sicoli, whenever you're ready.
18              MR. SICOLI:  Thank you, Your Honor.
19                   C R O S S - E X A M I N A T I O N
20     BY MR. SICOLI:
21     Q.  I don't have many questions for you.  But to be clear,
22     you don't know Bill from California, correct?
23     A.  Never know him.
24     Q.  You've never met him?
25     A.  Never.
```

1    Q.  You've never done any business with him?

2    A.  Never.

3    Q.  You never received any -- any women to him?

4    A.  Never.

5    Q.  Okay.  And the only other thing I want to ask you is

6    about your business.

7             I think you testified that you had charged $160 an

8    hour, is that correct?

9    A.  Yes.

10   Q.  And you would get $60 for the house fee?

11   A.  Yes.

12   Q.  And then $100 would go towards the debt that the women

13   owed you, is that correct?

14   A.  Yes.

15   Q.  And as time went on, you basically ended up really only

16   having women that owed debt to you stay because your

17   business was so lousy, isn't that true?

18   A.  What do you mean?

19   Q.  Well, let's go through your business.  I mean, you said

20   that the debt was $55,000 and then sometimes it would get

21   reduced to $50,000, correct?

22   A.  Yes.

23   Q.  And you said that the earliest it would get paid off is

24   eight month and sometimes longer than that, correct?

25   A.  Yes.

1   Q.  And that the women would get one day off, Sunday

2   usually, right?

3   A.  Yes.  To go to buy stuff, to the grocery, whatever

4   they would do on that day.

5   Q.  Let me see if -- all right.  I did a little bit of math.

6           So, let's assume that you had three customers a

7   day.  That's what the women had.

8           And let's give them two days off, so they have

9   five days a week that they're working.

10  A.  Yes.

11  Q.  And so that comes to 15 customers a week, correct?

12  A.  Yes.

13  Q.  And $100 goes towards the debt per customer, is that

14  correct?

15  A.  Yes.

16  Q.  So that would be approximately $1,500 a week, correct?

17  A.  Yes.

18  Q.  And I've multiplied it by four weeks in a month.

19  There's actually more than four weeks in a month because

20  sometimes there's a couple days extra, correct?

21  A.  Yes.

22  Q.  And so I've actually computed it times nine months,

23  giving one extra month to pay it off, and it comes to

24  $54,000, is that correct?

25  A.  Yes.

```
 1    Q.  So with -- that's with three customers a day, five days
 2    a week, correct?
 3    A.  Yes.
 4    Q.  So the women weren't making very much money at your
 5    houses, correct?
 6    A.  Yes.
 7    Q.  They didn't have a lot of work.  And part of the reason
 8    they didn't have a lot of work is because you were on drugs
 9    most of the time, is that correct?
10    A.  Part of it, yes.
11    Q.  I mean, you were using methamphetamine, correct?
12    A.  Yes.
13    Q.  And so, until you were pregnant, I mean, you had that
14    brief period of time where you didn't use, you were using
15    all the time and couldn't take care of business, correct?
16    A.  But later on, I had someone picked up the phone for
17    me.  Somebody took care of it for me.
18    Q.  All right.  You're still not doing very good business,
19    though, correct?
20    A.  Yes.
21    Q.  And do you remember when the Government Attorney, Ms.
22    Williams, asked you about using drugs with other people --
23    the women that worked at your house?  Do you remember those
24    questions?
25    A.  I do.
```

```
1    Q.  And based upon her questions, you sort of said, Well, I
2    gave them drugs because this was such hard work for them to
3    do.  So they sort of needed drugs to help them get through
4    the work.  Because -- do you remember that testimony?
5    A.  I just wanted to say something.  The person that I
6    used the drug with, she already had used drug prior to
7    this.  People who never used drug, I never gave them
8    drugs.
9    Q.  Okay.  I understand that.  But the answer to the
10   question is, that that -- let me rephrase that.
11            That wasn't true, though, as far as giving drugs
12   to women because this was such difficult work for them to
13   do.  That's not true, correct?
14   A.  Right.
15   Q.  And, in fact, the women walked away from you because
16   business was lousy, correct?
17   A.  Yes.
18   Q.  And they wanted to make more money, right?
19   A.  Yes.
20            MR. SICOLI:  Thank you.  I have nothing further.
21            C R O S S - E X A M I N A T I O N
22   BY MR. GERDTS:
23   Q.  Good morning, Madam.  My name is Daniel Gerdts.  I
24   represent Ms. Pawinee Unpradit.
25            It's true that you never met or communicated with
```

1     Ms. Unpradit until after you were arrested, right?

2     A.  I never knew her before.

3     Q.  And I wanted to ask you about that incident that you

4     discussed on direct testimony regarding Karn, the

5     Facebook --

6               Were those Facebook messages?  Am I correct about

7     that?

8     A.  So I had send that message to scare her for her to

9     come back to work.

10    Q.  Yeah.  The question was, was that -- was the message on

11    Facebook or was it on some other social media platform?

12    A.  It was Facebook.

13    Q.  Okay.  And as you pointed out, all of these women had

14    the Smartphones and they had access to these social media

15    sites like Facebook, correct?

16    A.  Everybody does.

17    Q.  And that's why you used it, because you knew you'd be

18    able to contact her somehow in that way?

19    A.  Yes.

20    Q.  But you testified that you were embarrassed about it, am

21    I correct about that?

22    A.  Yes.

23    Q.  Because this was a -- even for you, this was abhorrent

24    behavior, correct?

25    A.  Yes.

1    Q.  In fact, it was so unusual that even for you, that's the

2    only time you ever did that, right?

3    A.  Yes.

4    Q.  And if I understood correctly, yesterday at least, you

5    said that what you were mad about was that she hadn't paid

6    the debt, is that accurate?

7    A.  Yes.  There was also another reason why I did that,

8    was because she told my mother that I used drugs, too.

9    Q.  Okay.  So you were mad at her for a couple reasons.  One

10   is because she's snitching you off to your mom and she

11   hadn't paid her debt?

12   A.  Yes.

13   Q.  But if she had written you a check for what she owed

14   you, you wouldn't -- that would have satisfied -- you would

15   have been happy again, right?  Content?

16   A.  But she didn't do that.

17   Q.  True enough.  Thank you.

18           MR. ENGH:  No questions, Your Honor.

19           THE COURT:  All right.  Redirect if you wish,

20   Counsel.

21              R E D I R E C T   E X A M I N A T I O N

22   BY MS. WILLIAMS:

23   Q.  Okay.  Just a little bit, Noon.

24           Counsel for Ms. Unpradit just asked you about

25   those threatening text messages you sent to Karn, the

1     Facebook messages, do you remember that?

2     A.  Yes.

3     Q.  And he asked if that was the only time you've ever done

4     that.  Do you remember that?

5     A.  Yes.

6     Q.  Okay.  And is that the only time you've sent explicit

7     Facebook messages like that?

8     A.  Yes.

9     Q.  But to be fair, if somebody else -- when girls ran away,

10    was that just cool and you did nothing about it?

11    A.  Oh, yes.  There were other times that I texted to

12    other girls who ran away, but not as sounded so serious

13    like this one.

14             This time that I did that was because I was so

15    mad that she had something involving my family.

16    Q.  Okay.  But you don't -- girls just don't get to walk

17    away from the debt with no consequence, right?

18             MR. SICOLI:  Objection, leading.

19             THE COURT:  Sustained as to form.  She'll rephrase

20    the question.

21    BY MS. WILLIAMS:

22    Q.  What do you do when someone runs away from you?

23    A.  So for some women, I would tell other houses not to

24    accept that person to work at their houses.

25    Q.  Would you try and get them back?

```
 1    A.  Yes.

 2    Q.  And let's talk about -- let's talk about the woman you

 3    owned with Wan, Joom.

 4              When Joom left, who did you call?

 5    A.  So I told Wan about it.

 6    Q.  And did P'Wan get her back?

 7    A.  After that, Joom went to work at P'Wan's house.

 8    Q.  Defense Counsel at the very beginning -- well, and let's

 9    take it from the back.

10              Mr. Sicoli, Bill's attorney, did some math with

11    you.  And he said your business was -- was lousy.  Do you

12    remember that?

13              THE COURT:  Mr. Rivers?

14              MR. RIVERS:  Your Honor, I'd ask if she's not

15    commenting on the exhibit, that it not be displayed.

16              MS. WILLIAMS:  Oh, that's fine.

17    BY MS. WILLIAMS:

18    Q.  Do you remember Mr. Sicoli saying $30,000 a month was

19    lousy business?

20              MR. SICOLI:  That's a misstatement of what I

21    asked, Your Honor.

22              THE COURT:  I'll just ask you to -- let the jury

23    decide what was asked.  But you may inquire of the witness.

24    A.  I remember that.

25    BY MS. WILLIAMS:
```

```
1    Q.  And that's what you were making at the height, $30,000 a
2    month?
3    A.  That was money that I made while nobody had run away
4    yet.  But once they ran away, I didn't make much money.
5    Q.  Okay.  I just want to -- I just want to clarify that --
6    A.  My girls run away quite a bit.
7    Q.  I just want to clarify that your lousy business, $30,000
8    a month?
9            MR. RIVERS:  Objection.  Argumentative and
10   leading.
11           THE COURT:  Sustained as to the form, as to
12   leading.
13   BY MS. WILLIAMS:
14   Q.  Let's go back to the beginning of cross-examination.
15           Do you remember questions that you were asked
16   about owning people's bodies?
17   A.  Yes.
18   Q.  Now, I wasn't asking you what the -- what the
19   organization called it.  What -- what did the organization
20   call owning somebody?  What was the word for that?
21           THE COURT:  Before you answer, please.
22           MR. GERDTS:  Objection as to the form.  The
23   organization had a name or something.  I'm a little confused
24   about this.  Unless she's identifying a person, that's one
25   thing.
```

 1          MS. WILLIAMS:  I don't think the witness --

 2          THE COURT:  I'll -- as long as -- apart from what

 3   was thus far said in the case, if you understand the

 4   question, and understand what she's referring to, the

 5   organization, subject to questions by any of the other

 6   Counsel, she may answer the question.

 7   A.  They called them contracts girl.

 8   BY MS. WILLIAMS:

 9   Q.  And what do they call the person who holds the debt?

10   A.  Ma-tacs.

11   Q.  So I was asking you about the affect of being ma-tac.

12   When you are ma-tac, do you effectively own someone's body?

13          THE COURT:  Mr. Rivers?

14          MR. RIVERS:  Objection, Your Honor.  Vague.

15          THE COURT:  Well, I won't -- I'll let her answer

16   if she understands the question.  Whether it's -- if she

17   understands it, she may answer it.  If not, you should say

18   so.

19   A.  I understand the question.  But I never used owning a

20   person's body, but what we use is, I use the word ma-tacs

21   and girl -- contracts girl.

22   BY MS. WILLIAMS:

23   Q.  And I understand that.  What I'm asking you is during

24   the contract, who owned, for instance, Joom's body during

25   the contract?

```
 1              MR. GUERRERO:  Objection, vague.

 2              THE COURT:  If you understand the question, you

 3      may answer it.  If you don't understand it, you should say

 4      so.

 5      A.  Well, it's me.

 6      BY MS. WILLIAMS:

 7      Q.  And who else?

 8      A.  P'Wan.

 9      Q.  You know, actually, I'm not asking for the explanation,

10      just who.

11              MR. RIVERS:  Your Honor, I object.  I want to hear

12      what she said to say.

13              MS. WILLIAMS:  There wasn't a question.

14              THE COURT:  All right.  If she was still

15      completing her answer, you may interpret what she said.

16      A.  But there was no words to call I own this person's

17      body, I own that person's body.

18              It was an agreement between two people.  One

19      person agreed to come and pay off their debt and one

20      person agree to hold the debt, so they came to pay off

21      their debt.

22      BY MS. WILLIAMS:

23      Q.  And I'm not asking you about the terms you used.  I

24      think you've been clear, ma-tac and contract girls.

25              Who controls Joom while she is under debt?
```

1    A.  It was me.

2    Q.  And who else?

3    A.  P'Wan.

4    Q.  Okay.  Defense Counsel asked you some questions about

5    your grand jury statement.  Do you remember those?

6    A.  I don't remember the question anymore, but I remember

7    about grand jury.

8    Q.  Okay.  And there was questions about how long it took

9    the women to pay off the debt.  Do you remember that?

10   A.  Yes.

11   Q.  Okay.  I'd like to read the full excerpt so the jury can

12   hear that.

13            MR. RIVERS:  Objection.  Leading.

14            MS. WILLIAMS:  I'm completing what was only done

15   in part.

16            THE COURT:  I will let the statement be read for

17   the context of the statement, subject to any examination by

18   each of the Counsel.  You may read it.

19   BY MS. WILLIAMS:

20   Q.  And I'm referring to your grand jury statement, starting

21   on Page 15, Line 19, and going to the following page,

22   Line 6.  "So -- and it was me who put you in the grand jury,

23   right?

24   A.  Yes.

25   Q.  Okay.  And you're talking about a screening process.

1    And I say, "Question.  But to be fair, are the girls

2    basically expected to have sex with the customers who come

3    in?  Answer.  That's correct.  Question."  Go ahead, sorry.

4    A.  Yes.  There were customers at my house.

5    Q.  Okay.  And I don't need you to comment on it, I just

6    need you to tell me if this is your testimony.

7    A.  Okay.

8    Q.  And I asked, "Okay.  How long, if the girl has a $55,000

9    debt, how long is it going to take her to pay off that

10   debt?"  And you respond, "The fastest is eight months."

11   A.  Yes.

12   Q.  And I say, "Okay.  And the slowest can take a lot

13   longer?" And you answer, "Yes."

14   A.  Yes.

15   Q.  And then, "Question.  Okay.  And so do some women run

16   away from the organization because this is not great work?"

17   And you respond, "Answer.  Yes.  But also they escape

18   because they didn't want to pay off the tax."

19   A.  Yes.

20   Q.  So you've been clear from the beginning that this is not

21   great work for these women?

22   A.  Yes.

23   Q.  And you've been clear from the beginning that it takes

24   about eight months to pay off the debt, I think as Counsel

25   demonstrated, in your house?

 1    A.  Yes.

 2    Q.  And again and again in cross-examination we heard that

 3    the women walked away.  They walked away.  Is that right?

 4    Did they walk away or did they run away?

 5    A.  Actually they shouldn't have done that.

 6    Q.  Did Joom run away from you?

 7    A.  Yes.

 8    Q.  Did she do that the minute you gave her her passport

 9    back?

10    A.  Yes.

11    Q.  Let's talk about customers.  There were some questions

12    about your screening process.  Do you remember those

13    questions?

14    A.  Yes.

15    Q.  And I think we just heard in your grand jury testimony,

16    there was a screening process, but the women were expected

17    to have sex with who walked in the door.  Is that accurate?

18    A.  Yes.

19    Q.  Okay.  And I think you testified, they could tell you

20    later on if they had a problems so you could do something

21    about that, is that right?

22    A.  Yes.

23    Q.  And you talked about a notation system you had.  I don't

24    know that the jury has heard about this yet.  Describe

25    notation systems for bad customers.

```
1    A.  Do you mean the things that I memory, memorize in my

2    phone?

3    Q.  Yes.

4    A.  I would say, Fuck no or FFFF.

5    Q.  And what types of things would customers do to a girl

6    that she would go through to make that notation?

7    A.  For example, they would not pay the money or that

8    they aggressive with the girls, working girls.

9    Q.  Physically, sexually aggressive?

10   A.  There would be sometimes pulling hair.  Pulling their

11   body, or that stuff make the girls scared of them.

12   Q.  You were asked some questions about what the girls were

13   told in Thailand about how long it took to pay off their

14   debt.

15          From talking to the women who arrived -- and I

16   called them -- I know we're using the term girls a whole

17   lot.  Do people call themselves working girls sometimes?

18   A.  Working girls.

19   Q.  Okay.  But we're talking about -- we all know we're

20   talking about adult women, right?

21   A.  Yes.

22   Q.  Okay.  The working girls that you talked to, did they

23   tell you what Mammy told them about how quickly it would

24   take them to pay off the debt?

25   A.  On the day -- the day I arrived, they had told me
```

1    that, oh, Mammy said to them that the debt could be paid

2    off in three to four months.

3         But this could happen, but it's not a normal thing

4    to happen.

5    Q.  What was a normal thing to happen?

6    A.  For example, at my house, it took eight months or

7    longer.

8    Q.  So if Mammy is saying two, three, four months, is that a

9    trick?

10        MR. RIVERS:  Objection, vague.

11        THE COURT:  If she understands the word trick and

12   the question, she may answer it.  If not, she should say so.

13   BY MS. WILLIAMS:

14   Q.  Is Mammy tricking the girls?  Is my question.

15        MR. GUERRERO:  Objection.  She's calling for an

16   answer from somebody else's perspective.

17        THE COURT:  Well, the first question was, what she

18   considered it -- not what Mammy intended, but what she

19   considered it.

20        If she understands the question and the word

21   trick.

22   A.  So you would call Mammy tricked, that's probably yes.

23   But when they arrived here, I would explain to them so

24   that we could be on the same page.

25        After when they arrived -- after a while, then I

1    would send the money $22,000 to Mammy.  And that all the

2    agreement that we talked about that we were -- we both agree

3    on the terms.

4    BY MS. WILLIAMS:

5    Q.  Okay.  Noon, once the women had come here under debt and

6    once they are working here, can they change their mind and

7    walk away from your debt?

8    A.  No.

9    Q.  Could Joom change her mind after she had ripped and had

10   to keep working, could she have changed her mind at that

11   point?

12   A.  She never said to me that she changed her mind.  She

13   had worked this job before she came here.  But I

14   understand she told me that she was in pain.

15   Q.  Noon, answer my question.  Could she change her mind at

16   that point?

17   A.  No.

18   Q.  You were incarcerated previously with Ms. Wanless in

19   Sherburne County, is that right?

20   A.  Yes.

21   Q.  And I want a yes or no to this question.  Did Ms.

22   Wanless tell you not to make the organization look bad?

23   Just a yes or a no.

24   A.  Yes.

25   Q.  Did she also say to you that in court the good parts

1    aren't coming out, like how women could get a $10,000 tip

2    from one customer?  Just a yes or a no.

3    A.  Yes.

4    Q.  Have you ever heard that to be true, $10,000 from one

5    customer?

6            MR. RIVERS:  Objection, foundation.

7    BY MS. WILLIAMS:

8    Q.  Have you ever heard of that?

9            THE COURT:  If you have knowledge, and you may --

10   understand the question, you may -- you may give it.  The

11   jury can weigh it accordingly, based upon the basis of her

12   answer.  You may answer if you understand it.

13   A.  I've never heard of that.

14   BY MS. WILLIAMS:

15   Q.  You were asked --

16           THE COURT:  And then are you done with that --

17           MS. WILLIAMS:  Yes.  This would be a good time for

18   a limiting instruction.

19           THE COURT:  All right.  Members of the Jury, you

20   may consider the testimony you've just heard relating to the

21   exchange with the Defendant, Ms. Wanless, only against Ms.

22   Wanless.

23           You must not consider that evidence when you are

24   deciding if the Government has proven its case against any

25   or the other Defendants beyond a reasonable doubt at the

1    time of your deliberations.

2            You may continue -- I'm sorry.

3    BY MS. WILLIAMS:

4    Q.  Noon, you were asked some questions about Soy, Soysuda.

5    Do you remember those questions?

6    A.  Yes.

7            MS. WILLIAMS:  Permission to approach with

8    Government's 999?

9            THE COURT:  You may.

10   BY MS. WILLIAMS:

11   Q.  Noon, I'm showing you Government's 999.  That's a photo.

12   Who is in that photo?

13   A.  Soysuda.

14           MS. WILLIAMS:  Government moves Exhibit 999 into

15   evidence.

16           MR. GUERRERO:   No objection.

17           THE COURT:  Hearing no objection, that's received.

18   BY MS. WILLIAMS:

19   Q.  Who is Soysuda?  While I'm trying to figure this out?

20   Who is Soysuda?

21   A.  She is -- she also -- she was also a person who

22   opened a house in Chicago.  She was also Mammy's girl.

23   And as far as I heard, she's said the one who paid off

24   her debt in three months.

25   Q.  This is -- when you say she had a house in Chicago, she

```
1    was a house boss in Chicago, just to be clear?  A house

2    owner?

3    A.  Yes.  She opened a house for traveling girls who work

4    there.

5    Q.  And do you know of any connection she had to Minnesota?

6    A.  I had never heard of it before.  I just heard about

7    it when I was arrested.

8    Q.  Well, I want to focus you on things you heard about

9    before -- you knew about before you were arrested.

10         You also said that she came from Mammy.  Did that

11   mean she owed her tax to Mammy?

12   A.  Yes.

13   Q.  What houses do you know of that Soy was sent under debt?

14   A.  As far as I heard, that she was with P'Noiy.

15   Q.  Can you tell us about some other girls that went to

16   Noiy's house.  Do you know their nicknames?

17   A.  Do you mean working girls?  Other working girls?

18   Q.  Yep.

19   A.  There's Nan, Tik, Toon, Tai.

20         THE COURT:  Can you spell that?

21   BY MS. WILLIAMS:

22   Q.  Let's do it one at a time.  Can you spell it?

23   A.  Nan, N-A-N.  Tik, T-I-K.  Toon, T-O-O-N.  Tai, T-A-I.

24   Aom, A-O-M.

25   Q.  And, of course, do you know every single girl that went
```

1    through Noiy's house?

2    A.  Yes.

3    Q.  You do or you don't know every single woman?

4    A.  I know some of them.  I didn't know some of them.

5    Q.  Ms. Wanless' attorney talked about how at some point you

6    and Ms. Wanless had parting of ways.  And you did your thing

7    Chicago and Wan did her own thing in Texas.  Do you remember

8    that question?

9    A.  Yes, I do.

10   Q.  Let's just be clear, what was Wan's thing?  What was her

11   role?

12   A.  She opened a working house in Dallas.

13   Q.  Was she also ma-tac?

14   A.  Yes.

15   Q.  Was -- you've already testified that Wan owned half of

16   Joom with you.  To your knowledge, do you know the names of

17   any other women that she owned?

18   A.  There's Dream, D-R-E-A-M.  Bow, B-O-W.  As far as I

19   heard.

20   Q.  Do you know everyone she owned?

21   A.  No.

22   Q.  You were asked about Casey Benson.  And let's just clear

23   this up.  I'm approaching -- this is Government's 998.

24            I'm approaching --

25            MS. WILLIAMS:  May I approach?

```
 1                THE COURT:  You may.

 2    BY MS. WILLIAMS:

 3    Q.  I'm approaching with Government's 998.  I'm showing you

 4    a photograph.  Who do you see in that photograph?

 5    A.  This is P'Wan, that's Casey.  And P'O.

 6                MS. WILLIAMS:  Government moves 998 into evidence?

 7                MR. RIVERS:  No objection.

 8                THE COURT:  Received.

 9    BY MS. WILLIAMS:

10    Q.  And you said that's P'Wan, that's Casey, and that's P'O.

11    Let's start just so we can do it with a pen for the jury,

12    who's that on the right?

13    A.  P'Wan.

14    Q.  That's P'Wan.  Who's the man?

15    A.  That's Casey.

16    Q.  And who's the woman in the wedding dress?

17    A.  It's P'Yok.

18    Q.  P'Yok.  Y-O-K?

19    A.  She's Wan's friend.

20    Q.  What was Yok's role, if you know, in this -- in this

21    organization?

22    A.  As far as I know, she's also one of the working

23    women.

24    Q.  And you were asked questions, which is why we're looking

25    at this on cross-examination, about Casey Benson.  Who was
```

1    Casey Benson?

2    A.  He's a photographer.

3    Q.  Who does he work for?

4    A.  He was just a general photographer.

5    Q.  What kind of photographs does he take?  Maybe that's a

6    better question.

7    A.  As far as I know, he took sexy pictures for working

8    women.

9    Q.  And do you know, is he the one who's marrying Yok there?

10   A.  Yes.  That's what I heard.

11   Q.  And what did you know about Casey Benson's relationship

12   with Wan?

13   A.  As far as I know, it sounded like he used to be Wan

14   customer.

15   Q.  Finally, I think we can finish this up.

16            You were asked some questions about holding

17   passports and what affect did that have.  Do you remember

18   that?

19   A.  Yes.

20   Q.  Noon, did you hold passports?

21   A.  Yes.

22   Q.  Why did you hold passports?

23   A.  So I don't want them to run away.

24   Q.  And when you gave Joom back her passport to travel on

25   the airplane, what happened?

1    A.  She didn't get on the plane, she went to the spa.

2    Q.  And who got her back for you?

3    A.  P'Wan did.

4              MS. WILLIAMS:  No further questions.

5              THE COURT:  Any additional recross, Counsel?

6              MR. GUERRERO:   No, Your Honor.

7              THE COURT:  Mr. Rivers, if you like?

8              R E C R O S S   E X A M I N A T I O N

9    BY MR. RIVERS:

10   Q.  You indicated that there were two women by the name

11   Dream of Bow, correct?

12   A.  Yes.

13   Q.  That were under debt to Ms. Wanless, right?

14   A.  Yes.

15   Q.  And both had the same condition, didn't they?

16   A.  Yes.

17   Q.  And what was that?

18   A.  To pay off their debt.

19   Q.  Well, no.  Their conditions, their medical condition.

20   They were both pregnant, right?

21   A.  Yes.

22   Q.  And if they're pregnant, they couldn't pay off their

23   debt, right?

24   A.  Yes.

25   Q.  So like Dream went and had her baby, right?

1    A.  She didn't go to have a baby, she went back to

2    Thailand to get abortion.

3    Q.  Okay.  But in any event, she didn't continue to work.

4    And that was an issue, right?

5    A.  Yes.

6    Q.  And Mammy had a rule.  And the rule was, what?

7            If someone would walk away from their debt or if

8    they would become pregnant, what would Mammy do if they

9    hadn't paid off the $22,000 yet?

10   A.  So Mammy said that if the girls run away, or having

11   some issue, not able to pay their debt, she would be

12   responsible.  But that never happened.  She never took

13   any responsibility.

14   Q.  Right.  But when but she -- the agreement was that she

15   would send another girl in her place, right?

16   A.  Yes.

17   Q.  But she didn't live up to that end up of the bargain?

18   A.  She never did keep her promise.

19   Q.  And you talked about a conversation you had with Ms.

20   Wanless about an extravagant tip of $10,000.

21           Are you aware of a person that was a customer at

22   their house by the name of Mark -- they called him Mark

23   iPad?

24   A.  I don't know that person.

25   Q.  All right.  And part of the reason you don't know what

1  happened at her house, is because there had been a long time

2  since you had really talked to her after your business

3  together had dissolved, right?

4  A.  Yes.

5  Q.  And didn't one of the other things she said is tell the

6  truth?

7  A.  Yes.

8  Q.  And as far as Joom is concerned, Joom didn't run away

9  from the work, did she?

10  A.  Yes.  But she had paid off her debt.

11  Q.  Well, what I'm saying is, she didn't run away from the

12  work.  When she left the airport, she went to the spa,

13  right?

14  A.  Yes.

15  Q.  And isn't it true that you asked for Wan's help and she

16  came to work at Wan's house?

17  A.  Yes.

18  Q.  And they became good friends after that, didn't they?

19  A.  Yes.

20          MR. RIVERS:  Nothing further.

21          THE COURT:  Mr. Sicoli?

22          MR. SICOLI:  No, Your Honor.

23          THE COURT:  Mr. Engh?

24          MR. ENGH:  No, Your Honor.

25          THE COURT:  Mr. Gerdts?

```
1              MR. GERDTS:  No.

2              THE COURT:  Okay.  Any additional redirect?

3              MS. WILLIAMS:  Just one maybe.

4              R E D I R E C T   E X A M I N A T I O N

5    BY MS. WILLIAMS:

6    Q.  Joom ran away to a spa.  Is that right?

7    A.  Yes.

8    Q.  I think you testified yesterday on direct that these

9    spas were not particularly nice places?  Thank you.

10   A.  Yes.

11   Q.  Do you know if Joom had anywhere else to go, knew anyone

12   else?

13   A.  At the time Joom didn't know anyone, because she just

14   arrived here.

15   Q.  Showing you what's already been admitted in evidence as

16   Government's 1030A, Page 5.  Is this what these spas look

17   like?

18   A.  Yes.

19   Q.  So that's where she ran?

20   A.  Yes.

21              MS. WILLIAMS:  No further questions.

22              R E C R O S S   E X A M I N A T I O N

23   BY MR. RIVERS:

24   Q.  Have you ever been to that -- it's called King's Spa,

25   right?
```

1   A.  I never been there.  I never been to King's Spa.

2   Q.  So the pictures that were just shown to you, you've

3   never seen that particular spa, right?

4   A.  Never been there.

5   Q.  So you don't know if that's where Joom ran to, correct?

6   A.  No.  I don't know whether or not Joom went there.  I

7   only know that she went to a spa.

8   Q.  And her -- and you've been down to Ms. Wanless' place

9   down in Texas, right, where she had girls working, right?

10  A.  Yes.

11  Q.  And it was way nicer than the pictures than the pictures

12  you were seeing there, correct?

13  A.  It's much more beautiful.

14          MR. RIVERS:  Nothing further.

15             R E D I R E C T   E X A M I N A T I O N

16  BY MS. WILLIAMS:

17  Q.  And Defense Counsel just asked you, you've been to Wan's

18  place where girls were working.

19          To your knowledge, were those girls owned by Wan?

20  The girls that were working there?

21          THE COURT:   And before you answer.

22          MR. RIVERS:  Objection.  Asked and answered.

23          THE COURT:  We've been there.  But I'll let her --

24  I'll let her answer if she understands the question.

25  A.  At the time when I went there, there were both people

1    who were under debt and people were free and traveling

2    freely.  So there were both of these kind of women.

3    BY MS. WILLIAMS:

4    Q.  And the women under debt, did some of those women, was

5    it your understanding, owed their debts specifically to Wan?

6    A.  Yes.

7              MS. WILLIAMS:  No further questions.

8              THE COURT:  Anything further, Mr. Rivers?

9              MR. RIVERS:  No, Your Honor.

10             THE COURT:  Any other Defense Counsel?

11             MR. SICOLI:  No, Your Honor.

12             THE COURT:  All right.

13             We will stand in our noon recess.  It's about five

14   minutes to -- or three or four minutes to 1:00 -- or noon,

15   excuse me, we're not in eastern standard time.

16             So we'll stand in recess until 10 minutes after

17   1:00, 1:10.  So please rise for the jury.

18             (Jurors excused at 11:56 a.m.)

19                     REPORTER'S CERTIFICATE

20

21             I, Lynne M. Krenz, do certify the foregoing
     pages of typewritten material constitute a full, true and
     correct transcript of my original stenograph notes, as they
22   purport to contain, of the proceedings reported by me at the
     time and place hereinbefore mentioned.

23

24                     /s/Lynne M. Krenz
                       Lynne M. Krenz, RMR, CRR, CRC
25

     Date:  December 6, 2018